1
2
3
4
5
6       UNITED STATES DISTRICT COURT
7       EASTERN DISTRICT OF CALIFORNIA
8

| | |
|---|---|
| DUHN OIL TOOL, INC.<br><br>       Plaintiff,<br><br>  v.<br><br>COOPER CAMERON CORPORATION,<br><br>      Defendants. | 1:05-CV-01411 OWW LJO<br><br>MEMORANDUM DECISION AND ORDER<br>RE CLAIM INTERPRETATION |

## 1.  INTRODUCTION

Before the court are the parties' motions for a Markman
claim interpretation of United States Patent No. 6,920,925 (the
"'925 Patent" or the "Patent").  (Doc. 40, Duhn Oil's Claim
Construction Brief, Filed August 21, 2006 ("Pl. Brief");  Doc.
43, Defendant's Opening Markman Brief, Filed August, 21, 2006
("Def. Brief").)  Oral argument was heard on October 11, 2006.

## 2.  PROCEDURAL HISTORY

Plaintiff Duhn Oil Tool, Inc. ("Duhn Oil" or "Plaintiff")
filed its complaint for patent infringement against Defendant
Cooper Cameron Corporation ("Cameron" or "Defendant") on November
11, 2005.  (Doc. 1, Complaint.)  Cameron answered and filed a
counterclaim for declaratory relief of patent invalidity against
Duhn Oil on May 17, 2006.  (Doc. 15, Def.'s Answer and

1

1  Counterclaim.)   On April 12, 2006 Duhn Oil filed and answer to

2  Cameron's counterclaim.   (Doc. 18, Pl.'s Answer to Counterclaim.)

3      Cameron filed a motion for summary judgment on July 15,

4  2006.   (Doc. 26, Motion for Summary Judgment.)   On August 4, 2006

5  Duhn Oil opposed the motion.   (Doc. 31, Opposition.)   On August

6  14, 2006, Cameron filed a reply to the opposition.   (Doc. 33,

7  Reply/Response to Opposition.)

8      On August 21, 2006 Duhn Oil filed a claim construction brief

9  for a *Markman* hearing.   (Doc. 43, Duhn Oil's Claim Construction

10 Brief.)   On September 5, 2006 Cameron filed its opposition to the

11 brief.   (Doc. 47, Cameron's *Markman* Opposition Brief.)

12     Cameron filed its claim construction brief on August 21,

13 2006.   (Doc. 43, Cameron's Motion for Claim Construction.)   On

14 September 5, 2006 Duhn Oil filed its opposition.   (Doc. 44, Duhn

15 Oil's *Markman* Opposition Brief.)

16                    **3.   FACTUAL BACKGROUND**

17 **A.   Origin of Litigation**

18     Duhn Oil designs and manufactures quality completion

19 products for the oil industry.   (Doc. 1, Complaint, ¶ 4.)   Duhn

20 Oil's products are sold throughout the United States.   (*Id.*)   On

21 February 19, 2003 Duhn Oil filed an application with the United

22 States Patent and Trademark Office ("USPTO") to obtain a patent

23 for a wellhead isolation tool and a wellhead assembly

24 incorporating such a tool.   (*Id.*, ¶ 5.)   The application matured

25 into the '925 Patent entitled "Wellhead Isolation Tool" and the

26 patent was issued on July 26, 2005.

27     Duhn Oil sues Cameron for patent infringement alleging that

28 Defendant has offered products for sale in the United States that

**2**

infringe on Duhn Oil's '925 patent.  (*Id.*, ¶ 6.)  Duhn Oil

accuses Defendant of violating its '925 patent under 35 U.S.C. §

271.  (*Id.*, ¶ 7.)  Duhn Oil argues that it has been damaged by

the infringement and seeks the following relief:

1.   Declaratory judgment that the '925 patent is valid and
     is owned by Plaintiff.

2.   Declaratory judgment that Defendant has committed acts
     of patent infringement by its offer for sale and sale of
     products that infringe the '925 patent.

3.   Defendant should be enjoined from infringing on the
     patent.

4.   A mandatory injunction for Cameron to deliver to Duhn
     Oil for destruction any and all products in Defendant's
     possession embodying the patented invention as well as
     any promotional literature therefore.

5.   Damages.

6.   Prejudgment interest on infringement damages.

7.   Costs.

8.   Any other relief that the court may deem just and
     proper.

(Doc. 1, Complaint.)

    Defendant Cameron denies infringing Duhn Oil's '925 patent

and filed counterclaims asserting:

1.   Duhn Oil has failed to state a claim upon which relief
     can be granted.

2.   Defendant is not infringing and has never infringed,
     either directly or indirectly any valid claim of the
     '925 patent.

3.   The claims of the '925 patent are invalid for failure to
     meet the conditions of patentability in 35 U.S.C. §§ 102
     and 103, and for failure to comply with requirements of
     35 U.S.C. § 112.

4.   Duhn Oil failed to disclose material information with
     the intent to deceive the USPTO in applying for the '925
     patent.  The patent is unenforceable due to the actions
     and or omissions of Plaintiff and its agents
     constituting inequitable conduct during the prosecution

of the application that issued as the '925 patent.

5.    Plaintiff is estopped from enforcing the '925 patent as
      alleged because of statements, representations and
      admissions made, and/or actions taken during the
      prosecution of a related continuation application.

6.    Plaintiff's claims are barred, in whole or in part, by
      the doctrine of equitable estoppel.

7.    Plaintiff is precluded from recovering any alleged
      damages for any patent infringement occurring prior to
      the filing date of its complaint.  Plaintiff has failed
      to plead, and cannot prove, compliance with the marking
      requirements of 35 U.S.C. § 287.[1]

(Doc. 15, Def.'s Answer and Counterclaims To Plaintiff's

Complaint.)

**B.    Background of the '925 Patent**[2]

     Duhn Oil is the owner of the '925 patent.  The '925 Patent,

entitled "Wellhead Isolation Tool," generally relates to a

wellhead assembly used in high-pressure fracturing operations.

Fracturing operations are used to stimulate an existing well's

hydrocarbon production and involve introducing generally abrasive

material into the well's producing regions at very high pressure.

The wellhead assembly described in the '925 Patent includes a

casing head coupled to the wellbore, and a tubing head mounted

over the casing head.  The tubing head has a first radial flange

extending from it at an upper end.  The wellhead isolation tool,

---

[1] 35 U.S.C. § 287 provides that in the event of such a
failure to mark "no damages shall be recovered by the patentee in
any action for infringement, except on proof that the infringer
was notified of the infringement [which includes the filing of an
action for infringement] and continued to infringe thereafter, in
which event damages may be recovered only for infringement
occurring after such notice."

[2] This description is taken entirely from Doc. 43,
Defendant's Opening *Markman* Brief, Filed August 21, 2006.

**4**

1  or "frac mandrel," is suspended concentrically (circularly)

2  within the tubing head and aligned with a production casing

3  suspended below in the wellbore.  The frac mandrel is a generally

4  elongate[3] annular[4] member[5], and has a second radial flange

5  extending from it.  In some embodiments, the first flange

6  extending from the tubing head and the second flange extending

7  from the frac mandrel are fastened together.  When assembled with

8  respect to the wellhead assembly, the frac mandrel isolates to

9  protect certain wellhead components from the extreme pressures

10 used during well stimulation processes such as fracturing.

11 **C.   Claims At Issue[6]**

12      Claim 1 specifies a wellhead assembly having various

13 components as follows:

14

---

15      [3] The adjective use of the term "elongate" is defined as

16 "stretched out."  Merriam-Webster's Collegiate Dictionary,
   Eleventh Edition, http://www.m-w.com, (last visited January 22,

17 2007.)

18      [4] The term "annular" is defined as "of, relating to, or
   forming a ring."  Merriam-Webster's Collegiate Dictionary,

19 Eleventh Edition, http://www.m-w.com, (last visited January 22,

20 2007.)

21      [5] The term "member" is defined as "a part of a whole."
   Merriam-Webster's Collegiate Dictionary, Eleventh Edition,

22 http://www.m-w.com, (last visited January 22, 2007.)

23      [6] Defendant states that claims 1 and 37 recite similar

24 limitations and are sufficiently represented by the broader
   language of claim 1.  (Doc. 43, Def.'s *Markman* Brief.)  Even
   though claims 1 and 37 are the only independent claims at issue,

25 Duhn Oil argues that the following claims are dependent on claim

26 1, either directly or indirectly, and are therefore also at issue
   as being infringed by Defendant in this case: Claims 2-6, 10-12,

27 19, 28-30, and 34-36.  (Doc. 40, Pl. *Markman* Brief.)  Defendant
   only disputes claims 1 and 37 and, for this reason, only claims 1

28 and 37 are addressed in this order.

1.  A wellhead assembly comprising:

•   a casing;

•   a first tubular member mounted over the casing;

•   a first tubular member flange extending from the first
    tubular member;

•   a generally elongate annular member ("frac mandrel")
    suspended in the first tubular member, said annular member
    having a first end portion extending above the first tubular
    member and a second end portion below the first end portion;

•   a secondary flange extending from the frac mandrel;

•   a plurality of fasteners fastening the secondary flange to
    the first tubular member flange; and

•   a production tubular member aligned with the frac mandrel,
    wherein an axial force acts on the generally frac mandrel
    and is reacted in both the first tubular member flange and
    the secondary flange.

(Doc. 41, Ex. 1, Filed August 21, 2006.)

    Claim 1 identifies the components either by their location
and/or their functionality.  For example, the production tubular
member is aligned with the annular member in such a way that an
axial force acts on the annular member and such force is reacted
in the first tubular member flange and the secondary flange to
which it is attached.

    **i.   Terms in Dispute**

    The parties dispute two terms found in Claims 1 and 37.  The
first set of disputed terms relate to the "extending from
language" in the claims:

•   Claim 1: "...a secondary flange **extending from** the elongate

1    annular member..."

2  •   Claim 37: "...a second flange **extending from** the generally

3        elongate annular member..." and the variant, "said annular

4        member having a first end portion **extending above** the first

5        tubular member..."[7]

6        Duhn Oil argues for a broad reading of the term "extending

7   from" interpreted as "located or stretching outwardly."  This

8   interpretation would include products that abut each other.

9   Cameron argues that the term "extending from" should be narrowly

10  construed and limited to only include products that have a

11  structural relationship and are either integral or mechanically

12  connected to each other.  This interpretation would not include

13  products that abut each other.

14       The second set of disputed terms relate to the "wherein

15  clause" of claims 1 and 37:

16  •   Claim 1: "...**wherein** an axial force acts on the generally

17       elongate annular member and is reacted in both the first

18       tubular member flange and the secondary flange..."

19  •   Claim 37: "...**wherein** an axial force acts on the generally

20       elongate annular member and is reacted in both the first

21       tubular member flange and the secondary flange..."

22       Duhn Oil argues that the absence of the word "means" in the

23  "wherein" clause gives rise to a presumption that it is not a

24  "means-plus-function" claim.  Duhn Oil maintains that the

25  

26       [7] The disputed term "extend" is used throughout the patent.
    Though the term is given different locational references it is
27  used in the same way as describing a starting point for the
    location of one component as stretching out towards the path or
28  direction of another component.

1 "wherein clause" should not be construed as a "means-plus-

2 function" claim because the "wherein clause" explicitly

3 identifies both a function and the structures which perform the

4 claimed function.

5      Cameron, on the other hand, argues that the "wherein clause"

6 should be construed as a "means-plus-function" claim because the

7 clause uses functional language but does not recite any structure

8 for performing the claimed function.

9                    **4.   STANDARD OF REVIEW**

10      *Liquid Dynamics Corp. v. Vaughn Co.*, 355 F.3d 1361 (Fed.

11 Cir. 2004) explains:

12           An infringement analysis entails two steps.  The first step

13           is determining the meaning and scope of the patent claims

14           asserted to be infringed.  The second step is comparing the

15           properly construed claims to the device accused of

16           infringing."  Cybor Corp v. FAS Techs., Inc, 138 F.3d 1448,

17           1454 (Fed. Cir. 1998).  The first step, claim construction,

18           is a question of law.  *Id.* at 1451.  The second step is

19           factual.  *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353

20           (Fed. Cir. 1998).  When construing a claim, a court

21           principally consults the evidence intrinsic to the patent,

22           *viz.*, the claims themselves, the written description portion

23           of the specification, and the prosecution history.  *See*

24           *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83

25           (Fed. Cir. 1996).

26 *Liquid Dynamics Corp.*, 355 F.3d at 1367.

27      A patent is a fully integrated document.  It must set out a

28 written description of the invention "in such full, clear,

**8**

concise, and exact terms as to enable any person skilled in the art to which it pertains" to practice the invention.   35 U.S.C. § 112.   The written description required by 35 U.S.C. § 112 must clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed.   *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1346 (Fed. Cir. 2000).   Adequate description of the invention guards against the inventor's overreaching by insisting that he recount his invention in such detail that his future claims can be determined to be encompassed within his original creation.   *Id.*   In interpreting the meaning of an asserted claim, a court should first refer to the following sources of intrinsic evidence:  the patent claims, the specification, and the prosecution history.   *See Interactive Gift Express, Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1331 (Fed. Cir. 2001); *See also, Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 870 (Fed. Cir. 1998); *Vitronics Corp., v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Intrinsic evidence alone will usually be sufficient to resolve any ambiguities in disputed claim terms.   *See Vitronics*, 90 F.3d at 1583.   In such cases, extrinsic evidence should not be considered.   *See id.*

## A.   Patent Language

Patent claims are the numbered paragraphs at the end of a patent's specification that define the scope of the patent. *Trinity Indus. v. Road Sys.,* 121 F. Supp. 2d 1028, 1033 (Fed. Cir. 2000.)   The threshold issue in any patent infringement case is claim construction because it is necessary to understand the scope of the patent's claims to determine whether the accused

device infringes the patent. *Id.* Claim construction is a question of law for the court to decide. *Id.* In construing the meaning of disputed claim terms, the court first looks to the words (both asserted and nonasserted) of the claims themselves. *See Vitronics*, 90 F.3d at 1582. "[T]he language of the claim defines the scope of the protected invention." *Bell Comm. Research, Inc. v. Vitalink Comm., Corp.*, 55 F.3d 615, 619 (Fed. Cir. 1995); *see also Vitronics*, 90 F.3d at 1582. Words are generally given their ordinary and plain meaning, although a patentee may choose to be a lexicographer and define a word in a way other than its ordinary meaning. *See id.* (citing *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996) ("A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning."). The words of the claim are interpreted in accordance with their ordinary meaning, as understood by a person reasonably skilled in the art. *See Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1580 (Fed. Cir. 1995); *Vitronics*, 90 F.3d at 1582; *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387 (Fed. Cir. 1992). Technical terms should be construed from the perspective of a person experienced in the field of the invention. *See CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1153 (Fed. Cir. 1997). A USPTO examiner is a person skilled in the art of the patent. *See, In re Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002)(the foundation of the principle of judicial deference to the rulings

of agency tribunals is that the tribunal has specialized
knowledge and expertise such that when reasoned findings are
made, a reviewing court may confidently defer to the agency's
application of its knowledge in its area of expertise.)  In order
to ascribe a special definition to a claim term, the definition
must be clearly stated in the patent specification or the file
history.  *Vitronics*, 90 F.3d at 1582 (citations omitted).  A
claim should not be construed in a manner that renders the claim
language meaningless or superfluous.  *Texas Instruments, Inc. v.
United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir.
1993).

### B.   Specification

The claims "must be read in view of the specification, of
which they are a part." *Markman*, 52 F.3d at 979.  Section 112
provides:

> The specification shall contain a written description
> of the invention, and of the manner and process of making
> and using it, in such full, clear, concise, and exact terms
> as to enable any person skilled in the art to which it
> pertains, or with which it is most nearly connected, to make
> and use the same, and shall set forth the best mode
> contemplated by the inventor of carrying out his invention.
> The specification shall conclude with one or more claims
> particularly pointing out and distinctly claiming the
> subject matter which the applicant regards as his invention.

35 U.S.C. § 112, ¶¶ 1-2.

The specification is reviewed "to determine whether the
inventor has used any terms in a manner inconsistent with their

**11**

1  ordinary meaning." *Vitronics*, 90 F.3d at 1582; *CVI/Beta*
2  *Ventures*, 112 F.3d at 1153.  If the inventor uses a term in a
3  manner other than its ordinary meaning, that meaning is given
4  effect because the inventor is free to be his or her own
5  lexicographer. *See Vitronics*, 90 F.3d at 1582 (citing *Hoechst*,
6  78 F.3d at 1578).  In this regard, the specification "may act as
7  a sort of dictionary." *Markman*, 52 F.3d at 979.  The
8  specification can define terms either explicitly or by
9  implication. *See Vitronics*, 90 F.3d at 1582 (citing *Markman*, 52
10  F.3d at 979).
11      The specification "is always highly relevant to the claim
12  construction analysis.  Usually, it is dispositive; it is the
13  single best guide to the meaning of a disputed term." *Vitronics*,
14  90 F.3d at 1582.  Though claims should always be read in view of
15  the specification, the Federal Circuit cautions that the scope of
16  a claim should not be limited to specific embodiments disclosed
17  in the specification. *See, e.g., Ekchian v. Home Depot, Inc.*,
18  104 F.3d 1299, 1303 (Fed. Cir. 1997); *Intervet America, Inc. v.*
19  *Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989).
20      **C.   Prosecution History**
21      When construing the language of a claim, the prosecution
22  history of the patent should be considered, provided that it is
23  in evidence. *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d
24  1570, 1576 (Fed. Cir. 1995); *Markman*, 52 F.3d at 980; *Vitronics*,
25  90 F.3d at 1582 (citing *Graham v. John Deere*, 383 U.S. 1 (1966));
26  *CVI/Beta Ventures*, 112 F.3d at 1155.  The prosecution history, or
27  file wrapper, of the patent provides a complete record of all
28  proceedings, including all express representations made by the

1   patent applicant regarding the scope of the claims, before the

2   USPTO.  *See Vitronics*, 90 F.3d at 1583.  The file wrapper limits

3   the scope of a claim term so as to exclude any interpretation

4   disclaimed during prosecution of the patent.  *See id.* at 1583

5   (citing *Southwall Tech.*, 54 F.3d at 1576); *CVI/Beta Ventures*, 112

6   F.3d at 1155.  In addition, any prior art cited during the

7   prosecution history may indicate what the patent claims do not

8   cover.  *See Vitronics*, 90 F.3d at 1583 (citing *Autogiro Co. of*

9   *America v. United States*, 181 Ct. Cl. 55, 384 F.2d 391, 399 (Ct.

10  Cl. 1967)).  However, the prosecution history "cannot enlarge,

11  diminish, or 'vary' the limitations in the claims."  *Markman*, 52

12  F.3d at 980 (quoting *Goodyear Dental Vulcanite Co. v. Davis*, 102

13  U.S. 222, 227 (1880)).

14      **D.   Extrinsic Evidence**

15      Extrinsic evidence may be resorted to only for

16  interpretation of terms used in the claim and specification when

17  their meaning is in dispute or ambiguous.  *See Vitronics*, 90 F.3d

18  at 1584-85.  Extrinsic evidence is "all evidence external to the

19  patent, including expert and inventor testimony, dictionaries,

20  and learned treatises."  *Markman*, 52 F.3d at 979, 980.  Extrinsic

21  evidence may be consulted during construction of a claim to

22  assist with the understanding of "scientific principles, the

23  meaning of technical terms, and terms of art that appear in the

24  patent and prosecution history."  *Markman*, 52 F.3d at 980;  *see*

25  *Vitronics*, 90 F.3d at 1584.  Extrinsic evidence may be received

26  to aid in "'coming to a correct conclusion' as to the true

27  meaning of the language employed in the patent."  *Markman*, 52

28  F.3d at 979 (citations omitted).  After consideration of all

**13**

available intrinsic evidence, if there still is some genuine

ambiguity in the claims, extrinsic evidence may be consulted to

interpret the meaning of the language used in the claim.  *See*

*Vitronics*, 90 F.3d at 1584.  Extrinsic evidence cannot be used,

however, for the purpose of varying or contradicting the terms of

the claims.  *See id.*

## 5.  DISCUSSION

**A.  SHOULD THE TERM "EXTENDING FROM" IN CLAIMS 1 AND 37 BE
LIMITED TO PRODUCTS THAT ARE MECHANICALLY CONNECTED OR
SHOULD IT BE CONSTRUED TO ALSO INCLUDE PRODUCTS THAT ABUT
EACH OTHER BUT HAVE NO MECHANICAL CONNECTION?**

### i.   Patent Language Arguments

An analysis of the '925 patent language indicates that the

term "extending from" is not limited to "integral or mechanically

connected" structural relationships.  Interpreting "extending

from" as limiting the structural relationship between the

secondary flange and the frac mandrel to being either an integral

or mechanical connection, improperly confines the term "extending

from" to specific embodiments of the invention.  *Phillips v. AWH

Corp.,* 415 F.3d 1303, 1323 (Fed. Cir. 2005)(although the

specification describes very specific embodiments of the

invention, we have repeatedly warned against confining the claims

to those embodiments.)

Cameron disagrees.  Cameron first argues that the "extending

from" language is not specifically defined in the '925 patent.

Cameron asserts that a structural relationship characterized as

an abutment, as opposed to being integral or mechanically

connected, is not contemplated by the purported invention

disclosed and claimed in the '925 patent.  Cameron, however,

**14**

1  fails to explain why the patent's failure to contemplate the

2  structural relationship of an abutment limits the "extending

3  from" clause to being integral or mechanically connected.  In

4  essence, Cameron requests that the court interpret the patent's

5  "extending from" language to give it the meaning, "integral or

6  mechanically connected," which goes beyond the patent's express

7  language to add a meaning that is neither obvious nor required.

8  The structural relationship of an abutment contemplates a

9  relationship where two structures that abut (are in contact or

10  adjacent to each other) "extend from" each other.

11      Cameron next argues that Duhn Oil's interpretation of

12  "extending from" is inconsistent with the "wherein" clause and

13  would render the claimed device inoperable.  According to

14  Cameron, Duhn Oil's interpretation only requires that the

15  secondary flange be positioned "outward" of the frac mandrel with

16  no requirement that the flange be connected to the frac mandrel,

17  or even be touching the frac mandrel in any way.  Cameron argues

18  that this proposed definition is overbroad.  According to

19  Cameron, under Duhn Oil's construction there would be no way for

20  the force to transmit from the frac mandrel to its secondary

21  flange because it does not require that the secondary flange even

22  touch the frac mandrel.  It only requires that it be "positioned

23  outward."

24      However, the "wherein" clause does not require that the

25  "secondary flange" be mechanically connected to, or integral

26  with, the frac mandrel as Cameron contends.  The axial force

27  could be reacted to independently by the "first tubular member

28  flange" and the "secondary flange" if they are in contact without

15

being integrally connected.  Claim 12[8] states the wellhead
assembly of claim 4[9] which incorporates by reference the wellhead
assembly of claim 1 "wherein the secondary flange is separate
from the elongate annular member (frac mandrel)."  Since a
dependent claim is narrower in scope than the independent claim
on which it depends, claim 1 includes embodiments of the wellhead
assembly wherein the secondary flange is either separate from or
connected to the frac mandrel.  Similarly, claim 46 claims the
wellhead assembly of claim 37 "wherein the first tubular member
and the secondary flange are fastened together," thereby
demonstrating that claim 37 also claims embodiments of the
wellhead assembly wherein the secondary flange is either separate
from or connected to the frac mandrel.  The construction of the
term "extending from" taken in conjunction with the "wherein"
clause of claims 1 and 37 is consistent with the scope of those
claims and does not render either of those claims inoperative.

### ii.  Specification Arguments

When construing the "extending from" term in light of the
specification, Figure 4b of the patent shows that the term is
broader than Cameron asserts.  For example, Fig. 4b depicts an
embodiment of the claimed invention where the "lock screws 40...
are threadedly retracted to allow unrestricted access through
bore 92 defined through the secondary flange."  Because the lock

---

[8] Claim 12 reads: "A wellhead assembly as recited in claim 4
wherein the secondary flange is separate from the elongate
annular member (frac mandrel)."

[9] Claim 4 reads: "A wellhead assembly as recited in claim 1
further comprising a seal between the elongate annular member
second end portion and the first tubular member."

screws 40 are retracted in this embodiment, they do not interact
with the annular groves 212, 214 of the frac mandrel 60, and
therefore cannot be said to be "mechanically connected" to the
elongate annular member 60 (frac mandrel).  Fig. 4b, thus,
explicitly discloses an embodiment of the present invention where
the "secondary flange" is not integral with or mechanically
connected to the frac mandrel 60."



FIG. 4B

Cameron argues that Duhn Oil's construction is inconsistent with
the disclosure set forth in the '925 patent specification.
According to Cameron the '925 patent specifications reveal that
the use of the term is limited to reference to "integral" parts
of a single structural component of the wellhead assembly
described in the patent.  For example, the '925 Patent describes
an integral flange that connects to a fracturing tree as "[a]
radial flange 208 [that] extends from an upper end of the
wellhead isolation tool." Moreover, the non-integral secondary

**17**

1   flanges 70 and 110 illustrated in the '925 Patent are never

2   described as "extending from" the mandrel.  Only in the claims of

3   the '925 Patent is the secondary flange first described as

4   "extending from" the mandrel.  Thus, although '925 Patent

5   describes non-integral alternatives for the secondary flange,

6   interpreting the recitation "extending from" in a manner

7   consistent with the written description suggests that this

8   recitation is limited to an integral or one-piece relationship.

9   Cameron also argues that term "extending from is never defined

10  and there is no explanation of the term found in the prosecution

11  history."

12      According to Cameron the relationship between the frac

13  mandrel and the secondary flange is described in three different

14  ways in the patent specifications:

15      1.   **Mechanically connected**: Duhn Oil emphasizes that

16          the secondary flange is disclosed as a separate

17          part slid over the frac mandrel and positioned

18          outwardly of the frac mandrel but fails to address

19          the fact that the secondary flange is mechanically

20          connected.

21      2.   **Integral**: the secondary flange is described as

22          being an "integral" part of the frac mandrel at

23          Col. 3, lines 25-27, and at Col. 7, lines 22-24.

24      3.   **Threaded Connection**: the "secondary tie down

25          flange" described as secured to the frac mandrel

26          with a threaded connection.  (Col. 3, lines 28-37,

27          and Col. 7, lines 17-22.)

28      Cameron argues that there are no other possible

**18**

1   configurations contemplated or disclosed in the '925 Patent.
2   There is no suggestion in the '925 Patent that the secondary
3   flange is or may be disposed around but not connected to the
4   mandrel.  Cameron argues that the entire context of the '925
5   Patent evidences that the secondary flange is, at a minimum,
6   mechanically connected to the mandrel.  Lastly, Cameron argues
7   that every described embodiment of the invention requires some
8   sort of mechanical connection between the secondary flange and
9   the mandrel and that the mechanically extending flanges are not
10  just examples of flanges but are the only extending flanges
11  contemplated and claimed in the '925 patent.  According to
12  Cameron, the only logical conclusion is to construe "extending
13  from" as either integral or having a mechanical connection.
14  Because Cameron's products merely abut each other, Cameron argues
15  that they do not infringe.

16      Cameron correctly argues that the "extending from" language
17  is not specifically defined in the '925 patent.  However, it does
18  not follow that an abutment relationship is not included merely
19  because the term "extending from" is not defined.  To determine
20  the meaning of the term "extending from" an analysis of the
21  term's use in the patent language and a comparison to the
22  specifications is required.

23      Claim 1 describes a first tubular member flange "extending
24  from" the first tubular member.  In a separate provision, Claim 1
25  also describes "a plurality of fasteners fastening the secondary
26  flange to the first tubular member flange."  If the term
27  "extending from" were to only contemplate a mechanical
28  connection, then the term describing the relationship between the

**19**

secondary flange and the first tubular member through a plurality of fasteners would not be necessary.

Claim 3 describes "a wellhead assembly as recited in claim 2 wherein said annular lip extends radially inward defining an opening having a first diameter, wherein the elongate annular member first end portion comprises an inner surface having a second diameter and wherein the portion of the production tubular member comprises an inner surface having a third diameter, wherein said first, second and third diameters are equal."  An embodiment of this claim is found in Fig. 3.  A close analysis of Fig. 3 shows the annular lip "extending" into the inner bore. There is no mechanical connection contemplated in this diagram or description.  Both the diagram and the description show an abutment but not a connection



FIG. 3

Claim 37 describes, "A wellhead assembly comprising… a generally elongate annular member (frac mandrel) suspended in the first tubular member and said annular member having a first end portion extending above the first tubular member and a second end

portion below the first end portion within the first tubular

member[10], wherein the elongate annular member comprises an outer

surface before the first and second ends, wherein a portion of a

section of the outer surface of the elongate annular member mates

with the smaller diameter inner surface section of the first

tubular member."

An analysis of this claim and a comparison of Fig. 1

indicates that the lower portion of the frac mandrel is encased

by the upper portion of the first tubular member flange.  A

visual assessment of Fig. 1 reveals that the upper portion of the

frac mandrel abuts from the first tubular member.  Further, the

fact that the frac mandrel is "suspended" in the first tubular

member indicates a relationship where the first tubular member is

holding the frac mandrel in place by encasing it rather than

through a threaded or mechanical connection.  There is no

description of any mechanical connection in either the language

of this claim or in the visual description of the embodiment in

Fig. 1.

Claim 50 describes "A wellhead assembly as recited in claim

37 further comprising a third flange extending from the generally

elongate annular member spaced apart from the second flange."  In

Fig. 1 the third flange is indicated by no. 208 on the diagram.

There is no mechanical or threaded connection contemplated in the

relationship between the third flange and the frac mandrel.  The

third flange abuts the frac mandrel.

---

[10] The same relationship is contemplated in claim 52.

1    Claim 59 describes "A wellhead assembly as recited in claim

2   52 wherein a portion of the first tubular member extends within a

3   casing head coupled to the casing, the wellhead assembly further

4   comprising… an annular hanger suspended in the casing head…

5   wherein the first tubular member comprises a lower section within

6   the upper inner surface section of the annular hanger and wherein

7   the second end portion of the elongate annular member extends to

8   the intermediate inner surface section of the annular hanger

9   sandwiching a portion of the first tubular member lower section

10  between the outer surface of the elongate annular member and the

11  upper inner surface of the annular hanger…"

12    Similarly, the language of claim 50 compared to Fig. 1 does

13  not indicate a threaded or mechanical connection between the frac

14  mandrel, the casing head, and the first tubular member.

15  According to Fig. 1, all three components meet at the area of the

16  inner surface section of the annular hanger.  The components abut

17  each other in Fig. 1 and have a relationship where some

18  components are "suspended" by others in the relationship.

19  Neither the language nor the diagram indicates any mechanical

20  connection.

21    Based on a comparison between the language of the claims and

22  the attached diagrams of the patent, it cannot be said that the

23  term "extending from" was meant to only be limited to components

24  that are mechanically connected.

25    **iii. Prosecution History**

26    The Patent Examiner who is skilled in the art, interpreted

27  the term "extending from" to cover a wide variety of different

28  structural relationships between the flange and the member it

**22**

"extends from."  The common feature of all these configurations
is that the flange is "located or stretching outwardly from the
frac mandrel."  During the prosecution the Examiner used the term
"extending from" to cover various flange structures including a
use where the structure was "integral," but he did not limit the
application of "extending from" to that structure.  Duhn Oil
cites the Examiner's references to prior art in the prosecution
history of the '925 patent.

For example in the Smith '194 patent The Examiner describes
flange 20 threaded on member 19 as "extending from" that member.
He also describes Flange 22 slipped over member 34 as "extending
from" that member.  (Doc. 40, Ex. 2, Part 6., P. 247, Office
Action dated 10/05/2004).



In the Cornelssen et al '386 Patent, Flange 120, which rests on top of member 10 but has a wider diameter than member 10, is described by the Examiner as "extending from" that member.   (*Id.*)



FIG. 7

In the Van Bilderbeek '596 patent: The Examiner describes flange 330 as "extending from" the member of which it is an integral part.   (Doc. 40, Ex. 2, Part 8, P. 316, Office Action dated 1/18/2005).



Fig. 9

1    Based on the prosecution history of the patent, regardless

2   of in what configuration the term "extending from" is used, all

3   of the uses comprise a structure which is projecting from or

4   abuts another structure.  This is consistent with the ordinary

5   meaning of "extending from" which describes the relative position

6   of two components or portions of a component, not how they are

7   connected.

8    Cameron disputes Duhn Oil's use of the prosecution history

9   arguing that Duhn Oil's proposed construction is inconsistent

10  with the arguments it made before the USPTO during the

11  prosecution of the application that issued the '925 Patent and it

12  should be estopped to deny the position it then took.  Cameron

13  first argues that Duhn Oil is precluded from asserting the

14  "extending from" language of the Smith '194 patent and the

15  Cornelssen '386 patent because the USPTO's references to the

16  Smith '194 patent and the Cornelssen '386 patent were made in

17  rejecting Duhn Oil's then pending patent claims.  Cameron argues

18  that the Examiner rejected a number of Duhn Oil's claims

19  including claims 1 and 37 in the office action of October 5,

20  2004.  Defendant asserts that Duhn Oil then "refused to agree

21  that the flanges and frac mandrels identified by the Examiner

22  disclosed the claimed 'secondary flange' and frac mandrel of the

23  issued claims 1 and 37 in the '925 patent."  According to

24  Cameron, Duhn Oil effectively asserted that the "secondary

25  flange" identified by the Examiner was not "extending from" the

26  frac mandrel disclosed in the Smith and Cornelssen prior art

27  patents because Duhn Oil referred to those flanges and frac

28  mandrels as the "alleged" secondary flange and the "alleged" frac

**25**

1   mandrel.[11]  This argument does not follow.  Referring to the

2   secondary flange and the frac mandrel as "alleged" in the Smith

3   and Cornelssen patents is not the logical equivalent asserting

4   that those two components do not extend from each other.

5       However, the secondary flange, which was added along with

6   the "extending from" phrase and is one of the components that

7   participates in the reaction to fracturing force, was the element

8   added to overcome the rejection based on the Smith '194 patent.

9   Duhn Oil argues that the presence of the secondary flange, and

10  not its particular location, was the point of distinction.  The

11  amendment does not limit Duhn Oil's ability to claim the

12  definition of "extending from" to include the relative location

13  disclosed in the '194 patent.

14              **iv.  Extrinsic Evidence**

15      In support of its argument, Duhn Oil refers to the

16  dictionary meaning of the terms.[12]  The ordinary meaning of the

17  _____

18      [11] In support of its argument, Cameron cites *Cybor Corp. v
    FAS Technologies, Inc.*, 138 F.3d 1448, 1457 (Fed. Cir. 1998.) for
19  the rule that when a patentee takes a position before the USPTO
    during prosecution of a patent application, the patentee should
20  be barred from asserting an inconsistent position on claim
    construction.  However, Duhn Oil did not take an inconsistent
21  position during the prosecution of the case.

22
    [12] *Phillips* also provides a warning on the use of
23  dictionaries and other external sources.  The court states: "The
    problem is that if the district court starts with the broad
24  dictionary definition in every case and fails to fully appreciate
    how the specification implicitly limits that definition, the
25  error will systematically cause the construction of the claim to
    be unduly expansive.  *Phillips,* 415 F.3d at 1324.  This problem
26  does not exist in this case where the focus is instead on how
    Duhn Oil used the claim term in the claims, specification, and
27  prosecution history, rather than starting with a broad definition
    and limiting it by the claims and specifications language.
28

                              **26**

1  terms "extend" and "from" are readily apparent, and it is proper

2  to use a dictionary definition to ascertain their meaning.

3  *Phillips* 415 F.3d at 1314 (in some cases, the ordinary meaning of

4  claim language as understood by a person of skill in the art may

5  be readily apparent even to lay judges, and claim construction in

6  such cases involves little more than the application of the

7  widely accepted meaning of commonly understood words... In such

8  circumstances, general purpose dictionaries may be helpful.)

9      The term "extending" is commonly defined as "to jut out:

10  stick out: protrude, project."  (Doc. 45. Schwartz Decl., Ex. 3,

11  Filed September 5, 2006.)  Further the term "from" is commonly

12  defined as "used as a function word to indicate a starting

13  point."  (*Id.*)  Thus, the phrase "extending from" means to

14  "protrude" from a "starting point."  However, the definitions of

15  "extending" or "from," separately or in combination do not

16  require that whatever is "protruding" from the "starting point"

17  be "integral or "mechanically connected" to the "starting point."

18  The '925 patent only requires that one structure be positioned so

19  as to stretch or protrude outwardly in relation to the other

20  structure.

21  **B.  IS THE LANGUAGE OF THE "WHEREIN" CLAUSE IN CLAIMS 1 AND 37
       PURELY FUNCTIONAL SO AS TO BE INTERPRETED AS A "MEANS-PLUS-**

22  **FUNCTION" CLAIM UNDER 35 U.S.C. § 112, ¶ 6 OR DOES THE
       LANGUAGE DESCRIBE BOTH A FUNCTION AND A STRUCTURE SO THAT**

23  **INTERPRETING THE CLAUSE AS A "MEANS-PLUS-FUNCTION" CLAIM
       WOULD BE IMPROPER?**

24

25      The disputed language of the "wherein" clause states: "A

26  wellhead assembly comprising... a production tubular member

27  aligned with the elongate member, wherein an axial force acts on

28  the generally elongate member and is reacted in both the first

1  tubular member flange and the second flange."

2      The primary tools used by courts to discern the meaning of

3  claim terms are the specifications and the prosecution file

4  history.  *see, Phillips v. AWH Corp.,* 415 F.3d. 1303, 1313 (Fed.

5  Cir. 2005).  The intrinsic evidence is the first and principal

6  step toward determining the meaning of the claims.  see also,

7  *Vitronics Corp.,* 90 F3d at 1582.  While the court should look to

8  the specification for guidance as to how to interpret the

9  ordinary meaning of a claim term, it must avoid importing

10 limitations into the claims from the specification.  *See*

11 *Phillips,* 415 F.3d at 1323.

12     A patent is presumed to be valid.  35 U.S.C. § 282.  "While

13 we have acknowledged the maxim that claims should be construed to

14 preserve their validity, we have not applied that principle

15 broadly, and we have certainly not endorsed a regime in which

16 validity analysis is a regular component of claim construction."

17 *Phillips,* 415 F.3d at 1327.  In such cases, we have looked to

18 whether it is reasonable to infer that the USPTO would not have

19 issued an invalid patent, and that the ambiguity in the claim

20 language should therefore be resolved in a manner that would

21 preserve the patent's validity.  *Id.*  The applicability of the

22 doctrine in a particular case therefore depends on the strength

23 of the inference that the USPTO would have recognized that one

24 claim interpretation would render the claim invalid, and that the

25 USPTO would not have issued the patent assuming that to be the

26 proper construction of the term.  *Id.* at 1328.  A defendant

27 challenging the patent by arguing that the patent itself proves

28 its own invalidity, must demonstrate such proof clearly and

28

1    convincingly.  *see, e.g. University of Rochester v. G.D. Searle &*
2    *Co., Inc.*, 358 F.3d 916, 930 (Fed. Cir. 2004.)  However, when
3    claims are amenable to more than one construction, they should,
4    when reasonably possible, be interpreted so as to preserve their
5    validity.  *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d
6    1545, 1557 (Fed. Cir. 1996.)

7          **I.**   **The language of the "wherein" clause of claims 1
8               and 37 represents a functional limitation and not
                a method step.**

9         Courts have interpreted functional language in an apparatus
10   claim as requiring that an accused apparatus possess the
11   capability of performing the recited function.  *See Intel Corp.*
12   *v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991.)
13   Functional language is nothing more than defining something by
14   what it does rather than by what it is.  *In re Swinehart,* 55
15   C.C.P.A. at 1030.  In contrast to "functional language" a
16   "method" limitation recites a process or a step for using an
17   apparatus.

18        In the present case, the language of the "wherein" clause of
19   claims 1 and 37 does nothing more than define how the "first
20   tubular member flange" and the secondary flange react when an
21   axial force acts on the frac mandrel.  Accordingly the "wherein"
22   clause assumes the presence of an axial force.  The clause does
23   not require that an axial force be applied by a user nor does it
24   specify a method as to how the force is provided.  The clause
25   only requires that a wellhead assembly be subject to an axial
26   force.  Contrary to Cameron's contention, the axial force of the
27   wherein clause can be any axial force and is not limited to the
28   excess loads caused during fracturing.  The axial force can

1   include forces due to gravity, pressure from the well, or any
2   other environmental force that could act on the wellhead
3   assemblies of claims 1 and 37.

4        Further, the language of claims 1 and 37 does not require
5   that the device be in use to infringe.  One can infringe claims 1
6   and 37 simply by assembling a device that when under an axial
7   force, reacts (transmits) the axial force onto the first tubular
8   member flange and the secondary flange.  Cameron asserts that
9   "simple logic and a review of the '925 patent demonstrate that
10  this 'axial force' would not be present if the wellhead apparatus
11  were assembled and placed in a box.  However, the limitations of
12  claims 1 and 37 require that the "wellhead assembly" already be
13  connected to a well, and not lying in a box somewhere.  The
14  device claimed in both claims 1 and 37 includes the limitation of
15  a casing, which is actually a part of the working well itself and
16  therefore the claimed device can never be fully assembled in a
17  box.  Rather, when the claimed device is fully assembled at the
18  well, the device of claims 1 and 37 will inherently be exposed to
19  the axial force of gravity acting on it in addition to any
20  pressure applied by the well itself.

21       The "wherein" clause of claims 1 and 37 does not require
22  that a certain type of axial force act on the frac mandrel but
23  only requires that there is some type of axial force acting on
24  the frac mandrel.  In other words, the requirement of an axial
25  force merely requires that the wellhead assembly be in an
26  environment where there is an axial force present and acting on
27  the frac mandrel.  Given that an axial force is present and
28  acting on the frac mandrel, the wherein clause imports the

30

functional limitation that said axial force be reacted in both the first tubular member flange and the secondary flange.

Because the "wherein" clause of claims 1 and 37 merely limits the functionality of the first tubular member flange and the secondary flange while an axial force is present and acting on the frac mandrel, it does not constitute a method step as Cameron contends.  Instead, it is more analogous to claims that use "adapted for" language or conditional language to describe how an apparatus will behave under certain conditions.

## II. The prosecution history supports the argument that claims 1 and 37 merely describe how the device will react when such force inevitably acts on the device.

In light of the prosecution history and specification, the "wherein" clause of claims 1 and 37 is merely a functional limitation on the structure of the device of claims 1 and 37. According to the prosecution history of the Smith '194 patent, to overcome a rejection of claim 1 during prosecution of the '925 patent, Duhn's patent attorney argued that "if a load were to be axially acted upon the alleged frac mandrel 34 of Smith, the load will not be reacted in both the alleged first tubular member flange and the alleged secondary flange disclosed therein." Hence, Duhn differentiated claim 1 from the prior art by arguing that the language of the "wherein" clause limited claim 1, not by requiring a method step, but by requiring that "the first tubular member flange" and "the secondary flange" react in a different way from the prior art when an axial force is applied. Moreover, at no point during the prosecution of the '925 patent did the prosecuting attorney or the Examiner even hint at the possibility

31

that claims 1 or 37 require that the wellhead assembly actually
be used in order to meet the subject claim limitation.  The
Examiner, like the prosecuting attorney, agreed that the language
of the "wherein" clause of claims 1 and 37 merely places a
functional limitation onto the device being claimed.

As an example, Duhn Oil argues that during prosecution, the
Examiner rejected what was then claim 72 as being anticipated by
U.S. Patent No. 6,092,596 ("the '596 patent").  (*See* the Office
action of January 18, 2005  Claim 72 included language identical
to the language of the "wherein" clause of claims 1 and 37.)  The
Examiner found that Figure 9 and Col. 8, line 47 through Col. 9,
line 24 of the '596 patent disclosed what was recited in claim 72
including the language of the "wherein" clause.  The Examiner
stated that the '596 patent discloses a device "wherein an axial
force acts on the frac mandrel and is reacted in both the first
and second flanges."  The language of Col. 8, line 47 through
Col. 9, line 24 of the '596 patent describes structural elements
of a clamping well casing in terms of how those elements will
inherently function when the device is assembled.[13]

---

[13] Col. 8, line 47 through Col. 9 line 24 of the '596 patent
states:
Two compression rings 364 (each similar to one half of the
ring 64 of Fig. 4) separated by a plain ring 365 are retained
within a correspondingly shaped annular, internal recess formed
by the upper and lower section 303, 330. Also, within this recess
is an annular sleeve 301. The sleeve 301 is threaded at 302 onto
a corresponding internal thread on the section 330. Seals 304 are
provided to seal between the sleeve and the section 330.
The sleeve 301 has an upper region which has both an
internally tapered surface 306 and an externally tapered surface.
The upper section 303 has an upper internally tapered surface 308
and a lower internally tapered surface 307.
When the components are assembled as shown in Fig. 9,

1   The Examiner cited prior art against the language of the

2   "wherein" clause of claims 1 and 37, which describes a structure

3   in terms of functional limitations.  Thus, the Examiner, who is

4   of ordinary skill in the art, understood that the language of the

5   "wherein" clause of claims 1 and 37 constituted a functional

6   limitation and not a method step.  Therefore, applying the

7   presumption that the Examiner correctly analyzed the '925

8   application, it would be incorrect to do as Cameron suggests and

9   usurp the clear intent of the Applicant and the Examiner. to re-

10   write the functional limitation of claims 1 and 37 into a method

11

12   tightening of the nuts 342 (of which there will be several around
13   the circumference) draws the upper section 303 towards the lower
     section 330. This will cause all the taperng surfaces to ride
14   over one another.
         The surface 308 of the upper section 303 will ride over the
15   upper compression ring 364 and will compress the ring inwardly.
         The surface 307 of the upper section 303 will ride over the
16   upper part of the sleeve 301 and will compress the sleeve
17   inwardly.
         At the same time, the upper part of the sleeve 301 will be
18   driven into the tapering gap between the lower one of the
     compression rings 364 and the upper section 303, and this will
19   cause the lower compression ring to be compressed radially
     inwards, to grip the casing hanger 352, at whatever part of the
20   hanger lies within the circumference of the rings 364.
         In this embodiment, metal/metal seals exist between the
21   surfaces of the upper and lower sections, the compression rings
22   364 and the sleeve 301. The surfaces of the compression rings
     which will make contact with the hanger 352 can be ribbed or
23   serrated, in order to enhance the grip of the rings on the
     hanger. The compression ring could be made from a single
24   component with two oppositely tapered surfaces, instead of the
25   construction described above.
         The clamping/clamping system described here is easy and
26   simple to operate and allows the parts of the clamp to be held
     apart, against gravitational influences, until the components to
27   be clamped are in their correct relative positions. It also
     allows the clamp to be easily opened and closed to allow
28   adjustment of relative axial positions.

step.

### III. Whether Duhn Oil's claim of infringement is estopped by the *Festo* and the Doctrine of Equivalents is not reasonable on claim interpretation as a matter of law.

The doctrine of equivalents applies that when the patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection; the patentee may not argue that the surrendered territory comprised unforseen subject matter that should be deemed equivalent to the literal claims of the issued patent. *Festo v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd, et al*, 535 U.S. 722, 733-734 (2002). In some cases the USPTO may have rejected an earlier version of the patent application on the ground that a claim does not meet a statutory requirement for patentability. *Id.* at 727. When the patentee responds to the rejection by narrowing the claims, this prosecution history estops the patentee from later arguing that the subject matter covered by the original, broader claim was nothing more than an equivalent. *Id.* Competitors may rely on the estoppel to ensure that their own devices will not be found to infringe by equivalence. *Id.* at 727. Prosecution history estoppel ensures that the doctrine of equivalents remains tied to its underlying purpose. *Id.* at 734. Where the original application once embraced the purported equivalent but the patentee narrowed the claims to obtain the patent or to protect its validity, the patentee cannot assert that the patentee lacked the words to describe the subject matter in question. *Id.* at 734. The doctrine of equivalents is premised on language's inability to capture the essence of

34

1  innovation, but a prior application describing the precise

2  element at issue undercuts that premise.  *Id.* at 734.  In that

3  instance the prosecution history has established that the

4  inventor turned his attention to the subject matter in question,

5  knew the words for both the broader and narrower claim, and

6  affirmatively chose the narrower.  *Id.* at 734-735.

7       Cameron argues that Duhn Oil inserted the "wherein" clause

8  of claims 1 and 37 through a narrowing amendment admitted to be

9  made for "reasons related to patentability."  Cameron claims that

10 Duhn Oil filed a Petition to Make Special through which it

11 admitted that it was aware of the construction of the accused

12 products at the time the amended claims were submitted to the

13 Patent Office.  As a result, Cameron argues that Duhn Oil cannot

14 rebut the presumption which precludes it from asserting a claim

15 of infringement under the doctrine of equivalents.  However, the

16 parties have not sufficiently explained what was abandoned to

17 comply with the examiner's rejection to permit the application of

18 the doctrine of equivalents.  This is a factual inquiry that will

19 test whatever design and function the invention now has, to

20 determine what was rejected or limited by the examiner and

21 patentee.  The issues Cameron raises as well as the issue of how

22 and with what effect Duhn Oil chose to narrow its claims from

23 broader language to meet the requirements for patentability,

24 involve questions of fact that cannot be decided on this record.

25                        **6.  CONCLUSION**

26      For the reasons stated above, the following claim

27 interpretation is made for Plaintiff's '925 patent:

28

**35**

1   •    The term "extending from" in claims 1 and 37 is not

2         limited to products or structures that are mechanically

3         or structurally connected and includes structures or

4         products that abut each other.

5   •    The language of the "wherein" clause of claims 1 and 37

6         represents a functional limitation and not a method

7         step.

8   •    The Court cannot determine the applicability of

9         prosecution estoppel based on the Doctrine of

10        Equivalents on the existing record.

11  **SO ORDERED.**

12  DATED:  February 1, 2007.

13                     /s/ Oliver W. Wanger

14                   _____

                    **OLIVER W. WANGER**

15                  **United States District Judge**

16

17

18

19

20

21

22

23

24

25

26

27

28

36