1

2

3

4

5

6          IN THE UNITED STATES DISTRICT COURT FOR THE

7                  EASTERN DISTRICT OF CALIFORNIA

8

9   DUHN OIL TOOL, INC.,          )        No. CV-F-05-1411 OWW/GSA
                                  )
10                                )        MEMORANDUM DECISION GRANTING
                                  )        IN PART AND DENYING IN PART
11              Plaintiff,        )        CAMERON'S MOTION FOR PARTIAL
                                  )        SUMMARY JUDGMENT OF NO
12         vs.                    )        INFRINGEMENT (Docs. 445 &
                                  )        446)
13                                )
    COOPER CAMERON CORPORATION,   )
14                                )
                                  )
15              Defendant.        )
                                  )
16  _____)

17      Cooper Cameron Corporation ("Cameron") moves for partial

18  summary judgment on the ground that Duhn Oil Tool, Inc. ("Duhn")

19  cannot carry its burden of proof as to the following subset of

20  Duhn's allegations:[1]

21              1.  No direct infringement based on use or
                sales of an allegedly infringing wellhead
22              assembly, for instances that Cameron has
                proof of noninfringement;
23
                2.  No direct infringement based on
24              contributing to or, after April 2, 2009,

25  _____

26      [1]In seeking partial summary judgment, Cameron does not concede
    that it has infringed the '925 Patent.

                                1

inducing infringement; and

3.  **No infringement under the doctrine of equivalents.**

I.   <u>GOVERNING STANDARDS</u>.

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).  Materiality is determined by the substantive law governing a claim or a defense.  *Id.*  The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.  *Id*.

The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party to defeat summary judgment.  *T.W. Elec.*, 809 F.2d at 630.  The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial."  *Id*.  The nonmoving party

2

may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint." *Id*.  The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995).  This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff." *Id*.  The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment." *Id*.  In *Scott v. Harris*, ___ U.S. ___, 127 S.Ct. 1769, 1776 (2007), the Supreme Court held:

> When opposing parties tell different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

As explained in *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099 (9th Cir.2000):

> The vocabulary used for discussing summary judgments is somewhat abstract.  Because either a plaintiff or a defendant can move for summary judgment, we customarily refer to the moving and nonmoving party rather than to plaintiff and defendant.  Further, because either plaintiff or defendant can have the ultimate burden of persuasion at trial, we refer to the party with and without the ultimate burden of persuasion at trial rather

3

than to plaintiff and defendant.  Finally, we distinguish among the initial burden of production and two kinds of ultimate burdens of persuasion: The initial burden of production refers to the burden of producing evidence, or showing the absence of evidence, on the motion for summary judgment; the ultimate burden of persuasion can refer either to the burden of persuasion on the motion or to the burden of persuasion at trial.

A moving party without the ultimate burden of persuasion at trial - usually, but not always, a defendant - has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment ... In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial ... In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact ....

If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial ... In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything ... If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense ... If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment ... But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion.

210 F.3d at 1102-1103.

4

**II.   DUHN'S OBJECTIONS TO DECLARATION OF ROSS TOBIN.**

Exhibit B to Cameron's motion is the Declaration of Ross Tobin dated September 10, 2010.   Although a copy of this declaration in included with Cameron's courtesy copies, it is not included in Doc. 446 and is, therefore, not yet part of the record.

Mr. Tobin avers that he is currently an Account Manager III for Cameron and that he had previously been District Manager at the Cameron facility located at 2326 I-70 Frontage Road, Grand Junction, Colorado.

In Paragraph 4 of his declaration, Mr. Tobin avers:

> 4.   It was my responsibility to supervise and coordinate the installation of Cameron's frac mandrels at my facility.   At least since August 21, 2008, Cameron personnel, whether in the field or at the Grand Junction facility, have not placed the tubing-head lockscrew in a configuration such that the lockscrew would be in contact with the frac mandrel.   Cameron only offers and installs it [sic] frac mandrels in a configuration where the tubing head lockscrews do not contact the frac mandrel.   Since February 2009, when the Installation Checklist procedure was instituted, Cameron installed more than 841 frac mandrels with the lockscrews not in contact with the frac mandrel.   No customer has complained or criticized Cameron's new installation procedure.

Duhn objects to Paragraph 4 of Mr. Tobin's Declaration on the grounds of lack of foundation and/or personal knowledge. Duhn contends:

> Mr. Tobin fully relied on spreadsheets prepared by Cameron's counsel and took no steps to verify that the information contained therein was accurate.

Duhn refers to Mr. Tobin's deposition testimony at 28:14-20 and 31:2-11, attached as Exhibit 5 to Mr. Kolegraff's declaration (Doc. 484).   Mr. Tobin's deposition testimony makes clear that he was referring to frac mandrels maintained at Vernal or Longview, Texas, not Grand Junction, Colorado.

Duhn further objects to Paragraph 4 on the ground that Mr. Tobin never saw "these" spreadsheets until October 27, 2010, the day before his deposition and six weeks after he signed his declaration:

> Mr. Tobin's position has moved from Grand Junction to Denver, so he does not even have access to the underlying checklists, and is no longer responsible for day to day activities in Grand Junction ... Instead of having any personal knowledge, Mr. Tobin has placed complete and unwavering trust that Cameron's installers and field workers are following Cameron's procedures ... Mr. Tobin states that Cameron has installed more than 841 frac mandrels with the lockscrews not in contact with the frac mandrel.  He has no personal knowledge to support this statement ... The number '841' was provided by his counsel, and came from a spreadsheet Mr. Tobin never saw until weeks after signing the declaration.

In Paragraph 7 of his declaration, Mr. Tobin avers:

> 7.  To date, at least 685 frac mandrels have been received and documented under the return-checklist procedure.  The Return Checklists of at least 615 mandrels indicate the absence of dimples, thus, establishing that each given frac mandrel was not placed in the allegedly infringing 'dual load path' configuration.  It establishes at least 615 instances of noninfringement.

Duhn objects to Paragraph 7 for lack of foundation and/or personal knowledge as stated in connection with Paragraph 4.   *See*

1  *supra.*

2      In Paragraph 8 of his declaration, Mr. Tobin avers:

3          8.  To date, Cameron has documented the
           lifecycle of at least 535 mandrels.  That is,
4          Cameron has in Installation and Return
           checklist for at least 535 mandrels, each
5          such Installation Checklist indicating that
           given mandrel was installed with the
6          lockscrews not run in and had no dimples on
           it and each Return Checklist indicating the
7          condition of that mandrel when it returned.
           Of those 535 lifecycles, these checklists
8          indicate that at least 523 mandrels left
           Cameron's facility without dimples and
9          returned to Cameron's facility in the same
           condition.  Thus, these checklists evidence
10         at least 523 wells at which a Cameron mandrel
           was used in a confirmed-as-noninfringing
11         manner.

12     Duhn objects to Paragraph 8 for lack of foundation and/or

13  personal knowledge as stated in connection with Paragraph 4.  *See*

14  *supra.*

15     Cameron replies that Duhn's objections to Mr. Tobin's

16  declaration should be disregarded:

17         Mr. Tobin made it clear throughout his
           deposition that he had been working with
18         Cameron's frac mandrel checklists
           continuously over the past two years as the
19         District Manager of Cameron's Grand Junction,
           Colorado facility, and worked with the
20         underlying spreadsheet in which information
           from each of the checklists is recorded on a
21         monthly basis ... Duhn takes the quotes from
           Mr. Tobin's testimony regarding the
22         particular charts generated from the
           spreadsheets, and the particular compilations
23         of the checklists, which were prepared by
           Cameron's counsel after the filing of the
24         Motion, and mischaracterizes the testimony to
           assert that Mr. Tobin had not seen the
25         checklists he referred to in his Declaration
           until after he signed the Declaration.

26

7

1    Mr. Tobin has not laid the foundation to admit this

2   information as a business record under Rule 803(6), Federal Rules

3   of Evidence.   Cameron's response changes nothing.   If Cameron is

4   presenting a compilation, summary, or abstract of business

5   records, it must lay the proper foundation.   Duhn's objections to

6   Mr. Tobin's declaration are sustained.

7        III.   **STATEMENTS OF UNDISPUTED FACTS**.

8        A.   **CAMERON**.

9             1.   **U.S. Patent No. 6,920,925 ("the '925 Patent")**.

10   CUDF 1:   The '925 patent, entitled Wellhead Isolation Tool,

11   was issued on July 26, 2005, listing only Rex Duhn and Robert

12   Meek as inventors.

13             *Duhn's Response*: UNDISPUTED.

14   CUDF 2:   The asserted claims of the '925 patent contain the

15   following limitations: "a production tubular member" and "wherein

16   an axial force acts on the generally elongate annular member and

17   is reacted in both the first tubular member flange and the

18   secondary flange".   Additionally, claim 1, and the claims based

19   thereon, of the '925 patent contains the limitation: "a casing."

20   *Supporting Evidence*: Ex. A.1 (the '925 Patent) at col. 13, lines

21   42-62; col. 24, lines 26-56.

22             *Duhn's Response*: UNDISPUTED that the claims

23   contain the language quoted, but DISPUTED because the meaning of

24   a patent claim limitation is a question of law for the Court, *see*

25   *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-971

26   (Fed.Cir.1995).   Duhn objects that Cameron is attempting to read

a claim limitation outside of its context by inappropriately parsing limitation language, contending that the claim must be read as a whole.

CUDF 3:  Claims 13, 14, 31, and 86 contain limitations requiring "lock screws."  *Supporting Evidence*: Ex. A.1 (the '925 Patent) at col. 14, lines 42-67; col. 17, lines 8-25; col. 24, lines 26-56.

*Duhn's Response*: UNDISPUTED that the claims contain the language quoted, but DISPUTED because the meaning of a patent claim limitation is a question of law for the Court, *see Markman, supra*.  Duhn objects that Cameron is attempting to read a claim limitation outside of its context by inappropriately parsing limitation language, contending that the claim must be read as a whole.

CUDF 4:  A "casing" is a "pipe extending from the surface of the well down into the ground ... to the oil reservoir many thousands of feet below ground."  *Supporting Evidence*: Ex. A.2, Expert Report of Boyadjieff, p. 4.

*Duhn's Response*: UNDISPUTED that a casing is a pipe extending from the surface into the ground, but DISPUTED that a casing necessarily must reach the oil reservoir many thousands of feed below ground and DISPUTED that the meaning of a patent claim term is a question of law, citing *Markman*, *supra*.

CUDF 5:  A "production tubular member" is "the inner round pipe extending from the surface down to the oil or gas reservoir."  *Supporting Evidence*:  Ex. A.2, Expert Report of

Boyadjieff, p. 5.

*Duhn's Response*: Duhn does not dispute this construction but clarifies that a production tubular member may be the inner-most casing for a well.

CUDF 6:  The claimed wellhead assembly "of the '925 patent does not include every element of those claims until it is fully assembled at the location of the well."  *Supporting Evidence*: Ex. A.11, Declaration of Robert Meek, ¶ 2.

*Duhn's Response*: Duhn objects as vague the phrase "fully assembled."  DISPUTED: The wellhead assembly is complete when each limitation of the claims has been met.  There is no requirement that the wellhead assembly include anything more than the claimed limitations or that it be in a specific location.  As defined by the *Markman* ruling, there is no requirement that the wellhead assembly be in use for a finding of infringement.

CUDF 7:  During prosecution of the application for the '925 patent, then-pending claim 90 was a dependent claim based on then-pending independent claim 72.  The USPTO rejected then-pending claim 72 but indicated that then pending claim 90 would be allowable if rewritten into independent form. Duhn Oil amended then-pending claim 72 to include "a plurality of lock-screws," and rewrote then-pending claim 90 into independent form. *Supporting Evidence*:  Ex. A.3, Duhn Oil's February 2005 Response to Office Action, p. 23, 30 and 33.

*Duhn's Response*: Duhn objects to CUDF 7 as incomplete: The applicants amended original claim 72 by adding

10

1  "and a plurality of lockscrews each radially threaded through one

2  of said first flange and second flange and engaging the generally

3  elongate, annular member, wherein the other of said first flange

4  and second flange is threaded on the generally elongate annular

5  member, wherein the second flange is fastened to the first

6  flange, and wherein the second flange is separate from the

7  generally elongate member."  Otherwise UNDISPUTED.

8              **2.  <u>The Accused Products</u>.**

9     CUDF 8:  8. Cameron has never sold or offered for sale

10 underground pipes, such as the casing or production tubular

11 member recited in the claims of the '925 patent.  *Supporting*

12 *Evidence*: Ex. B, Tobin Declaration, ¶ 10.

13            *Duhn's Response*: DISPUTED to the extent Cameron

14 purports to construe the meaning of the terms of the '925 Patent;

15 otherwise UNDISPUTED.

16            **3.  <u>No Infringement if Lockscrews Are Not Run-In</u>.**

17    CUDF 9:  The Court determined that if the lockscrews are not

18 in contact with the frac mandrel, then there is no "dual load

19 path" as required by the "wherein" clause and, thus, no

20 infringement.  *Supporting Evidence*: Transcript of Hearing on

21 January 6, 2009 (Doc. 287) at 183:20-184:13.

22            *Duhn's Response*: DISPUTED.  The Court only

23 indicated that it would make a ruling regarding what was "not

24 within the call of the patent."

25    CUDF 10: If a Cameron frac mandrel is installed such that

26 the lockscrews are not in contact with the mandrel, there is no

1   infringement.

2          *Duhn's Response*: DISPUTED.   Duhn contends that if

3   a Cameron frac mandrel is installed in such a way that the

4   lockscrews cannot be in contact with the mandrel, there is no

5   infringement, referring to Duhn's proposed Order (Doc. 476-1 at

6   2), with respect to which the Court has not ruled.

7          CUDF 11:   During Mr. Rex Duhn's deposition on September 19,

8   2007, the following exchange took place:

9              Q [Cameron's Counsel]: So it is your opinion
               that when a lock screw is screwed down to
10             engage the mandrel, that there will be no
               load transfer unless there is a depression in
11              the frac mandrel?

12             A [Mr. Duhn]: Yes.

13             Q: And why is that?

14             A: You would have to have a contact shoulder
               for lock pin to engage.
15
               Q: So, in this configuration shown, are you
16             saying that's effectively the same as if the
               [lockscrews] were removed, pin 58?
17
               O [Duhn Oil's Counsel]: Objection, vague.
18
               A [Mr. Duhn]: There's no place for it to
19             react the force.

20             Q [Cameron's Counsel]: No place for 58—

21             A: To react the force on the elongate
               mandrel.
22
               Q: What if the pin 58 is screwed in real
23             tight, is your answer the same?

24             A: It would be insufficient friction
               coefficient to maintain the mandrel.
25
               Q: That's because there's no correspondent
26             depression on the frac mandrel for pin 58 to

                              12

1      engage?

2          A: Correct, you would have no shear point.

3  *Supporting Evidence*:  **Ex. A.8, Duhn Depo., dated Sept. 19, 2007,**

4  **at 39:14-40:12.**

5          *Duhn's Response*: **UNDISPUTED that the quoted**

6  **exchange occurred during Mr. Duhn's deposition with regard to**

7  **Claim 13.  Objection: FRE 802.**

8      **CUDF 12:  Mr. George Boyadjieff believes that any contact**

9  **between the lockscrews and the frac mandrel would be sufficient**

10  **to transfer loads in accordance with the "wherein" clause.**

11  *Supporting Evidence*: **Ex. A.9, First Supp. Boyadjieff Report, p.**

12  **3.**

13          *Duhn's Response*: **UNDISPUTED.**

14      **CUDF 13:  On August 21, 2008, Cameron issued an engineering**

15  **bulletin to its field locations reminding Cameron personnel that**

16  **the lockscrews should not be run-in and should not contact the**

17  **frac mandrel.**  *Supporting Evidence*: **Ex. B to Docket No. 255.**

18          *Duhn's Response*: **UNDISPUTED that Cameron sent out**

19  **an engineering bulletin to at least some Cameron installers;**

20  **otherwise DISPUTED: It is unclear if the bulletin went to all**

21  **"field locations" and whether the installers had previously been**

22  **informed not to tighten the lockscrews.**

23      **CUDF 14:  The vast majority of Cameron's surface U.S. frac**

24  **mandrel installations are coordinated out of Cameron's Grand**

25  **Junction, Colorado facility.**  *Supporting Evidence*:  **Ex. B, Tobin**

26  **Declaration, ¶ 4.**

*Duhn's Response*: Objection on the ground that the cited evidence does not support the fact. [OWW - I agree; paragraph 4 of Mr. Tobin's declaration quoted above does not support this fact] and on the ground of vagueness as it is unclear what "vast majority" means.  DISPUTED: Cameron maintains at least two other facilities that store and install frac mandrels, i.e., Longview, Texas and Vernal, Utah.  For the Encana installations that are done by Cameron, the installations are all done from Cameron's facility in Vernal, Utah.

**4.   <u>Installation Checklists</u>.**

CUDF 15: In February 2009, Cameron began documenting the installation of its frac mandrels at its Grand Junction facility.

*Duhn's Response*: UNDISPUTED.

CUDF 16:  The below pictures are accurate representations of the type of marking plate Cameron places on the hold-down flange of its frac mandrels: [OWW - I could not copy the picture but it is in Cameron's statement of undisputed facts].  *Supporting Evidence*: Ex. B, Tobin Decl., ¶ 3.

*Duhn's Response*: DISPUTED.  Cameron has not placed marking plates on all its frac mandrels and has no defined plan to get marking plates installed on all Encana-owned frac mandrels.

CUDF 17:  Cameron's marking plates conspicuously instruct "DO NOT RUN IT TUBING HEAD LOCKSCREWS TO CONTACT FRAC MANDREL. THIS HOLD-DOWN FLANGE FIRMLY SECURES THE FRAC MANDREL DURING FRAC OP".

14

*Duhn's Response*: UNDISPUTED as to correct quotation of plate text.  DISPUTED on ground that not all mandrels have been so marked and Cameron has presented no evidence that the plates are conspicuously placed considering the dirty, hostile and dangerous well site environment.

CUDF 18:  Additionally, Cameron delivered its updated installation procedures—which expressly state that the lockscrews should not contact the frac mandrel—to its customers, and to third parties that may come in contact with Cameron's mandrels. *Supporting Evidence*: Ex. B, Tobin Decl. at ¶¶ 11-19.

*Duhn's Response*: DISPUTED as to whether all customers, all third parties, and all operating companies that may come in contact with the Cameron frac mandrel.

CUDF 19: Cameron has received from the field managers of its customers Orion, Williams, Barrett, Anadarko and Bass, signed acknowledgments indicating that his or her respective company has received Cameron's revised installation procedures.  *Supporting Evidence*: Ex. B, Tobin Decl. at ¶¶ 11-19.

*Duhn's Response*: UNDISPUTED that Cameron has received signed acknowledgements from customers Orion, Williams, Barrett, Anadarko and Bass; DISPUTED to the extent the acknowledgements do not identify the person signing as a "field manager."

5.   <u>Cameron's Confirmed Non-Infringing Frac Mandrel is "Substantial"</u>.

CUDF 20:  Cameron's checklists indicate that Cameron has

15

installed at least 841 mandrels with the lockscrews not run in and, as such, not in contact with the mandrel. *Supporting Evidence*: Ex. B, Tobin Decl. ¶ 4.

*Duhn's Response*: Objection to foundation. *See discussion supra*. DISPUTED. The evidence demonstrates that the checklists that purportedly underlie this calculation are unreliable. Cameron's own checklists show that Cameron has had to buff out over 1000 dimples from its frac mandrels from September 2009 to April 2010.

CUDF 21:  Cameron's checklists indicate that at least 615 mandrels have returned to Cameron's facilities without dimples. *Supporting Evidence*: Ex. B, Tobin Decl. ¶¶ 7-8.

*Duhn's Response*: Objection to foundation. *See discussion supra*. DISPUTED for same reasons as CUDF 20.

CUDF 22: Cameron has an Installation Checklist and a Return Checklist for at least 535 mandrels. *Supporting Evidence*: Ex. B, Tobin Decl. ¶¶ 7-8.

*Duhn's Response*: Objection as irrelevant, misleading and lacking foundation. *See discussion supra*. DISPUTED because Cameron's pairing of Installation Checklists and Return Checklists did not start until at least June 11, 2009 and does not cover all of the infringing installations.

CUDF 23:  Cameron's checklists indicate that of the at least 535 mandrels for which Cameron has both an Installation and a Return Checklist, at least 523 mandrels were returned without dimples. *Supporting Evidence*: Ex. B, Tobin Decl. ¶¶ 7-8.

*Duhn's Response*: same as to CUDF 22 *supra*.

In Cameron's reply brief in reply to Duhn's evidentiary objections to CUDF 20-23, Cameron attaches as Exhibits A, B and C the Declaration of Joe Norris, District Manager for Cameron's Grand Junction, Colorado district office:

> I am the person in charge of maintaining Cameron's frac mandrel checklists for the Grand Junction office.  The following checklists are records of Cameron's returns, buffing, and installations of frac mandrels in the Grand Junction office.  These checklists were made at or near the time of these events, by (or from information transmitted by) a person with knowledge of these events.  These checklists were kept in the course of Cameron's regularly conducted business activities.  It has been the regular practice of Cameron to make these checklists since Cameron began its checklists procedures.

### 6.   Duhn Oil's Lockscrews.

CUDF 24:  There are only so many horizontal penetrations a flange can have, and the space necessary for the vertical bolts extending through this flange defines the maximum limit.  It is impossible to have an "infinite number of lockscrews" within a flange.  *Supporting Evidence*: Ex. A.7, Devlin Declaration at ¶ 4.

*Duhn's Response*:  UNDISPUTED as to there being only so many horizontal penetrations and that it is not possible to have an infinite number of lockscrews; DISPUTED as to the cause for the limitation.

### B.   DUHN'S STATEMENT OF ADDITIONAL MATERIAL FACTS.

### 1.   Cameron's Direct Infringement of the '925 Patent.

**DUDF 25: When a customer purchases or rents a Cameron frac mandrel, Cameron installs the frac mandrel in the tubing head at its facility.** *Supporting Evidence*: **Kolegraff Decl., Ex. 7, Tobin 4/9/10 depo. at 23:19-24; Ex. 6, Tobin 9/8/09 depo. at 12:5-15.**

**DUDF 26: At the well site in the field, Cameron assembles the wellhead assembly, including the frac mandrel in the tubing head.  This assembly includes attaching to "a casing" and aligning "a production tubular member."** *Supporting Evidence*: **Ex. 7, Tobin Depo. at 24:1-25:9, 25:24-26:3; Ex. 6, Tobin Depo. at 12:6-17.**

**DUDF 27: In addition to assembling the wellhead, Cameron performs testing of the wellhead assembly.** *Supporting Evidence*: **Ex. 7, Tobin Depo. at 25:4-9; Ex. 6, Tobin Depo. at 43:18-44:4; Ex. 1, Devlin 1/8/08 Depo. at 49:7-50:14.**

**DUDF 28: Cameron has assembled a wellhead that is within the scope of claim 2 of the '925 Patent.** *Supporting Evidence*: **Ex. 1, Devlin Depo. 15:16-21, 25:13-19, 27:14-17, 30:15-18, 31:22-24, 32:16-21, 33:5-11, 33:12-17, 20:15-18, 40:20-24, 41:14-24; Ex. 1a, Devlin Depo, Exh. 16; Ex. 8 Boyadjieff Report, 4-5; Ex. 9 Boyadjieff Supp. Report, 3.**

**2.   Cameron's Indirect Infringement of '925 Patent.**

**DUDF 29: Cameron's frac mandrels have been used in an infringing manner after April 2, 2009.** *Supporting Evidence*: **Ex. 6, Tobin Depo., 50:13-51:15, 68:9-69:23; Ex. 6a, Tobin Depo., Ex. 15; Ex. 6b, Tobin Depo. Ex. 17.; Ex. 4 and table summarizing buffing checklists at Kolegraff Decl. ¶ 6.**

**DUDF 30: Cameron did not install placards of all of its frac mandrels by April 2, 2009.** *Supporting Evidence*: **Ex. 6, Tobin Depo. at 15:5-14, 15:18-25.**

**DUDF 31: Cameron did not instruct its employees to install the frac mandrel without engaging the lockscrews - Cameron's purported non-infringing use - until some time in 2008.** *Supporting Evidence*: **Ex. 5, Tobin Depo. at 14:4-15:12.**

### 3.  Prosecution of the '925 Patent.

**DUDF 32: The '925 Patent matured from Application Number 10/369,070 filed on February 19, 2003.** *Supporting Evidence*: **Ex. 18.**

**DUDF 33: Claim 86 of the '925 Patent was first submitted to the Patent Office on November 15, 2004 as claim 90, which depended upon claim 72.** *Supporting Evidence*: **Ex. 13, 11/15/04 Amendment at 34, 41.**

**DUDF 34: In a January 10, 2005, Final Office Action, the Examiner allowed claim 90 as submitted.** *Supporting Evidence*: **Ex. 14, 1/10/05 Final Office Action at 4.**

**DUDF 35: In a January 10, 2005 Final Office Action, the Examiner rejected claim 72 as anticipated.** *Supporting Evidence*: **Ex. 14, 1/10/05 Final Office Action at 2.**

**DUDF 36: In an Amendment After Final submitted on February 22, 2005, the applicants amended then claim 90 to include the limitations of base claim 72 - converting claim 90 from a dependent to an independent claim.  The applicants did not change the scope of claim 90.** *Supporting Evidence*: **Ex. 15, Amendment**

19

After Final at 30, 33.

DUDF 37: In the February 22, 2005 Amendment After Final, the applicants amended claim 72, adding a limitation. *Supporting Evidence*: Ex. 15, Amendment After Final at 23, 33.

DUDF 38: On March 30, 2005, the Examiner issued a Notice of Allowability, allowing, *inter alia*, claims 72 and 90 as submitted in the February 22, 2005 Amendment After Final. *Supporting Evidence*: Ex. 16, Notice of Allowability.

DUDF 39: The '925 Patent issued on July 26, 2005 with original claim 90 issuing as claim 86 and original claim 72 issuing as claim 77. *Supporting Evidence*: Ex. 17; Ex. 18, Issue Classification.

4.   The Accused Device's "Lock Collar".

DUDF 40: The "lock collar" of Cameron's accused devices transfers a portion of the axial load from the elongate annular member to the secondary flange. *Supporting Evidence*: Ex. 8, Boyadjieff Depo. at 141:2-25, 144:7-16; Cameron brief (Doc. 447) at 24.

IV.   NO DIRECT INFRINGEMENT BASED ON SALES, OFFERS FOR SALE, OR USE.

Cameron moves for partial summary judgment on the ground that Duhn cannot support its allegations of patent infringement pursuant to 35 U.S.C. § 271(a) based on use, sales, or offers for sale of allegedly infringing wellhead assemblies.[2]  Cameron

_____

[2]35 U.S.C. § 271(a) provides:

1  asserts that the acts underlying each category of patent

2  infringement are different:

> For example, if a supplier sells an
> infringing widget to a customer, the supplier
> is liable for infringement based on that
> sale.  However, the customer is not liable
> for infringement, because there is no
> purchased-based infringement.  If the
> customer then exports the infringing widger
> overseas, he again would not be liable for
> infringement.  There is no export-based
> infringement.  The customer obviously cannot
> be accused of infringement based on
> manufacturing the widget, he did not make it,
> he just bought it.  However, if the customer
> were to use the widget, he would be liable
> based on that use.  Thus, the supplier is
> only liable to the patentee for an infringing
> sale, while the customer is only liable to
> the patentee for an infringing use.  Who the
> accused infringer is depends on which
> category of infringement the patentee
> asserts.

14  "Literal infringement of a claim exists when every

15  limitation recited in the claim is found in the accused device,

16  i.e., when the properly constructed claim reads on the accused

17  device exactly."  *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 532

18  (Fed.Cir.1996), *cert. denied*, 522 U.S. 812 (1997).  "[A]ny

19  deviation from the claim precludes a finding of literal

20

_____

> Except as otherwise provided in this title,
> whoever without authority makes, uses, offers
> to sell, or sells any patented invention,
> within the United States, or imports into the
> United States any patented invention during
> the term of the patent therefor, infringes the
> patent.

25  Duhn conceded at the hearing that Cameron does not sell or offer to
   sell the "casing" or "production tubular member" and that Cameron
26  is entitled to partial summary judgment on this ground.

infringement." *Litton Systems, Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1454 (Fed.Cir.1998). *See also London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1539 (Fed.Cir.1991): "There can be no infringement as a matter of law if a claim limitation is totally missing from the accused device."   Relying on these principles, Cameron contends:

> Thus, if an accused infringer can show that he 'used' a device lacking a component corresponding to a claim limitation, he is not liable for infringement based on that use.  Similarly, if an accused infringer can show he sold a device lacking a component corresponding to a claim limitation, he is not liable for infringement based on that sale.

Cameron contends that it does not use a wellhead assembly with a "casing" or a "production tubular member," which are required limitations of all of Duhn's asserted patent claims. Cameron asserts that each of the patent claims describe a "wellhead assembly" and includes the limitation "a production tubular member."   Claim 1 and the claims based thereon further include the limitation "a casing."  Cameron refers to the expert report of Mr. Boyadjieff, one of Duhn's designated expert witnesses, that "a casing" is a "pipe extending from the surface of the well down into the ground ... to the oil reservoir many thousands of feet below ground" and that a "'production tubular member' is the inner round pipe extending from the surface down to the oil or gas reservoir."  Cameron contends that both of these claim components are fixed in the ground and located at the well site.  Cameron refers to testimony of Mr. Meek, a named

inventor as well as a Duhn expert, that the claimed wellhead

assembly "of the '925 patent does not include every element of

those claims until it is fully assembled at the location of the

well."

Cameron moves for partial summary judgment on the ground

that it does not "use" an allegedly infringing wellhead assembly.

Asserting that "[t]his Court noted that infringing use

of a frac mandrel in a wellhead assembly requires employment in

the purpose from which the wellhead assembly's frac mandrel is

sold and intended," and to Duhn's assertion that "use"

encompasses testing and installation, Cameron refers to the

Court's statement at a hearing on January 25, 2010:

> THE COURT: How is that a use?  I understand,
> and I think as Mr. Rogers stated it, a frac
> mandrel is used by actually employing it to
> carry out its designed function, which is to
> dissipate force when the frac'ing of the well
> is going on.  And so I don't understand
> testing or installation to be use in that
> sense.  In other words, I think the use of a
> frac mandrel that is alleged to be infringed
> would be employing the frac mandrel for the
> purpose for which it's sold and intended.

(Doc. 408, 10:2-9).

Duhn responds that there is evidence that when a customer

purchases or rents a Cameron frac mandrel, Cameron installs the

frac mandrel in the tubing head at its facility; then Cameron

goes to the well site and assemblies the wellhead assembly,

including the frac mandrel in the tubing head, which assembly

includes attaching to "a casing" and aligning "a production

tubular member"; and that Cameron performs testing of the

23

completed assembly.

Duhn asserts that these activities, performed on the entire structure, constitute "use" of the '925 Patent, relying on the following cases.

In *Waymark Corp. v. Porta Systems Corp.*, 245 F.3d 1364, 1367-1368 (Fed.Cir.2001), the Federal Circuit noted:

> This court has established that testing is a use of the invention that may infringe under § 271(a) ... Nevertheless, the infringer must use the 'patented invention.'

*Paper Converting Machine Co. v. Magna-Graphics Corp.,* 745 F.2d 11, 19-20 (Fed.Cir.1984), held:

> Where, as here, significant, unpatented assemblies of elements are tested during the patent term, enabling the infringer to deliver the patented combination in parts to the buyer, without testing the entire combination together as was the infringer's usual practice, testing the assemblies can be held to be in essence testing the patented combination and, hence, infringement.

*See also General Electric Co. v. Sonosite, Inc.*, 568 F.Supp.2d 983, 992 (W.D.Wis.2008)("Testing is a 'use' of an invention that may infringe."); *McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*, 2005 WL 2346919 at * 5 (E.D.Cal., Sept. 23, 2005)("'Using' requires use of the complete invention, and encompasses 'assembly' and 'testing' of that invention."). As Duhn notes, Cameron cites no case authority that testing and assembly may constitute "use," relying instead upon spontaneous comments from the Court responding to an issue that had not been briefed by the parties.

1   Cameron replies that the testing of seals to which Duhn

2   refers is part of the alleged "making," not "use":

>           Duhn Oil refers to the installation of
>           Cameron's tubing head at the well site, and
>           testing of seals ... This is a part of Duhn
>           Oil's 'making' allegations.  To the extent
>           there is ever any testing of seals by Cameron
>           at the well site, any such testing would be
>           done to confirm that the assembly is complete
>           (which would fall under the category of
>           'making'), and therefore would not be a 'use'
>           of the wellhead assembly for the purpose set
>           forth in the '925 patent, which is fracing.
>           Cameron is not a fracing company.
>
>           Cameron's customers and the fracing companies
>           that they hire are the only persons that
>           'use' Cameron's accused products.  To the
>           extent that Cameron may be accused of
>           infringement for any such 'use,' those claims
>           would be limited to indirect infringement,
>           which would be a claim that Cameron allegedly
>           induced or contributed to the direct
>           infringement of the user.  Duhn Oil's claims
>           of <u>direct infringement</u> against Cameron for
>           alleged 'use' should be disposed of as a
>           matter of law.

16  Cameron requests that the Court finds as a matter of law that

17  Duhn's direct infringement claims to be presented at trial be

18  limited to making.

19      Cameron's motion for partial summary judgment on this ground

20  is DENIED; case authority supports Duhn's position that testing

21  and assembly in the field can constitute use for purposes of

22  direct infringement.

23      Cameron further seeks partial summary judgment of no

24  infringement for instances where Cameron can prove that its frac

25  mandrel was used in a noninfringing manner:

26          Duhn Oil cannot satisfy its burden by

alleging that infringement occurred in one
instance and then assume infringement
occurred in every instance.  Duhn Oil must
prove the totality of its allegations with a
preponderance of evidence.  Duhn Oil cannot
meet its burden.  In contrast, Cameron's
checklist procedure proves that Cameron's
mandrels were used hundreds of times in a
nonfringing manner.

Cameron cites *L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318

(Fed.Cir.2006):

Shertech [the patentee] cannot simply
'assume' that all of L & W's products are
like the one Dr. Holmes tested and thereby
shift the burden to L & W to show that is not
the case.  When a patentee with the burden of
proof seeks summary judgment of infringement,
it must make a prima facie showing of
infringement as to each accused device before
the burden shifts to the accused infringer to
offer contrary evidence.

Relying on *L & W, Inc.*, Cameron asserts that "the Federal Circuit

has repeatedly rejected a patentee's attempt to establish

infringement against an entire category of products by presenting

evidence relating to only a subset of that category."  Cameron

contends:

Duhn Oil cannot assert that *all* of Cameron's
mandrels are used in an allegedly infringing
manner by asserting, or even proving, that
*some* of Cameron's mandrels were used that
way.  Cameron should not have to pay damages
for instances where Duhn Oil cannot prove
with a preponderance of evidence that
infringement occurred.

Cameron refers to evidence of allegedly non-infringing use when

the lockscrews are not run in and asserts that it can prove

hundreds of instances pursuant to its checklist procedure,

commenced in early 2009.

26

Cameron further argues that Duhn's purported evidence of infringement does not "outweigh" Cameron's evidence of noninfringement.  Essentially, Cameron argues that Duhn's evidence that the frac mandrel will not work if the lockscrews are not run in is not credible:

> Duhn Oil contends that Cameron's frac mandrel will not work with the lockscrews not run in because they will 'dance.'  Mr. Boyadjieff, Duhn Oil's expert, stated that '[c]ustomers needed to use the lock screws in the tubing spool to contain the frac tree.'  Duhn Oil's assertions are without support and simply wrong.  Mr. Boyadjieff conceded that he has not done any calculation to determine if or when Cameron's mandrel would fail because the lockscrews were not run in.  Further, he conceded that the only Cameron frac mandrels he has seen undergo a fracing process were in two videos provided by Cameron.  And he agreed that those videos show Cameron's mandrels undergoing a frac job with tubing head lockscrews not run in, and that there was no failure or so-called 'dancing.'

Cameron contends that Duhn has presented no evidence that a Cameron frac mandrel would fail or fail to work properly if the tubing head lockscrews were not run in:

> Duhn Oil bases its entire argument by taking out of context a statement by Mr. Tom Taylor, a Cameron engineer, discussing that he had heard someone was concerned about the possible occurrence of 'dancing.'  However, after reading Mr. Boyadjieff's perversion of his testimony, Mr. Taylor made it clear that there has never been any instance of 'dancing.'

Cameron contends that it "is also quite telling" that Duhn presents no evidence from a third party stating that the lockscrews must be run in for Cameron's frac mandrel to work.

27

1  Cameron cites *E-Pass Technologies, Inc. v. 3Com Corp.*, 473 F.3d

2  1213, 1222-1223 (Fed.Cir.2007):

> If, as E-Pass argues, it is 'unfathomable'
> that no user in possession of one of the
> accused devices and its manual has practiced
> the accused method ..., E-Pass should have
> had no difficulty in meeting its burden of
> proof and in introducing evidence of even one
> such user.

7  Cameron contends that it has received written acknowledgements

8  from its customers,  acknowledging that they are aware of

9  Cameron's procedures that the lockscrews not be run in to contact

10 the mandrel.  Cameron also refers to evidence that Duhn's

11 inspection of Cameron's facilities and seen "countless" mandrels

12 without dimples and asserts that Duhn has repeatedly presented

13 isolated instances where the lockscrews were run in to assert

14 that the lockscrews are always run in.  Cameron contends that the

15 Court should hold Duhn to its evidentiary burden and grant

16 partial summary judgment of noninfringement for Cameron for the

17 at least 615 instances in which Cameron can show through its

18 checklists that its mandrel was used with the lockscrews not run

19 in.

20      Duhn responds that Cameron's position is without merit

21 because it attempts to conflate standards for damages with

22 standards for infringement liability.  Duhn cites *Lucent*

23 *Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317

24 (Fed.Cir.2009), *cert. denied sub nom. Microsoft Corp. v. Lucent*

25 *Technologies, Inc.*, ___ U.S. ___, 130 S.Ct. 3324 (2010):

26      To infringe a method claim, a person must

> have practiced all steps of the claimed
> method ... [A] finding of infringement can
> rest on as little as one instance of the
> claimed method being performed during the
> pertinent time period.

That Cameron can identify some instances of purported non-infringement, Duhn contends, has no bearing on whether Cameron is liable for direct infringement of the '925 Patent:

> [E]ven if Cameron can show some instances
> where there is no direct infringement, that
> is not sufficient to grant summary judgment
> of non-infringement; Duhn need only sow that
> there is some direct infringement ... [T]here
> is not disputing that Cameron infringed.  The
> amount of infringement is a factual question
> – here, a genuine factual dispute – for
> determining damages, not liability.

Duhn also argues that Cameron's evidence of non-infringement where the lockscrews are not run in is "highly suspect," referring to Duhn's objections to Mr. Tobin's declaration discussed *supra*.

Cameron's motion for partial summary judgment on this ground is DENIED; questions of fact remain to be resolved at trial.

V.   <u>NO CONTRIBUTORY INFRINGEMENT</u>.

Cameron moves for partial summary judgment on the ground that Cameron's "confirmed-as-noninfringing configuration is substantially used, and, as such, precludes a finding of contributory infringement as a matter of law."

35 U.S.C. § 271(c) provides:

> Whoever offers to sell or sells within the
> United States or imports into the United
> States a component of a patented machine,
> manufacture, combination or composition, or a
> material or apparatus for use in practicing a

29

> patented process, constituting a material
> part of the invention, knowing the same to be
> especially made or especially adapted for use
> in an infringement of such patent, and not a
> staple article or commodity of commerce
> suitable for substantial noninfringing use,
> shall be liable as a contributory infringer.

Cameron cites *Cross Medical Products, Inc. v. Medtronic Sofamor Danek,* 424 F.3d 1293, 1312 (Fed.Cir.2005):

> In order to succeed on a claim of
> contributory infringement, in addition to
> proving an act of direct infringement,
> plaintiff must show that defendant 'knew that
> the combination for which its components were
> especially made was both patented and
> infringing' and that defendant's components
> have 'no substantial non-infringing use.'

Cameron asserts that Duhn cannot satisfy this test.

Cameron asserts that Duhn must make a *prima facie* showing that there are no substantial non-infringing uses for the allegedly infringing product and must overcome any rebuttal evidence presented by Cameron. *See Golden Blount, Inc. v. Robert H. Peterson Co.,* 438 F.3d 1354, 1363 (Fed.Cir.2006). If Duhn fails to provide evidence that the accused device has no substantial non-infringing use, the allegation of contributory infringement cannot stand. *Lucent Technologies, Inc. v. Gateway, Inc.,* 2007 WL 925502 at *4 (S.D.Cal., March 19, 2007):

> Under 35 U.S.C. § 271(c), the determination
> of whether there are substantial
> noninfringing uses focuses on 'the thing
> sold' by the one accused of contributing to
> infringement. *Hodosh v. Block Drug Co.,
> Inc.,* 833 F.3d 1575, 1578 (Fed.Cir.1987); see
> also *Aquatex Industries, Inc. v. Techniche
> Solutions,* 419 F.3d 1374, 1380 n. **
> (Fed.Cir.2005)(noting that the proper
> question for contributory infringement was

> whether defendant's product as sold was a
> staple article, not whether the product
> contained components that themselves could
> have other noninfringing uses.

Cameron submits it can prove the "confirmed-as-noninfringing configuration of its mandrels is substantially used":

> Cameron's checklists conclusively show that
> its mandrels have been used hundreds of times
> in a confirmed noninfringing manner.  And
> while Duhn Oil may present instances of
> alleged infringement, isolated instances do
> not support Duhn's claim that there is no
> substantial noninfringing use.

Duhn responds that Cameron's analysis is faulty because it relies upon later developed installation procedures to excuse earlier infringing sales and contends that the focus should be on whether the products had a non-infringing use at the time of the sale.  Duhn cites *Bassick Mfg. Co. v. Adams Grease Gun Corporation*, 52 F.2d 36, 40 (2nd Cir.1931) and the Scheduling Order Following Pretrial Conference filed on September 29, 2010 (Doc. 467):

> 1.  The issue of contributory infringement in
> Cameron's Motion for Partial Judgment of No
> Infringement (Docket 446, filed September 12,
> 2010), shall be limited to the issue of
> contributory infringement after April 2009.

Duhn argues that there is no dispute that Cameron sold and placed into its rental pool the bulk of its frac mandrels prior to developing its modified installation procedures and there is no evidence that, prior to 2008, Cameron had developed a non-infringing method of using its product.  Therefore, Duhn contends, Cameron bears the burden of showing substantial non-

infringing uses for all sales of the product, including those
before the development of Cameron's non-infringing method.
Moreover, Duhn asserts, there is a genuine issue of material fact
whether Cameron's purported non-infringing use even is an
acceptable substitute for the patented system, referring to
evidence that installers continued to run in the lockscrews after
2008:

>           Thus, even if Cameron had instructed its
>           installers or customers not to run in the
>           screws, the continued running in of the
>           screws creates a genuine issue of fact as to
>           whether the purportedly non-infringing
>           configuration is acceptable to customers.

In reply, Cameron submits additional charts summarizing the
checklists since the filing of the motion and contends:

>           These charts summarizing Cameron's summary
>           judgment evidence, and the corresponding
>           compilations of these checklists, demonstrate
>           the irrefutable evidence through which
>           Cameron has established the substantial
>           noninfringing use for its accused frac
>           mandrel products.  For example, the Exhibit F
>           chart listing the 'Documented Lifecycles' of
>           Cameron's frac mandrels show that since the
>           April 16, 2009 implementation of the buffing
>           procedures through which Cameron confirmed
>           that its mandrels were 'clean' and without
>           dimples or indentations when sent into the
>           field, Cameron has documented 531 returns
>           with a corresponding installation after
>           buffing.  Of those 531 'Documented
>           Lifecycles,' 519 of the returns confirmed
>           that the frac mandrels had no
>           dimples/indentations when returned to
>           Cameron's facility.
>
>           Having established at least 519 instances in
>           which Cameron's accused frac mandrels were
>           installed and then returned with no
>           dimples/indentations on the frac mandrels
>           (which confirms that the mandrels were used

32

in a confirmed non-infringing configuration
with the tubing head lockscrews not in
contact with the frac mandrel), Cameron has
established the substantial noninfringing use
for its accused frac mandrel products.

Cameron acknowledges the Court's limitation regarding contributory infringement to contributory infringement after April 2009.  In its reply brief, Cameron requests the Court reconsider the limitation and recognize that the "substantial confirmed noninfringing use for which Cameron's accused products are suitable ... is a suitable use that is inherent in the design of the product and has existed since the first sale of the accused products":

Although Cameron's implementation of its
checklists procedures in 2009 provides the
evidentiary proof through which Cameron has
established that its accused products are
suitable for such use, this proven suitable
use did not come about by any change in the
product design, just a change in the use.
Cameron's accused frac mandrel products have
always been suitable for use with the tubing
head lockscrews not in contact with the frac
mandrel.  A finding of no contributory
infringement after April, 2009, based on the
indisputable fact that the accused products
are suitable for use with the lockscrews not
in contact with the frac mandrel, inherently
means that there can be no liability for
contributory infringement since the first
sale of the accused product.

Cameron's request for reconsideration is denied because it was requested for the first time in the reply brief.  Moreover, Cameron has three versions of the frac mandrel ("old style" with a narrow grove; "new style" with a wide grove; and "original "original design" with no groove).  The only one at issue where

33

the lockscrews were not run in is the Original Design, not the
New Style Design.  Cameron is not entitled to partial summary
judgment because questions of fact remain to be resolved at
trial.

VI.   <u>NO INDUCEMENT OF INFRINGEMENT AFTER APRIL 2, 2009</u>.

Cameron argues that, since April 2, 2009, Cameron, in
accordance with the Court's Order, has been specifically
instructing its customers not to run in the lockscrews and to
only use the confirmed-as-noninfringing configuration.  Even if a
third party were to run in the lockscrews, Cameron asserts,
Cameron did not have the specific intent to induce that
infringement and is entitled to partial summary judgment that it
did not induce others to infringe after April 2, 2009.

As explained in *Water Technologies Corp. v. Calco, Ltd.,* 850
F.2d 660, 668 (Fed.Cir.1988):

> The patent statute provides that '[w]hoever
> actively induces infringement of a patent
> shall be liable as an infringer.'  35 U.S.C.
> § 271(b).  Thus, a person infringes by
> actively and *knowingly* aiding and abetting
> another's direct infringement.  Although
> section 271(b) does not use the word
> 'knowingly,' the case law and legislative
> history uniformly assert such a requirement.

*See also Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363
(Fed.Cir.2003):

> To succeed on this theory, a plaintiff must
> prove that the defendants' 'actions induced
> infringing acts and that [they] knew or
> should have known [their] actions would
> induce actual infringement.' ... However,
> that defendants have 'knowledge of the acts
> alleged to constitute infringement' is not

34

> enough ... '[P]roof of actual intent to cause
> the acts which constitute the infringement is
> a necessary prerequisite to finding active
> inducement.' ... 'While proof of intent is
> necessary, direct evidence is not required;
> rather, circumstantial evidence may suffice.

Duhn responds that partial summary judgment on this ground is inappropriate: "While Cameron may have taken steps at some point to discourage infringement, there is a legitimate question of fact as to when these steps actually occurred." Duhn refers to evidence that the placards instructing customers not to run in the lockscrews were applied as the mandrels were returned and that, as of September 9, 2009, he could not say how many placards had been applied to the mandrels. In addition, Duhn contends, evidence of direct infringement after April 2, 2009 indicates that Cameron's efforts were incomplete, referring to evidence that some mandrels left Cameron's facility without dimples after April 2, 2009 and returned with dimples. Thus, Duhn argues, there is a genuine issue of material fact as to if or when there is a cut-off date for Cameron's inducement of infringement.

Cameron replies that Duhn has no evidence that Cameron encouraged anyone to use the frac mandrels in the allegedly infringing configuration after April 2, 2009:

> Any possible questions regarding the steps
> that Cameron has taken to encourage the use
> of the confirmed-as-noninfringing
> configuration is still no evidence of
> inducement of the alleged direct infringement
> of others, which would be encouragement of
> allegedly infringing configuration.

Cameron's motion for partial summary judgment is DENIED on

1  this ground; issues of fact and issues relating to damages remain

2  for trial.

3      VII.   <u>NO INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS</u>.

4      Cameron moves for partial summary judgment on the ground

5  that there is no infringement of the '925 Patent under the

6  doctrine of equivalents.   Cameron asserts that Duhn is estopped

7  from asserting the doctrine of equivalents for the asserted

8  claims; that Duhn may not vitiate the recited "lockscrews"; and

9  that the "lock collar" employed by Cameron is not legally

10  equivalent to the claimed "lockscrews."

11      Infringement under the doctrine of equivalents requires that

12  the accused product contain each limitation of the claim or its

13  equivalent.   *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351,

14  1359 (Fed.Cir.2000).   Infringement under the doctrine of

15  equivalents occurs when a claimed limitation and the accused

16  product perform substantially the same function in substantially

17  the same way to obtain substantially the same result.   *V-*

18  *Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1313

19  (Fed.Cir.2005).   An element in the accused product is equivalent

20  to a claim limitation if the differences between the two are

21  "insubstantial to one of ordinary skill in the art.   *KCJ Corp.,*

22  *id.*   Each element contained in a patent claim is deemed material

23  to defining the scope of the patented invention, and thus the

24  doctrine of equivalents must be applied to individual elements of

25  the claim, not to the invention as a whole.   *Warner-Jenkinson*

26  *Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29 (1997).

However, prosecution history estoppel prevents the application of the doctrine of equivalents as a tool to recapture subject matter surrendered during prosecution. *KCJ Corp., id.* Application of the rule precluding use of the doctrine of equivalents to recapture claim scope surrendered during patent acquisition is a question of law. *Id.*

In *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722 (2002), the Supreme Court held:

> Prosecution history estoppel requires that the claims of a patent be interpreted in light of the proceedings before the PTO during the application process. Estoppel is a 'rule of patent construction' that ensures that claims are interpreted by reference to those 'that have been cancelled or rejected.' ... The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes. When, however, the patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection, he may not argue that the surrendered territory comprised unforeseen subject matter that should be deemed equivalent to the literal claims of the issued patent. On the contrary, '[b]y the amendment [the patentee] recognized and emphasized the difference between the two phrases[,] ... and [t]he difference which [the patentee] thus disclaimed must be regarded as material.' ....

> A rejection indicates that the patent examiner does not believe the original claim could be patented. While the patentee has the right to appeal, his decision to forego an appeal and submit an amended claim is taken as a concession that the invention as patented does not reach as far as the original claim ... Were it otherwise, the inventor might avoid the PTO's gatekeeping

37

1    role and seek to recapture in an infringement
2    action the very subject matter surrendered as
     a condition of receiving the patent.

3    Prosecution history estoppel ensures that the
     doctrine of equivalents remains tied to its
4    underlying purpose.  Where the original
     application once embraced the purported
5    equivalent but the patentee narrowed his
     claims to obtain the patent or to protect its
6    validity, the patentee cannot assert that he
     lacked the words to describe the subject
7    matter in question.  The doctrine of
     equivalents is premised on language's
8    inability to capture the essence of
     innovation, but a prior application
9    describing the precise element at issue
     undercuts that premise.  In that instance the
10   prosecution history has established that the
     inventor turned his attention to the subject
11   matter in question, knew the words for both
     the broader and narrower claim, and
12   affirmatively chose the latter.

13   535 U.S. at 733-734.

14        A.   <u>Prosecution History Estoppel/Duhn May Not Vitiate</u>

15   <u>the Recited "Lockscrews"</u>.

16        Cameron argues that Duhn is estoped from asserting the

17   doctrine of equivalents for Claims 13, 14, 31 and 86 because of

18   the amendments Duhn made to obtain the '925 Patent.  Cameron

19   contends that the prosecution history regarding Claims 13, 14, 31

20   and 86 is "virtually identical" to that addressed in *Honeywell*

21   *Int'l, Inc. v. Hamilton, Sundstrand Corp.*, 370 F.3d 1131

22   (Fed.Cir.2004), *cert. denied*, 545 U.S. 1127 (2005).

23        In *Honeywell*, the Federal Circuit addressed "whether

24   rewriting a dependent claim into independent form, coupled with

25   the cancellation of the original independent claim, constitutes a

26   narrowing amendment when the dependent claim includes an

                                    38

additional claim limitation not found in the cancelled

independent claim or circumscribes a limitation found in the

cancelled independent claim."  370 F.3d at 1141.  The Federal

Circuit stated:

> In this case there is no question that the
> original independent claims (application
> claims 16 and 32 of the '893 and application
> claims 48 and 49 of the '194 patent) were
> rejected for reasons related to
> patentability.  All of the original
> independent claims were rejected as obvious
> in view of the prior art.  The original
> independent claim upon which application
> claim 35 depended was also rejected as
> indefinite under 35 U.S.C. § 112, paragraph
> two.  These rejected independent claims
> (application claims 17 and 35 of the '893
> patent and claim 51 of the '194 patent) were
> rewritten into independent form in order to
> secure their allowance.
>
> A presumption of surrender therefore arises
> if rewriting the dependent claims into
> independent form, along with canceling the
> original independent claims, constitutes a
> narrowing amendment.  Honeywell argues that
> prosecution history estoppel cannot occur
> where a dependent claim is merely rewritten
> into independent form.  Honeywell contends
> that, although it surrendered its broader
> independent claims, there is no presumption
> of surrender because the scope of the
> rewritten claims themselves have not been
> narrowed.  We disagree.

*Id.* at 1141.  Relying on *Festo Corp. v. Shoketsu Kinzoku Kogyo*

*Kabushiki Co.*, 535 U.S. 722 (2002), and Federal Circuit opinions

following *Festo*, the *Honeywell* Court held:

> In *Festo* the Supreme Court explained that
> '[a] patentee's decision to narrow his claims
> through amendment may be presumed to be a
> general disclaimer of the territory between
> the original claim and the amended claim.'
> 535 U.S. at 740 ... When the scope of the

patent claim is narrowed to secure the patent, the court 'must regard the patentee as having conceded an inability to claim the broader subject matter.' *Id.* at 737 ... The scope of the patentee's concession is determined on a limitation-by-limitation basis ... It necessarily follows that the presumption of surrender applies only to the amended or newly added limitation; there is no surrender of territory as to unamended limitations that were present in the original claim.  Thus, when a claim is rewritten from dependent into independent form and the original independent claim is cancelled, 'the correct focus is on whether [the] amendment surrendered subject matter.' ... Under such circumstances, the surrendered subject matter is defined by the cancellation of independent claims that do not include a particular limitation and the rewriting into independent form of dependent claims that do include that limitation.  Equivalents are presumptively not available with respect to that added limitation.

In this case there is a presumptive surrender of all equivalents to the inlet guide vane limitation.  The only independent claims asserted in this case, claims 4, 8 and 19, were originally dependent on independent application claims 16, 32, 48 and 49, which did not include the inlet guide vane limitation.  Claims, 4, 8 and 19 included the inlet guide vane limitation.  Claims 4, 8 and 19 were rewritten into independent form, and the original independent claims were cancelled, effectively adding the inlet guide vane limitation to the claimed invention.  Honeywell is presumptively estopped from recapturing equivalents to the inlet guide vane limitation.

370 F.3d at 1143-1144.

Cameron argues that Duhn amended its claims "in almost exactly the same manner" as the patentee in *Honeywell*.  During the prosecution of the '925 Patent, then-pending Claim 90 was a dependent claim based on then-pending independent Claim 72.  In

40

order to overcome rejections from the USPTO, Duhn amended then-pending Claim 72 to include "a plurality of lock-screws," and re-wrote then-pending Claim 90, which already included the "lock-screws" limitation, into independent form.  Cameron argues that, by amending then-pending Claim 72 to include the "lock-screws," Duhn conceded that then-pending Claim 72 was not patentable as originally presented and that, accordingly, this amendment carries the same effect as cancellation for purposes of the doctrine of equivalents.  By amending these claims, Cameron contends, which issued as Claims 77 and 86, respectively, Duhn narrowed the scope of its claims by adding the "lock-screws" limitation to obtain the '925 Patent.  Cameron further argues that Duhn's amendments to then-pending Claims 72 and 90 precludes application of the doctrine of equivalents with respect to the "lock screws" recited in issued Claims 13, 14 and 31.  By making the claim amendments, Duhn surrendered claim scope between the original claim and the specific structure of the "lock screws."  Cameron contends:

> The doctrine of equivalents requires analysis of technology a patentee is entitled to recapture and what technology he surrendered to obtain his patent.  Thus, it would be illogical and overly formulaic to say that Duhn Oil disclaimed a technology on some claims but is allowed to recapture that same technology via other claims using nearly identical language.  Indeed, similar claims terms in a patent should be interpreted as having similar scope.

Duhn responds that *Honeywell* has no application because *Honeywell* requires the cancellation of the independent claim,

which was not done here.

At a hearing on May 5, 2008, Cameron conceded that Duhn did not cancel an independent claim as was done in *Honeywell* but argues:

> And what they did in this case is they didn't cancel the independent claim; they added a bunch of other stuff to it and turned it into another claim. They morphed it into a whole different claim. It certainly didn't get issued as the independent claim it was started as. So technically they didn't cancel it, but effectively they did. And so that's really their defense to this. They say *Honeywell* doesn't apply.
>
> ... [I]t's a pure legal question for this Court to resolve, and, you know, from a perspective of patent jurisprudence, to me it's a[n] easy decision to say the *Honeywell* decision is not just limited to actually cancelling claims when you effectively cancel them by changing them and moving them off over somewhere else. It's the same as cancelling them.

(CT, Doc. 199, p. 81:18-82:7).

At the hearing, Duhn responded that *Honeywell* is not applicable, even given Cameron's effective cancellation argument:

> *Honeywell* is a situation where you have an independent claim and the examiner at the Patent Office says that a dependent claim, if it were added to the independent claim, would make that claim patentable. And then what happens is you essentially - and you can do this a number of ways. You can either keep that independent claim and add the dependent claim language - and it was very clear that that would create an estoppel, but as opposing counsel pointed out, sometimes what people were doing was essentially re-writing a brand new claim that included both.
>
> Neither of those happened here. In fact, what happened here was the 'wherein' clause

42

was added to the independent claim, and that is what was argued as making these claims patentable.

The fact that there are some dependent claims that later became independent claims that have the 'wherein' clause in them and also have this added language about the second lock screws does not mean that the lock screw language was required to obtain allowance of that claim.

So *Honeywell* is basically founded on the principal that if you have to add something to a claim to get it allowed, you can't later argue that that ought to be ignored. But there's no - we did not add the second lock screws to get those claims allowed, and therefore we would argue that we are entitled to a range of equivalence as to that element because it's not the element that allowed us to get the claims allowed.

(CT, Doc. 199, p. 108:25-109:25).

For the reasons stated by the Court at the hearing on November 15, 2010, Duhn's contention that *Honeywell* is inapplicable is rejected and Duhn is estopped by the prosecution history from arguing that Cameron's frac mandrel is the equivalent of Duhn's frac mandrel as to Claims 13, 14, 31 and 86 of the '925 Patent.[3]

With regard to Claims 13, 14 and 31, at the hearing Cameron cited *Glaxo Wellcome, Inc. v. Impax Laboratories, Inc.*, 356 F.3d 1348 (Fed.Cir.2004). Cameron described *Glaxo*:

[I]t resolves the issue - it's called

_____

[3]This ruling makes unnecessary consideration of Cameron's contention that partial summary judgment should be granted on the ground that the "lock collar" or "lock ring" of the TSWS is not legally equivalent to the "lock screws" of Claims 13, 14, 31 and 86 of the '925 Patent.

43

> 'infectious estoppel.'  So it says even if
> these other claims didn't go through this
> *Honeywell* process and get amended and get ...
> barred from Doctrine of Equivalence coverage,
> that claim limitation of the second set of
> lock screws that is barred from equivalence
> coverage in - based on *Honeywell*, it infects
> all the other claims that have that same
> language.  So *Glaxow* [sic] from the federal
> circuit tells us you've got infectious
> *Honeywell* estoppel that spreads cover to 13,
> 41 [sic] and 31.

(CT, Doc. 199, p. 80:24-81:8].

In *Glaxo*, Glaxo applied for a patent and obtained the '798

patent for a sustained release formulation of bupropion

hydrochloride.  The key ingredient for achieving sustained

release is HPMC.  Many of the patent claims as originally filed

did not recite HPMC as a limitation.  During the prosecution of

the patent, the examiner rejected the claims that did not recite

HPMC for lack of enablement under 35 U.S.C. § 112.  Glaxo amended

those claims to overcome the rejection.  Impax filed two

Abbreviated New Drug Applications with the FDA in which Impax

certified that its generic sustained release bupropion

hydrochloride did not infringe Glaxo's '798 patent because the

sustained release agent in Impax's proposed composition was HPC.

Glaxo sued Impax for patent infringement.  Impax was granted

summary judgment on the basis of prosecution history estoppel.

The District Court ruled that Glaxo's amendments narrowed the

patent with respect to sustained release and that at the time of

Glaxo's amendments, anyone skilled in the art would have known

that HPMC and HPC were substantially equivalent.  On appeal, the

44

Federal Circuit ruled that, by the amendments, Glaxo surrendered other controlled sustained release agents known to act as equivalents of HPMC.  354 F.3d at 1352.  In the section of the opinion captioned "Infectious Estoppel," the Federal Circuit ruled:

> Claim 1 of the '798 patent originally recited HPMC as the sustained release agent for bupropion.  Thus, the applicant did not amend the HPMC limitation of claim 1.  Because the applicant did not narrow this claim, Glaxo contends that the *Festo* presumption does not operate to divest claim 1 of the equivalents armor.  Thus, Glaxo asserts that the district court erred in removing the doctrine of equivalents from the equation used to evaluate infringement of this claim.  According to Glaxo, claim 1 is plagued by 'infectious estoppel,' an ailment Glaxo alleges the district court impermissibly imparted on the claim.  Glaxo misdiagnoses the legal situation.
>
> Under the law of this circuit, the *Festo* bar to the doctrine of equivalents applies to all of the '798 claims containing the 'critical' HPMC limitation.  This court has noted that subject matter surrendered via claim amendments during prosecution is also relinquished for other claims containing the same limitation ... This court follows this rule to ensure consistent interpretation of the same claim terms in the same patent ....

*Id.* at 1356.

The net effect in *Glaxo* was that Glaxo was limited to HPMC and could not claim the doctrine of equivalents to other sustained release agents.

Cameron's motion for partial summary judgment is GRANTED as to 13, 14 and 31 of the '925 Patent on the ground of infectious estoppel.

45

1

## CONCLUSION

2      For the reasons stated:

3      1.   Cameron's motion for partial summary judgment of no

4  infringement is GRANTED IN PART AND DENIED IN PART;

5      2.   Counsel for Cameron shall prepare and lodge a form of

6  order consistent with this Memorandum Decision within five (5)

7  court days following service of this Memorandum Decision.

8  IT IS SO ORDERED.

9  Dated:   December 2, 2010              /s/ Oliver W. Wanger
                                   UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26