1

2

3

4

5

6

7

8

9

10

11

12

13

14

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

---

| | |
|---|---|
| **DUHN OIL TOOL, Inc.,**<br><br>                    **Plaintiff,**<br><br>     **v.**<br><br>**COOPER CAMERON CORPORATION,**<br><br>                    **Defendants.** | **1:05-cv-01411-OWW-GSA**<br><br>**MEMORANDUM DECISION REGARDING MOTIONS FOR ENTRY OF JUDGMENT, MOTION FOR JUDGMENT AS A MATTER OF LAW** |

## I. **INTRODUCTION**.

Plaintiff Duhn Oil Tool, Inc. proceeds with a patent infringement action against Defendant Cooper Cameron Corporation. On February 2, 2011, a jury found Defendant liable for infringement and contributory infringement. (Doc. 668). The jury also found several of the patent's claims invalid and returned an advisory verdict on Defendant's counterclaim for inequitable conduct.

On February 9, 2011, the parties filed motions for entry of judgment. (Docs. 675, 676). The court heard the parties' motions on February 11, 2011 and requested briefing on a dispute between the parties regarding the scope of the jury trial. The parties submitted briefing on the jury issue on February 28, 2011. (Docs. 681, 682). The parties submitted proposed findings of fact on March 7, 2011. (Docs. 685, 686). The parties proposed findings

are based on their respective positions regarding the scope of they jury's verdict.[1]

## II. **FACTUAL BACKGROUND**.

Duhn Oil Tool, Inc. ("Duhn Oil" or "Plaintiff") and Cooper Cameron Corporation ("Cameron" or Defendant") are manufacturers of wellhead systems and components for the oil and gas industry. Cameron is a former purchaser of Duhn Oil wellhead components, including Duhn Oil's W2 tubing heads and W92 casing heads. Cameron purchased Duhn Oil components for resale to end users.

In 1996, Duhn Oil obtained a patent for a device it named the "Quicklock Drilling Flange" ("QDF"), a drilling flange capable of being quickly attached to a wellhead assembly. Duhn Oil's QDF is designed to be secured to the casing head of a wellhead assembly by lock screws that engage a groove cut in the body of the drilling flange. Use of lock screws to secure wellhead components in the manner disclosed in Duhn Oil's QDF patent is a standard method for securing wellhead components in the oil and gas industry.

In or about Feburary 2001, Cameron employee John Rogers called Rex Duhn, Duhn Oil's president, and requested development of a wellhead isolation tool for Barrett Resources, an end user of Duhn Oil's products. Rogers conveyed that Barrett Resources desired a "frac mandrel" that would permit Barrett Resources to continue using Duhn Oil's existing wellhead components, including the W2 tubing heads, W92 casing heads, and lock screws. A frac mandrel is a wellhead isolation tool designed to protect a well's hydrocarbon

---

[1] Defendant submitted a second set of proposed findings on June 8, 2011. (Doc. 701).

production components from pressures entailed by fracturing operations, which exceed the pressure rating of conventional production components. Fracturing operations stimulate an existing well's production by introducing abrasive material into the well's producing regions at high pressure in order to create pathways for hydrocarbon extraction. The frac mandrel Rex Duhn set out to create after speaking to John Rogers ultimately culminated in United States Patent No. 6,920,925 ("'925 Patent").

After his conversation with John Rogers, Rex Duhn began working on an extension of Duhn Oil's QDF system that would provide Barrett Resources with a frac mandrel compatible with Duhn Oil's W2 and W92 products. However, the single set of lock screws employed in Duhn Oil's original QDF device proved to be insufficient for retaining the frac mandrel in a tubing head under high pressure. Rex Duhn sought assistance from Robert Meek, Duhn Oil's chief engineer. Ultimately, a secondary flange with a second set of lock screws was conceived that rendered the frac mandrel functional under the extreme pressures generated by the fracturing process.

Rex Duhn sent preliminary design drawings to John Rogers in order to obtain feedback from Rogers and Barrett Resources. Rogers provided suggestions that Duhn Oil endeavored to incorporate into the design. Final design drawings for a "QDF frac mandrel" were completed in May, 2001 and Duhn Oil began marketing the QDF frac mandrel to end users. Rogers left Cameron and joined Duhn Oil in May, 2001 to begin marketing Duhn Oil's QDF frac mandrel. Rogers was terminated from Duhn Oil in 2005 for cause.

///

///

**3**

**The '925 Patent**

Duhn Oil filed a provisional patent application for its QDF frac mandrel on February 19, 2002 listing Robert Meek and Rex Duhn as inventors.  On February 19, 2003, Duhn Oil filed application number 10/363,070 ("070 Application"), which claimed priority to the provisional patent application filed in 2002.  On May 16, 2003, Duhn Oil submitted a Petition to Make Special requesting expedited review of the '070 Application.  The Petition to Make Special stated that Cameron was infringing at least some of the claims disclosed in Duhn Oil's patent application.

The Examiner initially rejected Duhn Oil's patent application as anticipated by prior art.  In response, Duhn Oil added a clause to claim 1 referred to by the parties as "the wherein clause."  The wherein clause is critical to the parties respective claims.  Duhn Oil's application matured into United States Patent No. 6,920,925 ("the '925 Patent"), entitled "Wellhead Isolation Tool," on July 26, 2005.  The '925 Patent is comprised of 88 claims.

The '925 Patent teaches a casing head coupled to a wellbore and a tubing head mounted over the casing head.  The tubing head has a first radial flange extending from it at an upper end.  A generally elongate annular member (the frac mandrel) is suspended concentrically within the tubing head and aligned with a production casing suspended below in the wellbore.  The frac mandrel has a second radial flange extending from it.  In some embodiments, the first flange extending from the tubing head and the second flange extending from the frac mandrel are fastened together.

All claims at issue in this action depend from claim 1 of the '925 Patent.  Claim 1 specifies a wellhead assembly having various

**4**

components as follows:

    1. A wellhead assembly comprising:
       . a casing;
       . a first tubular member mounted over the casing;
       . a first tubular member flange extending from the first tubular member;
       . a generally elongate annular member ("frac mandrel") suspended in the first tubular member, said annular member having a first end portion extending above the first tubular member and a second end portion below the first end portion;
       . a secondary flange extending from the frac mandrel;

       . a plurality of fasteners fastening the secondary flange to the first tubular member flange; and

       . a production tubular member aligned with the frac mandrel, wherein an axial force acts on the generally frac mandrel and is reacted in both the first tubular member flange and the secondary flange.

Claim 1 identifies the components either by their location and/or their functionality. For example, the production tubular member is aligned with the annular member in such a way that an axial force acts on the annular member and such force is reacted in the first tubular member flange and the secondary flange to which it is attached.

    The court has interpreted the critical "wherein" clause of claim 1 as follows:

    [The "wherein" clause] requires that the wellhead assembly be in an environment where there is an axial force present and acting on the frac mandrel. Given that an axial force is present and acting on the frac mandrel, the wherein clause imports the functional limitation that said axial force be reacted in both the first tubular member flange and the secondary flange. The clause does not require that an axial force be applied by a user nor does it specify a method as to how the force is provided.

    This "wherein" clause also requires a "dual load path" - which means that there must be an independent force path (engagement) between the claimed "elongate annular member" (e.g., a "frac mandrel") and each of the two claimed flanges, which are the "first tubular member

**5**

flange" (e.g., the upper flange of a "tubing head") and the "secondary flange." These two separate independent force paths (engagements) must each have contact with the frac mandrel, which provides for a transmission of the axial force from the elongate annular member to the first tubular member flange, and a separate transmission of the axial force from the elongate annular member to the secondary flange.

(Doc. 660 at 75).

**The Parties' Claims**

Duhn Oil asserts that Cameron's Time Saver Wellhead ("TSW") frac mandrel infringes claims 2, 3, 5, 19, and 29 of the '925 Patent. Each of these claims depend from claim 1 and includes the "wherein" clause. Duhn Oil seeks damages and injunctive relief.

Cameron seeks a declaration that the '925 Patent is invalid for obviousness and anticipation. Cameron's obviousness claim is based on two prior art references: (1) U.S. Patent No. 6,289,993 ("'993 Patent"); and (2) a 1994 Catalogue ("'94 Catalogue") describing an "MTBS Tubing Hanger" offered for sale by Cameron. The '993 Patent is one of the U.S. Patents listed in the References Cited section of the '925 Patent. The '94 Catalogue was not before the Examiner.

Cameron also asserts that the '925 Patent is unenforceable due to Duhn Oil's inequitable conduct. Specifically, Cameron contends that Duhn Oil committed inequitable conduct by failing to name John Rogers as an inventor and by failing to disclose the '94 Catalogue to the Patent Office. Cameron also asserts that Rex Duhn is improperly listed as an inventor on the '925 Patent.

**Jury Demand Confusion**

The only jury demand properly submitted by either party is Plaintiff's demand for a jury trial on the limited issue of willful

infringement. (*See* Doc. 424).  The Third Amended Complaint ("TAC")

provides: "Plaintiff hereby demands a trial by jury on the issue of

whether Defendant's infringement is willful."  (Doc. 424 at 9).

Defendant never demanded a jury trial on any issue.

Prior to 2010, both parties expressed their understanding that

the court would be the trier of fact.  For example, on January 6,

2009, the court conducted a hearing during which the following

exchange took place between the court and counsel:

> THE COURT: ...[Whether] this specific instance...is...an
> example of non-infringement or infringement, that's going
> to be for the jury to determine. That's going to be a
> question of fact. And whether the pressures make a
> difference or not, it's going to be a question of fact.
> It is that. And so –
>
> MR. DALY: One point, Your Honor, there is no jury
> demand in this case, so --
>
> THE COURT: There is no jury demand by either side?
>
> MR. DALY: No.
>
> MR. ROGERS: None by us either. You'll be the trier
> of fact, Your Honor.
>
> MR. DALY: You'll be the trier of fact
>
> THE COURT: Now you have really ruined my day because
> in all the patent cases that we have tried in this Court,
> when they've gone to the federal circuit, quite frankly,
> and they -- we've had some adverse rulings, but every one
> of them has been affirmed. I believe there's four. And
> the bottom line was it was the jury who made the findings
> of fact. So that I didn't know.
>
> MR. ROGERS: I appreciate that. I think I can close
> this issue out.
>
> THE COURT: Maybe the Court is going to appoint an
> advisory jury to give me some help.
>
> MR. ROGERS: I appreciate that, Your Honor.

(Doc. 287 at 46-47).

///

**7**

Confusion regarding the scope of the jury trial arose in 2010 during formulation of the joint pretrial statement required by Local Rule 281(a)(2).  E.D. Cal. R. 281.  On August 25, 2010, Plaintiff's counsel emailed a draft joint pretrial statement to Defendant's counsel.  Plaintiff's draft stated "Duhn has demanded a jury trial."  (Doc. 682, Rogers Decl. Ex. A).  Defendant's counsel responded to Plaintiff's counsel by emailing a modified draft joint pretrial statement on August 31, 2010.  Defendant's draft joint pretrial statement changed the language regarding Plaintiff's jury demand to read "Duhn **Oil** has demanded a jury trial **for its allegation of willful infringement.**"  (Id., Ex. B) (emphasis added to reflect Defendant's modification).  On September 1, 2010, Plaintiff's counsel emailed a second draft joint pretrial statement to Defendant's counsel which eliminated Defendant's changes so that the jury statement read "Duhn as demanded a jury trial."  (Id., Ex. C).  On September 2, 2010, Defendant's counsel emailed to Plaintiff's counsel a draft joint pretrial statement which combined the parties' respective statements regarding the jury demand:

> Duhn contends that it has demanded a jury trial. Cameron contends that Duhn Oil has only demanded a jury for its willful infringement allegations and cites to Duhn Oil's Third Amended Complaint (Doc. No. 424).

(Id. Ex. D).  The jury demand language contained in Defendant's September 2, 2010 draft became the operative language submitted in the parties' joint pretrial statement.  (Doc. 444).  The joint pretrial statement was signed by counsel for both parties.

During the pretrial conference on September 13, 2010, the court noted the divergent contentions regarding the jury demand

**8**

reflected in the joint statement and asked the parties to express their respective positions. The following exchange took place:

> THE COURT: My sense is that on the infringement issues, you're entitled to jury. And on other issues, we're going to have a jury, we could have an advisory jury where there are factual findings. I find that that often is very helpful. And so what's the parties' view?

> MR. ROGERS: The only jury demand in this case is the plaintiff has a demand for a jury on their singular issue of alleged willful infringement. As far as all the other issues, I believe we talked in the past about you wanting an advisory jury on the other issues.

> MR. WHITELAW: Your Honor, we do not object. In fact, [sic] suggest that a jury sit on the factual issues for infringement because before you get to willfulness, you've got to find infringement. And I'd leave it to the discretion of the Court in terms of which --

> THE COURT: The damages is normally a jury triable issue as well.

> MR. ROGERS: We understood, from our past hearings, that we would have advisory jury on -- that there would be a jury on all issues, that it would be as of -- as of the demand for the willful infringement issue and then advisory for all other issues.

> THE COURT: Defendant has not demanded a jury. There will be a jury on willful infringement issues and other issues, to which the entitlement exists as a legal right. In all other respects, the jury shall be advisory.

(Doc. 465 at 14-15). No party expressed any objection to the scope of the jury trial announced by the court at the pretrial conference.

The court entered a Final Pretrial Order ("FPO") on September 29, 2010. (Doc. 468). The FPO provides:

> II. Jury/Non-Jury Trial

> 1. Duhn contends that it has demanded a jury trial. Cameron contends that Duhn Oil has only demanded a jury for its willful infringement allegations and cites to Duhn Oil's Third Amended Complaint (Doc. No. 424).

> 2. Defendant has not demanded [sic] jury. There will be

**9**

a jury trial on willful infringement issues and other
issues to which the entitlement exists as a legal right.
In all other respects, the jury shall be advisory.

(Doc. 468 at 1-2).   The FPO further provides:

The Final Pretrial Order shall be reviewed by the parties
and any corrections, additions, and deletions shall be
drawn to the attention of the court immediately.
Otherwise, the Final Pretrial Order may only be amended
or modified to prevent manifest injustice pursuant to the
provisions of Fed. R. Civ. P. 16(e).

(Id. at 37).   Neither party sought clarification, amendment, or
modification of the FPO.

At the close of evidence, both parties moved for judgment as
a matter of law on various issues pursuant to Federal Rule of Civil
Procedure 50.   *Inter alia*, Plaintiff moved for judgment as a matter
of law on the issues of obviousness, anticipation, and
inventorship.   (Doc. 696 at 15-22).   Defendant moved for judgment
as a matter of law on infringement, inventorship, and damages,
among other issues.   (Id. at 28-40).   The court denied certain of
the parties motions on the record and took others under submission.

**The Jury's Verdict**

A fourteen day jury trial commenced on January 12, 2011.   On
February 2, 2011, the jury returned verdicts finding Defendant
liable for infringing claims 2, 3, 5, 19, and 29 of the '925 Patent
and for contributory infringement regarding claims 2, 3, 5, and 29,
but not claim 19.   (Doc. 668).   The jury found that Plaintiff is
entitled to $5,909,974 in lost profit damages and $2,750,000 in
lost royalties.   The jury rejected Plaintiff's claims of inducing
infringement and willful infringement and also rejected Defendant's
inequitable conduct defenses.

///

**10**

1    During deliberations, the jury sought clarification of the

2 court's instructions on independent and dependent claims. The jury

3 asked the following question:

4       Can we have additional clarification on independent and
        dependent claims? There are different interpretations
5       regarding claims. If an answer is yes/no on one claim,
        are all subsequent claims the same answer?
6

7 (Doc. 698 at 12). The court responded, in pertinent part:

8       There are two types of patent claims. Independent claims
        and dependent claims. An independent claim sets forth all
9       of the requirements that must be met in order to be
        covered by that claim. Thus it is not necessary to look
10      at any other claim to determine what an independent claim
        covers.
11
        For example, claim 1 of the '925 patent is an independent
12      claim. And so it stands alone. You don't have to look to
        any other part of the patent to determine what its
13      requirements are. Claims 2, 3, 4, 5, 19 and 29 in the
        '925 patent are dependent claims, which depend directly
14      or indirectly on claim 1. A dependent claim does not
        itself recite all the requirements of the claims, but
15      refers to another claim for some of its requirements. In
        this way, the claim depends on another claim. A dependent
16      claim incorporates all of the requirements of the claims
        to which it refers. And I think the parties will agree
17      that all these dependent claims refer to claim 1...To
        determine what a dependent claim covers, it is necessary
18      to look at both the dependent claim and any other claims
        to which it refers.
19
20 (Id. at 17-18). Juror number three then asked a follow up

21 question:

22      JUROR NUMBER THREE: do those instructions that you just
        gave regarding number 1, question number 1, also apply,
23      and specifically the way that you designated how we are
        to approach 1 and 2...Do those also apply to questions 2,
24      3, 4, et cetera?

25      THE COURT: Yes. You are -- specifically you are to
        approach, in the verdict form, the finding on
26      anticipation and the finding on obviousness, you approach
        that in the same manner. You go through and you analyze
27      each one of those questions in relation to the test you
        have for anticipation or obviousness.
28

**11**

(Id. at 22).

Ultimately, the jury found that Defendant proved by clear and convincing evidence that claims 2, 3, 4, 5, 19, and 29 are invalid for obviousness, and that claims 2, 3, 4, 5, and 29 are invalid for anticipation.  However, the jury found that claim 1 was not proven to be anticipated or obvious.  Claim 1 is the independent claim from which claims 2, 3, 4, 5, 19, and 29 depend.  After receiving the jury's verdicts on anticipation and obviousness, the court called a side bar in order to give the parties an opportunity to respond to the inconsistency in the jury's verdict.  Neither party requested that the jury be sent back for further deliberations to resolve the inconsistency.  Instead, at the parties' request, the court received the remainder of the jury's verdict.  The court then discharged the jury and thanked them for their service.

### III. **DISCUSSION**.

**A. Scope of the Jury Trial**

The parties dispute the scope of the jury trial.  Plaintiff avers the jury's verdicts are advisory on all issues other than willful infringement.  Defendant contends that all issues were submitted to the jury for binding determination with the exception of Defendant's equitable defenses.

### 1. The Seventh Amendment in Patent Infringement Actions

The Seventh Amendment right to jury trial applies in patent infringement actions for damages.  *E.g., Tegal Corp. v. Tokyo Electron Am., Inc.*, 257 F.3d 1331, 1339 (Fed. Cir. 2011) (discussing *Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1212 (Fed. Cir. 1987) and *Markman v. Westview Instruments*, Inc.,

517 U.S. 370 (1996)).[2]

> For purposes of the right to a jury trial in patent cases, it is inconsequential whether the parties are aligned in the conventional manner (patentee as plaintiff and accused infringer as defendant and invalidity counterclaimant) or in the manner that results when the accused infringer initiates the action as a declaratory judgment (accused infringer as plaintiff and patentee as defendant and infringement counterclaimant).

*In re Tech. Licensing Corp.*, 423 F.3d 1286, 1288 (Fed. Cir. 2005) (citing *In re Lockwood*, 50 F.3d 966, 974-75 (Fed. Cir. 1995) *vacated at* 515 U.S. 1182 (1995)).   The accused infringer or declaratory judgment counterclaimant is entitled to a jury trial if the infringement claim, as asserted by the patentee, would give rise to a jury trial.   *E.g., Tech. Licensing Corp.*, 423 F.3d at 1290.

Infringement and validity are legal issues that entail the right to a jury trial.   *See, e.g., Gardco*, 820 F.2d at 1212; *Lockwood,* 50 F.3d at 980; *Tech. Licensing Corp.*, 423 F.3d at 1290-91.   The Seventh Amendment jury trial right does not attach to claims based in equity, such as the defense of inequitable conduct. *E.g., Gardco,* 820 F.2d at 1213 ("the defense of inequitable conduct is 'equitable in nature and thus does not give rise to the right of trial by jury'").   If factual issues common to both legal and equitable claims are involved in a single case, the legal claims must be determined by the jury prior to any final court determination of the equitable claims.   *Shum v. Intel Corp.*, 499 F.3d 1272, 1277 (Fed. Cir. 2008) (citing *Dairy Queen, Inc. v. Wood*,

---

[2] Federal Circuit law controls the scope of the jury trial right in patent cases. *E.g., Gardco*, 820 F.2d at 1212 (noting that question "clearly implicates the jurisprudential responsibilities in [patent law,] a field within [the Federal Circuit's] exclusive jurisdiction").

369 U.S. 469, 479 (1962) and *Beacon Theatres v. Westover*, 359 U.S. 500, 508 (1959)).  Where "substantial commonality" exists between the factual questions presented by legal and equitable claims, jury findings pertaining to the legal claims constrain the court's determination of equitable claims.  *E.g., Cabinet Vision v. Cabnetware*, 129 F.3d 595, 600 (Fed. Cir. 1997) ("the facts underlying Cabnetware's inequitable conduct defense and its Walker Process counterclaim possess 'substantial commonality' so that, because the jury answered question 7, the Seventh Amendment constrains the court's equitable determination") (citing *Gardco*, 820 F.2d at 1212); *Shum*, 499 F.3d at 1277; *Beacon Theatres,* 359 U.S. at 508.

### 2. The Federal Rules of Civil Procedure

The Federal Rules of Civil Procedure preserve all jury trial rights under the Seventh Amendment and federal statutes.  *E.g., Craig v. Atlantic Richfield Co.*, 19 F.3d 472, 475 (9th Cir. 1994) (citing Fed. R. Civ. P. 38(a)).   Rule 38(b)[3] proscribes the procedural requirements for demanding a jury trial:

> On any issue triable of right by a jury, a party may demand a jury trial by:
>
> (1) serving the other parties with a written demand--which may be included in a pleading--no later than 14 days after the last pleading directed to the issue is served; and
>
> (2) filing the demand in accordance with Rule 5(d).

Fed. R. Civ. P. 38(b).  A demand pursuant to Rule 38(b) is considered a demanded for a jury trial on all issues triable as of

---

[3] Unless otherwise noted, all citations to Rules in this opinion are citations to the Federal Rules of Civil Procedure.

**14**

1 right unless the demand indicates that the demanding party only

2 seeks a jury trial on specified issues.  Rule 38(c) provides:

> In its demand, a party may specify the issues that it
> wishes to have tried by a jury; otherwise, it is
> considered to have demanded a jury trial on all the
> issues so triable. If the party has demanded a jury trial
> on only some issues, any other party may--within 14 days
> after being served with the demand or within a shorter
> time ordered by the court--serve a demand for a jury
> trial on any other or all factual issues triable by jury.

8 Fed. R. Civ. P. 38(c).  Rule 38(c) presents a party seeking a jury

9 trial with a choice: "either list specific issues for the jury to

10 consider, or make a general demand, which will be deemed to cover

11 all issues triable to a jury." *Lutz v. Glendale Union High Sch.,*

12 *Dist. No. 205*, 403 F.3d 1061, 1065 (9th Cir. 2005).[4]  "A jury demand

13 will be deemed to cover all issues only if it doesn't specify

14 particular issues." *Id.* (emphasis added).

15   "A party waives a jury trial unless its demand is properly

16 served and filed," Fed. R. Civ. P. 38(d), but courts must "indulge

17 every reasonable presumption against waiver" and "accept jury

18 demands that fall far short of the ideal," *Lutz*, 403 F.3d at 1064.

19 Although there is a strong presumption against waiver of the right

20 to a jury trial, in order to satisfy Rule 38's requirements and

21 preserve the right to a jury trial, a jury demand be sufficiently

22 clear to alert a careful reader that a jury trial is requested on

23 an issue.  *See, e.g., id.*, *see also Solis v. Los Angeles*, 514 F.3d

24 946, 954 (9th Cir. 2008) (citing *Lutz* for the proposition that

25 "because Solis's jury demand was 'sufficiently clear to alert' both

26

---

27 [4] Regional circuit law controls application of procedural rules related to jury
demands in patent cases. *E.g., Richardson v. Stanley Works, Inc.*, 597 F.3d 1288,
28 1296 (Fed. Cir. 2010).

1  the Defendants and the district court 'that a jury trial [wa]s
2  requested,'" plaintiff was entitled to jury trial).  Once a party
3  has filed a proper jury demand pursuant to Rule 38, the trial on all
4  issues encompassed in the party's Rule 38 demand must be by jury
5  unless the parties stipulate to a nonjury trial or the court finds
6  that there is no federal right to a jury trial on some or all of
7  those issues.  Fed. R. Civ. P. 39(a).  Issues on which a jury trial
8  is not property demanded must be tried by the court.  Fed. R. Civ.
9  P. 39(b).

10      Rule 39 provides two alternatives that permit cases to be tried
11  to a jury notwithstanding the absence of a proper jury demand under
12  Rule 38. First, Rule 39(b) authorizes district courts, on motion,
13  to order a jury trial on any issue for which a jury trial might have
14  been demanded.  *Id.*  A district court's discretion under Rule 39(b)
15  is narrow and does not permit a court to grant relief when the
16  failure to make a timely demand results from an oversight or
17  inadvertence, *E.g., Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080,
18  1086-87 (9th Cir. 2002) (citations omitted).

19      Second, Rule 39(c) permits courts to try matters to the jury
20  with the parties' consent.  Rule 39(c) provides:

21      Jury Trial by Consent. In an action not triable of right
        by a jury, the court, on motion or on its own:
22          (1) may try any issue with an advisory jury; or
            (2) may, with the parties' consent, try any issue by
23      a jury whose verdict has the same effect as if a jury
        trial had been a matter of right, unless the action is
24      against the United States and a federal statute provides
        for a nonjury trial.
25

26  Fed. R. Civ. P. 39(c).  Several circuit courts of appeal have held
27  that Rule 39(c) does not require express consent, and that failing
28  to object to conduct of a jury trial constitutes implied consent

**16**

1  sufficient to satisfy Rule 39(c). *E.g.*, *Bereda v. Pickering Creek*
2  *Indus. Park*, 865 F.2d 49, 52 (3rd Cir. 1988)("If one party demands
3  a jury, the other parties do not object, and the court orders trial
4  to a jury, this will be regarded as trial by consent" under Rule
5  39(c))(citing C. Wright & A. Miller, 9 Federal Practice and
6  Procedure § 2333 (1971) and *Stockton v. Altman*, 432 F.2d 946, 949-50
7  (5th Cir. 1970), *cert. denied*, 401 U.S. 994, 28 L. Ed. 2d 532, 91
8  S. Ct. 1232 (1971)); *Broadnax v. City of New Haven,* 415 F.3d 265,
9  273 (2nd Cir. 2005) ("if the parties do not object, a non-jury claim
10 may be tried and decided by a jury."); *Pals v. Schepel Buick & GMC*
11 *Truck, Inc.*, 220 F.3d 495, 501 (7th Cir. 2000) ("mutual implied
12 consent supports the jury's authority to resolve issues that
13 normally would be decided by the court"); *Thompson v. Parkes*, 963
14 F.2d 885, 886, 888 (6th Cir. 1992) (finding consent to try equitable
15 claims to a jury under Rule 39(c) where parties' course of conduct
16 and pretrial order indicated trial by jury). Although the court has
17 not located published Ninth Circuit authority establishing that
18 participation in a jury trial without objection is tantamount to
19 consent under Rule 39(c), this result necessarily extends from
20 binding Ninth Circuit precedent.

21     Pursuant to Ninth Circuit law, the procedural protections of
22 Rules 38 and 39 are subject to waiver. *See, e.g., Craig*, 19 F.3d at
23 477 (citing *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d
24 1292, 1304 (9th Cir. 1983), *cert. denied*, 464 U.S. 916 (1983) for
25 the "general proposition that a party's course of conduct may
26 prevent it from relying on procedural protections in Rules 38 and
27
28

**17**

39")).[5]     It is well settled that participation in bench trial without objection effects waiver of the jury trial right, *e.g., White v. McGinnis*, 903 F.2d 699, 703 (9th Cir. 1990) (en banc), notwithstanding the constitutional mandate to "indulge every reasonable presumption against waiver," *Lutz*, 403 F.3d at 1064. *A fortori*, where there is no risk to the venerable constitutional jury trial right hanging in the balance, participation in a jury trial without objection must effect waiver of the procedural protections afforded by Rules 38 and 39.  *See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,  399 F.Supp. 2d 1064, 1087 (N.D. Cal. 2005) (citing *Thompson*, 963 F.2d at 890 and Rule 39(c) for the proposition that court lacked power to treat jury's verdict on patent issues as advisory after case was submitted to a jury); *Simonelli v. Univ. of Cal.- Berkeley*, 2007 U.S. Dist. LEXIS 81634 * 8 (N.D. Cal. 2007) ("Where a party demands a jury trial on an issue that is not jury triable, the opposing party's failure to object may be deemed 'consent' to the jury") (citing *Broadnax*, 415 F.3d at 270); *see also Pradier v. Elespuru*, 641 F.2d 808, 811 (9th Cir. 1981) ("the parties are entitled to know at the outset of the trial whether the decision will be made by the judge or the jury."); Fed. R. Civ. P. 1 (Federal Rules of Civil Procedure "should be construed and administered to secure the just, speedy, and

---

[5]  In *Craig*, the Ninth Circuit held that where certain defendants did not "unambiguously and determinedly consent" to a co-defendant's jury demand, the defendants were not estopped from opposing the plaintiff's motion asserting an untimely jury demand under Rule 39(b).  19 F.3d at 477 (quoting *Reid Bros.*, 699 F.2d at 1305 (9th Cir.1983)).  *Craig* offers no analysis of Rule 39(c).  To the extent *Craig* can be read for the proposition that consent to jury trial under Rule 39(c) requires "unambigious, determined consent," the parties' course of conduct and assent to the pretrial order constitute the requisite level of consent in this case.

inexpensive determination of every action and proceeding").

### 3. The Final Pretrial Order

A final pretrial order supersedes all prior pleadings and controls the subsequent course and scope of the action. *E.g., Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 475 (2007) (quoting Fed. Rule Civ. Proc. 16(e)). Claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint, and conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim. *Id.* (citation omitted). Because the pretrial order has the power to supercede pleadings with respect to the substantive claims advanced by the parties, *id.*, it follows that the pretrial order also has the power to supercede the portions of the parties' pleadings setting forth jury demands, *see, e.g., Pals*, 220 F.3d at 501 (noting that if the court orders a trail to a jury and the parties do not object, both sides are deemed to consent to have the case decided by the jury and "the pleadings are deemed amended to give permission")*; Bereda,* 865 F.2d at 52 (noting that where court ordered trial to jury and neither party objected, jury's verdict was binding); *see also* Fed. R. Civ. P. 15(b) (permitting amendment of pleadings after trial to conform pleadings based on issued tried by implied consent). Parties are entitled to rely on the scope of the jury trial described in the pretrial order. *Pradier*, 641 F.2d at 811*; see also Thompson*, 963 F.2d at 886, 888.

Here, after the court discussed with the parties that the jury would decide al issues triable as of right to a jury, the FPO was drawn to so provide. The FPO contains an express provision that

**19**

instructed any party that believed amendment to the FPO was necessary to make the appropriate motion. *No* party sought to amend the FPO. Although the FPO is not a model of clarity, the plain language and the parties' course of conduct establish its meaning beyond the shadow of a doubt.

In order to interpret the meaning of an ambiguous provision of a pretrial order, the court must first consider the plain language of the order. *See, e.g., DP Aviation v. Smiths Indus. Aero. & Def. Sys.*, 268 F.3d 829, 842 (9th cir. 2001) (undertaking analysis of competing interpretations by first examining the language of the pretrial order and ultimately adopting most reasonable interpretation). Although the court's interpretation of the language employed in its own order is most authoritative, *Lampkin v. Int'l Union, United Auto., Aero. & Agric. Implement Workers of America*, 154 F.3d 1136, 1147 (10th Cir. 1998), the parties' course of conduct is also relevant to ascertaining the meaning of ambiguous portions of a pretrial order, *see DP Aviation*, 268 F.3d at 842 (evaluating parties' conduct at trial in construing the meaning of ambiguous language in pretrial order); *accord Johnson v. Geffen*, 294 F.2d 197, 199-200 (D.C. Cir. 1960) (same).

The plain meaning of the specific language employed in the FPO explicitly provides that this case was tried to a jury on all issues to which the Seventh Amendment jury trial right attaches, as the court intended and to which the parties assented. The FPO provides, in pertinent part:

> 1. Duhn contends that it has demanded a jury trial. Cameron contends that Duhn Oil has only demanded a jury for its willful infringement allegations and cites to Duhn Oil's Third Amended Complaint (Doc. No. 424).

**20**

2. Defendant has not demanded [sic] jury. **There will be a jury trial on willful infringement issues and other issues to which the entitlement exists as a legal right.** In all other respects, the jury shall be advisory.

(Doc. 468 at 1-2) (emphasis added).  After noting Defendant's contention that Plaintiff only demanded a jury trial on the issue of willful infringement and Plaintiff's assertion of a general jury demand, the FPO ordered a jury trial on willful infringement "*and other issues to which the entitlement exists as a legal right.*" (Id.) (emphasis added).  By ordering a jury trial on issues other than willful infringement, the FPO rejected Defendant's assertion that the jury trial should be limited solely to the issue of willful infringement and accepted Plaintiff's assertion of a general jury demand on all legal issues so triable.

Plaintiff now opportunistically reverses course and contends that, because the parties had already waived their jury trial rights on all other claims, the only issue "to which entitlement exist[ed] as a legal right" at the time the FPO was entered was willful infringement.  Plaintiff argues that in light of the parties' respective waivers under the Federal Rules of Civil Procedure, the FPO should be construed as setting a jury trial only on the issue of willful infringement.  Plaintiff's construction of the FPO is unreasonable and contrary to law, as it reads out the critical FPO phrase "and other issues to which the entitlement exists as a legal right," which is rendered completely superfluous.  Plaintiff's post hoc construction of the FPO also negates the language in the FPO setting forth Plaintiff's implicit contention that it had made a general jury demand.

///

**21**

The plain meaning of the language employed by the FPO cannot be reconciled with Plaintiff's revisionist construction.

Plaintiff argues that the parties' course of conduct, the form of the jury instructions, and certain statements by the court support its construction of the FPO. With respect to the parties conduct, Plaintiff notes that during a pretrial conference on September 13, 2010, Defendant "fought to limit Duhn's jury demand to the singular issue of willfulness." (Doc. 681 at 7). The FPO issued on September 29, 2010, however. The fact that Defendant correctly noted the limited scope of the jury demand asserted in Plaintiff's TAC prior to issuance of the FPO is of no moment, as the FPO superceded the pleadings and all prior motions.

Contrary to Plaintiff's contentions, the conduct of the parties at trial was consistent with the plain meaning of the FPO, which set for jury trial "willful infringement issues and other issues to which the entitlement exists as a legal right." Critically, at the close of evidence, both parties moved for judgment as a matter of law pursuant to Rule 50 on issues that did not pertain to willful infringement, such as patent validity. As the Federal Circuit has noted, accepting the argument that a jury's verdict on validity issues is merely advisory after the parties have argued Rule 50 motions "would make charades of [such] motions...in patent cases," as Rule 50 motions apply only to binding jury verdicts. *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 985 n.5 (Fed. Cir. 1984); Fed. R. Civ. P. 50.

Plaintiff next contends that the jury verdict form suggests an advisory jury on validity issues because

The jury verdict form had two questions on invalidity:

**22**

Question 5 directed to anticipation, and Question 6 directed to obviousness. (See Verdicts of Trial Jury, pg. 6-7, attached as Ex. G to the Decl. of J. Whitelaw) Irrespective of how the jury found on these questions, the jury was instructed to continue making findings on Inventorship (Questions 7a and 7b), Inequitable Conduct (Questions 9a and 9b), Lost Profits (Questions 10a and 10b), and Reasonable Royalty (Question 11). Had the parties intended the jury to be binding on the issue of invalidity, there would be no reason to have the jury continue to these other Questions if the jury found all of the asserted claims to be invalid. Having the jury undertake these additional burdens would only be useful in the case where an advisory jury found the claims invalid, but the Court did not follow the jury's guidance.

(Doc. 681 at 9). Plaintiff's argument is not persuasive in light of the totality of the record, as the parties contemplated having the jury answer the damages inquiries upon a finding of infringement, notwithstanding the verdict form's inclusion of validity and equitable conduct issues. During a hearing on January 28, 2011, the following exchange took place:

MR. ALEXANDER: That's perfectly correct, Your Honor. That's slightly different from the version that was sent around last night. And so the Court apparently has the right version, so I apologize for taking the Court's time. The only other issue with the charge that may be correct in the Court's version, is that in the version that we received, the damages questions were not predicated on a positive finding with regard to liability.

THE COURT: All right. Where do you find that?

MR. ALEXANDER: Your Honor, if the Court will turn to question 11. Excuse me. Question 10.

THE COURT: Yes.

MR. ALEXANDER: And the lack of instruction with regard to predicating. Actually, page 10, under "Inequitable Conduct."

THE COURT: Yes.

MR. ALEXANDER: It simply instructs the jury to answer questions 10a and 10b and it carries on that request

following all the damages issues. And we submit it makes
sense, and I think it was agreed upon -- in fact, I
thought it was in an earlier draft, that the damages
questions, as typically done, would be predicated on
positive findings as to liability.

THE COURT: This is the Court's understanding. We
designed the questions on liability such that if they
found no infringement under any theory, they were to sign
and return the verdict. So they would not get to this
question.

MR. ALEXANDER: I apologize. I must have misunderstood the
way the verdict form went.

THE COURT: That was the structure of the verdict.
So they would only get to damages if they had found on
one of the infringement issues.

MR. ALEXANDER: The -- I'm obviously missing it. The
instructions, at least in the verdict form I was
submitted, Your Honor, or that we were submitted, each
question is followed by a request to answer the following
question. I don't see an instruction to the jury that if
they --

THE COURT: All right. Somehow it got omitted. Because
there should be at the bottom of -- this is inducing
infringement, page 4. If you answered no -- well, let me
retract that. What I remember now of our discussion was
that because there are the invalidity and
unenforceability defenses, if you will, that we were
going to have the jury go forward to decide those claims.
And so that having been made, we do need the instruction
which would, at the -- it would be on page 10. And it
would be at line 24.

If your answers to questions 1 -- and I'm going to
say as to all subparts of question 1, question 2,
question 3 -- we don't have to give them 4, because if
they answer no, they don't have to answer question four.

MR. ALEXANDER: I agree.

THE COURT: If one, two and three are no, sign and
return this verdict. And then otherwise answer questions
10a and 10b.

MR. REDDEN: Or at least 10a, Your Honor. Because if
they answer 10a "no," they don't get to 10b.

THE COURT: Well, let's just have them answer
question 10.

MR. REDDEN: Okay.

1
2       THE COURT: All right. That's the proposed change,
        which would make the verdict form, then, I think fully
3       explanatory and correctly directive of how the jurors are
        to proceed in their deliberations. Do the plaintiffs have
4       any input in this?

5       MR. SCHUCK: We have no objection to that change,
        Your Honor.
6
(Doc. 697 at 13-14).
7
        Plaintiff also notes that during an in-chambers jury
8
instruction conference on the eve of deliberations, Plaintiff
9
objected to the inclusion of an obvious instruction and to Question
10
6 of the verdict form, pertaining to obviousness. Plaintiff argued:
11
        that neither the Instruction, nor the Question was
12      proper, as Cameron offered no evidence at trial regarding
        obviousness, and that Cameron had limited its invalidity
13      position to asserting just two pieces of art as
        anticipatory. [Plaintiff] further argued that it would be
14      prejudicial and confusing to ask the Question regarding
        obviousness, when there was no evidence presented.
15
(Doc. 681 at 10). Plaintiff's arguments during the in-chambers
16
conference do not suggest that it viewed the jury's findings on
17
validity questions as advisory; to the contrary, Plaintiff's
18
arguments are comparable to the same arguments advanced in
19
connection with its Rule 50 motion on the obviousness issue. Citing
20
the declaration of James Whitelaw, Plaintiff also avers:
21
        The Court...acknowledged that the Court would make the
22      ultimate decision since the jury was advisory on
        obviousness.
23
(Id.). This extra-record statement was purportedly made *after*
24
Defendant had already presented its case at trial based on the
25
understanding that validity issues would be decided by the jury.[6]
26
///
27
───────────────
28  [6] The court and the parties worked in chambers for approximately 15 hours
    finalizing the jury instructions.

**25**

Plaintiff also contends that "at a hearing during trial on inventor-misjoinder, the Court confirmed the jury's advisory nature." (Doc. 681 at 2, 12). In overruling Plaintiff's objection to Defendant's motion to conform the pleadings to proof under Rule 15 regarding the issue of Rex Duhn's inventorship, the court stated:

> as with the amendment to conform with proof that the plaintiffs have made, if the matter is one that is advisory, because it is an equitable or a non-jury issue, then the jury would provide an advisory finding, but it would be the Court that would be granting or denying any relief with respect to the claim

(Doc. 697 at 7).[7] The court's comment regarding any advisory nature of the jury's inventorship finding is consistent with the plain language of the FPO that the jury would be advisory on equitable issues to which the jury trial right does not attach.[8]

Finally, Plaintiff points to the following statement by the court during the February 2, 2011 motion for judgment hearing:

> I was trying to get the parties to have a jury trial, and the parties came in not wanting a jury trial except on the one issue I think I talked you into, quite frankly, was willful infringement. But beyond that, the parties said this not a jury trial, it hadn't been demanded, and that is reflected there is that inconsistency in the final pretrial order, and that's another matter for the Court to interpret.

(Doc. 679 at 23). As the court noted, interpretation of inconsistency contained in the FPO is a matter for the court to resolve in light of the plain language of the FPO and the conduct

---

[7] Due to counsel's designation of the Rule 15(b) motion as a "request" on the court's CM/ECF docket, no hearing date was set, permitting the motion to slip through the cracks. The motion is moot in light of this decision.

[8] In response to the court's comment, Defendant urged the court to treat inventorship as an invalidity issue under 35 U.S.C. § 102. (Id.). As discussed below, the inventorship issues raised in this case must be treated as legal claims.

1  of the parties.

2      Notwithstanding the parties' initial positions on the scope of
3  the jury trial, Plaintiff made the deliberate strategic choice to
4  submit language in the joint pretrial statement suggesting that
5  Plaintiff had made a general jury demand, and that the jury trial
6  would not be limited to willful infringement.  Plaintiff submitted
7  this language over Defendant's repeated attempts to provide an
8  accurate statement regarding Plaintiff's jury demand.  Plaintiff
9  cannot complain that the court accepted its invitation to submit
10  issues other than willful infringement to the jury.

11      In light of the plain language of the FPO, the parties' assent
12  to the FPO and their conduct at trial, and the representation of a
13  general jury demand Plaintiff advanced in the joint pretrial
14  statement, the FPO must be interpreted to order a jury trial on all
15  issues to which the Seventh Amendment jury trial right attaches.
16  This result is buttressed by the principal that, to prevent
17  prejudice, parties are typically bound by the statements they
18  advance in connection with formulation of the pretrial order.  *See*
19  *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 996 (9th Cir.
20  2009).

21      The jury returned findings on the following issues: (1) direct
22  infringement; (2) contributory infringement; (3) inducing
23  infringement; (4) willful infringement; (5) anticipation; (6)
24  obviousness; (7) inventorship; (8) inequitable conduct; (9) patent
25  damages-lost profit; and (6) patent damages-reasonable royalty.  The
26  Seventh Amendment right to jury trial does not attach to Defendant's
27  equitable claim of inequitable conduct. *E.g., Gardco*, 820 F.2d at
28  1213 ("the defense of inequitable conduct is 'equitable in nature

**27**

1 and thus does not give rise to the right of trial by jury'").
2 Pursuant to the FPO, the jury's verdict regarding inequitable
3 conduct is advisory.

4 Infringement, validity, and damages are issues to which
5 entitlement to a jury trial exists as a legal right; pursuant to the
6 FPO these issues were properly submitted to the jury. *See, e.g.,*
7 *id.* at 1212 (confirming that infringement and validity are issues
8 to which the jury trial right attaches); *Minks v. Polaris Indus.*,
9 546 F.3d 1364, 1370-71 (Fed. Cir. 2008)(noting violation of Seventh
10 Amendment where court reduced jury's damages finding in patent
11 infringement case). Although Defendant's inventorship claim was
12 raised in the context of an inequitable conduct defense, under the
13 circumstances of this case, had Defendant successfully proved its
14 contentions that Rex Duhn was deceptively named as an inventor and
15 that John Rogers was omitted as an inventor in bad faith, it appears
16 that the '925 patent would have been rendered invalid as a matter
17 of law under section 35 U.S.C. § 102(f). *See Pannu v. Iolab, Corp.*,
18 155 F.3d 1344, 1349 (Fed. Cir. 1998) ("section 102(f) [] makes the
19 naming of the correct inventor or inventors a condition of
20 patentability; failure to name them renders a patent invalid");
21 *Boston Sci. Corp. v. Johnson & Johnson*, 550 F. Supp. 2d 1102, 1114
22 (N.D. Cal. 2008) (citing *Pannu* for the proposition that where the
23 patentee does not claim relief under 35 U.S.C. § 256 and incorrect
24 inventorship is proven, the court should hold the patent invalid as
25 a matter of law for failure to comply with section 102(f));[9] *see*

26

27 [9] Had Defendant proved its inventorship theories, relief under section 256 would
have been unavailable to Plaintiff. *See* 35 U.S.C. § 256; *see also Eli Lilly &*
28 *Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004) (noting that section
256 "creates a cause of action in the district courts for correction of

*also Memry Corp. v. Ky. Oil Tech., N.V.,* 2007 U.S. Dist. LEXIS 73315 *38 (N.D. Cal. 2007) ("If nonjoinder of an actual inventor is proved by clear and convincing evidence, a patent is rendered invalid"); *but see St. Jude Med., Inc. v. Access Closure, Inc.*, 2010 U.S. Dist. LEXIS 124810 * 9-10 (D. Ark. 2010)(distinguishing inventorship claims asserted as invalidity defenses from inventorship claims under section 256 for purposes of ascertaining right to jury trial on the issue); *Shum*, 499 F.3d 1272, 1278-79 (Fed. Cir. 2007) (noting that alleged co-inventor would not be entitled to jury trial on stand-alone claim under section 256). Further, the jury instructions provided on anticipation expressly required the jury to consider whether Defendant had proven that "Rex Duhn did not himself invent the invention." (Doc. 660 at 30). Accordingly, inventorship is most properly treated as a validity issue in this case and was subject to a binding jury determination under the FPO; this result is consistent with Defendant's request to treat inventorship as a validity issue in its Rule 15(b) motion at the close of evidence, the jury instructions taken as a whole, the parties' mutual conduct in filing Rule 50 motions on the issue, and Defendant's concession that the jury's findings on inventorship are binding. (Doc. 685 at 27).

**B. The Jury's Verdict**

The jury found that Defendant proved by clear and convincing evidence that claims 2, 3, 4, 5, 19, and 29 are invalid for obviousness, and that claims 2, 3, 4, 5, and 29 are invalid for anticipation. However, the jury found that claim 1 was not proven

non-joinder of an inventor on a patent *provided* the non-joinder error occurred without deceptive intent.") (emphasis added).

to be anticipated or obvious.[10]   The jury's findings are legally and irreconcilably inconsistent.   The jury received the following instruction on anticipation:

> For inventors to be entitled to a patent, the invention must actually be "new." Cameron claims that the '925 patent is anticipated. The '925 patent's claims are anticipated if they are not new.

> Anticipation must be determined on a claim-by-claim basis. Cameron contends that claims 1, 2, 3, 4, 5, 19 and 29 of the '925 patent are invalid because these claims are not new (anticipated). Cameron must prove anticipation by clear and convincing evidence.

> Here is a list of alternative ways that Cameron can show that a patent claim is anticipated. If:
> (1) The claimed invention was known to or used by others in the United States before the date of invention. An invention is known when the information about it was reasonably accessible to the public on or before that date; and/or
> (2) The claimed invention is not new if it was already patented or described in a printed publication, anywhere in the world before the date of invention; and/or
> (3) The claimed invention was publicly used, sold, or offered for sale in the United States prior to February 19, 2001; and/or
> (4) Rex Duhn did not himself invent the invention;
> (5) The claimed invention was described in a patent granted on an application for a patent by another filed in the United States before the date of invention.

(Doc. 660 at 30).   The jury received the following instruction on obviousness:

---

[10]   Defendant contends that, because Plaintiff did not seek damages for infringement of Claim 1, and because Defendant sought only declaratory relief concerning the validity of Claim 1, the jury's findings regarding Claim 1 are advisory.   Defendant's argument lacks merit.   The verdict form for both the obviousness and anticipation issues expressly required the jury to examine asserted claims 2, 3, 4, 5, 19, and 29 with reference to "all the requirements of claim 1."   The jury's fact-finding on the asserted dependant claims necessarily entailed resolution of the same factual issues raised by Defendant's request for declaratory relief concerning Claim 1, the independent claim from which each of the asserted claims depends.   The jury's fact-finding is binding with respect to claim 1.   *See, e.g., Cabinet Vision*, 129 F.3d at  600 (where "substantial commonality" exists between the factual questions presented by legal and equitable claims, jury findings pertaining to the legal claims constrain the court's determination of equitable claims); *Shum*, 499 F.3d at 1279 (same).

Cameron also asserts that the claimed invention was obvious. Cameron must prove obviousness by clear and convincing evidence.

Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of wellhead isolation tools and wellheads incorporating such tools, at the time the invention was made.

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in this field at the time of the claimed invention; the scope and content of the prior art; and any differences between the prior art and the claimed invention.

The existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. In considering whether a claimed invention is obvious, you may but are not required to find obviousness if you find that at the time of the claimed invention, there was a reason that would have prompted a person having ordinary skill in this field to combine the known elements in a way the claimed invention does, taking into account such factors as (1) whether the claimed invention was merely the predictable result of using prior art elements according to their known function(s); (2) whether the claimed invention provides an obvious solution to a known problem; (3) whether the prior art suggests that the elements in the invention should be combined or not; and (4) whether it would have been obvious to try the combinations of elements, such as when there is a need to solve a problem. To find prior art rendered the invention obvious, you must find that the prior art suggested a reasonable expectation of success.

In determining whether the claimed invention was obvious, consider each claim separately. Do not use hindsight, i.e., consider only what was known at the time of the invention. In making these assessments, you should take into account any objective evidence that may have existed at the time of the invention and afterwards that may shed light on the obviousness or not of the claimed invention, such as:

   a. Whether the invention was commercially successful as a result of the patented features;

   b. Whether others copied the invention; or
   c. Whether others in the field praised the invention.

31

In considering whether the claimed invention was obvious
at the time it was made, you should consider the scope
and content of the following prior art:
    1. The '993 Dallas patent; and/or
    2. The '94-'95 Cameron catalogue and the MTBS tubing
    spool and hanger. (Jury Instruction No. 26 (Doc.
    660, pg. 30))

(Doc. 660 at 30-32).

The Jury received the following instruction on independent and

dependent claims:

There are two types of patent claims: independent claims
and dependent claims.

An "independent claim" sets forth all of the requirements
that must be met in order to be covered by that claim.
Thus, it is not necessary to look at any other claim to
determine what an independent claim covers. For example,
claim 1 of the '925 patent is an independent claim.

Claims 2, 3, 4, 5, 19, and 29 in the '925 patent are
"dependent claims" which depend directly or indirectly on
claim 1. A dependent claim does not itself recite all of
the requirements of the claim but refers to another claim
for some of its requirements. In this way, the claim
"depends" on another claim. A dependent claim
incorporates all of the requirements of the claims to
which it refers. The dependent claim then adds its own
additional requirements. To determine what a dependent
claim covers, it is necessary to look at both the
dependent claim and any other claims to which it refers.
A product that meets all of the requirements of both the
dependent claim and the claims to which it refers is
covered by that dependent claim.

(Doc. 660 at 17).

Claim 1 is the independent claim from which claims 2, 3, 4, 5,
19, and 29 depend. "A broader independent claim cannot be
nonobvious where a dependent claim stemming from that independent
claim is invalid for obviousness." *E.g., Comaper Corp. v. Antec,
Inc.*, 596 F.3d 1343, 1350 (Fed. Cir. 2010) (citing *Callaway Golf Co.
v. Acushnet Co.*, 576 F.3d 1331, 1344 (Fed. Cir. 2009) and *Ormco
Corp. v. Align Tech.*, Inc., 498 F.3d 1307, 1319 (Fed. Cir. 2007)).

32

1  Similarly, if an independent claim is not found invalid for
2  anticipation, claims that depend from the independent claim cannot
3  be either. *E.g., RCA Corp. v. Applied Digital Data Sys., Inc.*, 730
4  F.2d 1440, 1446 (Fed. Cir. 1984) (if prior art did not anticipate
5  independent claim, it could not anticipate dependent claim); *CNET*
6  *Networks, Inc. v. Etilize, Inc.*, 584 F. Supp. 2d 1260, 1264 (N.D.
7  Cal. 2008) (same). The jury's verdicts are irreconcilable as a
8  matter of law.

9       The court called the parties to a side bar and raised the issue
10 of the jury's inconsistent findings as the jury was returning its
11 verdicts. Despite being given the opportunity to address the jury's
12 inconsistent findings, both parties requested that the remainder of
13 the jury's verdicts be taken and entered and agreed to permit the
14 jury to be discharged.

15      **1. Nature of the Verdicts**

16      The parties dispute the nature of the jury's verdicts on
17 obviousness and anticipation. Plaintiff contends that the jury
18 rendered special verdicts pursuant to Rule 49(a). Defendant argues
19 that the jury's verdicts are general verdicts under Rule 49(b).
20 Neither position is entirely correct.

21      The Ninth Circuit's decision in *Zhang v. Am. Gem Seafoods*,
22 *Inc.*, provides the framework for determining whether a verdict is
23 special or general:

24          The Federal Rules of Civil Procedure explicitly
            contemplate two types of verdicts, special verdicts, see
25          Fed. R. Civ. P. 49(a), and general verdicts with
            interrogatories, see Fed. R. Civ. P. 49(b), and
26          implicitly contemplate common law general verdicts
            without interrogatories. Both special verdicts and
27          interrogatories comprise only factual findings; a special
            verdict is "in the form of a special written finding upon
28          each issue of fact," Fed. R. Civ. P. 49(a), and

**33**

1    interrogatories are returned "upon one or more issues of
2    fact the decision of which is necessary to a verdict,"
    Fed. R. Civ. P. 49(b).

3    The Federal Rules do not define general verdicts, but
4    they imply that general verdicts do not involve factual
    findings but rather ultimate legal conclusions. *See id.*
5    This view is of course consistent with the common law and
    our own caselaw; in *Floyd v. Laws*, 929 F.2d 1539 (9th
6    Cir. 1991), we held that the theoretical distinction
    between general and special verdicts is that general
7    verdicts require the jury to apply the law to the facts,
    and therefore require legal instruction, whereas special
8    verdicts "compel the jury to focus exclusively on its
    fact-finding role." *Id.* at 1395. Black's defines a
9    general verdict as "[a] verdict whereby the jury find
    either for the plaintiff or for the defendant in general
10   terms." Black's Law Dictionary 1560 (6th ed. 1990). Thus
    in a general verdict the jury announces only the
11   prevailing party on a particular claim, and may announce
    damages.

12   A jury may return multiple general verdicts as to each
    claim, and each party, in a lawsuit, without undermining
13   the general nature of its verdicts. See, e.g., 9A Charles
    Alan Wright & Arthur R. Miller, Federal Practice &
14   Procedure § 2504.1 (2d ed. Supp. 2003) ("In cases
    involving multiple claims . . . or defendants, the
15   district court may . . . have the jury render multiple
    general verdicts."). Although some general verdicts are
16   more general than others, encompassing multiple claims,
    the key is not the number of questions on the verdict
17   form, but whether the jury announces the ultimate legal
    result of each claim. *If the jury announces only its*
18   *ultimate conclusions, it returns an ordinary general*
    *verdict; if it makes factual findings in addition to the*
19   *ultimate legal conclusions, it returns a general verdict*
    *with interrogatories. If it returns only factual*
20   *findings, leaving the court to determine the ultimate*
    *legal result, it returns a special verdict.*

21
22   These terms are not adequate to capture every answer that
    a jury may give. In addition to the ultimate legal
23   conclusion in a case, a jury may make legal conclusions
    as to subsidiary issues, such as affirmative defenses, or
24   the amount of damages owed, which are neither findings of
    fact nor quite "verdicts." Such answers are similar in
25   kind to general verdicts, because they require
    application of the law to the facts, but we have found no
26   precise label for them.

27  339 F.3d at 1031 (emphasis added).

28  ///

1  **b. Obviousness**

2    Obviousness under 35 U.S.C. § 103 is a mixed question of law

3  and fact. *E.g., Wyers v. Master Lock Co.,* 616 F.3d 1231, 1247 (Fed.

4  Cir. 2010) (Linn, J., concurring)[11] (citing *Takeda Chem. Indus.,*

5  *Ltd. v. Alphapharm Pty., Ltd.,* 492 F.3d 1350, 1355 (Fed. Cir.

6  2007)); *Connell v. Sears, Roebuck & Co*, 722 F.2d 1542, 1547 (Fed.

7  Cir. 1983).   In the ordinary patent case in which obviousness is

8  asserted, the trier of fact must answer the factual inquiries

9  outlined in *Graham v. John Deere Co.*, 383 U.S. 1 (1966) relating to:

10  (1) the scope and content of the prior art, (2) differences between

11  the prior art and the claims at issue; (3) the level of ordinary

12  skill in the art; and (4) whatever objective evidence may be present

13  as indicia of nonobviousness.   *Connell*, 722 F.2d at 1547.

14    Under the well-settled law of the Federal Circuit, the legal

15  issue of obviousness may be determined by a jury.   *E.g., id.*

16      [I]t is not error to submit the question of obviousness
       to the jury. No warrant appears for distinguishing the
17      submission of legal questions to a jury in patent cases
       from such submissions routinely made in other types of
18      cases. So long as the Seventh Amendment stands, the right
       to a jury trial should not be rationed, nor should
19      particular issues in particular types of cases be treated
       differently from similar issues in other types of cases.
20      Scholarly disputes over use of jury trials in technically
       complex cases relate to the right to trial by jury
21      itself, and center on whether lay juries are capable of
       making correct fact determinations, not over the
22      propriety of submitting legal questions to juries. The
       obviousness issue may be in some cases complex and
23      complicated, on both fact and law, but no more so than
       equally complicated, even technological, issues in
24      product liability, medical injury, antitrust, and similar

25

26  [11]  Justice Linn concurred in both the conclusion reached and the reasoning
     expressed in the majority's opinion, but wrote separately to address concerns
27  raised following the Supreme Court's decision in *KSR International Co. v.*
     *Teleflex, Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007) with
28  respect to general verdicts relating to obviousness.   *Id.* at 1247.

**35**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

cases. Indeed, though the analogy like most is not perfect, the role of the jury in determining obviousness is not unlike its role in reaching a legal conclusion respecting negligence, putting itself in the shoes of one "skilled in the art" at the time the invention was made in the former and in the shoes of a "reasonable person" at the time of the events giving rise to the suit in the latter.

*Connell*, 722 F.2d at 1547. While, "the judge must remain the ultimate arbiter on the question of obviousness," this role is properly exercised on "giving proper instructions on the law to the jury before it considers its verdict" and again "when presented with a motion for JNOV or new trial." *Wyers*, 616 F.3d at 1248 (Linn, J., concurring) (citing *R.R. Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506, 1515 (Fed. Cir. 1984)).

"Submission of the obviousness question to the jury should be accompanied by detailed special interrogatories designed to elicit responses to at least all the factual inquiries enumerated in *Graham*, and based on the presentations made in the particular trial." *Connell*, 722 F.2d at 1547. Although "Black box" general verdicts on obviousness are disfavored, they are permissible. *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1356 (Fed. Cir. 2001).

Here, the verdict form for the issue of obviousness did not require the jury to make specific factual findings on the *Graham* inquiries, rather, it asked only for the jury's ultimate legal conclusion on the obviousness of each claim. The verdict form provides:

<u>Obviousness</u>

Question 6: Has Cameron proved by clear and convincing evidence that any of the following claims would have been obvious to a person of ordinary skill in the field at the time the invention was made?

**36**

Claim 1:
     Yes                No

Claim 2 (including all the requirements of claim 1):
     Yes                No

Claim 3 (including all the requirements of claims 1
and 2):
     Yes                No
Claim 4 (including all the requirements of claim 1):
     Yes                No

Claim 5 (including all the requirements of claims 1
and 4):
     Yes                No

Claim 19 (including all the requirements of claims
1 and 4):
     Yes                No

Claim 29 (including all the requirements of claim
1):
     Yes                No

(Doc. 668).

Under *Zhang*, the jury's obviousness findings resemble general verdicts.  339 F.3d at 1031 ("If the jury announces only its ultimate legal conclusions, it returns an ordinary general verdict"); *accord Sjolund v. Musland*, 847 F.2d 1573, 1575 (Fed. Cir. 1988) ("when the legal question of obviousness is submitted to the jury, it is technically improper to characterize that question as a special verdict under Fed. R. Civ. P. 49 (a), because Rule 49 (a) only provides for the submission of fact questions to the jury"). However, the jury's obviousness verdicts do not fit neatly into the general verdict classification, as the verdict form did not permit the jury to "find for either for the plaintiff or for the defendant in general terms" on Defendant's affirmative defense of invalidity. *Zhang*, 339 F.3d at 1031 (quoting Black's Law Dictionary 1560 (6th ed. 1990)).  Instead, the jury's verdicts on obviousness fall within

the interstice between ultimate legal conclusions and legal conclusions on subsidiary issues entailed in an affirmative defense, "which are neither findings of fact nor quite 'verdicts.'" *Id.* "Such answers are similar in kind to general verdicts, because they require application of the law to the facts," but there is no precise label for them. *Id.*

### a. Anticipation

Anticipation is a factual issue for the jury to decide based on resolution of subsidiary questions of fact such as whether knowledge of an invention was publicly accessible, whether use of the invention was publicly accessible, or whether the invention was subject to a commercial offer for sale in the United States more than one year prior to the application date of the patent. *See, e.g., 3M v. Chemque, Inc.*, 303 F.3d 1294, 1306-07 (Fed. Cir. 2002) (discussing anticipation generally in the context of review of denial of judgment as a matter of law). The verdict form on the issue of anticipation provides:

<u>Anticipation</u>

Question 5: Has Cameron proved by clear and convincing evidence that the following claims of the '925 patent are "anticipated" (not new?)
    Claim 1:
        Yes_____     No _____

    Claim 2 (including all the requirements of claim 1):
        Yes             No

    Claim 3 (including all the requirements of claim 1):
        Yes             No

    Claim 4 (including all the requirements of claim 1):
        Yes             No

    Claim 5 (including all the requirements of claim 1):
        Yes             No

    Claim 19 (including all the requirements of claim

**38**

1    1):
          Yes              No
2
     Claim 20 (including all the requirements of claim
3    1):
          Yes              No
4
(Doc. 668).

     The jury's verdict on the issue of anticipation is comprised
of ultimate factual findings on whether each contested claim was
anticipated, although the jury did not return specific findings on
any subsidiary questions of fact.  *Compare Therasense, Inc. v.
Becton, Dickinson & Co.*, 593 F.3d 1325 , 1330, 1336 (Fed. Cir. 2010)
(treating answer to jury question: "Have defendants proven by clear
and convincing evidence that Claims 11 and 12...are invalid by
reason of anticipation or obviousness?" as general verdict) and
*Roberts v. Sears, Roebuck & Co.*, 723 F.2d 1324, 1340 (7th Cir. 1983)
(finding that verdict form which broke validity issues down into the
components of obviousness and anticipation was not truly a "special
verdict" under Rule 49(a), as special verdicts resolve subsidiary
questions of fact pertaining to specific, contested issues)[12] *with
E. V. Prentice Co. v. Associated Plywood Mills, Inc.*, 113 F. Supp.
182, 187 (D. Oregon 1953) (illustrating clear example of special
verdict on anticipation issue where jury answered specific

---

[12] As the reasoning in *Roberts* suggests, simply separating the obviousness and
anticipation inquiries into separate jury questions would not have transformed
the verdict in *Therasense* from a general verdict into a true special verdict.
*Accord Zhang*, 339 F.3d at 1031 ("Although some general verdicts are more general
than others, encompassing multiple claims, the key is not the number of questions
on the verdict form, but whether the jury announces the ultimate legal result of
each claim.").

**39**

subsidiary questions).[13]  Although the jury's verdict does not provide answers to "subsidiary fact questions [] of the who-did-what-to-whom variety" that are the hallmark of proper special verdicts, *see Roberts*, 723 F.2d at 1347 (Posner, J., dissenting), the jury's anticipation verdicts are not in true general form either, *see Zhang*, 339 F.3d at 1031 (noting that Rule 49(b) implies that general verdicts do not involve factual findings but rather ultimate legal conclusions).  Nor can it be said that the jury's findings on anticipation are in the form of interrogatories accompanying a general verdict, as the verdict form does not contain a query on the general issue of invalidity.  *See id.*

As *Zhang* acknowledges, the terms "general verdicts" and "special verdicts" do not capture every answer that a jury may give. 339 F.3d at 1031.  The jury's anticipation verdicts resemble special verdicts (albeit very general special verdicts) under Rule 49(a), as they embody only factual findings, technically leaving the court to determine the ultimate legal result of invalidity.  *Id.*  However, it would be anomalous to characterize the jury's verdicts on anticipation as special verdicts under Rule 49(a) while treating the jury's obviousness verdicts as general verdicts under Rule 49(b),

---

[13] The special verdict submitted to the jury in *E.V. Prentice Co.* contained the following queries: "1. Does the Raimann patent either alone or in combination with the Anderson or Painchaud patents anticipate the Skoog patents? 2. Does the combination of elements and steps in the Skoog patents produce an unusual and surprising result? 3. Was there public knowledge of the accused machine in the United States before the Skoog invention? 4. Was the accused machine disclosed in publications before the Skoog inventions? 5. Was the accused machine 'on sale' in the United States before the Skoog inventions?" 113 F. Supp. at 187.

**40**

1 as both anticipation and obviousness were presented to the jury as

2 subsidiary issues underlying Defendant's affirmative defense of

3 invalidity. Had the parties included a general verdict query on the

4 overarching issue of invalidity, the jury's findings on anticipation

5 would be easily characterized as answers to factual interrogatories

6 accompanying a general verdict under Rule 49(b).

7 **2. Import of the Jury's Inconsistent Verdicts**

8 Ordinarily, ascertaining whether a jury's verdict on an issue

9 is general or special is a prerequisite analytical step in

10 determining how to treat inconsistent jury findings. *Zhang*, 339

11 F.3d at 1031. From a procedural perspective, whether an

12 inconsistent verdict is general or special is often important

13 because the waiver rule applicable to general verdicts under Rule

14 49(b) does not apply to special verdicts under Rule 49(a). *Compare*

15 *Pierce v. Southern Pacific Trans. Co.*, 823 F.2d 1366, 1370 (9th Cir.

16 1987) (a party may object to inconsistent special verdicts under

17 Rule 49(a) even where no objection is raised prior to discharging

18 the jury) *with Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d

19 1322, 1331 (9th Cir. 1995) (citing *Los Angeles Nut House v. Holiday*

20 *Hardware Corp.*, 825 F.2d 1351, 1354-55 (9th Cir. 1987) for

21 proposition that counsel risks waiver of objections to any

22 inconsistencies in the jury's general verdicts if counsel does not

23 raise the issue before the jury is excused)). From a substantive

24 perspective, whether a verdict is general or special is of critical

25 importance because inconsistent general verdicts on separate claims

26 are typically permitted to stand, *Zhang*, 339 F.3d at 1036-38

27 (collecting cases), whereas irreconcilably inconsistent special

28 verdicts require a new trial, *e.g., Floyd v. Laws*, 929 F.2d 1390,

**41**

1396 (9th Cir. 1991) (courts have a duty under the Seventh Amendment
to harmonize a jury's seemingly inconsistent answers if a fair
reading allows for it and must order retrial in cases of
irreconcilable inconsistency) (citing *Gallick v. Baltimore & O.R.R.
Co.*, 372 U.S. 108, 110 (1963)). Here, however, it is unnecessary
to force round pegs into square holes in order to determine proper
treatment of the jury's irreconcilably inconsistent verdicts on
obviousness and anticipation.

Anticipation and obviousness are subsidiary issues raised by
Defendant's affirmative defense of invalidity. A true general
verdict (in the traditional sense of the term) on Defendant's
affirmative defense of invalidity would have been in a form of a
singular finding expressing whether the patent is invalid or valid.
On the opposite end of the spectrum, a true special verdict would
have been in the form of special written findings on specific issues
of fact unique to the parties contentions regarding obviousness and
anticipation of the '925 Patent. The verdict form submitted by the
parties in this case is located in the twilight zone of this
spectrum. The form of verdict on Defendant's invalidity defense is
comprised of (1) a series of quasi-general verdicts expressing
conclusions on the subsidiary legal issue of obviousness; and (2)
a series of generalized special verdicts expressing conclusions on
the subsidiary factual issue of anticipation. There are "no precise
lable[s]" for these verdicts. *See Zhang*, 339 F.3d at 1031.

The Ninth Circuit has not directly addressed how inconsistent
verdicts that are neither general nor special, and for which there
are no "precise labels," should be treated, but *Zhang* is
instructive. In *Zhang*, the Ninth Circuit contemplated

**42**

three ways in which legal conclusions such as general verdicts might be alleged to be inconsistent: the jury might disregard instructions requiring two general verdicts to be harmonious; the jury might return a general verdict that, under the facts of the case, implies a lack of evidence underlying another general verdict; or the jury might return two general verdicts that, under any facts, seem to be legally irreconcilable.

339 F.3d at 1031. After noting that the circumstances at issue in *Zhang* presented the latter two situations, the Ninth Circuit concluded that it lacked authority to grant a new trial on the basis of legally irreconcilable general verdicts:

We have found no Supreme Court or Ninth Circuit cases in which an appellate court has directed the trial court to grant a new trial due to inconsistencies between general verdicts, and Ninth Circuit precedent dictates that we cannot do so. In *International Longshoremen's Union v. Hawaiian Pineapple Co.*, 226 F.2d 875 (9th Cir. 1955), we explained that legally inconsistent verdicts "may nonetheless stand on appeal even though inconsistent." *Id.* at 881. In that case, the jury had returned general verdicts holding the defendant unions liable while "exonerating the individual defendants" who had acted on behalf of the unions. *Id.* While the court admitted difficulty in understanding "why the jury found [the unions] liable and did not also hold some of the leaders responsible," id., it upheld that jury's right to do so. "That is the jury's prerogative." *Id.*

*Id.* at 1035. Critically, however, the Ninth Circuit also stated: "unless one legal conclusion is the prerequisite for another, inconsistencies between them must stand." *Id.* at 1034.

In this case, the legal conclusion that independent claim 1 is obvious is an absolute prerequisite to the legal conclusion that dependent claims 2, 3, 4, 5, 19, and 29, each of which incorporates all the elements of claim 1, are obvious. *E.g., Comaper Corp.*, 596 F.3d at 1350. (broader independent claim cannot be nonobvious where a dependent claim stemming from that independent claim is invalid for obviousness). The jury's inconsistent findings on obviousness

**43**

present precisely the type of situation contemplated in *Zhang* in which one legal conclusion is the prerequisite for another. Analogously, a finding that dependent claims 2, 3, 4, 5, and 29 are anticipated requires, as a matter of law, a prerequisite finding that independent claim 1 is anticipated. *See, e.g., RCA Corp.,* 730 F.2d at 1446 (if prior art did not anticipate independent claim, it could not anticipate dependent claim). *Zhang* establishes that verdicts cannot stand in the face of such inconsistency, even assuming *arguendo* that the issue is subject to waiver. *See Id.* at 1034. However, *Zhang* does not conclusively establish that a new trial on the issue may be ordered. *See id.* at 1035 ("We have found no Supreme Court or Ninth Circuit cases in which an appellate court has directed the trial court to grant a new trial due to inconsistencies between general verdicts, and Ninth Circuit precedent dictates that we cannot do so").[14]

Rule 49(b) does not directly address the unique situation presented in this case, but the types of scenarios contemplated in Rule 49(b)(4) are similar:

> *Answers Inconsistent with Each Other and the Verdict.* When the answers are inconsistent with each other and one or more is also inconsistent with the general verdict, judgment must not be entered; instead, the court must direct the jury to further consider its answers and verdict, *or must order a new trial*.

Fed. R. Civ. P. 49(b)(4) (emphasis added).   Pursuant to Rule

---

[14] The Ninth Circuit also remarked: "We cannot sanction the time and expense of a new trial on the basis of an alleged inconsistency that, had it been raised earlier, could have been remedied by proper instructions to the jury." *Id.*

49(b)(4), when there are fatal inconsistencies among one or more factual findings and one or more of the factual findings is also inconsistent with the general verdict, the court must either direct the jury to further consider its answers or order a new trial.

When a jury returns a general verdict on obviousness, the verdict entails implied resolution of factual disputes underlying the legal question of obviousness. *See, e.g.*, *McGinley*, 262 F.3d at 1356.   By finding that certain dependent claims were proven obvious, while simultaneously finding that independent claim 1 was not proven obvious, the jury returned implied findings on the subsidiary factual issues attendant to analysis of claim 1 that are inconsistent with the implied findings regarding the claims the jury found to be obvious.   The jury's implied factual findings regarding the obviousness of certain dependent claims are also irreconcilably inconsistent with the quasi-general verdict finding that independent claim 1 was not proven to be obvious.   The same type of inherent conflict plagues the jury's findings on anticipation.

Under circumstances analogous to those presented here, Rule 49(b)(4) requires courts to either direct the jury to further consider its answers and verdict, or to order a new trial.   The court raised the inconsistency in the verdicts with the parties to given them an opportunity to address the inconsistency by further deliberations before the jury was discharged.   Only the latter option is available now, as the parties chose to accept the jury's findings and requested inconsistent verdicts be entered.   Pursuant to the guidance provided by *Zhang* and Rule 49(b)(4), a new trial on the issue of obviousness is warranted to the extent the Plaintiff is not entitled to judgment as a matter of law on the issue.   For

**45**

1  the same reasons, a new trial on the issue of anticipation is

2  warranted.[15]

## C. Plaintiff's Rule 50 Motion on Obviousness

Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of law in jury trials, and "allows the trial court to remove cases or issues from the jury's consideration 'when the facts are sufficiently clear that the law requires a particular result.'" *Weisgram v. Marley Co.*, 528 U.S. 440, 447-48 (2000).[16] Rule 50(a) provides in pertinent part:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). A Rule 50(b) motion for judgment as a matter of law is a renewed Rule 50(a) motion. *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). The Ninth Circuit states the standard for judgment as a matter of:

> When confronted with a motion for judgment as a matter of law, whether at the end of a plaintiff's case or at the close of all the evidence, a trial court must scrutinize the proof and the inferences reasonably to be drawn therefrom in the light most amiable to the nonmovant . . .In the process, the court may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of evidence . . . A judgment as a

---

[15] This result is easily reached if the jury's anticipation verdicts are treated as true special verdicts under Rule 49(a). *E.g., Floyd v. Laws*, 929 F.2d at 1396 (new trial on issue required where findings of fact expressed in special verdict under 49(a) cannot be reconciled).

[16] Grant or denial of a motion for judgment as a matter of law ("JMOL") is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie. *E.g., Lucent Techs. v. Gateway, Inc.*, 580 F.3d 1301, 1309 (Fed. Cir. 2009).

**46**

1
2
3
> matter of law may be granted only if the evidence, viewed
> from the perspective most favorable to the nonmovant, is
> so one-sided that the movant is plainly entitled to
> judgment, for reasonable minds could not differ as to the
> outcome.

4   *Gibson v. City of Cranston*, 37 F.3d 731, 735 (9th Cir. 1994)

5   (citations omitted).

6       Plaintiff's motion for judgment reasserts that Plaintiff is

7   entitled to judgment as a matter of law on the issue of obvious.

8   (Doc. 676 at 10-16).[17]  A patent is invalid for obviousness if

9   "differences between the subject matter sought to be patented and

10  the prior art are such that the subject matter as a whole would have

11  been obvious at the time the invention was made to a person having

12  ordinary skill in the art to which said subject matter pertains."

13  35 U.S.C. § 103(a). "Throughout the obviousness determination, a

14  patent retains its statutory presumption of validity, *see* 35 U.S.C.

15  § 282, and the movant retains the burden to show the invalidity of

16  the claims by clear and convincing evidence as to underlying facts."

17  *McGinley,* 22 F.3d at 1349 (citation omitted).  In the ordinary

18  patent case in which obviousness is asserted, the trier of fact must

19  answer the factual inquiries outlined in *Graham v. John Deere Co.*,

20  383 U.S. 1 (1966) relating to: (1) the scope and content of the

21  prior art, (2) differences between the prior art and the claims at

22  issue; (3) the level of ordinary skill in the art; and (4) whatever

23  objective evidence may be present as indicia of nonobviousness.

24  *Connell*, 722 F.2d at 1547.

25      Defendant contends that Plaintiff is not entitled to judgment

26  as a matter of law on the issue of obviousness because "it would

27

28  [17] Plaintiff did not advance a Rule 50 motion on the issue of anticipation at the
    close of evidence.

have been obvious at the time of invention for one of ordinary skill in the art to have run in the lock screws shown in Figure 3 in the Dallas '993 Patent."  (Doc. 696 at 18).[18]  Defendant cites the testimony of Cameron expert witness Gary Delvin ("Delvin") and Plaintiff's expert, Ivan Boyadjieff ("Boyadjieff"), in support of its contention.  (Id.); (Doc. 685 at 17) (citing Doc. 692 at 74, 76; Doc. 693 at 24).  Defendant also contends that it would have been obvious to a skilled artisan to modify the device depicted in the '94 Catalogue to create a dual load path to lessen the retained load on the lock screws employed by the device, but Defendant cites no evidence in support of this proposition.  (Doc. 685 at 20).

### 1. Evidence Regarding the Scope and Content of Prior Art

A prerequisite to making a finding on the scope and content of the prior art is to determine what prior art references are pertinent.  *State Contr. & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1069 (Fed. Cir. 2003) (citing *In re Clay*, 966 F.2d 656, 658 (Fed. Cir. 1992)).  As the Federal Circuit has explained:

> Whether a prior art reference is analogous is a question of fact. A reference is analogous if it is from the same field of endeavor as the invention. *Id.* at 658-59. Similarity in the structure and function of the invention and the prior art is indicative that the prior art is within the inventor's field of endeavor. *In re Deminski*, 796 F.2d 436, 442 (Fed. Cir. 1986). If a reference is outside the inventor's field of endeavor, it is still analogous art if the reference "is reasonably pertinent to the particular problem with which the inventor is involved." *Clay,* 966 F.2d at 659.

---

[18] Defendant also argues that, although the evidence establishes that running the lock screws in on the '993 Patent would damage the mandrel, it would have been obvious to a skilled artisan to modify the mandrel by cutting groves in the mandrel to accomodate the lock screws.  However, Defendant fails to make the threshold showing that a person of ordinary skill in the art would have been motivated to try using 5,000 psi lock screws to secure a frac mandrel, as discussed below.

1 *Id.*

2     At trial, Delvin testified that he believed that the '993
3 Patent demonstrated most of the features disclosed in the '925
4 Patent. (Doc. 692 at 67-68). Delvin opined that the '993 Patent
5 teaches and invention:

> 6   much like a Tree Saver frac mandrel. It's much like the
>   frac mandrel in question here in this case. It's a
> 7   mandrel that is involved with a blowout preventer,
>   another piece of equipment on the wellhead. But they all
> 8   do basically the same things.

9 (Id. at 69). Delvin also testified concerning the pertinence of the
10 '94 Catalogue as prior art. Delvin testified that the '94 Catalogue
11 discloses a secondary flange mounted on top of a tubing spool,
12 inside of which is a tubing hanger secured by lock screws. (Id. at
13 90). Delvin described the function of the tubing spool, flange,
14 tubing hanger, and lock screws as follows:

> 15   There -- that hanger is trying to blow out of that -- you
>   know, trying to launch it in space. So these lock screws
> 16   are holding it down. You can see they're fully engaged
>   right here...But you have this seal assembly sitting in
> 17   there recessing in that pocket. The way this works is
>   when you bolt those two together, you basically cramp
> 18   those down and create a seal on the upper neck of that
>   tubing hanger. And obviously, as that force is generated
> 19   launching it up, it's going to transfer that force
>   through these seals and into this flange, which is the
> 20   secondary flange.

21 (Id. at 96-97).

22     Boyadjieff provided further testimony relevant to whether the
23 '993 Patent and '94 Catalogue constitute analogous prior art.
24 During voir dire, the following exchange took place:

> 25   WITNESS: I've had cases to analyze how mandrels are
>   installed in general. There are other kinds of mandrels
> 26   that are used in wellheads and wells. And so a mandrel is
>   a term of a device that goes inside a tubular area. And
> 27   I've had work and analyzed how you would install such
>   devices, how you would retain those devices, what kind of
> 28   forces would be involved in those devices, how you would

**49**

install them in the field. All those kinds of things. But specifically to a unique frac mandrel, no.

THE COURT: And do you know whether there is any difference, engineering difference in the mandrels you're familiar with and frac mandrels?

THE WITNESS: No, there's no difference.

THE COURT: Same purpose and --

THE WITNESS: Same purpose.

THE COURT: -- operation?

THE WITNESS: They all have -- they all provide purpose in the well

(Doc. 693 at 59).

In light of the testimony offered by Delvin and Boyadjieff, the record is sufficient to support a rational finding that both the '993 Patent and '94 Catalogue are analogous references for purposes of the obviousness inquiry.  Both references disclose structures reasonably pertinent to the general problem the '925 Patent is designed to address: reaction of axial loads in wellhead equipment. *Clay,* 966 F.2d at 659.

## 2. Differences between the '925 Patent and Prior Art

Obviousness requires evaluation of the "differences between the subject matter sought to be patented and the prior art" with an eye on "the subject matter as a whole . . . at the time the invention was made" from the perspective of "a person having ordinary skill in the art." *KSR Int'l Co.*, 550 U.S. at 406 (quoting 35 U.S.C § 103(a)). Substantial evidence was presented at trial regarding differences between the references advanced by Defendant and the '925 Patent.

///

**50**

### a. The '993 Patent

The '993 Patent teaches a mandrel device designed to protect a tool referred to as a Blow Out Preventer used in fracing operations. (Doc. 692 at 69; Doc. 693 at 106). The '993 Patent discloses a structure including a first flange and a secondary flange that each react axial force through a single load path. (Doc. 691 at 44-45, RT. at 811-811).

Several witnesses testified about differences between the '925 Patent and the '993 Patent. Both Delvin and Meek testified that, unlike the '925 Patent, the '993 Patent does not disclose a direct connection between the secondary flange and the tubing head flange. (Doc. 692 at 111-112) (Delvin) (Doc. 691 at 93-95) (Meek). Meek testified that the lack of a direct connection between the secondary flange and tubing head flange in the '933 Patent is a material difference with respect to the potential functions of lock screws in the device. (Doc. 691 at 94-95). According to Meek, lack of a direct connection between the secondary flange and tubing head flange makes use of lock screws to secure the mandrel impractical in the '993 device due to manufacturing tolerances. (Doc. 691 at 94-95). Meek opined that manufacturing tolerances permitting slight deviations in the length of components located between the secondary flange and tubing head flange in the '993 Patent would make it difficult to precisely locate lock screw groves in the mandrel body, making it difficult to confidently seal the device. (Id.). Defendant presented no evidence to controvert Meek's testimony.

Both Delvin and Meek testified that running in the lock screws depicted in the '993 Patent to contact the mandrel body would cause damage to the mandrel. Meek and Delvin also both testified that if

**51**

the lock screws on the '993 device are not run in, there is no dual load path.  Meek testified:

> Q. Where I've drawn that green line, is that about right, Mr. Meek? Can you read for us what this patent teaches.
>
> A. Okay.  What it says is "The mechanical lock down mechanism secures the mandrel against the bit guide to maintain a fluid seal but does not restrain the mandrel from downwards movement."
>
> Q. So what does that tell you about how the '993 is constructed?
>
> A. It tells me that the mandrel is in compression and it must move downwards to seal on the bit guide. It tells me the lock screws can not be run in.
>
> Q. And so what does -- does that tell you anything about the way the '993 must respond and react to forces?
>
> A. It's a single load path.

(Doc. 695 at 95).

Boyadjieff also testified concerning general differences between the '993 Patent and the '925 Patent:

> Q. Now, throughout your engagement as an expert, you've been required to look at the '993 patent; is that correct?
>
> A. Yes, I was.
>
> Q. Is that -- is that a mandrel system? Is that a sleeve system? How would you classify that?
>
> A. Well, it's got a mandrel. But it's got a much different purpose than a wellhead mandrel. It's what they call a BOP mandrel. "BOP" stands for blowout preventer. It's a great big 10, 15 foot tall pressure device that you use when you're drilling a well. In case the well blows out, it's supposed to be how you close the well off. And that 9 -- that patent that you're talking about, it describes a long mandrel that you would stick down through the BOP device into the wellhead to protect the BOP device from the erosion caused by the frac fluid. So I don't even consider it anything similar at all.

(Doc. 693 at 106).

### b. The '94 Catalogue

The '94 Catalogue discloses a device described as an "MTBS Tubing Hanger" used for hanging tubing in a well whereby a set of lock screws are run in to the tubing body in order to react axial loads. (Doc. 695 at 90). Rex Duhn provided testimony relevant to the general structure and function of the MTBS Tubing Hanger:

> A tubing spool is a spool that has flange on top and a flange on the bottom. Kind of like a sewing spool. So it has flanges opposing each other.

(Doc. 690 at 23).

Meek testified that the MTBS Tubing Spool is designed in a manner that prohibits the mandrel from moving upwards towards the upper flange of the spool because movement of the mandrel would damage the metal seal at the top end of the tubing hanger and cause the seal at the bottom of the tubing hanger to become unseated. (Doc. 695 at 90-91). Meek further testified that the lock screws on the MTBS Tubing Spool are required to react the entire axial force acting on the mandrel, and thus that no dual load path is present in the device. (Id.). Devlin also testified that the '94 Catalogue does not dipict a dual load path. (Doc. 692 at 119-120).

### 3. Level of Ordinary Skill in the Art

Obviousness requires a showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention. *Unigene Labs., Inc. v. Apotex*, Inc., 2011 U.S. App. LEXIS 17762 * 16 (Fed. Cir. 2011) (citing *KSR Int'l. Co.*, 550 U.S. at 421). "Teachings from prior art, suggestions beyond the literal teachings of those art references,

1  or even motivations from the store of common knowledge of one of
2  ordinary skill in the art field []...provide the sources of evidence
3  that an ordinary skilled artisan might have found and combined at
4  the time of the invention. *Id.* (citing *Ortho-McNeil Pharm., Inc.*
5  *v. Mylan Labs.*, Inc., 520 F.3d 1358, 1364-65 (Fed. Cir. 2008)).

6      Little evidence was presented at trial concerning the level of
7  ordinary skill in the art, but the record does contain testimony
8  relevant to the inquiry.  Boyadjieff testified about the general
9  qualifications of a professional engineer:

10         To register as a professional engineer, you have to
11         qualify in your profession either through exam or
           through...experience. [To qualify based on experience,]
12         You have to show that you have been practicing the
           profession in a professional manner and that you are well
13         aware of all the elements of the profession that you have
           to know in order to be very knowledgeable of that
14         profession.

15  (Doc. 693 at 42).

16      Boyadjieff also testified about the general approach to
17  designing equipment suitable for fracing operations.  Boyadjieff
18  stated that, in order to design mandrels for use in wellhead
19  equipment, it is necessary to know the configuration of the
20  wellheads typically used.  (Doc. 693 at 56).  Boyadjieff further
21  testified about engineering practices attendant to designing frac
22  mandrels:

23         Q. What are some considerations you would have to take
24         into account when you're assembling and using these kind
           of high pressure frac equipment?

25         A. You have to take into account the -- as I said, the
26         pressure forces. You have to consider any other potential
           forces you might encounter. It's good engineering to,
           when you -- when you select equipment, to avail yourself
27         of all the knowledge of the forces that are going to be
           placed on that equipment. And that's what you do as an
28         engineer.

**54**

(Doc. 693 at 71).

#### 4. Objective Evidence of Nonobviousness

Objective evidence of nonobviousness may include, *inter alia*, commercial success and long-felt but unsolved needs. *E.g., WMS Gaming Inc. v. International Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999). Evidence adduced at trail established that the technology disclosed in the '925 Patent brought Duhn Oil commercial success. Rex Duhn testified that, as a result of the '925 Patent technology, Duhn Oil was able to expand its business and acquire several new customers. (Doc. 689 at 55, 66 RT at 468, 479). Evidence adduced at trial also established that the '925 Patent solved long-standing problems attendant to larger systems available at the time that were unwieldy, costly, and less safe. (Doc. 689 at 72-74, RT at 485-87).[19]

#### 5. Failure to Establish Prima Facie Case of Obviousness

To establish a prima facie case of obviousness, evidence must show "some objective teaching in the prior art or that knowledge generally available to one of ordinary skill in the art would lead that individual to combine the relevant teachings of the references." *Tec Air, Inc. v. Denso Mfg. Mich., Inc.*, 192 F.3d 1353, 1359 (Fed. Cir. 1999) (citation omitted). There is no

---

[19] Defendant contends that there is no nexus between the indicia of nonobviousness Plaintiff advances and the '925 Patent's dual load path. Defendant's argument is of no avail, as Defendant failed to establish a prima facie case of obviousness. *See, e.g., WMS Gaming Inc. v. International Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999) (noting "objective evidence of non-obviousness may be used to rebut a prima facie case of obviousness based on prior art references"). Further, it is clear that the '925 Patent's dual load path enabled Duhn Oil to meet Barrett Resources' specific request for a frac mandrel permitting re-use of existing Duhn products, including lock screws. The nexus between the dual load path and the commercial success of the '925 Patent is established.

1   suggestion to combine, however, if a reference teaches away from its

2   combination with another source.   *Id.*   If when combined, the

3   references "would produce a seemingly inoperative device," then they

4   teach away from their combination.   *Id*.   Specific findings

5   establishing why it would have been "apparent" to combine elements

6   of prior art are required to declare an invention obvious.   *Ruiz v.*

7   *A.B. Chance Co.*, 234 F.3d 654, 665 (Fed. Cir. 2000).

8       The only two references asserted by Defendant are the '94

9   Catalogue and the '993 Patent.   There is a failure of proof by

10  Defendant on the issue of whether a skilled artisan would have been

11  motivated to combine the elements of the '94 Catalogue and the '993

12  Patent to produce the dual load path disclosed in claim 1 of the

13  '925 Patent.   No witness testified on this subject.

14      Defendant argues that the '993 Patent discloses a set of lock

15  screws that, if run in, could create a secondary pathway for

16  transmitting an axial force from the mandrel.   (Doc. 692 at 47).

17  However, the evidence established that running the lock screws in

18  on the '993 device would damage the mandrel, potentially to the

19  point of rendering it inoperable.   (Doc. 691 at 121-122; Doc. 692

20  at 114).   Nothing presented at trial is sufficient to establish by

21  clear and convincing evidence that the '993 Patent would have

22  suggested use of a dual load path to a skilled artisan at the time

23  the '925 Patent issued, especially in light of the fact that the

24  '993 Patent was considered by the Examiner.   *See, e.g., PowerOasis,*

25  *Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008)

26  (noting added burden of deference regarding evidence considered by

27  the Patent Office).

28  ///

**56**

1    Defendant contends that the '94 Catalogue renders the '925
2 Patent obvious because it employs a first flange, secondary flange,
3 and set lock screws to react axial loads. However, like the '933
4 Patent, the '94 Catalogue does not suggest use of a dual load path.
5 Although Delvin initially speculated that the MTBS Tubing Hanger
6 could suggest a dual load path whereby force is reacted by the lock
7 screws and secondarily in a flange located above the lock screws,
8 on cross-examination, Devlin conceded that a skilled artisan would
9 have designed the MTBS device so that the lock screws retained the
10 total axial load, preventing any axial force from traveling past the
11 lock screws. (Doc. 692 at 119-120). The evidence presented by both
12 parties supports only one result: the lock screws employed in the
13 '94 Catalogue are designed to retain the total axial load. (*Id.* at
14 91, RT at 1898).

15    Pursuant to the jury instructions, the only two references the
16 jury was permitted to consider in adjudicating obviousness were the
17 '94 Catalogue and the '993 Patent. Defendant presented no testimony
18 sufficient to establish by clear and convincing evidence that the
19 '94 Catalogue or the '993 Patent, either independently or in
20 combination, would have suggested implementation of the type of dual
21 load path structure disclosed in the '925 Patent to a person of
22 ordinary skill in the art at the time of the '925 Patent's issuance.
23 Nor did Defendant present sufficient evidence to establish that
24 either the '993 Patent or the '94 Catalogue suggests using lock
25 screws rated for 5,000 psi production equipment to secure a frac
26 mandrel. To the contrary, record evidence establishes that, to the
27 skilled artisan evaluating the two references, applying the '94
28 Catalogue's run-in lock screw feature with the '933 Patent's mandrel

**57**

design would have appeared likely to produce failure, not success. In other words, combination of the only two references advanced by Defendant teaches away from the '925 Patent's unique structure. *See, e.g.*, *Tec Air,* 192 F.3d at 1359.

The testimony and patent file establish that conception of the dual load path disclosed in the '925 was prompted by the unique engineering problem posed by a customer's specific request to employ 5,000 psi lock screws for the herculean task of reacting the extreme axial force generated by fracturing operations. Defendant did not prove by clear and convincing evidence that, absent specific motivation to do so, there would be any "motivation to try" using 5,000 psi rated lock screws to retain a frac mandrel. Rather, Defendant's Senior Principal Engineer, Thomas E. Taylor, testified that because of the low psi rating of lock screws used in production wellhead equipment, his engineering team *did not even consider* using such production lock screws to retain a frac mandrel when they set out to design Defendant's TSW frac mandrel. (Doc. 691 at 199).

Although expert testimony is not always required to establish obviousness, *e.g., Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009), in light of the record, the nature of the art, and the onerous burden of proof that must be met to establish obviousness, no rational jury could have found claim 1 of the '925 Patent to be obvious based on Defendant's asserted references. All other claims at issue in this action depend from claim 1. Plaintiff's renewed motion for judgment as a matter of law is GRANTED. Alternatively, pursuant to Rule 50(c), Plaintiff's alternative request for a new trial on the issue of obviousness is GRANTED. Fed. R. Civ. P. 50(c).

**58**

**D. Inequitable Conduct Defenses**

Defendant advanced two theories of inequitable conduct at trial: (1) that Plaintiff committed inequitable conduct by failing to disclose John Rogers' contributions to the Patent Office; and (2) that Plaintiff committed inequitable conduct by intentionally withholding the '94 Catalogue from the Patent Office with the intent to deceive. The jury's finding that John Rogers should not have been named as an inventor on the '925 Patent controls adjudication of Defendant's inequitable conduct defense on the basis of inventorship. *See, e.g., Cabinet Vision*, 129 F.3d at 600 (where "substantial commonality" exists between the factual questions presented by legal and equitable claims, jury findings pertaining to the legal claims constrain the court's determination of equitable claims). The jury returned advisory verdicts finding that neither Rex Duhn, Robert Meek, or Constantine Marantidis (1) withheld material information or submitted materially false information to the Patent Office; or (2) knowingly failed to disclose material information or misleading statements with an intent to deceive the Examiner. The court is free to accept or reject the advisory jury's findings, but is obligated to make its own independent assessment of the issues submitted to the advisory jury. *See, e.g.,* Fed. R. Civ. P. 52(a) ("In an action tried on the facts...with an advisory jury, the court must find the facts specially and state its conclusions of law separately"). After reviewing the record and considering the jury's advisory verdicts, the court issues the following findings of fact and conclusions of law.

**Findings of Fact**

1. Rex Duhn, Robert Meek, and Constantine Marantidis each had a good

**59**

faith basis to believe, and actually believed, that there was no
basis for naming anyone other than Rex Duhn and Robert Meek as
inventors of the '925 Patent.

2. There is no substantial likelihood that a reasonable examiner
would have considered information regarding John Rogers' discussions
with Rex Duhn and Robert Meek important in deciding whether to allow
the application to issue as a patent.

4.  In May 2003, Duhn Oil filed a declaration in connection with its
Petition to Make Special indicating that it had conducted complete
and thorough search of prior art.

5.  Duhn Oil employed a professional search firm to survey prior art
relevant to Duhn Oil's patent application. Robert Meek also
performed a search for prior art.  All items of prior art found by
Meek and the professional search firm were disclosed to the Patent
Office.

6.  Robert Meek had the '94 Catalogue in his possession and chose
not to disclose it to the Patent Office.

7.  Robert Meek did not submit the '94 Catalogue to the Patent
office in connection with prosecution of the '925 Patent because he
did not believe it was related to the subject matter of the '925
Patent.  Robert Meek had a good faith basis to believe that the '94
Catalogue was not related to the subject matter of the '925 Patent
because the '94 Catalogue does not disclose a dual load path and

does not teach use of lock screws to secure a frac mandrel.  Use of lock screws to secure tubing hangers, as depicted in the '94 Catalogue, is a long-established prior practice in the oil and gas industry and the '94 Catalogue would have been cumulative of other references disclosed in the '925 Patent application.

8. Robert Meek did not intend to deceive the Patent Office in deciding not to submit the '94 Catalogue in connection with prosecution of the '925 Patent.

9. There is no substantial likelihood that a reasonable examiner would have considered the '94 Catalogue material in deciding whether or not to issue the '925 Patent.

**Conclusions of Law**

1.  Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent. *Therasense, Inc. v. Becton, Dickinson & Co.*, 99 U.S.P.Q.2D 1065, 1069 (Fed. Cir. 2011) (en banc).

2. To prevail on the defense of inequitable conduct, the accused infringer must prove, by clear and convincing evidence, that the applicant misrepresented or omitted material information with the specific intent to deceive the Patent Office. *Id.* (citing *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008)).  Although circumstantial evidence may be sufficient to constitute clear and convincing evidence of inequitable conduct,

to meet the clear and convincing evidence standard, the

**61**

1       specific intent to deceive must be the single most
2       reasonable inference able to be drawn from the evidence.
      Indeed, the evidence must be sufficient to require a
3       finding of deceitful intent in the light of all the
      circumstances. Hence, when there are multiple reasonable
4       inferences that may be drawn, intent to deceive cannot be
      found.

5  *Therasense*, 99 U.S.P.Q2d at 1073 (citations omitted).  A finding

6  that the misrepresentation or omission amounts to gross negligence

7  or negligence under a "should have known" standard does not satisfy

8  this intent requirement.  *Therasense*, 99 U.S.P.Q.2D at 1072

9  (citation omitted).

10

11 3. Intent and materiality are separate requirements that must each

12 be satisfied.  *Id.* at 1073.  A court must weigh the evidence of

13 intent to deceive independent of its analysis of materiality.  *Id.*

14

15 4. Where an inequitable conduct claim is based on failure to

16 disclose a reference, clear and convincing evidence must show that

17 the applicant made a deliberate decision to withhold a known

18 material reference.  *Id.* at 1072.

19

20 5.  Prior art is material if the Patent Office would not have

21 allowed a claim had it been aware of the undisclosed reference.  *Id.*

22 at 7073.  An exception to this standard applies "in cases of

23 affirmative egregious misconduct."  *Id.*  This exception to the

24 general rule requiring but-for proof incorporates elements of the

25 early unclean hands cases before the Supreme Court, which dealt with

26 "deliberately planned and carefully executed scheme[s]" to defraud

27 the PTO and the courts." *Id.* at 1974.

28

6.  Defendant has not carried the burden of establishing its inequitable conduct claim regarding Robert Meek's decision not to provide the '94 Catalogue to the Patent office because Defendant did not establish by clear and convincing evidence that Robert Meek harbored intent to deceive the Patent Office when he made the decision not to submit the '94 Catalogue.   Mr. Meek satisfactorily explained why he did not view the contents of the '94 Catalogue as relevant to the elements of the invention.

7. Defendant has not met its burden of establishing the inequitable conduct claim regarding Robert Meek's decision not to provide the '94 Catalogue because Defendant did not establish by clear and convincing evidence that the '94 Catalogue would have been material prior art to the Examiner.   The '94 Catalogue would not have been material because, *inter alia*, it does not disclose a dual load path and does not teach use of tie down lock screws to secure a frac mandrel.

8.  A person is a joint inventor only if she contributes to the conception of the claimed invention.   *E.g., Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004) (citations omitted).   Contributions to realizing an invention may not amount to a contribution to conception if they are too far removed from the real-world realization of an invention.   *Id.*   One who simply provides the inventor with well-known principles or explains the state of the art without ever having a firm and definite idea of the claimed combination as a whole does not qualify as a joint inventor. *Nartron Corp. v. Schukra U.S.A., Inc.*, 558 F.3d 1352, 1356 (Fed.

**63**

Cir. 2010) (citing *Ethicon*, 135 F.3d at 1460).  Inventorship requires that a person "contribute in some significant manner to the conception or reduction to practice of the invention [and] make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention."  *Id*. (citing *Pannu*, 155 F.3d at 1351).

9. Deliberate concealment of a true inventor's involvement in conceiving and invention constitutes inequitable conduct that renders a patent unenforceable.  *E.g., Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.,* 607 F.3d 817, 828 (Fed. Cir. 2010).

10. A good faith decision not to name a person as an inventor of a patent does not provide the basis for an inequitable conduct ruling. *See PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.,* 225 F.3d 1315, 1321 (Fed. Cir. 2000).

8.  Defendant has not carried its burden of proving inequitable conduct regarding the issue of inventorship because Defendant failed to establish by clear and convincing evidence that Rex Duhn, Robert Meek, or Constantine Marantidis had a basis to believe, or actually believed, that John Rogers should have been named as an inventor of the '925 Patent.  Neither Rex Duhn, Robert Meek, or Constantine Marantidis intended to deceive the Patent Office with respect to the identity of the named inventors included on the '925 Patent. Because the decision not to include John Rogers as an inventor on the '925 Patent was made in good faith, Defendant cannot prevail on its inequitable conduct claim.  The court adopts the jury's findings

1  on this issue.

2

3  9. Defendant has not carried its burden of proving inequitable
4  conduct regarding the inventorship issue because Defendant has not
5  established by clear and convincing evidence that information
6  regarding John Rogers input would have been material to the
7  Examiner. Despite providing ideas related to the '925 Patent such
8  as, *inter alia*, use of lock screws, John Rogers is not an inventor
9  of the '925 Patent because John Rogers' preliminary ideas were too
10 far removed from the real-world realization of the invention
11 embodied in the '925 Patent. *See Eli Lilly & Co.*, 376 F.3d at 1359.

12 **E. Judgment under Rule 54(b)**

13     Rule 54(b) provides that final entry of judgment should be made
14 on individual claims in multiple claim suits "upon an express
15 determination that there is no just reason for delay." Fed. R. Civ.
16 P.54(b). In determining whether just reason for delay of entry of
17 judgment exists, courts consider such factors as the
18 interrelationship of the claims so as to prevent piecemeal appeals.
19 *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 954
20 (9th Cir. 2006).

21     Certification of partial judgment pursuant to Rule 54(b) is not
22 appropriate. A new trial is required on Defendant's affirmative
23 defense of anticipation. Because a judgment of invalidity
24 necessarily moots the issue of infringement, *see, e.g., Sandt Tech.,*
25 *Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1356 (Fed. Cir.
26 2001), there is just reason for delay of entry of judgment under the
27 circumstances presented, *see Fin Control Sys. Pty v. Oam*, 265 F.3d
28 1311, 1321 (Fed. Cir. 2001) (noting that adjudication of invalidity

counterclaim was a prerequisite to entering final judgement in a patent infringement case).

### ORDER

For the reasons stated, IT IS ORDERED:

1) As a new trial is required on the defense of anticipation, entry of judgment is not appropriate at this time;

2) Plaintiff's motion for judgment as a matter of law on Defendant's claims of obviousness is GRANTED;

3) Plaintiff's alternative request for a new trial on the issue of obviousness is conditionally GRANTED pursuant to Rule 50(c);

4) This case shall be reset for trial on the defense of anticipation. In the event Defendant prevails, judgment shall be entered against Plaintiff on all Plaintiff' claims and in favor of Defendant. If Plaintiff prevails, judgment in favor of Plaintiff shall in all respects be entered for Plaintiff and against Defendant on liability and damages; and

5) A form of order consistent with this memorandum decision shall issue.

IT IS SO ORDERED.

Dated:    September 30, 2011            /s/ Oliver W. Wanger
                                    UNITED STATES DISTRICT JUDGE