1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF CALIFORNIA

3

4   DUHN OIL TOOL, INC.,              )    Case No. 05CV1411-H
                                      )
5            Plaintiff,               )    San Diego, California
                                      )
6   vs.                               )    Wednesday,
                                      )    February 15, 2012
7   CAMERON INTERNATIONAL             )    9:00 a.m.
    CORPORATION,                      )
8                                     )
             Defendant.               )
9   _____)    VOLUME I

10                  TRANSCRIPT OF BENCH TRIAL
               BEFORE THE HONORABLE MARILYN L. HUFF
11                 UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:           JOSEPH THOMAS, ESQ.
                                 WILLIAM KOLEGRAF, ESQ.
14                               PAUL SCHUCK, ESQ.
                                 Thomas, Whitelaw & Tyler, LLP
15                               18101 Von Karman Avenue
                                 Suite 230
16                               Irvine, California 92612
                                 (949) 679-6400
17
    For the Defendant:           CHARLES ROGERS, ESQ.
18                               JOE REDDEN, ESQ.
                                 Conley Rose
19                               600 Travis Street, Suite 7100
                                 Houston, Texas 77002
20                               (713) 238-8000

21  Transcript Ordered by:       JOSEPH THOMAS, ESQ.

22  Court Recorder:              Lynnette Lawrence
                                 United States District Court
23                               940 Front Street
                                 San Diego, California  92101

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

I-ii

1 | Transcriber:                    Jordan Keilty
                                    Echo Reporting, Inc.
2                                   6336 Greenwich Drive
                                    Suite B
3                                   San Diego, California  92122
                                    (858) 453-7590
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I-iii

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Ronald Frishmuth | I-57 | I-142 | -- | -- |
| Gary Devlin | I-179 | -- | -- | -- |

| EXHIBITS | | | IDENTIFIED | RECEIVED |
|---|---|---|---|---|

Joint

| JX44 | File history | I-189 | I-189 |
|---|---|---|---|
| JX77 | U.S. Patent No. 6,688,386 | I-191 | -- |

Plaintiff's

| 33 | Diagram of MTBS Tubing spool and hanger | I-177 | I-177 |
|---|---|---|---|
| 76 | ANSYS project report, case six | I-177 | I-177 |
| 78.1 | Figures from Brugman report | I-177 | I-177 |
| 78.2 | Figures from Brugman report | I-177 | I-177 |
| 78.3 | Figures from Brugman report | I-177 | I-177 |
| 78.4 | Figures from Brugman report | I-177 | I-177 |
| 78.5 | Figures from Brugman report | I-177 | I-177 |
| 80 | Force distribution for ANSYS | I-161 | I-177 |
| 81 | Case six stress plot | I-162 | -- |

Defendant's

| A | Cameron catalog | I-196 | I-198 |
|---|---|---|---|
| B | Page 719, Cameron catalog | I-197 | I-198 |
| C | Cameron MTBS metal-to-metal tubing hanger | I-7 | -- |
| C.001 | Photo of Cameron MTBs metal-to-metal sealing tubing hanger | I-117 | -- |

I-iv

| EXHIBITS | (Cont'd.) | IDENTIFIED | RECEIVED |
|---|---|---|---|
| D | MTBS photos | I-198 | I-198 |
| E | MTBS assembly drawings | I-199 | I-201 |
| F | MTBS invoices | I-199 | I-201 |
| G | MTBS running procedure | I-198 | I-201 |
| I.001 | FEA model colors with mesh | I-103 | -- |
| M.001 | Displacement with tubing | I-112 | I-117 |
| M.002 | Displacement with tubing | I-112 | I-118 |
| R | Vector Mechanics for Engineers | I-58 | -- |
| S.001 | Engineering Mechanics of Deformable Bodies | I-86 | -- |
| AG | SY full hanger 2 view | I-110 | I-110 |
| AI | SY assembly steps 3 to 6 | I-128 | I-128 |
| AK | Displacement with tubing | I-117 | I-117 |
| BA.001 | Load balance by analysis substep | I-103 | I-110 |
| EB | Frismuth report | I-67 | -- |
| EB.017 | Frismuth report | I-76 | -- |
| EC.009 | Boyadjieff report | I-82 | -- |
| ED.016 | Frismuth report, Exhibits A & C | I-177 | I-177 |
| ED.017 | Frismuth report, Exhibits A & C | I-177 | I-177 |
| EF | Brugman report | I-131 | -- |

I-1

1  <u>SAN DIEGO, CALIFORNIA  WEDNESDAY, FEBRUARY 15, 2012 9:00 AM</u>

2                      --oOo--

3       (Call to order of the Court.)

4            THE CLERK:  Number one on calendar, Eastern

5  District of California, Case 05CV1411, Duhn Oil Tool, Inc.

6  versus Cooper Cameron Corporation, for a bench trial.

7            THE COURT:  Thank you.

8            Could you state your appearances?

9            MR. THOMAS:  Be happy to, your Honor.  Good

10 morning.  Joseph Thomas, William Kolegraff, Kerri Rich, Paul

11 Schuck, on behalf of the Plaintiff, Duhn Oil Company.

12           THE COURT:  Thank you.

13           MR. REDDEN:  Good morning, your Honor.  Joe Redden

14 and Charles Rogers on behalf of Cameron.

15           THE COURT:  Thank you.

16           We're ready to proceed.  The Court's had an

17 opportunity to read the transcript of the trial before, and

18 do the parties also agree that the Court can consider the

19 prior trial record?

20           MR. THOMAS:  We do, your Honor.

21           MR. REDDEN:  Yes, your Honor.

22           THE COURT:  All right.  Thank you.

23           You may proceed.

24           MR. THOMAS:  We've agreed, your Honor, that the

25 Defendant was going --

I-2

1          THE COURT:  It's backwards.  You may proceed.

2          OPENING STATEMENT ON BEHALF OF THE DEFENDANT

3          MR. REDDEN:  Thank you, your Honor, and may it

4 please the Court.

5          This is really a simple case because it boils down

6 to one critical issue, do the prior art references cited by

7 Cameron, this MTBS tubing hanger referenced in this 1994

8 Cameron catalog and this U.S. patent, the '993 Dallas patent

9 -- and we see here a blowup of Figure 3 of the '993 patent

10 -- do these prior art devices have a dual load path.

11          If either one of these pieces of prior art has a

12 dual load path, then claim one, the independent claim from

13 which all the other claims continued is anticipated and,

14 therefore, invalid.

15          The requirement of a dual load path comes from the

16 so-called wherein clause of the Duhn Oil patent, which is

17 the last -- as you can see, is the last clause of claim one.

18 It says:

19          "Wherein an axial force acts on the

20          generally elongate annular member and is

21          reacted in both the first tubular member

22          flange and the secondary flange."

23          In other words, when a force is applied to an

24 annular member, will that force be reacted in each of the

25 two flanges that are identified in claim one.

1          THE COURT:  What do you do about Figure 2?  So,

2    typically, the -- so on the claim construction, the -- this

3    has been the dual load path, but typically, a court looks at

4    the patent, and it would be error to read out of the patent

5    one of the figures.  Figure 2 appears to depict a single

6    load path.  The upward force on the frac mandrel acts on the

7    upper flange but only reaches the tubing head flange through

8    the upper flange.  And so Figure 2 seems to suggest that

9    there's no independent force path from the frac mandrel to

10   the tubing head flange, and if the lock screws -- the one

11   set of lock screws were screwed in, the lock screws would

12   create a second independent force path from the frac mandrel

13   to the tubing head flange.

14          So do you say that the lock screws have to be

15   screwed in or that we read that out because of prosecution

16   history estoppel?

17          MR. ROGERS:  Your Honor, that's one of the issues

18   of claim construction that we covered quite extensively in

19   the trial brief, and the point that you raise is our point,

20   that is, that claim construction -- the dual load path claim

21   construction is wrong, and it's wrong exactly for the reason

22   you pointed out, because it reads out Figure 2 of the

23   patent.  Figure 2 has a description in column six of the

24   patent that matches up with the wherein clause.

25          THE COURT:  All right.  So we'll get back to that,

I-4

1   and then the issue is on the prosecution history estoppel on

2   the Cornelssen reference.

3          MR. ROGERS:  That's a claim construction issue as

4   well that was never resolved by Judge Wanger.  We have not

5   prepared our trial today to address that issue.

6          THE COURT:  You may want to then during the course

7   of it take a look at that, because I understand your

8   position on the dual load path, and on Figure 2, unless by

9   prosecution history estoppel, since the wherein clause was

10  added to read around Cornelssen, whether that then is the

11  answer for the other side.

12         MR. ROGERS:  Yes.

13         THE COURT:  Okay.  You may continue.

14         MR. REDDEN:  Thank you, your Honor.

15         The wherein clause is obviously important because

16  it was added, as I think the Court knows, by Duhn Oil during

17  the prosecution in order to overcome an initial rejection by

18  the Patent Office.

19         So all the claims that are being asserted in this

20  case, including claim one, were initially rejected by the

21  Patent Office, as you can see here, and the rejection was

22  based primarily upon three earlier patents on wellhead

23  assemblies, the Smith, Cornelssen, and Watkins patents.

24         So basically the Patent Office determined that

25  Duhn Oil had not invented anything new and, therefore, it

I-5

1  was not patentable.  It was at that point that Duhn Oil

2  amended claim one by adding the wherein clause.  As you can

3  see here, it's the underlined portion amending claim one --

4  and argued that claim one and all the claims that were

5  dependent on claim one should now be allowed over Smith,

6  Cornelssen, and Watkins.

7      And with very little analysis, the Patent Office

8  agreed, withdrawing its rejection of claim one and any

9  claims that depended from claim one.  So claim one is

10 critical because it contains the wherein clause that Duhn

11 Oil had to add to get its patent and because it's the

12 independent claim upon which all the other asserted claims

13 depend.

14     Okay.  Go to the next slide.  Got these out of

15 order.  Okay.  Here's -- well, I apologize.  I thought I had

16 a slide.  Let's just use this Duhn Oil model.  You can see

17 in this model this -- this blue piece right here of the Duhn

18 Oil device is the frac mandrel, and that's the embodiment in

19 the Duhn Oil device of what is called the annular member in

20 the '925 Duhn Oil patent, and that member is retained by

21 these two sets of lock screws here and here in this lower

22 flange and the red and white screws shown in this other

23 flange.

24     And what those lock screws do and what was clear

25 at the trial is that when they are screwed in, they push

I-6

1  down on that mandrel to keep it from blowing out of the well

2  when well pressure is generated by the fracking operation.

3  Now, at trial Duhn Oil said its frac mandrel is a dual load

4  path device because when a force, an upward force is applied

5  to the annular member, it would be reacted in both places in

6  this flange here, the bottom flange, through this set of

7  lock screws and in this upper flange through the top set of

8  lock screws.

9        Now, in support of its infringement claim, Duhn

10  Oil said that Cameron's frac mandrel was also a dual load

11  path device.  In this model, the mandrel is shown in red.

12  In the Cameron device, there is one let of lock screws in

13  the tubing mandrel, which if screwed in against the mandrel,

14  Duhn Oil said would create one load path.  And then in

15  Cameron's device, at the second set of lock screws, there's

16  what's called a load ring depicted here by blue, and the

17  load ring is in the upper flange here.  So the lower flange,

18  upper flange.

19        Duhn Oil's infringement theory was that if any

20  force acts on this mandrel, it's going through reacting

21  through this lock screw that's screwed in in the lower

22  flange and also through the load ring in the upper flange.

23        And this slide here is a slide that Duhn Oil

24  actually used at trial to depict the idea of reaction of the

25  lock screws into the lower flange and at the load ring in

I-7

1  the upper flange.

2          Now that we're here in this invalidity trial, Duhn

3  Oil has shifted gears, and they say that somehow this tubing

4  member which has a lower flange, an upper flange, a set of

5  lock screws --

6          THE COURT:  This is Dallas?

7          MR. REDDEN:  No.  No, this is not, and let me

8  clear that up.  This is the other piece of prior art.  This

9  is what we call the MTBS --

10          THE COURT:  This is the -- this is the catalog?

11  No?

12          MR. REDDEN:  Yes.

13          THE COURT:  Okay.  This is the catalog.

14          MR. REDDEN:  We call it the catalog.  This device

15  that's shown here that you'll be hearing about today --

16          THE COURT:  And that exhibit is what?

17          MR. REDDEN:  I believe that's D?

18          THE COURT:  It's a blowup of D as in dog?

19          MR. REDDEN:  It's C, isn't it?

20          MR. ROGERS:  C is the specimen that's downstairs.

21          THE COURT:  Uh-huh.

22          MR. ROGERS:  This is a photograph of it, and that

23  photograph that's blown up is within the -- it is D.006.

24          THE COURT:  Thank you.

25          MR. REDDEN:  All right.  So here we have a device

I-8

1 called a tubing spool and tubing hanger.  But, first of all,

2 it has a mandrel.  That's the brown piece shown right here

3 or I should say probably annular member, and that's the

4 annular member.  It has an upper flange, this one up here.

5 It has a lower flange.  It has a set of lock screws going

6 through the lower flange and contacting the annular member.

7 And it has up here the metal seal that's in the upper flange

8 that also contacts the annular member.  As you'll hear, both

9 of these transmit downward forces into this annular member,

10 and it's Duhn Oil's position that this invalidity trial that

11 somehow when a force -- an upper force from the well

12 contacts this device, no loads are reacted, neither here,

13 the lower flange or lock screws or here in the upper flange.

14          Your Honor, not only is this a classic case of

15 flip flopping, but it defies common sense, and it defies the

16 laws of physics.  You'll be hearing more about that today

17 with our first witness, Doctor Ronald Frishmuth -- stand by

18 the -- thank you.

19          Doctor Frishmuth is a distinguished expert in

20 structural analysis and mechanical behavior of materials.

21 He will testify that this MTBS tubing hanger and catalog

22 device is also a dual load path device because, just like

23 the Duhn Oil and Cameron frac mandrels, there are two

24 mechanisms that push down on the annular member to retain

25 it, here at the metal seal and here at the lock screws, and

I-9

1  when an upward force is applied to this annular member, that

2  force will be reacted in both places, at the lower flange in

3  these lock screws and in the upper flange through this metal

4  seal.

5         Doctor Frishmuth will also tell you a lot of the

6  opinions of Duhn Oil's expert, Mr. Boyadjieff, are

7  incorrect.  He will explain that Mr. Boyadjieff failed to

8  account for the fact that the metal parts in this MTBS

9  hanger are not rigid bodies but, rather, are elastic bodies

10  that would form and store the energy when you apply

11  sufficient force to them, and you will learn that very heavy

12  loading forces are applied when this device is installed.

13         Now, Doctor Frishmuth will also explain that he's

14  prepared computer models to simulate what happens when an

15  upward force is applied to this tubing hanger, and these are

16  called Finite Element Analyses.  And, as you'll see, the

17  results of these Finite Element Analyses clearly show that

18  an upward force reacting or acting on this annular member

19  will be reacted in both flanges, thus satisfying the

20  requirement of a dual load path.

21         This slide is a demonstrative taken -- a still

22  shot of an actual movie taken as part of Doctor Frishmuth's

23  FEA, and he will explain to you what's being shown here.

24  But basically what this proves is that when a force is

25  applied, pressure is applied from below, that you will have

I-10

1   a reaction with this flange with the lock screws coming in

2   and also up here on this flange where this metal seal which

3   is actually called a U-cup seal come in.

4        In addition to Doctor Frishmuth, who will be

5   talking about the catalog device, we'll call Mr. Gary

6   Devlin.  Gary, would you stand up, please?  Thank you.

7        Mr. Devlin is Cameron's vice president of quality

8   and customer experience.  He's very familiar with the oil

9   field equipment that's at issue in this case, including frac

10  mandrels and tubing hangers, and Mr. Devlin will explain why

11  he agrees with Doctor Frishmuth that Cameron's MTBS tubing

12  hanger has a dual load path.

13       Mr. Devlin will also testify about the other piece

14  of prior art from which Cameron is relying, which is the

15  '993 patent that was granted to Murray Dallas back in 2001.

16  And Mr. Devlin will explain why this Dallas '993 patent also

17  satisfies each limitation of claim one of the Duhn Oil

18  patent.

19       Now, Duhn Oil claims that the '993 does not

20  satisfy the dual load patent requirement because let's say

21  this figure shows the lock screws not being turned in.  But

22  Mr. Devlin will explain that one of ordinary skill in the

23  art would inherently know that these lock screws would be

24  turned in.  Mr. Devlin will also address the dependent

25  claims Duhn Oil is asserting and will explain why they are

I-11

 1  also anticipated by the tubing hanger and/or the '993

 2  patent.

 3          So that's basically our case, your Honor.  What --

 4  what can you expect to hear from Duhn Oil?  Well, as you

 5  heard at our last meeting, Duhn Oil went out and hired an

 6  FEA expert of their own.  That's Mr. Brugman who's back

 7  there in the courtroom, and they had to do that because

 8  their other expert, Mr. Boyadjieff, has no expertise in

 9  Finite Element Analysis.

10          Mr. Boyadjieff, even though he's done no testing

11  to support his theories, is going to claim that Doctor

12  Frishmuth is wrong and it's simply impossible, he says, for

13  this MTBS hanger to react to any force over here at the lock

14  screws, over here at the metal seal.

15          Clearly, either he's wrong or Doctor Frishmuth is

16  wrong.  There's really not a lot of middle ground here.  One

17  of them's got to be incorrect.  And you'll have to determine

18  who's right and who's wrong.

19          As to Mr. Brugman, the FEA expert, he has some

20  criticisms of Doctor Frishmuth's FEA model.  And Doctor

21  Frishmuth will address his criticisms, and basically he will

22  tell you that either those criticisms are not valid or

23  they're simply irrelevant to the problem that Doctor

24  Frishmuth was addressing.

25          Significantly, Mr. Brugman has not done any FEA

I-12

1   analysis of his own.  All he's done is throwing rocks at

2   Doctor Frishmuth.  Even though Mr. Brugman says when I took

3   his deposition the other day he's done thousands of FEA's

4   over the years in his career, and he says he could have done

5   one, but he wasn't asked to.

6           Now, I would suggest that you can draw a pretty

7   strong inference from his failure to do his own FEA, that he

8   knew the result would not be favorable to Duhn Oil.  And

9   then I understand they intend to call Mr. Meek.  Mr. Meek is

10  one of the inventors on the patent.  Not surprisingly, he's

11  sure it's valid.

12          Now, Duhn Oil knows they have some problems with

13  respect to this dual load path.  And so they have some fall-

14  back arguments as to why Cameron's prior art doesn't meet

15  all the limitations of claim one.

16          For example, they now argue for the first time

17  after years of litigation that this term "generally elongate

18  annular member" in claim one is somehow limited to a frac

19  mandrel and, therefore, that this tubing hanger doesn't

20  satisfy claim one because they say, "Well, this annular

21  member is not a frac mandrel."

22          Well, this argument runs afoul of several basic

23  principles of patent law.  First, it ignores the

24  prosecution's history.  The evidence will show that the

25  Patent Office clearly considered tubing hangers to be

I-13

1  elongate annular members.  Second, it's directly contrary to

2  the Court's claim construction.  Next slide.

3       If you look at Judge -- this is an excerpt of

4  Judge Wanger's claim construction, and he talks about the

5  claim elongate annular member, for example, a frac mandrel.

6  So Judge Wanger recognized in his claim construction that an

7  elongate annular member does not have to be a frac mandrel,

8  that the frac mandrel is simply one example of an elongate

9  annular member.  So when Duhn Oil's expert, Mr. Boyadjieff

10  -- go back to that slide.  This is from Mr. Boyadjieff's

11  expert report.  And, as you can see, he decided he was going

12  to play judge here, and he was going to change generally

13  elongated annular member for frac mandrel.  Apparently he

14  doesn't understand that he doesn't have the power to do

15  that, that he has to go with the Court's claim construction.

16  So that's the second problem with this argument.

17       Third, Devlin simply ignores the fact that Duhn

18  Oil chose to use the term "elongate annular member" instead

19  of a narrower term like "frac mandrel."  Presumably they

20  wanted to cast a wider net for potential infringers, but

21  they can't have it both ways.  According to the Supreme

22  Court, a patent may not like a nose of wax be twisted one

23  way to avoid anticipation and another to find infringement.

24       And, fourth, the Federal Circuit has made clear

25  that one of the cardinal sins of patent law, reading a

I-14

1 limitation from the written description in their claims, and

2 yet that's what Duhn Oil wants you to do, not only with

3 respect to elongate annular member, but there's two other

4 limitations they want to do that with, plurality of

5 fasteners and suspended in.  We've got it highlighted here

6 for you in claim one.

7         In the case of plurality of fasteners, Duhn oil

8 wants to get around the '993 patent by adding a limitation

9 that would require a direct fastening of the secondary

10 flange to the first tubular member flange, even though the

11 claim doesn't say anything about that.  In the case of the

12 limitation that says the elongate annular member must be

13 suspended in the first tubular member, Duhn Oil wants to

14 change the limitation from suspended in to supported by in

15 yet another attempt to get around the '993 patent.

16        Your Honor, these transparent attempts to add or

17 change limitations in claims is clearly improper and should

18 be dismissed out of hand by this Court.

19        Now, another thing you're going to hear a lot

20 about from Duhn oil is the so-called stinger device, which

21 is one of the embodiments of the '993 patent.  And they're

22 going to talk about how the stinger device was bigger than

23 the -- how it compares to the Duhn Oil frac mandrel, shall

24 we say.  It was bigger.  It didn't work the same way.

25        Well, that's totally irrelevant to a proper

I-15

1  invalidity analysis.  The issue is whether the prior art

2  satisfies the claims, not the embodiment of the claims.  So

3  in the case of the '993 patent, the question is does Figure

4  3 and the corresponding description in the patent disclose

5  each limitation of the claims.  That's the proper patent

6  analysis, not comparing an embodiment of the '993 patent to

7  an embodiment of the '925 Duhn Oil patent.

8          Your Honor, we're confident that when you've heard

9  all the evidence, it will be clear to you that all the

10 claims asserted by Duhn Oil are invalid as anticipated.  And

11 I'd like to -- Mr. Rogers has a brief statement he'd like to

12 make.  I think we're still within our time limit.  So I'll

13 ask if he can have a minute.

14          THE COURT:  He may.

15          MR. ROGERS:  Your Honor, just a brief statement.

16          We've exchanged slides, and so we can see from

17 their opening that they've got a discovery dispute issue

18 that they want to raise.

19          When we were last here before the Court, we -- I

20 committed to you that I would continue to cooperate and get

21 the electronic documents, the FEA analysis documents to the

22 other side, just like I've done before.

23          We had an issue where I hired a courier to deliver

24 a document to the expert directly.  The reason is because we

25 have -- these electronic files are so large you cannot

I-16

1  transfer them through the Internet.  So we put them on hard

2  drives and deliver them.  And their expert, Mr. Brugman,

3  lives in Houston, where I live.  And so rather than shipping

4  these out to California and then having their attorney ship

5  them to their expert, I talked to the -- Mr. Kolegraff and

6  offered to provide the files directly to their expert.  I

7  hired a courier.  I finished the documents about 1:00 in the

8  morning.  The courier was supposed to deliver it to his

9  house, leave it at the front door.  And the reason his house

10 is because I guess he has a job that's separate from what

11 he's been retained to do in this case, and so they only gave

12 me his home address to deliver.  They said he's not at home

13 during the day.  So I couldn't deliver during the day.  So

14 the courier was supposed to drop off these documents at the

15 door overnight so when he gets up in the morning to leave

16 for the office, he'll have it rather than when he comes

17 home.  I didn't want to hear him complain that he didn't get

18 them until 7:00 o'clock that night when he came home from

19 work.

20         Unfortunately, the courier not only called him at

21 3:00 in the morning and woke him and his family up, then the

22 courier also made him sign for the delivery at 3:00 in the

23 morning.  So it's an unfortunate incident.  I apologize, but

24 intentions -- there was no purpose to cause any disruption,

25 and from what I see from their slides, it's not only a

I-17

1  complaint about this, which they have a valid complaint that

2  their expert was woken up in the middle of the night, no

3  intentions there.  Good intentions, get the documents to him

4  as quick as possible.  I understand their complaint.  But

5  what's -- the reason why I'm going through this explanation

6  is because the slides and the presentation they are prepared

7  to make to you are so misleading they'd leave the impression

8  -- they're trying to leave the impression that we had these

9  documents weeks in advance and we waited until close to

10 trial, delivered them at 3:00 in the morning and

11 intentionally disrupted their expert and his family.

12         The documents, they're on the drive that was

13 delivered to them.  There's a collection of documents.  Some

14 were just finished that night before the delivery was sent.

15 There are other files on that document which they refer to

16 it in their chart as us having finished -- in their slides

17 as having finished long ago.

18         Well, they already had those files.  They had them

19 in the format that they had requested, and what was

20 delivered I voluntarily called -- when they said they're

21 going to hire -- they were asking for documents earlier,

22 electronic documents and not in the native format, in a

23 specific format they wanted, and we gave them to them.

24         When they said they were going to hire an expert,

25 I voluntarily offered to give them the files in the native

I-18

1  format for some cases that had been done after the

2  deposition when we gave them the first set of native file

3  documents.  Those were the files.  Those were the delivered

4  -- no bad intent.  If you have any questions after they

5  raise the issue, I'll be happy to explain any further if

6  necessary.

7             Thank you.

8             THE COURT:  Thank you.

9         OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

10            MR. THOMAS:  Your Honor, I'm just going to

11 rearrange --

12            THE COURT:  You may.

13            MR. THOMAS:  -- a few items here.

14            May it please the Court.  Good morning, your

15 Honor.  Joseph Thomas on behalf of the Plaintiff, Duhn Oil

16 Company.  And, as the Court is very familiar, this case was

17 tried about a year ago to a jury.  I guess we were in trial

18 almost two weeks or a little bit longer, heavily litigated

19 case.  Nobody at the time believed we'd be doing this within

20 12 months.

21            THE COURT:  With a different judge.

22            MR. THOMAS:  Yeah.  And I had to remark on my --

23            THE COURT:  And a different area.

24            MR. THOMAS:  -- my esteemed colleagues, and I do

25 -- I know we're litigants, but I do respect both of them,

I-19

1  and we -- so we do this every year about this time.  I don't

2  know what we'll be doing next year.

3          Anyway, I make a couple -- let me -- before I

4  begin my remarks, I want to introduce Mr. Kelly Joy, who is

5  chairman of Seaboard, which now owns Duhn Oil Company.  Mr.

6  Joy, would you stand up.  Thank you.

7          THE COURT:  Thank you.

8          MR. THOMAS:  And behind Mr. Joy are the experts.

9  These are all expert witnesses, Mr. George Boyadjieff, and

10 next to him is Jim Brugman, who's our FEA analysis, and then

11 Bob Meek, who was a co-inventor of the '925, a current Duhn

12 employee.

13          So we have an interesting case here.  We have two

14 non-retained experts, and we have Mr. Devlin, Gary Devlin,

15 who is and has been for a very long time a Cameron employee

16 and still is, as well as Mr. Meek, the same with Duhn, as

17 well as some other very highly qualified experts.

18          I mentioned the trial for a couple of reasons as a

19 prelude to my opening statement remarks the first trial.

20 The first trial did not include an FEA analysis.  There was

21 no theory of that.  I believe they thought that was their

22 one trial that they were going to get subject to some

23 appellate ruling, and if they believed this FEA thing so

24 strongly, one must wonder -- you must wonder, I certainly

25 wonder, why in the world didn't they come up with this in

I-20

1 the first trial, and I know the rules allow them on a new

2 trial to add new evidence.  So here we are.

3           So with that, I think there are a lot of questions

4 bout this FEA analysis.  We're going to go into that.  We're

5 going to explain why we don't think this computer modeling

6 program was run correctly, it comes anything close to the

7 nature of clear and convincing evidence.  And, as the Court

8 well knows, in a case of anticipation, asserted anticipation

9 to invalidate a patent, it's the very highest burden of

10 proof, clear and convincing.

11          So we all know that Mr. Redden and Mr. Rogers and

12 Cameron start way behind the eight ball here, and they know

13 that, and I think that in part explains what the FEA

14 analysis is what I described as a hail Mary pass in a

15 football game, why it came in so late and what happened.

16          So, without further ado, I'm going to start with

17 our describing kind of this case and put it in context so as

18 you hear the questions on both sides, you can understand why

19 the questions are being propounded.

20          As we know, the parties are Duhn Oil.  The

21 Plaintiff, Rex Duhn, and his father started the company in

22 1947.  It was a family owned business.  It started in

23 Bakersfield, which is the heart of the oil drilling area of

24 California.  They set up the manufacturing operations for

25 Duhn Oil in Bakersfield.  Duhn Oil became very successful

I-21

 1  and was later acquired by Seaboard in 2008 and more recently

 2  by another company called Weir this past December.

 3          And what does Duhn do?  They manufacture a line of

 4  equipment.  They're not an oil and gas production company,

 5  but they're an oil equipment manufacturer, primarily devices

 6  used at the surface, surface drilling as opposed to below

 7  the surface not for deep-sea drilling.

 8          Cameron International is a very large company

 9  headquartered in Houston, very well known.  It's a large

10  supplier of equipment and services to onshore and offshore

11  oil and gas drilling operations.  They're not an oil

12  producer either to my knowledge.

13          Duhn Oil is an innovative -- started as a family

14  business, but it made its mark by being an innovative

15  manufacturing company.  Here are a series of the patents

16  that are owned -- or developed and owned by Duhn Oil Company

17  over the years, and you'll see in the yellow is the '925

18  patent.  That just happens to be one of many patents that

19  this company has developed and used.  It's a well-known

20  company and a very successful company.

21          Rex Duhn is the president -- was the president of

22  Duhn Oil until 2008.  He's the co-inventor of several

23  patents, and he and Bob Meek are the co-inventor of the '925

24  patent.

25          THE COURT:  And there was the previous

I-22

1   inventorship issue.  The jury returned that, and that's a --

2            MR. THOMAS:  Yes.

3            THE COURT:  -- factual matter, and you won?

4            MR. THOMAS:  We won, and that's all gone.

5            Mr. Meek I mentioned.  He's the chief engineer for

6   Duhn Oil and also the co-inventor.

7            Litigation history, you're familiar with this.

8   The patent was issued in July of '05.  Duhn filed a lawsuit

9   in November '05.  Took about six years because we are in the

10  busiest courthouse in the United States in Fresno.

11           THE COURT:  I'm well aware.  That's why I'm here.

12           MR. THOMAS:  That's why you're here helping out,

13  and we do appreciate that.

14           Jury trial January and February about a year ago.

15  Duhn prevailed at the jury trial on infringement.  They

16  found that Cameron infringed claims two, three, five, 19 and

17  29, which -- all of which depend from claim one.

18           THE COURT:  And you had not inserted claim one?

19           MR. THOMAS:  Yes, we had not.  And there are

20  multiple accusations --

21           THE COURT:  That's the cake and the frosting

22  concept referenced in the trial.

23           MR. THOMAS:  Yes.  I think that's what you're

24  referring to -- multiple accusations of inequitable conduct

25  which were disposed of in the first trial.  They're not at

I-23

1 issue now, multiple accusations of inventorship which were

2 disposed of, not at issue in this case.  Obviousness was

3 also disposed of in the first trial and is not part of this

4 case.

5           The jury awarded about $8.6 million in damages for

6 infringement, and the only issue left to try that we're here

7 to talk about today is anticipation.  We're not here to talk

8 about -- relitigate.  I know Mr. Rogers can't resist it.  He

9 seems to do it at every hearing when we're in front of you

10 or Judge Wanger, historically is to try to reargue why that

11 Judge Wanger got his claim construction wrong.

12           THE COURT:  So on the obviousness, it's correct

13 that the jury found the dependent claims invalid for

14 obviousness under two, three, four, five, 19 and 29, right?

15           MR. THOMAS:  Yes, dependent only, not the

16 independent claims.

17           THE COURT:  And -- and claims two, three, four,

18 five and 29 invalid for anticipation, and then it was Judge

19 Wanger --

20           MR. THOMAS:  Yes.

21           THE COURT:  -- that flipped it around on

22 obviousness.

23           MR. THOMAS:  Yes, correct.

24           THE COURT:  And then the new trial --

25           MR. THOMAS:  Trial.

I-24

1          THE COURT:  -- on anticipation?

2          MR. THOMAS:  That's correct, your Honor.

3          So here we have --

4          THE COURT:  And then the jury -- so on the lost

5 profits, that's kind of out there still --

6          MR. THOMAS:  Yes.

7          THE COURT:  -- there was a motion on the lost --

8 there was a motion on the damages.

9          MR. THOMAS:  Yes.  They attacked everything in the

10 post-trial motions in front of Judge Wanger and his --

11          MR. ROGERS:  Your Honor, we have not filed a JMOL.

12 Judgment has not been entered on the damages.

13          THE COURT:  And there was -- remember, you made

14 the motion then reserved it.

15          MR. ROGERS:  Yes.  There were pretrial motions on

16 the damages issues.

17          THE COURT:  And those are still lurking.

18          MR. ROGERS:  Yes.  And if judgment was entered,

19 then we'd be filing a JMOL on the damages issues, but we

20 knew --

21          MR. THOMAS:  We can -- I mean, this is not the

22 time and place.  Those were argued.  They were filed, and we

23 can talk about the history to those at the appropriate time.

24 But clearly today we're not here to discuss the damage

25 issues.

I-25

1        Okay.  The state of the art back in -- I think

2   it's worth doing a little review --

3        THE COURT:  But what the parties might think of is

4   on the lost profits I got a real issue on the lost profits,

5   and so rather than have you go through the whole trial and

6   then say "Whoa, surprise.  How did that come up," I just

7   want to let you know I've got an issue on the lost profits,

8   and one way to tweak it after they file their motion is can

9   you resurrect it by changing it into a royalty analysis.

10        So, anyway, I just want to not have you surprised.

11        MR. THOMAS:  Okay.  All right.  Well, we'll deal

12   with the issue as it develops, but we're here today for

13   anticipation, your Honor.  And I think it's good for you to

14   step back and understand we are going to be talking about at

15   issue the validity of the '925 patent, but I think it's

16   important for you to understand what the '925 patent did in

17   significance to the oil and gas drilling industry and what

18   the prior art was prior to this invention.

19        The state of the art in the oil and gas drilling

20   fracking world was the '993, the so-called Dallas patent,

21   and that was filed in '99.  It was state of the art through

22   2002.  It was issued in September 18, 2001.  And the '993

23   patent is a frac sleeve to be used exclusively with and to

24   protect a blowout preventer from exposure to high pressures

25   and corrosive fluids during the frac process.  That's the

I-26

1  summary of the invention in the abstract.

2          This is the Figure 3 of the '993 patent.  It's

3  also, your Honor, on that blowup over here.  That's the same

4  blowup Figure 3 on the board closest to you.  And you can

5  see on this that the '993 patent designed a frac system that

6  consisted of a frac sleeve inserted into a blowout

7  preventer.  This green area is a blowout preventer, and it

8  was installed using a large hydraulics cylinder, a setting

9  tool.  That's the green area.  That's just the setting tool

10 that's used to install the frac sleeve onto the system.

11         There were a lot of problems with the '993 patent

12 in terms of how it was used and its commercial embodiment.

13 It always required this BOP, blowout preventer, during the

14 fracking process, which is placed on the top of the wellhead

15 to control high pressures.  The BOP is a very expensive and

16 large device ranging between 6,000 to 8,000 pounds and can

17 be as large as 50 to 60 thousand pounds.  So it's a huge

18 expensive, requires a crane, manpower to put on and take

19 off.  It required heavy equipment to install.

20         The other problem was it had to be used with a

21 setting tool.  The setting tool with the crane weighed about

22 11,000 pounds to take on and take off.  And you had to be --

23 for each fracking process, it had to be removed and

24 reinstalled during multiple stages.  And what happens,

25 you'll -- a lot of these oil and gas wells, multiple times

I-27

1    they'll go down and they'll frac.  They'll produce.  Then

2    they'll go down and frac again.  So you're constantly

3    removing and installing this very large device.  It's

4    difficult, dangerous, expensive and time consuming to

5    install and use.

6           So when high pressure fracking became more common,

7    the industry needed a better solution, and by 2000, oil and

8    gas companies needed to frac at pressures up to 10,000 psi

9    because wells were deeper and, as a result, they needed new

10   and more abrasive frac fluids.  And to protect the standard

11   wellhead appointment which is rated at 5,000 psi, there was

12   a strong need in the industry for a safer, more efficient

13   solution than using a BOP and a stinger for fracking and

14   multiple fracking.

15          So the '925 invention was as quantum leap forward

16   in the oil and gas industry, and I'll explain why.  It

17   eliminated the need for a blowout preventer at all being

18   used during the frac process.  It eliminated the need for

19   the stinger in a large hydraulic setting tool, and it

20   consolidated the system into a single smaller and more

21   efficient device that can be assembled faster and safer with

22   less equipment and manpower.

23          In the QDF system, which when we say QDF, this is

24   the quick drilling flange system.  This highlight, your

25   Honor, is the model of the QDF system.  It's less than four

I-28

1  feet tall, weighs about 960 pounds.  It replaced the need

2  for three very large expensive pieces of equipment, the BOP,

3  the stinger, and the hydraulic setting tool, with the

4  combined weight anywhere from 17,000 to 66,000 pounds.

5              So this invention took a system that was very

6  difficult to use and cumbersome and turned it into a 960

7  pound device that didn't require a crane, didn't require

8  extensive manpower and risk to the men involved to take and

9  remove.

10             The '925 patent claims are embodied in our frac

11 system.  Again, we have the frac model here, but this will

12 -- will show you where the claims are on the PowerPoint,

13 where the axial force acts on the elongate member and the

14 frac mandrel.  You'll see that the frac fluid is pushed

15 down.  The yellow arrow shows the frac fluid going down

16 through the wellhead.  The axial force, the red arrow, shows

17 the axial force responding to the pressure -- high pressure

18 going down.  Pressure reacts, comes back up.  And, as a

19 result, the frac mandrel is retained with two sets of lock

20 screws in the lower flange and the upper flange, and you can

21 see the first transmission of the force on the first flange.

22             THE COURT:  Same question for you.  What do you do

23 about Figure 2 that looks like it only has one set of lock

24 screws?

25             MR. THOMAS:  Your Honor, there are two figures

1 attached.  And, as we know, this went through a prosecution

2 filing and refiling.  The -- we believe that it's

3 appropriate in a prosecution -- in the filing history to

4 identify these figures, more than one embodiment of the

5 invention.  Figure 2 happens to be what I think was a single

6 load path, and Figure 1 is I believe a dual load path.

7          Is that right, Bill?

8          MR. KOLEGRAFF:  That is correct, your Honor.

9          THE COURT:  And what happened was kind of the --

10 some of the -- one of the patents kind of crossed in the

11 path from the time that you put it in, and then they

12 identified Cornelssen, but you had put yours in before

13 Cornelssen issued.  Then Cornelssen issued, and then they

14 said, "Well, what about Cornelssen," and then there was the

15 wherein clause that was added to get around it.

16          Can we just read out Figure 2?

17          MR. KOLEGRAFF:  Your Honor, what happened is we

18 filed claims in the original prosecution of the '925 patent,

19 and that broad claim was rejected based upon Cornelssen and

20 two other pieces of prior art.

21          Responsive to that, we narrowed the claim by

22 adding the wherein clause, and that is perfectly normal with

23 patent prosecution to have a broader claim that gets

24 narrowed.  So the claim was narrowed so that it covers

25 Figure 1, which is the dual load path.

I-30

1          THE COURT:  But then nobody took out Figure 2?

2          MR. KOLEGRAFF:  Nobody takes it out.  But, again,

3   there's going to be other -- other patents that are --

4          THE COURT:  And generally, you look at the -- you

5   look at the patent first before you get to -- so you look at

6   the patent, and generally it would be error to do a

7   construction that reads out one of the figures that says --

8   in the figure it says here's a preferred embodiment, and yet

9   the preferred embodiment can't be the preferred embodiment

10  because it doesn't have a dual load path.  The only way we

11  can get around that is what I was assuming, since the

12  parties did argue Cornelssen, that on prosecution history

13  estoppel that's read out.

14         MR. KOLEGRAFF:  Well, we actually don't have to

15  have the claims cover every embodiment that's listed in the

16  patent.  We can -- we can have claims that are directed

17  towards certain aspects of the invention, and that is what

18  happened here.

19         THE COURT:  But do you see my confusion, that

20  Figure 2 has a single lock screw?  Do you agree Figure 2 is

21  a single load path?

22         MR. KOLEGRAFF:  I agree that Figure 2 -- first of

23  all, it has -- it has a threaded retention at the top, and

24  then there's lock screws down below.

25         THE COURT:  The threaded retention means that red

1  thing that's going down through the lock screws?

2          MR. KOLEGRAFF:  I'm sorry.  Mine is not a

3  colorized version of that.

4          THE COURT:  Probably because -- yes.  So, anyway,

5  are you talking about the -- when you say "threaded

6  retention," what are you talking about?

7          MR. KOLEGRAFF:  Are you talking about Figure 2 of

8  our '925 patent?

9          THE COURT:  Correct.

10         MR. KOLEGRAFF:  So which is JX1?  And it's --

11  Figure 2 is actually JX1.4.

12         THE COURT:  Okay.

13         MR. KOLEGRAFF:  And if you look at JX1.4, if you

14  look, you can see where the lock screws sit.  I think

15  they're identified with the numbers 40.

16         THE COURT:  Yes, 40.  Where the lock screws sit?

17         MR. KOLEGRAFF:  And just right above the lock

18  screw 40, you see the number 110?

19         THE COURT:  Yes.

20         MR. KOLEGRAFF:  And it's -- the numbers are very

21  small.  You can see that there is a threaded connection

22  between the mandrel and the -- the flange.  So what happens

23  in Figure 2, you still have this set of lock screws.  So the

24  set of lock screws that you're seeing in Figure 2 is that

25  same set of lock screws.  But instead of having the second

1  retention mechanism which you have here, they actually

2  thread this mandrel right in there.  So you'll see there's a

3  little thread in there right around the number one.

4          THE COURT:  Okay.

5          MR. KOLEGRAFF:  And, as illustrated, you'll see

6  that those lock screws are illustrated not tied in.

7          THE COURT:  Yes.  But then how is this a dual load

8  path?

9          MR. KOLEGRAFF:  As those are, that's not a dual

10 load path.

11         THE COURT:  Yeah.  That's the -- that's the issue.

12 So I think the only way you save the claim construction is

13 on prosecution history estoppel.

14         MR. KOLEGRAFF:  We may be saying the same thing,

15 your Honor.  You're right.  But when we added the wherein

16 clause and we added that in response to Cornelssen, Smith

17 and I forget what the third reference was, that would have

18 made this into only a dual load path claim -- claim

19 construction.  So that was --

20         THE COURT:  But when you added it, you didn't

21 remove Figure 2.

22         MR. KOLEGRAFF:  We did not physically remove

23 Figure 2.  I don't believe under patent prosecution rules

24 you're actually allowed to amend the specification to remove

25 items on the specification.  You can narrow your claims to

1 claim less than all that's disclosed, but you don't actually

2 go back and remove things out of the application.

3          THE COURT:  If there's -- in the post-trial

4 briefing, if there's case law on that, I -- or some --

5 something that I can refer to, that would be helpful.

6          MR. KOLEGRAFF:  Certainly, your Honor.

7          THE COURT:  All right.  You may continue.

8          MR. THOMAS:  Okay.  Okay.  Okay.  So we were

9 describing how this dual load path works with respect to the

10 '925 device and the commercial embodiment of the QDF system.

11          Let's turn now to the law of anticipation.  Every

12 element of a claim must be found in a single reference.  We

13 have two pieces of prior art here.  For express

14 anticipation, the reference shows or describes the element.

15 For inherent anticipation, the reference must always and

16 necessarily be configured with all elements of the

17 challenged claim.  What one skilled in the art would know is

18 not relevant to inherency.

19          Mere probability that something could, anticipated

20 is insufficient.  And extrinsic evidence is irrelevant and

21 inadmissible to this analysis.

22          If independent claim one is valid, all the

23 asserted dependent claims are also valid.  Cameron infringed

24 on dependent claims two, three, five, 19, 29, all of which

25 depend from claim one.

I-34

1          THE COURT:  So here the jury had -- so the jury

2    had a question in the previous trial, and they asked do they

3    all flow, and the answer was no.  And so I think in the

4    question, the jury was asking about this, and on -- on

5    infringement it makes sense, but then the jury was told, no,

6    they don't flow.  You have to do them independently, which

7    is why perhaps the jury comes out with this verdict that's

8    inconsistent under the law.

9          MR. KOLEGRAFF:  Your Honor, during that -- that

10   question -- and I was actually the one that was answering

11   the question from the juror, and at least my recollection of

12   the exchange was there was some confusion whether or not the

13   jury was asking the question on anticipation or on --

14          THE COURT:  Infringement.

15          MR. KOLEGRAFF:  -- infringement.

16          THE COURT:  Yes, because you wouldn't know.

17          MR. KOLEGRAFF:  Right.  And the answer is

18   different depending upon if you're answering an infringement

19   question or an invalidity question.

20          For example, if the issue is infringement, if you

21   have found claim one infringed, then every dependent claim

22   is -- I mean, you have to analyze each one of them

23   independently.  It does not flow down.

24          But in anticipation, if claim one is valid, then

25   it doesn't flow down to all the dependents.  So the answer

1  is different whether you're going through an infringement

2  analysis or an invalidity analysis, and that's where the

3  confusion came in I believe.  But I'm speculating on where

4  the confusion came in, though.

5          THE COURT:  I'll try to find that, and when I'm --

6  so we'll keep going.  I'll try to find that on the colloquy.

7  Could I -- okay.  So I think I find it.

8          So here's what the Court says.  It's independent.

9          "Your Honor, the assessment of

10         infringement versus validity is a little

11         bit different.  On infringement, if it's

12         a -- it is a true statement that if you

13         find one not infringed, then the rest of

14         them cannot be, but on anticipation and

15         obviousness, it's different."

16         And then the Court says:

17         "It's independent."

18         That's not -- that's --

19         MR. KOLEGRAFF:  That's very ambiguous, yeah.  The

20  -- the law --

21         THE COURT:  And the Court goes to say:

22         "Further, each one has to be found

23         separately."

24         And I -- so if -- and what we're saying is if one

25  is one way, then how could the jury have found the rest of

I-36

1  them differently.

2        MR. KOLEGRAFF:  For anticipation, finding claim

3  one valid means that all of the dependents under Federal

4  Circuit law had to be valid as well.

5        THE COURT:  But what the Court says is it's

6  independent.  It's each and every one.  Each one has to be

7  found separately, and then you say "I think there may be

8  some confusion" because it's -- because you don't know what

9  they're talking about.

10        MR. KOLEGRAFF:  At that point, your Honor, I do

11  believe I was confused whether the jury was referring to

12  infringement question or an anticipation question.

13        THE COURT:  All right.  And then it's further

14  confusing because claim one wasn't asserted.

15        MR. KOLEGRAFF:  That is true.  Claim was not

16  asserted.

17        MR. THOMAS:  But claim one was put into the

18  verdict.  So the jury was finding on claim one.

19        THE COURT:  But then -- so it goes on -- then the

20  Court goes on to say:

21             "On the anticipation and obviousness

22             defenses, one does not depend on the

23             other."

24        MR. KOLEGRAFF:  That is I believe a true statement

25  that anticipation and obviousness tests are independent of

1  each other.

2          THE COURT:  Oh, I see.  Anticipation, that's --

3  oh, I see.  I thought he was -- each of those questions is

4  to be separately considered.  I get -- he's talking about

5  those two things, not whether if you find one, then do the

6  rest of them flow.  All right.

7          MR. KOLEGRAFF:  Because on the jury form,

8  anticipation was a page.  Obviousness was a page, and they

9  had to be independently analyzed under different legal

10 tests.

11         THE COURT:  Got it.  All right.  You may continue.

12         MR. THOMAS:  Okay.

13         THE COURT:  That's helped me a little bit.

14         MR. THOMAS:  Okay.  So all right.  I think we

15 wrapped up my summary of kind of the law on anticipation

16 here.  As we know, anticipation has a high burden.  The '925

17 has a statutory presumption of validity.  It's the strongest

18 presumption for art considered by the examiner, and the

19 clear and convincing standard applies.

20         So in this case, for anticipation, Cameron asserts

21 the same two pieces of prior art from the last litigation.

22 There's no new art asserted.  On the left is the Dallas '993

23 patent which we've talked about, and on the right is the

24 Cameron MTBS tubing hanger from its 1994 catalog.

25         Okay.  I was -- okay.  So the '993 patent, we --

I-38

1    Dallas patent, the inventors, Rex Duhn and Bob Meek,

2    disclosed the '993 patent to the patent examiner.  The '993

3    is discussed in the body of the Duhn '925 patent, and the

4    examiner considered the '993 and allowed the '925 claims

5    over it.

6            And as to dependent claim one, we believe the

7    evidence will show for the '993 Dallas patent there is no

8    dual load path.  There's no suspended frac mandrel.  And

9    there's no direct connection from the tubing head to the

10   adapter.

11           THE COURT:  Can you show me that?

12           MR. THOMAS:  I'm sorry.  That being which one?

13           THE COURT:  No direct connection from the tubing

14   head to the adapter, can you show me what you mean on a

15   model?

16           MR. THOMAS:  On the -- we're talking about --

17   yeah, I'm going to let Mr. Kolegraff step up there real

18   quick.

19           MR. KOLEGRAFF:  You will be hearing my --

20           THE CLERK:  Counsel.

21           MR. KOLEGRAFF:  So you're asking about the direct

22   connection on the '993.  On the -- let me start and show you

23   the model on the '925 and explain why we have to have these

24   directly connected, and this all gets back to this frac

25   mandrel right here is actually seated and supported and

1 sealed in this tubing heading body right here.  And in order
2 to do that, it has to not only seat very firmly and
3 accurately within the body of the tubing head, but also
4 these lock screws have to line up very very precisely.  In
5 technical lingo, we call that registration.  The lock screws
6 have to register into this depression that is in the frac
7 mandrel.  If you're off by just a very small amount, these
8 lock screws are not going to make contact and engage and
9 apply the proper pressure to seat and seal.  So that's a
10 necessary part to make this device operable.

11          Over her on this device you see there are many
12 many what we call interposing devices.  Here is what you --
13 what the evidence and when we testify will probably be the
14 secondary flange is this light green piece right here.  The
15 tubing head flange, of course, is this light blue color down
16 here.

17          The distance between here and here is going to be
18 different in every installation of the '993.  That's because
19 ahead of time we don't know how big this will all eventually
20 be.  We don't know how big --

21          THE COURT:  There's no standard in the industry?
22 They're all different?

23          MR. KOLEGRAFF:  They're basically a little bit
24 different.  And that one -- in the '993, the way they handle
25 this, if you look at the '992 -- I seem to be getting my

I-40

1  nines mixed up here -- the '925 patent, it is one solid

2  piece.  From the top to the bottom, it's one solid piece.

3  You'll always know how big it's going to be.  You'll always

4  have to know where it's going to land.  You have a great

5  deal of predetermined knowledge about this member.

6           In contrast, over here, this frac sleeve you can

7  see is made up of multiple parts.  Even as it's illustrated

8  here, it has a part here that's threaded into a part here,

9  that's threaded into a part here.  This is actually made up

10 of three different parts, and they -- they have this --

11 there could be three, four, five parts depending upon how

12 big this is.

13          You notice this piece right here looks pretty

14 small and looks to be about a bigger scale than this.  Well,

15 in real life, that blowup preventer would be this one was

16 installed here.  It would start here and would go up to

17 here.  That thing can be huge.  This piece right here can be

18 six, seven, eight, nine, 10 feet long.  So, again, you have

19 to have a great deal of variability in here.

20          Going back to the manufacturing technology, a

21 little technical for a second, every time you make a piece,

22 it's not going to be exactly one foot long.  It's going to

23 have errors.  It's going to have tolerances as we call them.

24 And when we look at all of the pieces and parts that sit

25 from here down to here, there's so much tolerance, so much

I-41

1 error that this lock screw is very unlikely to find that

2 groove.

3          THE COURT:  So can you say what is -- what are you

4 referring to as the adapter?

5          MR. KOLEGRAFF:  There are actually two adapters in

6 the claim.  The first one is the -- excuse me.  There is the

7 adapter flange down here, and then there's a secondary

8 flange which is this light green piece right here.

9          THE COURT:  So you'd refer to an adapter as the

10 flange?

11          MR. KOLEGRAFF:  I'm sorry.  Where did you get the

12 word adapter --

13          MR. THOMAS:  Well, it's on the PowerPoint.  That's

14 where --

15          THE COURT:  Direct connection from the tubing head

16 to the -- to the flange.

17          MR. KOLEGRAFF:  It should be to the secondary

18 flange.  That may be a bad word.  It should be to the

19 secondary flange.  So we're saying there needs to be a

20 direct connection --

21          THE COURT:  So you're talking about the lock

22 screws have this direct --

23          MR. THOMAS:  Yes.

24          THE COURT:  -- connection, and then you're saying

25 that on the secondary that's the one where it's kind of

I-42

1  abutting, the abutting issue?

2          MR. KOLEGRAFF:  Well, it's a little different

3  issue.  Here we're trying to say there needs to be a direct

4  connection.  If you look here, there is a direct connection

5  from the secondary flange, which is stock ring piece.

6  There's a direct connection to the tubing head flange.  So

7  these are the through holes that connect those together, and

8  that has to be that way in order to have this lock screw

9  accurately sitting in that depression.

10          Here, if you look at the equivalent parts over

11  here on the '993, if you look at the equivalent parts, here

12  is that tubing head flange.

13          THE COURT:  But this direct connection has nothing

14  -- so the claim construction had nothing to do with that.

15          MR. KOLEGRAFF:  The word "direct connection" does

16  not show up in the actual claim language.  That's true.

17          THE COURT:  So it's not the wherein clause, but it

18  was one of the other elements?

19          MR. KOLEGRAFF:  Yes, it's one of our -- our

20  elements.  This is not in the wherein clause.

21          THE COURT:  Casing, first tubular member mounted

22  over the casing, first tubular member flange extending from

23  the first tubular member.  Secondary flange extending from

24  the elongate annual member.  Which one -- which element in

25  the claim has to do with the direct connection?

I-43

1          MR. KOLEGRAFF:  Your Honor, I have a blowup of the

2    patent claims here, if I could use this.

3          THE COURT:  You may.

4          MR. KOLEGRAFF:  This element that you see right

5    here where it says a plurality of fasteners fastening a

6    secondary flange to the first tubular member flange.  Let me

7    show it on this device first.  What we're talking about is

8    you'd have -- I'll just kind of walk through it slowly -- a

9    secondary flange.  It's this dark green piece.  I'm sorry.

10   It would be a plurality of fasteners.  So the plurality of

11   fasteners are these through bolts fastening the secondary

12   flange, this dark green piece, to the first tubular member

13   flange right here.

14          So this is the connection that we're saying has to

15   be directly made from the secondary flange to the tubing

16   head flange.

17          THE COURT:  Okay.  So if you take the plurality of

18   fasteners fastening the secondary flange to the first

19   tubular member, going back to '993, then why does it not

20   have it?

21          MR. KOLEGRAFF:  Okay.  So, first of all, let me

22   identify the parts.  So we are saying that this is the piece

23   that would be the secondary flange, this light green piece.

24   The piece that would be the first tubular flange is this

25   light blue piece.  The plurality of fasteners fastening

I-44

1 together have to go through this entire long series of

2 connections going this way, and it's not directly connected.

3          Our device, because it has to seat and support

4 within the tubing head --

5          THE COURT:  So you're just saying it doesn't

6 fasten it?

7          MR. KOLEGRAFF:  It doesn't fasten it accurately,

8 that's correct.

9          THE COURT:  Okay.  Thank you.

10          MR. KOLEGRAFF:  Okay.  Thank you.

11          MR. THOMAS:  Okay.  So now we're going to talk

12 about the Cameron 1994 catalog.  This is -- this is a

13 device.  It's a tubing hanger.  Tubing hangers have been in

14 the industries for a long time.  It's not used for fracking.

15 It's just a simple well known tubing hanger.

16          The examiner considered a 2002, 2003 Cameron

17 tubing hanger and allowed the '925 claims over it.  The

18 2002, 2003 Cameron tubing hanger disclosed all the same key

19 elements that the '94 catalog shows and that Cameron now

20 claims anticipate the '925 patent, tubing head, lock screws,

21 adapter head, and metal seal.

22          So while they're arguing about a prior art

23 reference that wasn't directly cited by the Patent Office,

24 we believe that when you look at the -- what was allowed

25 over these tubing hangers, essentially the arguments being

1    developed here today are those that were essentially

2    considered, necessarily considered by the examiner.

3            So the examiner also considered 14 other documents

4    that had tubing hangers and allowed the '925 claims over all

5    of them.  So here is the Cameron '94 --

6            THE COURT:  Can you go back to that last slide?

7    Okay.  Continue on.

8            MR. THOMAS:  So the 1994 catalog does not disclose

9    the necessary element, the dual load path.  The only common

10   element is a tubing head, and we've shown -- this is on the

11   left side is the Cameron catalog.  The frac mandrel is

12   inserted, as we talked, to protect the wellhead during these

13   high pressure fracking.  This does not protect the wellhead.

14   This operates within it.  The wellhead tolerance is, the

15   typical wellhead, of 5,000 psi.  This is where -- on the

16   left side where the forces react, as our experts will

17   testify, and as our experts will also testify, where the two

18   areas where the forces react on the right on the QDF or the

19   '925 patent.

20           This is just a cap with no force reacting on it,

21   as our experts will testify.

22           THE COURT:  So your expert says the 1994 has no

23   load?

24           MR. THOMAS:  No dual load, yes.

25           THE COURT:  No dual load or no load at all?

1          MR. THOMAS:  There's no load reacted during.  So

2    there's no -- since there is no load, there's no dual -- no

3    dual load path can be disclosed during the '94 catalog.

4          This is a page off the '925 patent, and you can

5    see on the -- on the face page that the first -- the yellow

6    one is the Dallas patent.  We know the examiner considered

7    and allowed the '925 over that.  The green one is the

8    reference to the 2002, 2003 Cameron tubing hanger.  That's

9    up top in green.  So we know the patent examiner allowed the

10   '925 claims over that.

11         THE COURT:  And is the 2002, 2003, the Cameron

12   tubing hanger, is that similar to the '94 catalog?

13         MR. THOMAS:  We believe it is, your Honor, and

14   that's -- if I can go back quickly, this is a summary of

15   what we think are the same key elements that are present in

16   the 2002, 2003 catalog that are also present in the '94

17   catalog that they're arguing about.

18         So let's fast-forward here.  So there are 14 other

19   separate tubing hanger references that have many of the same

20   elements, and those are highlighted.  I don't want to go

21   through all of them, but you can see that not only was the

22   2002, 2003 Cameron tubing hanger considered by the patent

23   examiner when it allowed these claims, it considered 14

24   other pieces of art that are essentially tubing hangers as

25   well and allowed these claims.

I-47

1          I don't think there's any contention there's

2 anything specifically unique about this particular tubing

3 hanger, the '94 catalog.

4          So what are we left with?  We're left with this

5 brand new theory, and that is this Finite Element Analysis

6 which you heard me come to you and explain our woes and

7 trials in trying to respond and get ready for trial on a

8 very short basis, and I thought it was important for you to

9 understand at least what we had to go through, because you

10 will hear some testimony from our experts about how quickly

11 they had to react to this situation and deal with it.

12          What happened here on January 5, 2012, Cameron

13 retained for the very first time, okay -- it's important to

14 me because you set a trial back on November 18th, and,

15 again, we know they tried this case once believing they had

16 one trial, and they -- this idea never occurred to them.  So

17 they go out, and they retain this brand new expert, Doctor

18 Frishmuth, who's -- who suggests running an FEA, which is a

19 Finite Element Analysis.

20          January 6 we know from deposition Doctor Frishmuth

21 actually began running his first FEA analysis internally.

22 On January 9th, Cameron disclosed Doctor Frishmuth's expert

23 report, and there's absolutely no reference in his initial

24 disclosures of his expert opinions to any FEA analysis or

25 any findings or that he's even working on an FEA analysis.

I-48

1  So we are then responding to on a -- we had a one-week

2  turnaround to respond to that report.  Had nothing to do

3  with FEA.

4           January 18 they serve a rebuttal to our expert,

5  and this is the first time, January 18, that we hear

6  anything or know anything or learn anything that they would

7  tend to come forward with this FEA analysis to argue a dual

8  load path.

9           January 20th we took Doctor Frishmuth's

10  deposition.  On February 7th -- and you'll hear about this

11  because Doctor Frishmuth I believe is the very first witness

12  in this case, and you'll hear the term "cases," and he ran

13  -- ultimately ran six different cases, okay.  The first four

14  he had run prior to his deposition.  After his deposition,

15  he continued to run more cases.

16           THE COURT:  Cases in their lingo are different

17  than cases in --

18           MR. THOMAS:  Yes.

19           THE COURT:  -- litigation cases.

20           MR. THOMAS:  This is not a litigation case.  This

21  is a case study, if you will, or a run.  You'll even hear

22  about -- shortly about how this FEA -- complicated this

23  modeling system is and how when you run these tests, you'll

24  get an unconverged result, meaning it didn't show anything.

25           He ran numerous unconverged results, and until we

I-49

1  got through the first four cases with converged results,

2  which he testified about in his deposition, but after his

3  deposition, he ran cases five and six which are the heart I

4  think of what the testimony of what these opinions are based

5  on, which it's just important for you to understand that.

6          So we deposed the guy, and he hadn't even run

7  these at the time we deposed him.  And that's the stuff that

8  got dropped off at 3:00 a.m.  So it's not just dropping off

9  stuff at 3:00 a.m. that we're complaining about.  And it is,

10  frankly, a legitimate complaint.  I apologize to my own

11  expert to be woken up in the middle of the night and having

12  to sign for a package.

13          But the -- the complaint I've got as a trial

14  lawyer is that we're getting the heart of his expert opinion

15  on cases five and six -- and you'll learn this quickly on

16  direct examination -- all of his real opinions come out of

17  five and six.  We get that at 3:00 a.m., after his

18  deposition on February 7th with a February 15 trial date.

19  These are -- so they were completed, and we know from the

20  runs that they were completed on January 7th and February 2,

21  which I'm not sure why we got them so late, but that's what

22  happened.

23          February 9th, Brugman's report is served, and you

24  can see from the timing of this our expert was dealing with

25  the Frishmuth deposition and the four cases and spending his

I-50

1  time comparing his opinions based on that.  So he had very

2  little time to analyze the 3:00 a.m. delivery of cases five

3  and six at his deposition.

4          February 10th he hadn't fully evaluated five and

5  six, but he can't speak to five and six today, but I think

6  it's important for you to understand that kind of backdrop

7  to what we're dealing with here.

8          THE COURT:  He had to scramble.

9          MR. THOMAS:  We scrambled.  And you'll hear

10  criticism -- in fact, Mr. Redden raised this very point --

11  well, why didn't they run their own analysis?  We could

12  barely respond to what they did.  I mean, it's very obvious

13  why we didn't run our own analysis.  We're lucky we even had

14  an expert to come into the courtroom given the timing

15  constraints.

16          So it's very clear what happened here, and I think

17  the answers to the questions Mr. Redden raised are, frankly,

18  self-answered and self-evident.

19          Cameron's rebuttal opinion really relies on FEA.

20  It's a finite element analysis.  You'll hear from our expert

21  and theirs.  It's a computer simulation program that

22  attempts to estimate or model how a real part will react in

23  the real world.  Okay.  It's a very complex mathematical

24  representation of the characteristics of the parts that are

25  combined together into a single object.

1        It's a part that's become more complex, and as
2   there are more and more parts, it's nearly impossible to
3   obtain any really reliable result using this.  And you'll
4   hear from -- certainly from Mr. Brugman that the FEA's --
5   frankly, it's a risky analytical tool to use because even
6   small errors in a setup in the operation will have a
7   dramatic impact on those results, and it's -- yes, it's
8   risky in a sense in this courtroom, but the risk that I
9   think the experts really look to -- because they run FEA
10  analysis many times to try to get a feel for what -- how a
11  device will behave before it's put in use, for safety and
12  for other considerations.  And that's an enormous risk.  And
13  the people that work with these FEA analyses like Mr.
14  Brugman will tell you you have to be very careful how and
15  when you use those and how reliable they really are.
16        So the operator of this case, you'll learn, Mr. --
17  Doctor Frishmuth, he's the operator.  He determines the
18  mathematical model, the constraints, the boundary
19  conditions, and the software operation.  And all this can
20  skew the results.  And there's a term "simplification."  And
21  you'll hear about that from Doctor Frishmuth, also from Mr.
22  Brugman.  It's an attempt by the operator to -- when they
23  have these runs and they can't get a converged result or any
24  clear data as a result of the math -- of the model, they
25  have to go back and simplify the model, reduce the

I-52

1 assumptions or change the assumptions in order to get any

2 kind of result that would mean anything.  And when you do

3 that, you many times introduce more unreliability factors

4 into the computer model.  So the resulting model is less

5 like reality when you simplify and the data becomes more

6 unreliable.

7           So when you simplify, you're moving the model away

8 from the true object that you're studying.  You're moving it

9 further and further away.

10          You'll hear testimony from our expert, Mr.

11 Brugman, on the FEA that they made -- that Doctor Frishmuth

12 made numerous errors.  His analysis contains 11 modeling

13 errors you'll hear about, did not horizontally connect the

14 lock screws to the tubing head as they're actually done in

15 real life.  He removed all these 16 flange bolts in his

16 computer model.

17          THE COURT:  Isn't that one of the issues if the

18 lock screws are connected then it damages the frac mandrel?

19 So if he didn't connect them --

20          MR. THOMAS:  No.  I mean, in our device, the lock

21 screws are to be tied in.  There was an issue, I believe, on

22 the '993 whether you can tie anything in in the '933.

23          MR. KOLEGRAFF:  Yes, your Honor.  The issue you're

24 referring to is the one in the '993 device you note that the

25 lock screws are not engaged in this picture, and because

I-53

1  that tube is just a thin tube, you can take those lock

2  screws and tie them in, we contend that that crushes or

3  damages the model.

4           This is a little different.  This is dealing with

5  the mathematical model that Doctor Frishmuth put into his

6  finite element analysis.  And what he did is he artificially

7  constrains or ties a lock screw to a fixed point when really

8  in reality it's able to move.  So this is just showing kind

9  of an error in the model.

10          THE COURT:  Okay.

11          MR. THOMAS:  And, your Honor, just so we're clear,

12 the FEA model that he ran was against the -- we'll call it

13 the QDF device, which is the commercial embodiment of the

14 '925.  He didn't run an FEA model on the '993.  He only ran

15 it against our device.

16          MR. KOLEGRAFF:  On the '94 catalog.

17          MR. THOMAS:  I'm sorry -- on the '94 catalog.  I

18 misspoke.  He only ran them on their tubing and their

19 catalog.  He didn't run them on the stinger.

20          THE COURT:  But the purpose was to show that it's

21 a dual -- on their side to show that it's a dual load path.

22          MR. THOMAS:  Exactly.

23          THE COURT:  Or capable of being a dual load path

24 if you do these things.

25          MR. THOMAS:  If you do these things.  And what

I-54

1   we're saying is when he did his computer modeling, he

2   changed the way it is actually used in operation.  The

3   computer model varies from what was actually -- how it's

4   actually used, and when you do that, we say the results are

5   unreliable.  And these are the examples of things he changed

6   on the tubing here, your Honor.  He didn't horizontally

7   connect the lock screws to the tubing head.  He removed the

8   16 flange bolts, selectively used friction.  We'll talk

9   about that.  There's a friction setting on the FEA ANSYS is

10  the name of the software program.  That's A-N-S-Y-S I

11  believe, ANSYS.  And it has the capability to set friction

12  settings on various components.  He selectively used that,

13  in some cases did not use it at all.  He bonded parts

14  together that are not actually bonded.  He actually welded a

15  part together that you'll hear about that's not welded at

16  all in the tubing hanger.

17          So by failing to model the parts as they are used

18  in reality, the results we believe are completely

19  unreliable.

20          In addition, you'll hear that he incorrectly

21  allowed about a million pounds of force to act on the U-cup

22  when it was only designed to withstand up to 400,000 pounds

23  of force, and so what we're saying is his computer model

24  that shows -- he would tell you shows dual load path, it's

25  so wrong because if that ever were done in reality, it would

1 destroy that seal, that U-cup seal, because it can't

2 withstand 1,000,000 pounds of force.  But in order to get

3 the result that he wanted, he had to make the

4 simplifications or changes to reality.

5         He incorrectly allowed 20,000 psi to act on the

6 tubing head when it was only designed to withstand up to

7 15,000 pounds of psi.

8         So you see all these variances from the real world

9 that could, frankly, never -- should never happen.  So the

10 results that come forward, not surprisingly, are completely

11 unreliable.  And if this were a different time and a

12 different trial, we would probably be filing, you know, a

13 Daubert motion for this, but we don't have time to do that,

14 and it's just easier to go through it, but that's how

15 strongly we feel about the unreliability nature of this

16 evidence.

17         THE COURT:  Well, you can file one -- I mean, you

18 can make an oral motion.

19         MR. THOMAS:  Yes.

20         Okay.  So the FEA results are also, you'll hear

21 from Mr. Boyadjieff, our other expert as well, are contrary

22 to Newton's laws of physics.  Newton's third law of physics

23 says that no part can generate a force on itself.  Forces

24 have to come from an external body.  Doctor Frishmuth's FEA

25 results report that the MTBS tubing head conjures up 148,000

I-56

1  pounds of force out of thin air.  I'm going to let Mr.

2  Boyadjieff explain that to you and Mr. Brugman.  But when

3  you run these cases five and six, the final two, you'll see

4  how that happened.

5           So, in essence, he's identified the MTBS as a

6  perpetual motion machine.

7           So, in conclusion, we really believe very strongly

8  so that the results just simply do not match reality, and we

9  have a simple model.  I'm going to step forward here.  This

10 is a model Mr. Boyadjieff assembled.  That's a photo of it,

11 and he'll -- when he's testifying, he'll explain how this

12 model shows how this computer model simply would not work as

13 suggested.

14          That's it, your Honor.

15          THE COURT:  All right.  Thank you.

16          Why don't we take a morning recess break.  Let's

17 just be in recess -- can we do 10 minutes?

18          MR. THOMAS:  Yes, your Honor.

19          MR. REDDEN:  Yes.

20          THE COURT:  Is that enough time?  You can get some

21 coffee, and then we'll resume.  What time do you have then?

22          THE CLERK:  10:25, your Honor.

23          THE COURT:  10:25.  So 10 minutes, then we'll be

24 back.

25      (Proceedings recessed briefly.)

I-57

1       THE COURT:  We're ready to start the evidence.

2  You may call your first witness.

3       MR. REDDEN:  Thank you, your Honor.  We'd call

4  Doctor Ronald Frishmuth.

5     RONALD FRISHMUTH - DEFENDANT'S WITNESS - SWORN

6       THE CLERK:  Sir, if you can please state your name

7  and spell your first and last name for the record.

8       THE WITNESS:  Yes.  My name is Ronald Frishmuth.

9  That's R-O-N-A-L-D.  Frishmuth is F-R-I-S-H-M-U-T-H.

10       THE CLERK:  Thank you.

11       MR. REDDEN:  May I proceed, your Honor?

12       THE COURT:  Yes.

13                 DIRECT EXAMINATION

14  BY MR. REDDEN:

15  Q    Good morning, Doctor Frishmuth.

16  A    Good morning.

17  Q    Would you tell the Court where you live?

18  A    Houston, Texas.

19  Q    And are you a Ph.D.?

20  A    Yes, sir.

21  Q    What is your Ph.D. in?

22  A    Theoretical and applied mechanics.

23  Q    Where did you obtain that degree?

24  A    University of Illinois.

25  Q    And do you have a bachelor of science degree as well?

I-58

1   A      I do, yes.

2   Q      What is that in?

3   A      Civil engineering.

4   Q      And where did you obtain that degree?

5   A      Drexel in Philadelphia.

6   Q      Do you have a masters degree?

7   A      Yes, I do.

8   Q      What is your masters degree in?

9   A      Engineering mechanics from Penn State.

10  Q      All right.  Doctor Frishmuth, how are you currently

11  employed?

12  A      I'm a consulting engineer.

13  Q      Do you have any particular specialty areas in which you

14  consult?

15  A      Fatigue fracture and finite element analysis.

16  Q      All right.  What about mechanics, applied mechanics?

17  A      That's a general area of applied mechanics, includes

18  all those topics, fatigue fracture, finite element analysis.

19  Q      All right.  Let's talk a little bit about mechanics.

20  Have you -- is there a textbook that we could look at that

21  would help explain what the field of mechanics involved?

22  A      Yes, I believe there is, the Statics and Dynamics

23  textbook.

24          MR. REDDEN:  All right.  Your Honor, this is

25  Exhibit -- Defense Exhibit R, which we would like to use

*Echo Reporting, Inc.*

1  with Doctor Frishmuth as a learned treatise.

2  BY MR. REDDEN:

3  Q    Can you tell us what this textbook is about?

4  A    It's a statics and dynamics class textbook that is

5  typically used and has been used in undergraduate school.

6  Q    Do you own this book?

7  A    Yes, I do.

8         MR. REDDEN:  Let's go to the next page, please,

9  Charles.  Could you blow that up a little, zoom in on it

10 maybe.

11 BY MR. REDDEN:

12 Q    It says there, Doctor Frishmuth, "What is mechanics?"

13 And what does the author tell us?

14 A    If I can read it from here:

15         "Mechanics may be defined as the science

16         which describes and predicts the

17         conditions of rest or motion of bodies

18         under the action of forces.  It is

19         divided into three parts, mechanics of

20         rigid bodies, mechanics of deformable

21         bodies, and mechanics of fluids."

22 Q    All right.  In this case what type of mechanics are we

23 dealing with?

24 A    These parts that we're dealing with are deformable

25 bodies.

I-60

1   Q    The next paragraph says that:

2            "In this part of the study of mechanics,

3            bodies are assumed to be perfectly

4            rigid.  Actual structures and machines,

5            however, are never absolutely rigid and

6            deform under the loads to which the are

7            subjected."

8        Do you see that?

9   A    Yes, I do.

10  Q    Do you agree with that statement?

11  A    Yes, I do.

12  Q    Does that include even such materials as steel tubing

13  hangers?

14  A    Yes, it does.

15  Q    All right.  And if we could go down to the bottom of

16  that page, Charles.

17       Just looking at the last page, it says:

18            "The purpose of mechanics is to explain

19            and predict physical phenomena and,

20            thus, to lay the foundations for

21            engineering applications."

22       Is that an accurate statement?

23  A    Yes.  That accurately describes applied mechanics.

24            MR. REDDEN:  All right.  You can take that down.

25  \\

I-61

1  BY MR. REDDEN:

2  Q    Let me ask you some questions about your employment

3  history.  When you got out of school, who did you go to work

4  for?

5  A    General Electric, gas turbine division in Schenectady,

6  New York.

7  Q    And how long were you with GE?

8  A    It was two different times, total of about eight years.

9  Q    And what did you do for General Electric?

10 A    I worked in the mechanics of materials group and the

11 gas turbine division developing material properties for use

12 in turbine design.

13 Q    Were those steel turbines?

14 A    Excuse me?

15 Q    Steel turbines?

16 A    Yes.

17 Q    All right.  Who did you work for next?

18 A    In between my eight years that I worked at Alcoa, I

19 worked for -- or GE, rather, I worked for Alcoa Research Lab

20 in Pittsburgh, Pennsylvania.

21 Q    And what sorts of materials were you working with at

22 Alcoa?

23 A    They were aluminums.

24 Q    And what were you doing with those materials?

25 A    The division I worked in was engineering properties and

I-62

1 design division, and the group that I ran there and headed

2 up was responsible for developing material properties for

3 use by engineers in the rolling and forming operations of

4 Alcoa.

5 Q    All right.  And then I'm looking at your CV.  It looks

6 like in 1982 you moved to Houston, is that right?

7 A    Yes.

8 Q    And you went to work for Cameron Ironworks?

9 A    Cameron Iron, that's correct.

10 Q    And how long were you with Cameron Iron?

11 A    Don't recall off the top of my head, but about three or

12 four years I believe.

13 Q    All right.  And what did you do for Cameron Iron?

14 A    I worked in the -- I was a mechanics and materials

15 engineer working in the metallurgy group at Cameron.

16 Q    And what sorts of materials did you work with there?

17 A    The were oil field steels.

18 Q    Steels used to put together oil field devices?

19 A    Equipment, yes, sir.

20 Q    Now, let me ask you, you mentioned you have expertise

21 in finite element analysis, correct?

22 A    Yes.

23 Q    When did you first start working in that field?

24 A    The first time I used ANSYS was when John Swanson, the

25 fellow who started ANSYS first started building his program.

I-63

1  So that would have been 1969, 1970 time frame.

2  Q    And tell the judge what ANSYS is?

3  A    ANSYS is the nomenclature for a finite element program,

4  and it's one of many.  There are several codes -- commercial

5  codes available.

6  Q    When you say codes, is that another word for computer

7  software?

8  A    Computer software, that's right.

9  Q    All right.  Can you give the Court some idea of how

10  much experience you have had doing finite element analysis

11  since you first began?

12  A    Quite a bit.  Right now I'm doing about 15 to maybe 30

13  analyses a year.

14  Q    All right.  And for how many -- for what period of time

15  have you used this ANSYS software?

16  A    Well, most recently, the concentrated efforts in

17  analysis have been since about 1995 perhaps, 1992 maybe.

18  Q    Okay.  I want to go back and pick up your employment

19  history just to fill in the gaps.  It looks like you left

20  Cameron in 1984 and went to work for Cortest Laboratories,

21  is that right?

22  A    That's correct.

23  Q    And what did you do at Cortest?

24  A    That was a materials testing group that I had started

25  and eventually sold out to my partners.

I-64

1  Q    In 1988 you went to work for Vetco Grey in Houston?

2  A    That's right.

3  Q    And what sort of a company is Vetco?

4  A    Vetco is an oil field manufacturing company.

5  Q    What sorts of products were they manufacturing at that

6  time?

7  A    They make a lot of sub C equipment, riser connectors,

8  riser equipment, sub C well heads, that sort of thing.

9  Q    And what was your position at Vetco?

10 A    I was running the analysis, the finite element analysis

11 group in the western hemisphere operation.

12 Q    And it looks like you were with Vetco for about six

13 years?

14 A    That's correct.

15 Q    And then I see you worked for an outfit briefly called

16 Engineering Cybernetics, Incorporated in Houston?

17 A    That's correct.

18 Q    What was that company doing?

19 A    Engineering Cybernetics was an ANSYS reseller.  So I

20 was kind of a consulting engineer helping our customers make

21 use of ANSYS and did a little bit of training.

22 Q    All right.  And have you been an independent consulting

23 engineer since about 1996?

24 A    That's correct, yes.

25 Q    And what sorts of -- what sorts of things have you done

1  since that time?  Just give the Court a thumbnail sketch of

2  what your activities have been.

3  A    Well, a lot of my activity has to do with the various

4  companies around the Houston area who work in the oil field

5  equipment area, FMC, Vetco, Oil States, companies like that.

6  Q    Okay.  And other than the brief period of the two or

7  three years in the 1980s when you worked for Cameron Iron,

8  have you ever done any other work for Cameron?

9  A    No, I have not.

10  Q    Are you a licensed professional engineer in the State

11  of Texas?

12  A    Yes, I am.

13  Q    Are you a member of the American Society of Mechanical

14  Engineers?

15  A    Yes, I am.

16  Q    Are you a member of the American Society of Testing

17  Materials?

18  A    Yes, I am.

19  Q    Have you served on any of its committees?

20  A    ASTM Committee, EOA Fatigue and Fracture Committee.

21        MR. REDDEN:  All right.  Your Honor, we would move

22  the Court to accept Doctor Frishmuth as an expert in applied

23  dynamics, mechanical engineering, and finite element

24  analysis.

25        THE COURT:  Applied dynamics, mechanical

I-66

1  engineering --

2          MR. REDDEN:  I'm sorry.  Applied mechanics,

3  mechanical engineering, and finite element analysis.

4          THE COURT:  He may testify.

5          MR. REDDEN:  Thank you, your Honor.

6  BY MR. REDDEN:

7  Q    All right.  Doctor Frishmuth, when were you retained in

8  this case?

9  A    I believe the engagement letter that I have was January

10 5th.

11 Q    Okay.  And what is it that you were asked to do?

12 A    I was asked to look at this -- this tubing hanger

13 assembly with a spool and assess whether or not I would

14 agree that there were -- there was a dual load path through

15 the top of the hanger.

16 Q    All right.  Now, I want to clear up one thing.  There

17 was a lot said about your finite element analysis during the

18 opening.  You were here during Mr. Thomas' opening

19 statement, correct?

20 A    Yes.

21 Q    Now, is your opinion in this case that there's dual

22 load path based solely upon your FEA?

23 A    No, it is not.

24 Q    You've actually written two expert reports in this

25 case, have you not?

1  A     Yes.

2  Q     And in your first -- your first expert report was

3  written before you completed any finite element analysis,

4  correct?

5  A     That's correct.

6  Q     And if we could take a look at the last page, this is

7  Exhibit EB for identification.  This is the last page of

8  this first expert report.

9        All right.  Doctor Frishmuth, this is the last page of

10 your first expert report dated January 9th, 2012, correct?

11 A     Yes, it is.

12 Q     And your conclusion is:

13              "For the reasons discussed above, it is

14              my opinion that the MTBS is a dual load

15              path device because it has two

16              mechanisms that push down on the annual

17              member, and that in turn retain the

18              annular member when an upward load is

19              applied to it, number one, the lock

20              screws, and number two, the adapter

21              flange U-cup seal."

22       Did I read that correctly?

23 A     Yes, you did.

24 Q     And what was your opinion at the time that you wrote

25 your initial report, what was it based upon?

I-68

1  A    That was based upon my many years of experience in the

2  oil pipes business and understanding the mechanics of how

3  these bits and pieces of equipment move when they're elastic

4  materials.

5  Q    Now, before writing your report and coming to your

6  conclusion, had you looked at diagrams of the MTBS device?

7  A    Yes, I did.

8  Q    All right.  You have now also actually seen the model

9  that we're going to show the Court here shortly, correct?

10 A    Yes, that's correct.

11 Q    And you looked at photographs of it, right?

12 A    Yes.

13 Q    Have you also reviewed installation procedures for this

14 type of device?

15 A    Yes, I did.

16 Q    Okay.  Now -- all right.  We have a blowup here of the

17 Cameron MTBS tubing hanger, correct?

18 A    Yes, you do.

19         THE COURT:  And that's Exhibit D dash?

20         MR. ROGERS:  Defendant's 6.

21         MR. REDDEN:  Defendant's 6.

22         THE COURT:  Defendant's 6.  Thank you.

23 BY MR. REDDEN:

24 Q    All right.  Doctor Frishmuth, before being retained in

25 this case, were you generally familiar with tubing spools

I-69

1 and tubing hangers?

2 A    Yes, generally.

3 Q    How so?

4 A    Well, a lot of this equipment is very typical in the

5 oil field because we always have production tubing hanging

6 in a well, and we have to react to those forces and contain

7 them in a wellhead of some sort.

8 Q    What is this type of device used for?

9 A    This particular device is aimed at, as I said,

10 supporting the tubing hanger and the tubing string that's

11 hanging down in the well through which the production fluids

12 are extracted from the well.

13 Q    Would you be able to identify for the Court the various

14 components of this device by using this blowup?

15 A    Yes, I could.

16         MR. REDDEN:  Your Honor, could he step down and do

17 that?

18         THE COURT:  Yes.  You want to give him a mic.

19 BY MR. REDDEN:

20 Q    In fact, why don't you stand over here so you don't

21 block the judge's view.

22         MR. ROGERS:  Your Honor, while they're setting

23 that up, Defendant's Exhibit 6, it's actually page six of D.

24 So it's D6.

25         THE COURT:  D6?

I-70

1           MR. ROGERS:  D6, yes.

2           THE COURT:  Thank you.

3           MR. THOMAS:  Your Honor, could I -- I want to make

4    sure you can see it, but the way this is set up --

5           THE COURT:  You can move --

6           MR. THOMAS:  If we could maybe just slide it a

7    little bit more this way.

8           THE COURT:  Sure.

9           MR. REDDEN:  Which way you want --

10          MR. THOMAS:  Just, yeah, a tad.  That would

11   probably -- the Court can see it.  That way I can see it.

12          THE COURT:  And if the people in the back, you

13   want to come around and kind of -- you can.

14          THE WITNESS:  Okay.  Well, Judge, what we have

15   here is -- is a cross-section, a cutaway view of the

16   assembling of the tubing hanger and the spools and the

17   associated parts.

18          THE COURT:  And this is from the '94 catalog?

19          MR. REDDEN:  Yes, it is.

20          THE WITNESS:  Yeah.  So basically, obviously, this

21   whole thing should be 360 degrees, but we've cut off two

22   sections so that we can see what's inside.

23          What we have here, this I guess you would call it

24   yellow part, is the tubing hanger.  Attached to the tubing

25   hanger is a piece of tubing which is this pipe that's

1  threaded into the bottom here hanging down into the well.

2  The tubing hanger is resting on this red part which I refer

3  to as the hard seat.  The hard seat then transmits the

4  vertical loads coming from the hanger into this white part

5  which is the tubing spool.

6  This part here is the lock screw which comes in

7  from the side through the top flange of the tubing spool and

8  basically locks down the tubing hanger.  These screws are

9  also energized in order to set the metal to body seal which

10 is this small triangular area right here at the bottom.  So

11 that small little piece is the MTBS seal, and that's how

12 this device gets its name, the MTBS metal to body seal.

13 So once these -- these things are locked in, the

14 next step in the assembly process is to lay in this gasket

15 at this location.  That's called the BX gasket.

16 BY MR. REDDEN:

17 Q    Let me stop you there for just a minute, Doctor

18 Frishmuth.  How many of these lock screws are there in the

19 tubing spool?

20 A    Yeah, we see many of them going around the side.  For

21 this tubing spool, there are 16 of those lock screws.

22 Q    Okay.  And this area that you referred to up here above

23 this BX gasket, is that a separate flange up there?

24 A    Yes, it is.  That's what we're -- everyone seems to be

25 referring to the adapter flange.  It is up there at the top.

I-72

1  Q    So when you -- when you initially set this thing up,

2  when you put the tubing hanger down in there, is that the

3  flange device or is that something that gets added after

4  that?

5  A    That gets added after.  That's the next few steps in

6  the running procedure.

7  Q    Okay.  Go ahead.

8  A    So once this is in place and the lock screws on the

9  tubing spool are locked in, then we lay in the BX gasket,

10 and we lay in this U-cup seal assembly which is made up of

11 three different parts right here.  So those two parts are

12 added to the top of the tubing spool, and then the final

13 step in the process is to bring over this adapter flange,

14 set it down carefully on those two metal seals, and then

15 with these heavy screws here, to bolt up the flange to pull

16 everything together.

17     What that does is it -- it goes in and makes metal-to-

18 metal contact on the BX gasket.  It makes metal-to-metal

19 contact on the U-seal assembly, and then when you're making

20 up the bolts, it's pulling everything together.

21 Q    The bolts you're talking about we see here and here?

22 A    That's a single bolt.

23 Q    Single bolt?

24 A    With two nuts, one nut on each end.

25 Q    Those bolts go all the way around the device?

I-73

1  A     Yeah.  There's also 16 of those.

2  Q     So does Cameron specify the amount of force or torque

3  that has to be put on this to install it properly?

4  A     Yes.  There's a specification for both the lock screw

5  and the through bolts.

6  Q     Okay.  And what's the reason that you have the lock

7  screws?

8  A     Well, the reason -- the primary reason for the lock

9  screws is to drive the hanger down in order to set or

10  activate the metal to body seal.  So when -- when you're

11  driving this screw in, there's a 45 degree shoulder here,

12  and it drives the hanger down in order to activate this

13  metal seal.

14  Q     Why is it important to have a seal?

15  A     Well, if you can look at the annular space between this

16  gray part, the tube and the -- the spool body, if you got

17  well fluid into this region pushing up underneath of the

18  hanger, you want to be able to seal that surface off so it

19  stops the fluid right there.

20  Q     And you mentioned there's also a seal up there in the

21  upper flange, correct?

22  A     That's right.  There's a seal here too.  That's the

23  secondary seal.  So if this one should leak, hopefully that

24  one would seal along with the BX gasket.  There's also an

25  elastomer seal located here which has no structural

I-74

1  component but when it's activated with this other screw

2  here, it activates that elastomer rubber seal there to

3  basically make sure that this area in the annulus between

4  the spool and the hanger is protected from the environment.

5  Q    You mentioned that when these lock screws are run in,

6  it exerts a downward force on the tubing hanger, correct?

7  A    Yes, it does.

8  Q    Now, what about when you tighten up these bolts in this

9  flange here, what does that do?

10 A    Well, it also -- it also provides a force that comes

11 through the U-cup seal down into the hanger, and it adds

12 forces to this joint down here.  So it's adding more force

13 to the metal seal and the -- and the hard seat here.

14 Q    What is Newton's first law?

15 A    Newton's first law says that when you have a single

16 body, you have free body diagram, all the forces have to

17 balance in order to have equilibrium so that it doesn't

18 move.  If a force is out of balance, it's going to move the

19 component.

20 Q    So in this case, you told us that as far as setting

21 this up, there are downward forces coming from two different

22 places?

23 A    Yes, that's right.

24 Q    Where's that again?

25 A    From the lock screw and from the metal U-seal.

I-75

1  Q    Where are those forces offset?

2  A    Those forces in this preload condition are offset by

3  the forces here at the -- at the hard seat.

4  Q    All right.  So hypothetically, if you had -- if you had

5  say a million pounds of force pushing down on the annular

6  member, would there be a million pounds pushing up?

7  A    Yes, there would be a million pounds pushing up here in

8  order to keep the system -- the hanger in balance.

9  Q    Okay.  Does that pretty well describe the main parts of

10 this assembly?

11 A    I believe so.

12         MR. REDDEN:  Your Honor, at this time, if this

13 would be an appropriate time to go downstairs and let's take

14 a view of --

15         THE COURT:  Why don't we do that at noon.

16         MR. REDDEN:  At noon, okay.

17 BY MR. REDDEN:

18 Q    All right.  Doctor Frishmuth, you mentioned the seals,

19 and they're a little bit hard to see in that.  You had a

20 colorized diagram attached to your report that kind of pulls

21 those out, correct?

22 A    Yes.

23 Q    Let's put that up if we might.

24         THE COURT:  It's Exhibit C?

25         MR. REDDEN:  This is --

1           THE COURT:  His report, DX EB.016?

2           MR. REDDEN:  .017.

3           THE COURT:  All right.  DX EB.017?

4           MR. REDDEN:  That's right.

5      (Pause.)

6  BY MR. REDDEN:

7  Q    All right.  So what do we see in those circles over

8  there on the left?

9  A    Well, the top circle shows the three different parts

10  that make up the U-seal assembly.  There's a spacer block at

11  the top.  Then there's a V-shaped thing that drives down

12  into the U-cup seal, and when that's made up, those forces

13  push that assembly together and drive the ears of the U-cup

14  outward so that it engages the surface of the adapter flange

15  on one side and the surface of the tubing hanger on the

16  other side.

17  Q    Okay.  And is the purpose of -- of applying these

18  forces to the tubing hanger, is that to make sure it stays

19  in place if you had an upward force coming out of a well?

20  A    Partially, yeah.  It -- the makeup is intended to make

21  the seal.  And then, in addition to that, the

22  action/reaction forces through those various parts basically

23  transmit the forces from the adapter flange to the hanger or

24  in the case of an upward load, transmitting forces from the

25  hanger into the adapter flange.

1  Q    Okay.  You mentioned something I want to ask you about

2  -- talk about, an action/reaction force.

3  A    Right.

4  Q    What does that mean?

5  A    Well, by Newton's third law, every action has an equal

6  and opposite reaction.  And so wherever there's a contact

7  between two parts and there's a force between those parts,

8  one side is the action, and the other side sees the

9  reaction.

10 Q    All right.  Let's see how that applies in this case.

11 if you -- if you screw in one of these lock screws --

12 A    Correct.

13 Q    -- is that an action?

14 A    You could consider that an action on the hanger, and

15 then the reaction is the force that the hanger's imposing on

16 the lock screw.  So it's an action/reaction pair.

17 Q    Okay.  And where would that reacting force be felt in

18 this device?

19 A    Well, the -- the one force is carried through the

20 hanger to the primary load shoulder at the hard seat.

21 Q    Okay.

22 A    And the reacting force goes back up through the lock

23 screw and forces the lock screw up against the top -- the

24 top corner of the -- yeah, the tubing spool.  So the

25 reaction forces there are loading up the spool.

I-78

1  Q    Okay.  By the spool, you mean this lower flange?

2  A    Yes, that's right.  I guess you would call it the lower

3  flange in this case.

4  Q    And then up here where we have the top seal --

5  A    Right.

6  Q    -- the U-cup seal, do you have a similar situation?

7  A    We have several action/reaction pairs going up through

8  there.  There's three different parts with an end on each

9  piece, and there's an action/reaction at each interface.

10 And so, again, the forces reacts, if you will, on one end of

11 that assembly against the adapter flange and at the other

12 side, on the lower side, it provides the forces into the

13 tubing hanger.

14 Q    Okay.  Let me see if I understand that.  You have

15 forces going into the tubing hanger from the seal?

16 A    Yes, sir.

17 Q    And those have reacted down here at the lower --

18 A    That's correct.

19 Q    And is there -- you said there's another

20 action/reaction pair up here?

21 A    Yeah.  Obviously, you know, if we have an

22 action/reaction pair at the lower end of the U-seal, at the

23 opposite end of the assembly, we have an equivalent

24 action/reaction pair between the top edge of the U-seal

25 assembly further up, right there at the top, right.  And so

I-79

1  there's an action/reaction pair that goes between the tubing

2  spool -- or, I'm sorry, the adapter flange load face and the

3  U-seal assembly.

4  Q    So you have a force reacting from the U-seal assembly

5  and then the adapter flange?

6  A    Yes.

7  Q    All right.  Now, I want you to assume that after you --

8  this thing has been preloaded as you described according to

9  the installation procedures, that you exposed it to 100,000

10  pounds of force coming upward out of the well, right?

11  A    Okay.

12  Q    What effect, if any, would that have upon this

13  preloaded system?

14  A    Well, one of the first things that happens is we're

15  going to start to unload the primary load shoulder at the

16  hard seat.  So those forces are going to start to decrease.

17  Q    Is that at this point here?

18  A    That's right.

19  Q    And let me go back a little bit.  You had -- you told

20  us before that because of these downward forces imposed by

21  the lock screws and the U-cup seal that there was an

22  opposite force here at the hard seat, right?

23  A    That's right.

24  Q    So that would be an upward force?

25  A    It's upward on the hanger.

I-80

1 Q    On the hanger?  Pushing up on the hanger?

2 A    On the hanger, downward on the hard seat.

3 Q    So now we're definitely adding an additional 100,000

4 pounds of upward force?

5 A    Right.

6 Q    And what effect is that going to have here?

7 A    That's going to start to unload that.  It's like a

8 spring action that's occurring right there.  So we're trying

9 to release the stored energy in the spring that would have

10 been compressed by the preload.

11 Q    All right.  Are you saying this thing's going to

12 actually move from the seat?

13 A    Yes, it has to move.

14 Q    Okay.  Is it going to lose contact with the seat?

15 A    No, not necessarily.

16 Q    Okay.

17 A    It would have to exceed the separation load of the

18 connection to do that.

19 Q    And what else is going to happen in this assembly?

20 A    Well, since the -- the hanger has to move up in order

21 to relieve that load and to react to the pressure from

22 below, the hanger is going to move up, and it's going to

23 start loading or increasing the load on the lock screw.

24 Q    Here?

25 A    Right.  And then it's going to also increase the load

I-81

1  on the metal U-seal at the top there because the entire

2  hanger is moving up.

3  Q    Okay.  And as those loads are imposed, are they going

4  to react then in these flanges?

5  A    Yes.  For example, if the load on the lock screw is

6  increased because of the hanger motion, the reacting forces

7  increase the load in the lower flange.  Likewise, the metal

8  seal at the top, the reacting forces increase the load on

9  the upper adapter flange as well.

10 Q    Okay.  And your opinion is based upon what?

11 A    That's elastic body -- deformable body mechanics and

12 the fact that we have -- we know from all the textbooks and

13 whatnot that when you have elastic bodies, things like that,

14 those local contact forces and energy basically deform the

15 material locally in an elastic manner so that in order to

16 unload a spring, you basically have to remove the load and

17 increase the distance.

18 Q    Now, you understand in this case the Duhn Oil expert,

19 Mr. Boyadjieff, disagrees with you, correct?

20 A    Yes, I do.

21 Q    You understand that Mr. Boyadjieff says under the

22 hypothetical I just gave you that there will be no

23 additional load imposed either here with the lock screw

24 against the annular member or right here where the contact

25 -- or contacts the metal seal?

I-82

1  A     Correct.

2  Q     All right.  Is he correct?

3  A     No, because it's not a rigid body.

4  Q     I want to show you a page from Mr. Boyadjieff's initial

5  expert report in this case.  For the record, it's DX EC.009,

6  page nine of Mr. Boyadjieff's report.  You've seen this

7  before, right?

8  A     Yes, I have.

9  Q     Now, here Mr. Boyadjieff has got three diagrams here as

10 part of his Figure 3, and on the left side he shows downward

11 forces on the hanger both up here at the U-cup seal and also

12 where the lock screws come in, correct?

13 A     Correct.

14 Q     And that's what you told the Court would be imposed by

15 doing that, right?

16 A     Yes.

17 Q     And then he shows an upward force.  He calls it an up

18 reaction opposing that -- that motion, correct?

19 A     Yes.

20 Q     Is he right so far?

21 A     Yes.

22 Q     Okay.  And then the next part he's put some actual

23 numbers in.  So let's assume that 10,000 pounds up here at

24 the U-cup seal and 400,000 pounds at the lock screws for a

25 total of 410,000 pounds pushing down, right?

I-83

1  A     Yes, sir.

2  Q     He says, okay, you'd have to have 410,000 pounds

3  pushing up to offset that force, correct?

4  A     Yes, sir.

5  Q     Is he right?

6  A     Yes, sir.

7  Q     So far?  Okay.  And then over here he says let's add

8  100,000 pounds of upward force to the well, which is what I

9  asked you about, right?

10 A     Yes.

11 Q     And he says you add 100,000 pounds and everything stays

12 the same up here at these shoulders, at the U-cup seal and

13 at the lock screws and that the amount of upward force on

14 the lower shoulders simply reduces the 410,000 to 310,000

15 pounds, right?

16 A     Yes, sir.

17 Q     Is he correct?

18 A     I don't believe so.

19 Q     Why not?

20 A     That's not -- he doesn't consider an elastic body.  The

21 310,000 pounds he has there is not correct.

22 Q     Okay.  When you say elastic, tell the judge what you

23 mean by elastic body.

24 A     Well, it might be better to use an example.

25 Q     Okay.

I-84

1  A     We can use a demonstrative.

2  Q     All right.  I think we put them up there.

3  A     Where is the best place to do this, right here?  Okay.

4  Is that okay for you?  Okay.  Well, what we have here is two

5  sponges.  I've got a little piece of cardboard that I'm

6  going to put in between them just to -- so that we can see

7  the clear indication of the interface between the two

8  locations.

9       So a deformable body, right, is one that when we

10  compress it, it basically compresses like a screen.  The U

11  -- the contact interface moves down.  In order to unload

12  that, if I put -- if I have any force trying to pull my arm

13  up, for example, if somebody grabbed my arm and tried to

14  pull it up, I would have to unload this elastic action

15  before I ever arrived at separation of the surface.

16       So it's this elastic unloading of the assemblies that

17  is missing in Mr. Boyadjieff's analysis.  So in order to

18  unload this spring in any way, in order to drop that 410,000

19  pounds in the center diagram, in order to reduce that to any

20  number, you have to physically unload the elastic spring

21  that's on the interface between those parts.

22  Q     All right.  And you're talking about an elastic spring

23  being in this tubing hanger, right?

24  A     Well, this is -- this is more akin to the local action

25  right -- right at the contact surface.

I-85

1  Q      Here?

2  A      Right there.  That -- the red part, the hard seat as

3  I've shown here, it would be the lower sponge, is deforming

4  down.  The upper part is the local area right around that

5  load shoulder is the lower end of the tubing hanger, and

6  it's also deformed.  So to unload that interface, we have to

7  relax the loads, which means I physically have to move the

8  hanger.

9        Now, this is a sponge, right.  So it's not at all like

10  a hard seat.  So if I had a -- let me take a book here.  If

11  I had a textbook and I'm pushing down on the table, we still

12  have the same type of action that we have in the spring,

13  except it's at such a fine scale that you can't possibly see

14  it with the naked eye.  And so in order to demonstrate that

15  more realistically, we would want to impose a spring on this

16  interface.

17        So if I took a little spring here to model the elastic

18  action of the interface, I would put the spring here, put

19  the book on top and push down, and then as I try to lift the

20  book up or release the load, the spring is going to push

21  back until I get to separation.  Separation is the point

22  where the surfaces physically come apart.  But before you

23  get to separation, you have to first unload the elastic

24  recovery of the interface.

25  Q      Okay.  Let me see if I understand that as it applies to

I-86

1  this.  You're not telling the judge that when you get this

2  upper force you're going to have actual separation of this

3  contact, are you?

4  A    Certainly not, correct.

5  Q    What you're saying is that when this thing is loaded,

6  it's storing up elastic energy?

7  A    You're releasing the elastic energy that was stored

8  when you preloaded it.

9  Q    So when you preloaded it, you stored elastic energy.

10  When you impose the upper force, you're partially relieving

11  that downward force?

12  A    That's right.

13  Q    Okay.  Because of the elastic nature of the material?

14  A    Right.  And I should point out that we have entire

15  books that are written on this subject.

16  Q    We'll look at one of them in just a minute.

17  A    Okay.

18  Q    In fact, we'll do it right now.  Are you familiar with

19  a textbook called The Engineering Mechanics of Deformable

20  Bodies?

21  A    Yes, I am.

22  Q    Is that one of the references that you've included in

23  your expert report?

24  A    Yes.

25           MR. REDDEN:  Your Honor, for the record, this is

I-87

1  Exhibit S.

2          THE COURT:  DX?

3          MR. REDDEN:  DX S.001.

4  BY MR. REDDEN:

5  Q    Are you familiar with this textbook?

6  A    Yes, I am.

7  Q    Is it a book that you own?

8  A    Yes, it is.

9  Q    So there's a whole book just written on the mechanics

10 of deformable bodies, correct?

11 A    Yes, there are many books written on that topic.  This

12 is one.

13 Q    Is that an area that you studied at work?

14 A    Yes.

15 Q    In your professional career?

16 A    Yes.

17 Q    All right.  Let's go to the next page.  And it starts

18 out by saying:

19          "The primary reason for the existence of

20          an engineering material, member or

21          structure is to resist loads."

22      True?

23 A    Yes.

24 Q    Okay.

25          "Engineering mechanics of deformable

I-88

```
 1            bodies deals with relationships between
 2            the loads applied to the bodies and the
 3            resulting internal effects and dimension
 4            changes of the bodies."
 5      Is that right?
 6  A    Yes.
 7  Q    Is that what's going on here where you load -- preload
 8  this tubing hanger?
 9  A    Yes, it is.
10  Q    And then in the blue it says:
11            "In statics you study force systems of
12            equilibrium of force systems acting on
13            bodies, but these bodies were considered
14            to be rigid and no consideration was
15            given to dimension changes or to the
16            intensities of internal forces in the
17            bodies."
18      Correct?
19  A    That's what it says, yes.
20  Q    All right.  So is it fair that studying deformable
21  bodies takes -- kind of goes to the next level of
22  sophistication?
23  A    Yes, that's correct.
24  Q    Okay.  You start out considering bodies being kind of
25  rigid.  You kind of learn some basic principles, right?
```

I-89

1 A     Yes, that's correct.

2 Q     What's this is saying in the real world, there are no

3 such things as rigid bodies?

4 A     That's correct, yes, sir.

5 Q     Okay.  And when you're considering what happens in a

6 system such as this with multiple parts that are loaded

7 under a lot of force, do you have to take into consideration

8 the principles of deformation of deformable bodies?

9 A     Yes, you do because every part in the assembly there is

10 deformable.

11 Q     Do you understand that Mr. Boyadjieff claims that the

12 only way you can get any load in either place on the annular

13 member is that you have to exceed preload?

14 A     Yes.

15 Q     Was he correct?

16 A     No, not in this case because, again, because it's -- he

17 hasn't considered the elastic body.

18 Q     Fundamental error?

19 A     Yes.

20 Q     Now, do you have -- do you have another demonstration

21 you'd like to perform for the judge to illustrate this

22 principle?

23 A     Yes, I do.

24 Q     All right.  And have you brought some additional

25 materials for that purpose?

I-90

1  A     Okay.

2  Q     Tell her first what -- what the reason is you're doing

3  this demonstration.

4  A     Okay.  What I'm going to demonstrate is the dual load

5  path amongst all these various interfaces here.  We have the

6  -- the interface at the heart seat.  We have the interface

7  at the lock screw, and we have the other interface up at the

8  U-seal.  And what I'd like to do is to show you the spring

9  reactions at these three interfaces.  So the first thing I'd

10 like to do on my little dow rod here is to put a washer

11 through on the dow rod and anchor it with a cotter pin.

12 This is going to represent the hard seat, that red part that

13 we see there.  So this washer is the hard seat, the physical

14 hard seat itself.

15       Then I'd like to put a spring on here and add another

16 washer that is now going to be the tubing hanger itself so

17 that the spring is representing of the deformation locally

18 between the two parts, and so the two parts, again, are the

19 middle washer is the hanger and the bottom washer is the

20 hard seat.

21       So what I'd like to do now is add another part which

22 will be -- which will now be the part that is going to

23 represent the lock screw.  So the lock screw is basically

24 going to load up the tubing hanger.  So this little neoprene

25 washer represents the lock screw.  So I'm going to drive it

I-91

1  down, preload it, and put in a cotter pin to lock that

2  preload in position.

3      So there's an assembly now that's been made up with a

4  lock screw, the tubing hanger, and the hard seat at the

5  bottom.  Then our final step in the process is to add on top

6  of that another spring that's going to represent the metal

7  U-seal pushing down on the hanger. So this last washer I'm

8  going to put in represents the metal U-seal.

9      So now we push down on the U-seal.  We lock it in place

10 like that.  So now we have an assembly with two parallel

11 screws, two parallel load paths, and two parallel springs,

12 and we have down here a spring that represents the contact

13 between the tubing hanger and the hard seat at the bottom.

14     Now, if we have pressure from below that's trying to

15 move the hanger, what happens is we'll put pressure

16 underneath the hanger and try to push it up.  Well, when we

17 push the hanger up, what we see is this spring at the bottom

18 is unloading, and these two springs at the top are

19 compressing.

20     So the motion of pressure from below on the hanger is

21 unloading the spring that represents the seat between the

22 two parts of the hanger and the lock screw -- or the hanger

23 and the hard seat, and we're compressing both the spring

24 going to the lock screw and the spring going to the upper U-

25 seal.

I-92

1    So whenever we have pressure from below pushing the

2 hanger up, we're unloading both -- we're unloading one

3 spring and loading two springs.  So that's the -- that's the

4 dual load path.

5    Now, again, remember we're using the springs to

6 represent the elastic action of the interface between the

7 parts.  So these -- these springs are not the parts

8 themselves.  They're the elastic action between the parts.

9         MR. REDDEN:  Any questions about the

10 demonstration, your Honor?

11 BY MR. REDDEN:

12 Q    All right.  All right.  Now, did you also do a finite

13 element analysis in this case?

14 A    Yes, I did.

15 Q    And why did you do that?

16 A    Well, it's nice to have these theories, but it's also

17 good to have confirmation of your theories.  And so I

18 thought, well, let's build a quick little FEA model as best

19 we can and proceed to do an analysis where we would apply

20 pressure to the -- to the hanger in order to see what's

21 going to happen with the assumptions of elastic materials

22 instead of really super inelastic, rigid type materials.

23 Q    All right.

24 A    The other reason I wanted to do that is because in my

25 little demonstration there, I didn't have the springs that

I-93

1  represent the spool and the adapter flange.

2  Q    Okay.  All right.  What is finite element analysis,

3  Doctor Frishmuth?

4  A    Well, finite element analysis, again, I have a

5  demonstration for the judge if you want to proceed with

6  that.

7  Q    All right.  Please.

8  A    Well, Judge, this is a -- this is a kind of a model of

9  a finite element.  So each one of these blocks that I have

10 here is a finite element per se, and what I've done is

11 attach the finite elements together at things we refer to as

12 node points, which are basically -- the node points are the

13 corners of the elements.

14     So in building this little horse type structure,

15 whatever you want to call it here, I've connected together a

16 bunch of individual elements and I have these -- locked

17 these node points together to make this fixture.  Now, in

18 finite element analysis, we have to be able to anchor the

19 equipment so that things don't move around.

20     So there's different types of anchors that we have

21 available to us, and we have to be careful when we put

22 together an FEA model to be sure to anchor it so it doesn't

23 move, because if things start to move, then your solution

24 isn't going to -- to solve.  You won't get a converged

25 solution as we say in the trade.

I-94

1  Q    Going back, I just want to -- is a -- an FEA is a

2  computer model?

3  A    Yes, sir.

4  Q    Okay.  And is it meant to simulate as best you can

5  what's going to happen in the real world?

6  A    Yes, it is.

7  Q    And is it commonly used commercially?

8  A    Yes, it is.

9  Q    And what are some of the things it's used for?

10  A    Well, NASA uses it a lot on its space shuttle and space

11  shuttle parts and things like that.  In the oil patch we use

12  it for all sorts of things, wellhead connectors, wellheads,

13  all sorts of parts that we --

14  Q    Is the purpose to see how some part is going to respond

15  to a force?

16  A    Yes, sir.

17  Q    Okay.  So you'll know whether or not it's going to

18  work?

19  A    Yes.  We're also concerned about interferences under

20  pressure.  So we look at things like, you know, how do

21  things move when they're under load and are they going to

22  interfere with parts.

23  Q    Okay.  So I'm not sure I understand what a node is?

24  A    A node?

25  Q    You had mentioned nodes.

I-95

1 A    Okay.  Well, the node is the -- is the contact point

2 between the elements.  Okay.  So wherever we have elements

3 in contact, we would typically want to have a node there or

4 perhaps some sort of a -- a boundary condition like a roller

5 for example.  So suppose we wanted to have this thing so

6 that it could move left and right like this or -- but we

7 wouldn't want to allow it to move downward through the

8 table.

9     So this is -- this is called a roller constraint, if

10 you will.  Then we also have a fixed constraint.  So we

11 would basically take one of our node points or a series of

12 node points and anchor it in space.  So now it can't move

13 left or right in spite of the fact that there's rollers

14 there.

15     So we basically have different types of constraints in

16 the FEA approach.  We also have to prevent rotation.  We

17 don't want the thing to rotate.  So we have to constrain

18 rotation and displacement.

19 Q    How do you use this ANSYS software?

20 A    Well, you basically -- practically speaking, you take a

21 CAD file, a computer-aided design file of some sort, import

22 it into ANSYS or COSMOS or any of the other codes, and then

23 you would mesh the model with your finite elements.

24 Q    Is that what you did in this case?

25 A    Yes, it is, and I believe you have a slide or two of

I-96

1 that.

2 Q    Where did you get the CAD file from?

3 A    The CAD files -- the basic CAD file came from the guys

4 at Cameron, the CAD folks at Cameron who put it together,

5 and then we -- we and another -- the CAD company that I work

6 with, we basically converted it into an ANSYS file.

7 Q    All right.  What we see here on the screen, DX -- is

8 that Exhibit I?

9 A    That's the finite element model, the mesh, and so each

10 one of those things that you see there, that's the physical

11 mesh of this three-dimensional part, and so that's -- that's

12 all these mesh node points and elements.

13 Q    And you said mesh.  What's that mean?

14 A    Well, again, you know, they're finite elements, each

15 one of those tetrahedron that are in there, and they're all

16 connected at the corners at their node points.

17 Q    Okay.  You have done -- well, first of all, what do you

18 do after you get to this stage?

19 A    Well, at this stage you would start to put on your

20 boundary conditions as I was describing earlier, because you

21 don't want that part moving around in space.  You need to

22 anchor it.

23     There's also a lot of elements in here that are at the

24 interfaces that don't show up in this -- in this view and

25 wouldn't really show up in any view for that matter, but

I-97

1  there's contact of elements.  We call them contact elements

2  in between all those parts so that you can transmit loads

3  and forces from one component to the next component.

4  Q    Okay.  Building your model, did you model all parts in

5  the tubing hanger?

6  A    No.  That model is a 22 and a half degree segment going

7  through two of the bolt holes in the flange and containing

8  one single lock screw.

9  Q    So 22 and a half is one-sixteenth?

10 A    Yes.

11 Q    Okay.  And within the constraints of that, were there

12 some parts that you just didn't include in your model?

13 A    Yes.  For example, let's see, well, I left out the

14 metal seal, the MTBS seal.  That's carrying some load but

15 just a little bit really compared to the rest of the parts.

16 Then there's the lock screw that holds the hard seat in.

17 That wasn't in the model either, and then there's an

18 elastomer seal that's in the packing gland screw at the lock

19 screw.

20 Q    This here?

21 A    That there.

22 Q    Why did you not include those things?

23 A    They're not really carrying any load to speak of.  In

24 fact, the -- the retaining ring at the bottom, that's

25 actually unloaded in service.  So it's -- it was just left

I-98

1 out.

2 Q    Okay.  And once you built your model, what's the next

3 step?

4 A    The next step is to get all the boundary conditions on.

5 So I've got a 22 and a half degree segment.  So I have to

6 put symmetry, boundary conditions on both of those cut

7 planes.  Then I need to anchor it vertically to prevent the

8 whole system from moving in space, and so I anchored the

9 bottom plane.

10 Q    Okay.  What's the next step?

11 A    The next step is to figure out how to apply the forces

12 and nodes, and so we have two input forces we have to worry

13 about.  We have to load up the lock screw to drive it into

14 the hanger and push the hanger down, and then we have to

15 load up the U-cup seal by pulling the flanges together where

16 the bolts are in the real product.

17 Q    Did you account for that in your model?

18 A    Yes, those forces were input.

19 Q    And at some point did you attempt to run this and see

20 if you could get a solution?

21 A    Yes.

22 Q    Did you get -- I've heard the word "converged

23 solution."  I think we heard that earlier.  What is a

24 converged solution?

25 A    Well, what the analysis -- how the analysis goes

I-99

1  technically -- and I'll try to -- try to keep it short and

2  not go into much, but it's basically a displacement.  You

3  start out with displacements of all the bits and pieces.  So

4  you apply a force.  That imparts a displacement, and then

5  the displacement from one element goes to the next element,

6  goes to the next element, goes to the next element.

7       So that ends up with a huge matrix of analysis files

8  that need to be solved.  We're talking on the order of a

9  million types of numbers, million equations that have to get

10 solved.  And so --

11 Q    So the computer does that?

12 A    The computer -- I certainly wouldn't, but, yeah, the

13 computer does that.  And so basically you basically take all

14 those equations and if something comes apart or something

15 gets so deformed that the -- the computer doesn't know how

16 to deform the element, it will just crash on you and say

17 non-converged solution for any variety of reasons.  Perhaps

18 the gap elements aren't connecting up properly and parts are

19 flying off into space.

20      So it's extremely rare that you would ever push the

21 button the first time and get a solution, especially

22 something with all these contact elements.

23 Q    Okay.  So what do you do when you don't get an solution

24 the first time?

25 A    Well, you'd go into the computer output and you try to

I-100

1  find out what's coming apart or what's going on, what's

2  deforming so much that it can't solve it.  So then you may

3  change your mesh density or do something like that.

4      The other issue can be that the model is just simply so

5  big that it's taking a week of, you know, 24/7, seven days

6  to solve and that's just too long.  So you end up having to

7  reduce the mesh size, cut off parts that are of no interest

8  to you.  In this case, for example, I cut off the lower part

9  of the flange that doesn't have the flange on the bottom.

10 And so I cut the spool partway down, down near that lower

11 flange.  I took the lower flange out of the system.

12     And, again, that was done in order to reduce the -- the

13 number of elements.  Likewise, as you can see, I took out

14 the bolts and the nuts because they were increasing the --

15 the solution time to the point where it was getting

16 untenable, and we can -- we'll talk about that later because

17 I've been criticized for doing that.

18 Q    Okay.  We will talk about that.  Now, you gave a

19 deposition in this case?

20 A    Yes, I did.

21 Q    Correct?  And the deposition was given after you turned

22 over your rebuttal report, correct?

23 A    Yes, sir.

24 Q    And your rebuttal report discussed I think your first

25 four converged solutions?

I-101

1  A    I believe that's correct.

2  Q    All right.  And when did you actually finish that work

3  with respect -- in relationship to your deposition?

4  A    That final run that was described in that supplemental

5  report was finished about 3:00 o'clock in the afternoon on

6  the day that that report was due.

7  Q    Okay.  And that was turned over, and you were

8  questioned about it at your deposition, right?

9  A    Yes, sir.

10 Q    And did you make an error?

11 A    Yes, I did.

12 Q    And what kind of error did you make in that solution?

13 A    When I did the load balance and presented the load

14 balance data, I inadvertently included the forces on the

15 hard seat.  So I ended up overestimating the hard seat

16 loads.

17 Q    Here?

18 A    That's -- at the lower end of that red part.

19 Q    Here?

20 A    Right there, yeah.

21 Q    All right.

22 A    So the forces, the pressure forces were applied to the

23 bottom of the hard seat and the very bottom of the hanger,

24 the two locations.  So when I was doing a load balance on

25 just the hanger, I inadvertently included the load on the

I-102

 1  hard seat when I should not have and have since corrected

 2  that.

 3  Q    Okay.  And Mr. Boyadjieff for one took you to task in

 4  his rebuttal report --

 5  A    Yes, sir.

 6  Q    -- because your runs didn't match, right?

 7  A    Yes, sir.

 8  Q    Okay.  And you admit you made an error?

 9  A    Yes, sir.

10  Q    And you've since corrected it?

11  A    Yes, sir.

12  Q    Okay.  Now, you did some additional work after your

13  deposition was done, correct?

14  A    Yes, I did.

15  Q    And you did a case five and a case six?

16  A    Yes.

17         THE COURT:  Now, did they depose him after the

18  case five and case six?

19         MR. REDDEN:  I was just going to ask him that

20  question.

21         THE COURT:  Oh.

22  BY MR. REDDEN:

23  Q    Doctor Frishmuth, you were in my office at Mr.

24  Brugman's deposition last Friday I believe, on the 10th,

25  correct?

I-103

1  A    Yes, that's correct.

2  Q    And, originally, you had been asked to give a

3  deposition that day after Mr. Brugman, correct?

4  A    Yes, sir.

5  Q    And were you there and were you willing to be deposed?

6  A    Yes, I was.

7  Q    And opposing counsel decided they didn't want to take

8  your deposition, correct?

9  A    That's correct.

10 Q    All right.  So they had every opportunity to take your

11 deposition and ask you whatever they wanted to about cases

12 five and six?

13 A    Yes, sir.

14       MR. REDDEN:  All right.  All right.  I want to --

15 now I would like to put up Defendant's Exhibit BA.001.

16       Before I do that, I'd like to offer into evidence

17 Defendant's Exhibit I.001.

18       THE COURT:  Any objection?

19       MR. THOMAS:  No objection, your Honor.

20       THE COURT:  I.001 is received.  Is it DX I.001?

21       MR. REDDEN:  Yes.  Yes, your Honor.

22       THE COURT:  That's received.

23 BY MR. REDDEN:

24 Q    All right.  Referring to Defendant's Exhibit BA.001,

25 can you tell the Court what this is?

I-104

1        THE COURT:  I'm now getting it.  DX is your
2  Defendant's exhibit, is that right?
3        MR. REDDEN:  Yes.
4        THE COURT:  That's your coding.  Thank you.
5        THE WITNESS:  That looks like -- as best I can see
6  from here, that's the final output from my load case six,
7  and it's been converted to 360 degree loads from the 22 and
8  a half degree loads from the model.
9        So the -- the vertical axis on the left is in
10 total pounds for the various load shoulders in the complete
11 360 degree model.
12 BY MR. REDDEN:
13 Q   All right.  I want to walk through this in some detail.
14       MR. REDDEN:  May I approach, your Honor?
15       THE COURT:  You may.
16       MR. REDDEN:  Handing you a copy so that you could
17 -- are you able to see that all right, your Honor?
18       THE COURT:  Yes.
19 BY MR. REDDEN:
20 Q   Okay.  All right.  On the left-hand side you have a
21 column that says upward force, and we have five different
22 bars in different colors, correct?
23 A   Yes.
24 Q   Can you explain what each of those represents?
25 A   Okay.  The -- the yellow bar on the far left on the set

1 on the left is the adding of the 400,000 pounds tubing

2 weight pulling the hanger down onto the load shoulder

3 because of the tubing, the weight of the tubing.

4 Q    Okay.  And just so we're clear, we hadn't talked about

5 that too much.  If you look here at the tubing hanger, as

6 you told the Court, the whole purpose is to hang tubing,

7 right?

8 A    Right.

9 Q    And so you've got all this tubing going down in the

10 well in order for this --

11 A    Yes.

12 Q    That's what you're talking about?

13 A    Yes.

14 Q    Okay.  So you assume that's 400,000 pounds worth of

15 tubing hanging on a hanger, right?

16 A    That's right.

17 Q    All right.  And what's the blue bar?

18 A    The blue bar according to the legend here is complete

19 setting lock screw and start of the flange makeup.  So the

20 blue represents the load on the primary load shoulder now

21 due to making up the lock screws.  So that force is on the

22 order of looks like maybe 130,000 pounds -- or, I'm sorry,

23 that's a million, 1,300,000 pounds.

24 Q    Now, so we're clear here, this is -- is this assuming

25 an upward force?

1 A    No, there's no -- no upward forces at this point.

2 We're just making up the connections.

3 Q    Okay.  So what you're saying is when you do the first

4 step, you turn your lock screws, you get looks like about a

5 million, million two --

6 A    Yes.

7 Q    -- pounds?

8 A    Yes, sir.

9 Q    Okay.  And then what's the red?

10 A    The red is when we complete the flange makeup and

11 before we apply any annular pressure to the well.  So the

12 difference between the blue and the red is the fact that

13 we're making up those 16 bolts that are connecting the

14 flanges together.

15 Q    These guys here?

16 A    Yes.

17 Q    So now you've got the lock screws in and you've got the

18 flange?

19 A    Yes.

20 Q    And that's why the force goes up or was it just the

21 lock screws?

22 A    Yes.

23 Q    So the red force is the highest?

24 A    That's right.

25 Q    So that's the preload?

I-107

1   A     That's the preload.

2   Q     Looks like you got about 2.2 million, something like

3   that?

4   A     Yes.

5   Q     And that's all downward force?

6   A     Yes.

7   Q     All right.  Now, what is green?

8   A     I'm sorry.  That's an upward force.

9   Q     I'm sorry.

10  A     Yes.  The green and the purple now are the two cases

11  where I've started to add pressure from below, trying to

12  force the hanger up out of the well.

13  Q     Okay.  Well, what's the difference in the green and the

14  purple?

15  A     One is where I've applied just pressure in the annulus

16  space, and the -- the purple is when I've basically blocked

17  off the well as if there were a plug in the hanger and we

18  were pressuring the entire cross-section of the spool.

19  Q     Okay.  So what do we see here?  What --

20  A     What we see is the primary load shoulder is starting to

21  unload because the pressure is dropping down off of the

22  primary shoulder.  We also can see that the lock screw to

23  hanger which is the center lock of the five that are up

24  there, we can also see that we're loading up the lock screw

25  to hanger interface.  We're going from the red, stepping up

I-108

1  to the green and stepping up to the purple.

2  Q    Let's take this a little slower because I have to admit

3  I had a hard time following this the first couple of times.

4        All right.  The upward force that you're referring to

5  over there in the first column, is that the force that's

6  being exerted here at this load show?

7  A    Yes, that's the force from the hard seat into the

8  hanger.

9  Q    Okay.  And that's reacting to the force, the downward

10  force or the tightening in the lock screws and the flange,

11  right?

12  A    Right.  That's the initial set condition.

13  Q    That's the initial set.  Okay.  And that's the red?

14  A    Yes.

15  Q    All right.  Then when you start applying upward force,

16  let's just -- let's just take the purple, for example.  We

17  see that the upward force drops from where it was at the red

18  downward, right?

19  A    That's correct.

20  Q    And why does that happen?

21  A    Well, that's the elastic unloading as in my spring

22  example that we used earlier.  I'm unloading that spring

23  that is at that interface there.  At the same time, you can

24  see the next two blocks from the red to the green to the

25  purple, they're loading up.  So the dual load path is the

I-109

1  load path at the lock screw and the load path at the U-seal,

2  and both of those springs are compressing, and so we're

3  putting more force on the U-cup seal and the lock screw.

4  Q    All right.  So the second model there is a hanger at

5  the U-seal.  That's up here?

6  A    Yes.

7  Q    The third is the lock screw to the hanger.  That's

8  here?

9  A    Right.

10  Q    Okay.  Casing load, of course, stays the same?

11  A    Yes.

12  Q    All right.  And so what does that prove?

13  A    Well, it basically proves that when we apply pressure

14  to this device, we're unloading in an elastic manner the

15  load shoulder, the primary load shoulder.  At the same time,

16  because we're unloading that shoulder, it's physically

17  moving the hanger up, a very small amount, but it's moving

18  up, and it's engaging or forcing more load into both the U-

19  seal and the lock screw.

20  Q    And does your computer program actually measure the

21  amount of those forces?

22  A    The amount of the force, yes, as well as the

23  displacement.

24        (Pause.)

25            THE COURT:  Why isn't it also moving up at the

I-110

1  hard seal?

2          THE WITNESS:  Well, it is moving up there.  It's

3  just we didn't --

4          THE COURT:  So then why isn't it a triple load?

5          THE WITNESS:  We didn't measure it.  Well, but

6  we're looking at the hanger and forcing the hanger up.  The

7  -- the force that you see on the primary load shoulder, that

8  left set of charts there, already has accounted for the fact

9  that the hard seat is also moving up.  It's been subtracted

10 out because I'm only looking at the force there.  If I were

11 to do a body -- a free body diagram of the hard seat by

12 itself, I would have a different set of forces involved.

13     (Pause.)

14         MR. REDDEN:  Your Honor, we'd offer into evidence

15 Defense Exhibit BA.001.

16         THE COURT:  Okay.

17         MR. REDDEN:  Did you still have a question for

18 Doctor Frishmuth?  Okay.  Is that received in, your Honor?

19         THE COURT:  Yes, it's received.

20         MR. REDDEN:  And also I'd like to offer the

21 underlying spreadsheet.

22         MR. ROGERS:  AG.

23         MR. REDDEN:  AG?

24         MR. ROGERS:  Defendant's Exhibit AG.

25         MR. REDDEN:  Defendant's Exhibit AG.

I-111

1          THE COURT:  AG is received.

2          MR. REDDEN:  Could we just show that slide now,

3    the one where the underlying spreadsheet is.

4          MR. ROGERS:  This is a projection of it.

5          THE COURT:  A projection of that.  And is that in

6    the exhibit book?

7          MR. ROGERS:  Yes.

8          THE COURT:  Okay.

9          MR. REDDEN:  Okay.  I just wanted to make sure I

10   didn't --

11          THE COURT:  Under AG -- under AG?

12          MR. ROGERS:  Yes, and the reason is because it's

13   an Excel spreadsheet rather than just a pdf printout.  So it

14   has the underlying data imbedded in it.  So when you hover

15   over something, it will show the underlying data in the

16   spreadsheet.

17          THE COURT:  My AG is blank.

18          MR. ROGERS:  It's an electronic file.  We have an

19   external storage device.  We will submit to the Court all of

20   the electronic files.  The FEA files are too large to do

21   anything other than provide an external storage device that

22   has the files on it.

23          So this is an electronic file, an Excel

24   spreadsheet.  We've printed this out as a pdf, and that's

25   the exhibit -- Defendant's Exhibit BA.001 that's been

I-112

1  admitted, and this is the underlying spreadsheet with the

2  data that we're offering.

3             THE COURT:  Okay.  Thank you.

4             MR. REDDEN:  So is AG admitted, your Honor?

5             THE COURT:  AG is received.

6             MR. REDDEN:  Okay.

7  BY MR. REDDEN:

8  Q    All right.  Let me show you another exhibit.

9  A    You just had it there.

10  Q    And that is Defendant's Exhibit M as in Mary .001.

11  Doctor Frishmuth, what are we seeing here?

12  A    That's the vertical downward displacement for each of

13  the load cases that we looked at, and it's at six different

14  locations on the hanger where I pulled out the displacement

15  data, and I believe the next chart shows where those things

16  are located.  Starting at the bottom right, I believe that's

17  A.

18  Q    Hang on a second.  Now we're looking at -- let's get

19  the exhibit number.

20             MR. ROGERS:  DX M.002.

21  BY MR. REDDEN:

22  Q    All right.  What do we see here?

23  A    What I've got there is a picture portrayal of the

24  hanger portion of the FEA model, and I've identified the

25  locations where I'm measuring the downward displacement at

I-113

1 various steps in the process.  So the location A is the

2 lower corner of the hanger.  Location B is at the hard seat

3 interface.  Location C is near the -- at the bottom side of

4 the lock screw interface.  D is right above that in the

5 hanger on the top, and then there's two locations for the

6 hard seat.  One is what I call the inner location, and then

7 the other is the outer location.  So there are six total

8 locations where I measured the displacements here in this

9 model.

10          MR. REDDEN:  Could he step down here to the model

11 and explain that a little better?

12          THE COURT:  Sure.

13          THE WITNESS:  Okay.  So what we're looking at here

14 is let's see, A, B, C, D, E, and F.  So A is basically right

15 here at this location.  B --

16          THE COURT:  So describe what this location is.

17          THE WITNESS:  Okay.  I'm sorry.  This location is

18 the very bottom edge of the hanger.  Then location B is the

19 outer edge of the hard seat to hanger interface, and it's on

20 the hanger itself.  Location C is at the corner of the 45-

21 degree slope that makes up the lock screw interface, and

22 it's on the lower end of the lock screw.

23          The next one -- let's see, A, B, C -- D is the

24 upper edge of the lock screw interface, and then E -- can't

25 tell where it -- is E the inner one?  I believe E is the

I-114

1  inner -- E is the inner location at the U-seal on the

2  hanger, and the final one, F, is the outer location on that

3  location.

4         So, A, B -- A, B, C, D, E, and F are the locations

5  where I physically went into the FEA model and measured the

6  deflections.  And that's what's shown on the bar chart in

7  the next sheet.

8  BY MR. REDDEN:

9  Q    And when you say deflections or displacements, what do

10 you mean?

11 A    Well, it's the physical displacement from its original

12 zero position with no load and no preload and nothing going

13 on at the very beginning of the model.

14 Q    All right.  So have a seat.  All right.  So that

15 explanation then -- let's look at the first column, the A.

16 It says hanger bottom at pressure face A.  So what are we

17 seeing here?

18 A    Well, what you're seeing is at the various steps that

19 are indicated by the legend on the right, the colored legend

20 on the right, we're basically making up the hanger, pushing

21 it down, and then the final two bars in each case are when

22 we're applying the pressure load from below.  So the full

23 makeup condition is the longest dark blue bar in the center

24 of each set.  So the red and the green go to make up the

25 dark blue in the center, and so that's basically making up

I-115

1   the connection.  So I think the part we're most interested

2   in is what happens after it's made up and you apply pressure

3   from below.

4        So what we're looking at is going from the dark blue to

5   the light blue, and we can see that the interface at the --

6   at the hanger is going up or a less negative number.  So

7   we're basically driving the hanger vertically upward.

8   Q    Here?

9   A    Yes.

10  Q    Okay.

11  A    And if we look at the numbers, we can see we're looking

12  at very very small numbers, on the order of .0004 inches or

13  so in each case.  So it's -- it's a very small displacement,

14  but it's enough to move the hanger and unload the elastic

15  preload that was put into the seal.

16             THE COURT:  All right.  We'll stop here.

17             How long do you estimate for our viewing of the

18  item?

19             MR. REDDEN:  As I understand, we're not going to

20  do testimony out there.  It's just a matter of looking at

21  it.  It's really up to you, your Honor.  I mean, no more

22  than a couple of minutes.

23             THE COURT:  Does he want to show -- do you want to

24  show parts of it or what?

25             MR. REDDEN:  If you don't mind, we'll just -- I

I-116

1  think it will go pretty quickly because we've already been

2  through what the parts are.  So I just wanted you to be able

3  to see the actual device.

4          THE COURT:  So are you saying five minutes?

5          MR. REDDEN:  Probably.

6          THE COURT:  Five minutes?

7          MR. ROGERS:  Yes.

8          THE COURT:  Okay.  So we'll go -- whoever wants to

9  go can go -- and we'll take a look at it, and then we'll be

10 back at 1:15.

11     (Proceedings recessed to reconvene.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I-117

1                    AFTERNOON SESSION

2                        --oOo--

3          THE COURT:  We're back in session.

4          So on the demonstrative that we saw downstairs, is

5  that marked for identification?

6          MR. REDDEN:  Yes, your Honor, it is.

7          THE COURT:  We will refer to that as?

8          MR. ROGERS:  C.

9          THE COURT:  .

10         MR. ROGERS:  And there's a corresponding

11  photograph of it, C.001, in the notebooks.

12         THE COURT:  All right.  Thank you.  You may

13  continue.

14         MR. REDDEN:  Your Honor, before I begin, I offer

15  into evidence this last graph that we were discussing before

16  the lunch break, which is DX M.001.

17         THE COURT:  That's received.

18         MR. REDDEN:  And I'd like to offer the underlying

19  spreadsheets for all the exhibits.

20         MR. ROGERS:  AK.

21         THE COURT:  That's received.

22         MR. ROGERS:  That's M.001 and .002.

23         MR. REDDEN:  And also we used DX M.002.  I'd offer

24  that as well.

25         THE COURT:  That's received.

I-118

1    RONALD FRISHMUTH - DEFENDANT'S WITNESS - PREVIOUSLY SWORN

2                   DIRECT EXAMINATION   (RESUMED)

3   BY MR. REDDEN:

4   Q    Doctor Frishmuth, showing you a demonstrative here.

5   Would this demonstrative help you explain some of the

6   testimony that you gave earlier this morning?

7   A    Yes.  It looks similar.

8   Q    All right.  And on the left-hand side you're depicting

9   the force at the U-cup and the force at the lock screws,

10  those being downward forces, correct?

11  A    Yes, that's right.

12  Q    And then the force to the shoulder, load shoulder being

13  an upward force, correct?

14  A    That's correct.

15  Q    And it's saying here that an upward force can only be

16  balanced by something that pushes down to maintain

17  equilibrium, correct?

18  A    Yes.

19  Q    And the force at the shoulder, is that an upper force

20  or a downward force?

21  A    The force at the shoulder is an upward force.

22  Q    Okay.  So you can only have an upward force there at

23  the shoulder, correct?

24  A    Yes, that's right.

25  Q    Any way that shoulder can push down?

*Echo Reporting, Inc.*

I-119

1  A     No, it can't push down, on.

2  Q     Okay.  And so an upward force -- if you have an upward

3  force coming out of the well, can that force react against

4  any force there at the shoulder?

5  A     Well, it can unload some of that force at the shoulder.

6  Q     Okay.

7  A     And that's not a reaction.  It's a relaxation if you

8  want to look at it that way.  You're relaxing the force

9  there.

10 Q     Okay.  So whatever -- whatever happens here at this

11 load shoulder, you're going to continue to have an upward

12 force?

13 A     Yes.

14 Q     Okay.  Let's go to the next -- what do we see here in

15 this demonstrative?

16 A     This is showing the actual force data from the finite

17 element analysis for different conditions.  The one on the

18 left is when we have 400,000 pounds of tubing weight hanging

19 in the well, and we've set the lock screws at -- it looks

20 like -- is that 845,000 pounds?  And the force at the U-cup

21 is 1,198,000 pounds.  And together they put a force on the

22 load shoulder of 2,242,000 pounds.

23 Q     That's without any kind of an upward force, correct?

24 A     Right.  That's just the tubing weight in the hanger.

25 Q     Okay.  And then what do we see on the right-hand side?

I-120

1  A    The right-hand side we're adding some well pressure

2  force of 419,754 pounds.

3  Q    It's actually 519,000.

4  A    Excuse me?

5  Q    It's 519,000.

6  A    Five hundred -- what did I say?  I'm sorry, 519,000.

7  So that's the -- the force form the -- from the pressure in

8  the annulus.  I think maybe that's the entire well.  I'm not

9  sure which one that is, but it's pushing up on the -- on the

10  bottom of the hanger, and as a consequence, the force on the

11  shoulder is being reduced from 2,242,000 down to 1,903,000.

12  And, correspondingly, the forces at the lock screw and the

13  force at the U-cup are increasing.

14  Q    So we had more downward force at those two points?

15  A    At those two points.  You're increasing.  I believe the

16  next slide may show the actual numbers.

17  Q    Okay.  So is this basically doing the arithmetic here?

18  A    Yes, it is.

19  Q    So if I understand this, on the right-hand side, as a

20  result of this force of 519,754 pounds upward, you had a

21  decrease in the force of the shoulder of 388,240 pounds?

22  A    Yes.

23  Q    And an increase in the downward force at the lock

24  screws where the lock screws engage the annular member of

25  436,680 pounds?

I-121

1  A     Yes, that's right.

2  Q     And you have an increase of 45,024 in downward force at

3  the U-cup?

4  A     Yes, that's right.

5  Q     Now, has your FEA also analyzed the question of whether

6  those -- where those forces react?

7  A     Yes, it has.

8  Q     All right.  Before we get to that, there's one other

9  slide I want to show you.  Before lunch, we looked at the

10 bar chart regarding displacement down.  Do you recall that?

11 A     Yes, I do.

12 Q     Is this slide also referring to the downward

13 displacement caused by the load pressure from below?

14 A     Yes, it does.

15 Q     And can you explain what we see on the left and what we

16 see on the right?

17 A     On the left side is the condition for just the tubing

18 weight pulling down.  And the connections are preloaded at

19 the lock screw and the metal U-seal.  On the right we've

20 added pressure from below, and it's the same pressure that

21 was on the previous slide, and it's showing the downward

22 displacement is decreasing at the bottom of the hanger.

23 It's moved from minus .0254 to minus .01739.

24 Q     And what is -- I think you noticed --

25 A     Yeah, there's --

1  Q     -- there's a typo in there.

2  A     There should be a minus sign in front of that.

3  Q     On the middle one?

4  A     Middle, on the lock screw shoulder.

5  Q     It should read minus .023636?

6  A     Yes.

7  Q     Okay.  So taking that into consideration, what changes

8  do we see on the right-hand side?

9  A     We're moving the lock screw shoulder up from the

10 original position of minus .0278.  It's moving up to minus

11 .036 is that?

12 Q     Here in the middle?

13 A     Yes.

14 Q     Minus .023636?

15 A     Three six three six, okay.  And then, correspondingly,

16 at the U-cup seal shoulder, it's moving from minus 0.345 is

17 that to minus 0.303.

18 Q     Okay.  I don't know if you're having trouble seeing the

19 numbers.  Let me give you this.

20 A     I can't see that.

21 Q     Try that again.

22 A     Okay.  This is the U-cup seal.  Downward displacement

23 without upward force is minus .034351, and after we apply

24 the force from below to -- to handle the upward pressure

25 from below, it moves up to minus .030355.

I-123

1   Q    And then what about at the lock screws?

2   A    Excuse me?

3   Q    What about at the lock screws?

4   A    Well, the lock screws, it's also moving up.

5   Q    So downward -- okay.  So the changes are .027807 --

6   A    Right, to minus .03636.

7   Q    .023636?

8   A    Right.

9   Q    Okay.  All right.  Now, let me go to the question I

10  asked you earlier, which is did your FEA also take a look at

11  where these forces that you have identified at the U-cup

12  seal and the lock screws, where those forces react?

13  A    Yes.  They -- for the lock screw, there's an

14  action/reaction pair at the -- between the hanger and the

15  lock screw.  So there's equal and opposite forces at that

16  contact surface.  So that imposes a force in the tip of the

17  lock screw.  That in turn forces the lock screw up slightly,

18  and it contacts the edge of the lower spool or the lower

19  flange in this case, and then there's an action/reaction

20  pair there where those loads are transferred into that

21  spool.

22  Q    And you actually have a movie that would depict that?

23  A    I believe we do, yes, sir.

24  Q    All right.  Was this generated by your ANSYS software?

25  A    Yes, it is.  What we're looking at there is the tubing

I-124

1  hanger isolated form the model.  Then we're showing the

2  stresses as they increase at various stages, and then we can

3  go through the individual files.

4  Q    Okay.  First of all, what -- what are we saying here?

5  A    Okay.  The red color indicates that our stresses there

6  -- this is the axial stress, in other words, the stress in

7  the vertical direction of the hanger, and we're saying

8  between 40,000 and minus -- I'm sorry -- minus -- I can't

9  read the number there.  What is it?  Is that 30,000 or

10 300,000?

11 Q    Hang on a second.  Your eyes are getting as tired as

12 mine.

13 A    So the bottom line is that the stresses in the red

14 color are between minus 30,000 and minus 40,000.

15      (Pause.)

16           MR. REDDEN:  Your, we would offer this movie,

17 Exhibit DX AG, into evidence.

18           THE COURT:  It's received.

19 BY MR. REDDEN:

20 Q    And then I think we have a PowerPoint that steps

21 through this a bit at a time so we can follow a bit more

22 closely.  Let's put that up.  Okay.  What do we see here?

23 A    This is the general area that we're looking at in this

24 particular movie.

25 Q    Okay.

I-125

1  A    And I believe this shows the view on the right-hand

2  side in the movie where we've zeroed in on the load

3  shoulder.  The frame in the left side of the movie is

4  standing back a little bit and seeing more of the hanger.

5  Q    Okay.  Let's go to the next one.

6  A    So the right-hand side is the zoomed-in area and the

7  left --

8  Q    That's this area?

9  A    Right.

10 Q    Okay.  All right.  And then we're applying pressure

11 from the bottom?

12 A    Right.  This is initial contact.  So there's virtually

13 nothing going on between S0 and S1.

14 Q    Go ahead.

15 A    This is .25.  So we're scrolling through to initial

16 contact.  So if we scroll through to -- to right there.  So

17 now we've made initial contact, and then we're setting the

18 hanger.

19 Q    Okay.  And S2 to S3 is what?

20 A    S2 to S3 we're going from -- the hanger is now hanging

21 in the well with 400,000 pounds of load, and now we're

22 driving the lock screw in to set it to the required makeup

23 torque.

24 Q    Okay.  What are we seeing happen here?

25 A    We're loading up the primary load shoulder now right

I-126

1  there.  And, likewise, the -- the lock screw interface is

2  starting to see higher stresses too because that's being put

3  together.

4  Q    Okay.  So -- okay.  Still in the lock screw.

5  A    Right.

6  Q    We're still in the preload condition?

7  A    Still in preload.

8  Q    Okay.  What's next?

9  A    It's S3 to S4 where now we're going to make up the

10 flange.

11 Q    Okay.  So what does this red indicate?

12 A    Okay.  The red is between a minus 30,000 stress and a

13 minus 40,000 stress.

14 Q    And what about -- so we see red up here?

15 A    Right.

16 Q    That's yellow there.

17 A    It's viewed on the right side there.  Yes, uh-huh.

18 Q    Right.  Is that what you would expect to see when you

19 put a second flange, that you'd have this --

20 A    Yes.  We're putting that segment of the hanger from the

21 lock screw down to the load shoulder that's going into

22 compression.

23 Q    Okay.  What happens next?

24 A    Next we're going to add the annular pressure going from

25 step four to step five.

I-127

1  Q    What's happening here?

2  A    Okay.  So now the stresses are -- are changing, and the

3  yellow color is getting larger in that lower section.  So

4  we're increasing the volume of material that's between minus

5  40,000 and minus 50 or 60 thousand.  So the compressive load

6  in that segment between the lock screw and the shoulder is

7  increasing.

8  Q    In here?

9  A    Yes.

10  Q    Okay.  What's next?

11  A    We're also changing the pattern up there at the load

12  shoulder that you see in the right-hand side as well.

13  Q    Okay.

14  A    And then this is the final case where we've now got

15  full blow pressure on it, but it's load step --

16  Q    All right.

17  A    -- six times six, yes, uh-huh.

18  Q    Now, you said initially the question you were asked to

19  look at and analyze is whether you had an annular force

20  reacting on this -- excuse me -- an upward force acting on

21  this annular member, whether that would react to force in

22  the -- both of these flanges, correct?

23  A    Yes, that's correct.

24  Q    And does the FEA address that issue?

25  A    Yeah.  It's basically confirming that we're seeing

I-128

1  changes at both the lock screw and the U-cup seal when we

2  apply pressure from below.

3  Q    Okay.  Okay.  Do we have another view also?

4  A    I believe there's a two-dimensional cross-section view.

5         MR. REDDEN:  Okay.

6      (Pause to confer.)

7  BY MR. REDDEN:

8  Q    All right.  This is the actual movie.  What are we

9  looking at here?

10  A    We kind of zoomed in on the region of the middle U-cup

11  seal and showing the stresses as they transfer from the load

12  on the hanger into the U of the U-cup seal and then into the

13  other parts of the assembly and finally up into the upper

14  flange.

15  Q    Is this that BX gasket?

16  A    That's the BX gasket, and you can see the contact

17  stresses there between the various four corners of the BX

18  seal.

19  Q    So it would be this here, right?

20  A    Yes, that's right.

21  Q    Okay.  Do you have the PowerPoint --

22         MR. ROGERS:  Offer AI.  AI.

23         MR. REDDEN:  I'd offer AI, Defense Exhibit AI.

24         THE COURT:  It's received.

25      (Pause.)

I-129

1  BY MR. REDDEN:

2  Q    All right.  This PowerPoint slide showed the area that

3  we looked at?

4  A    Yes, that's right.

5  Q    That's from the movie that the judge just saw, right?

6  A    Yes.

7  Q    Okay.  All right.  So, again, we see in the top of the

8  hanger we're seeing the adapter flange here, the BX gasket.

9  Is this the U-cup seal here?

10 A    Yes, that's the U-cup seal, and now we've started to

11 set the flange -- pull the flange down.

12 Q    So this is the preload -- this is the preload going on

13 here, right?

14 A    Preload, yes.  It shows the -- the load path going

15 through the U-cup seal from the flange to the hanger through

16 the U-cup seal.

17 Q    Go to the next one.  We're now -- looks like we're now

18 applying some annular pressure.

19 A    Yes.

20 Q    From the well?

21 A    Yes.

22 Q    Okay.  What are we seeing here?

23 A    Well, we're starting to see some color changes.  It's

24 difficult to see, but we can see the areas that are being in

25 the blue and the greens and the reds is changing slightly as

I-130

1  the pressure from below increases the load on that U-cup

2  seal assembly.  Again, showing the load transfer into the

3  adapter flange at the top.

4  Q    (Indiscernible.)

5  A    Yes.  These are stress numbers not loaded.  So it's

6  force divided by area, similar.

7  Q    Okay.  Next.

8  A    And then going from five to six we're adding slightly

9  more pressure, assuming that the well bore is blocked off

10  and we have full pressure.

11  Q    All right.  So what is -- what is that answering to

12  you?

13  A    It's showing me that as we increase the pressure load

14  below the hanger, we're increasing the loads going through

15  this -- the upper end of the hanger at the U-cup seal and

16  progressing up the U-cup seal into the adapter flange.

17  Q    Now, new topic.  You were in the courtroom this morning

18  when some criticism was leveled at your FEA program,

19  correct?

20  A    Yes, I was.

21  Q    And, specifically, the judge was told that Mr. Brugman

22  has I think he said 11 modeling errors.  Did you hear that?

23  A    Yes.

24  Q    Okay.  Now, you've reviewed his expert report, have you

25  not?

I-131

1  A     Yes, I did.

2  Q     And you were also present when his deposition was given

3  last week?

4  A     Yes, that's correct.

5  Q     Have you had a chance to evaluate each of those alleged

6  criticisms?

7  A     Yes, I have.

8  Q     All right.  I'd like to go through that briefly with

9  you.

10          MR. THOMAS:  Your Honor, may I -- I'll do anything

11  to keep the case as efficient as possible.  What he's

12  getting into is rebuttal to Mr. Brugman, and I'm okay with

13  that because he was at his depo.  I just want to have an

14  understanding that if we're going to cover all this now,

15  he's not going to be recalled.

16          THE COURT:  Correct?

17          MR. REDDEN:  Well, I may recall him, but I don't

18  intend to go over the same thing again.

19          THE COURT:  Okay.

20  BY MR. REDDEN:

21  Q     All right.  For the record, Mr. Brugman's expert report

22  is DX EF.  And I'm going to start with paragraph 15 where he

23  says:

24          "FEA modeling error number one lock

25          screw preload method invalid."

I-132

1    Would it be helpful if I gave you a copy of the report?

2  A    Yes, it probably would be.

3  Q    All right.  Let me --

4  A    It's hard for me to read that.

5  Q    I got it.

6  A    Thank you.

7  Q    Do you have an understanding of the criticism that's

8  being leveled at you here in paragraph -- beginning in

9  paragraph 15 of Mr. Brugman's report?

10  A    Yes, I do.

11  Q    What's your understanding?

12  A    Well, Mr. Brugman is claiming that the way I anchored

13  and drove in the lock screw is not correct because the

14  forces I was applying were not in any way attached to the

15  flange itself.

16  Q    Okay.  And what's your reaction to that?

17  A    Well, my reaction is that it's probably a valid

18  criticism, but it has virtually little effect on the results

19  and the fact that we ended up with two load paths going up

20  through the hanger.  So while it may change perhaps the

21  actual numbers, it's not going to change the eventual

22  conclusion.

23  Q    Why is that?

24  A    Well, because the hanger is going to move up under --

25  under forces from below, and the downward force coming from

I-133

1  the lock screw, while it's important for the preload in this

2  situation, it's -- the value of it, whether it's 300,000 or

3  290,000 pounds, doesn't matter a whole lot with respect to

4  the upward load and displacement and the fact that there are

5  two load paths going back into the lock screw and up into

6  the U-seal.

7  Q    All right.  Let's go to his second criticism, paragraph

8  18.  He says:

9           "Tubing hanger upper flange preload

10          method invalid."

11      Have you read through that?

12 A    Yes, I read through that.

13 Q    All right.  What's he saying here?  What's your

14 understanding?

15 A    Okay.  The complaint here is that I removed the bolts

16 and the nuts that pulled the flange together and didn't

17 properly model those.  I elected not to do that because of

18 the fact that it makes very little difference.  In fact, if

19 I did do that and put the lock screw in, it would have shown

20 the forces in the U-cup seal were increasing under the load,

21 because if I put a spring in there, which is what would

22 happen with that -- with that bolt, then as the forces

23 coming up through -- into the -- into the adapter flange

24 from the U-seal, as they were starting to increase, the

25 downward force or the clamping force at that bolt would

I-134

1  increase.

2  Q    Are you saying that this alleged error actually cut in

3  their favor?

4  A    Yes.

5  Q    Okay.  Does he point that out in his report?

6  A    No, he does not.

7  Q    Let's go to modeling error number three.  He says "No

8  friction on the hanger seat."  What's he saying here, Doctor

9  Frishmuth?

10 A    There's a figure there, Figure 4, in his report that

11 shows the issue.  The interface at the hanger to what I've

12 termed the hard seat, that red part there, it's a friction

13 surface because you've got heavy load, and then there's --

14 there's friction between two pieces of steel there.

15     The problem with the friction is it's a horizontal

16 force, and our primary goal in this whole analysis was to

17 assess the upward forces and loads going up through the

18 hanger.  So I really was not interested in horizontal force

19 there.

20 Q    That's sort of apples and oranges?

21 A    Yes.

22 Q    Does this alleged error in your opinion, does it have

23 anything to do with whether or not your model can properly

24 measure whether there's a dual load path?

25 A    No.  There still would be a dual load path.

I-135

1  Q    Okay.  Let's go to alleged error number five.  Charles,

2  that's still part of the last one.

3       He says the tubing load 500,000 pounds was not included

4  in the preload.  Do you have a response to that?

5  A    Well, I believe you missed one.

6  Q    I'm sorry?

7  A    I believe you missed one, did you not?

8  Q    You're right.  I did.

9  A    Error four.

10 Q    That's right.  Error number four, selective components

11 have been bonded.  What does that mean?

12 A    Well, I bonded the -- I bonded the hard seat to the

13 spool because I really was not interested in the forces

14 going into that region.

15      Now, again, while motion of the hard seat may affect

16 the magnitude of some of the forces, it's not going to

17 change the eventual conclusion that there are two load paths

18 going through the structure.  So, again, this is a case

19 where we can -- we can change the -- some of the loads'

20 values, the magnitude of the loads, but we're not going to

21 change the eventual conclusion.

22 Q    All right.  By the way, is bonding an accepted

23 technique in FEA work?

24 A    Yes, it is.

25 Q    All right.  Now let's go to alleged error number five.

I-136

1  He says the tubing load was not included in the preload.

2  A    Yeah, that was fixed in model number six, the one that

3  we've been talking about today.  So there was actually

4  400,000 pounds in the models we've produced today.

5  Q    And you were present at Mr. Brugman's deposition,

6  correct?

7  A    Yes, I was.

8  Q    And do you remember him acknowledging that he was aware

9  that you had, in fact, run a model that purported to include

10  the preload?

11  A    Yes.

12  Q    He just said he hadn't had time to analyze it, right?

13  A    that's correct.

14  Q    Okay.  And then let's go to alleged error number six.

15  It says symmetry boundary conditions not valid.  What's that

16  all about?

17  A    Well, when Mr. Brugman looked at the CAB files that

18  were supplied to him, he noticed that there were sets of

19  three.  There wasn't 16 bolts.  There were four quadrants of

20  the hanger system that only had sets of three screws, three

21  lock screws, and so his argument here is I didn't have a

22  symmetry condition, but I -- what was overlooked is the fact

23  that the real components have 16, and a 22 and a half degree

24  segment is 360 divided by 16, and so we have an actual

25  symmetry condition.

I-137

1   Q    Okay.  So he was thinking there are only 12 locks for
2   each apparently?
3   A    Yeah.  He thought that there were a different number of
4   lock screws there.  It looks like 12.
5   Q    Okay.  So is there any validity to this criticism?
6   A    No.
7   Q    All right.  Let's go to alleged error number seven.  He
8   says the U-cup seal mesh is not appropriate.  What do you
9   say to that?
10  A    If you look at the figure there at the bottom on the
11  screen, you can see that there is a fairly course mesh on
12  the adapter flange side to the right of the U-seal and the
13  metal hanger on the left side of the U-seal, and he was
14  complaining about the mesh being inappropriate.
15       If I was doing a contact stress analysis or any type of
16  stress analysis, I would not have made the model like that,
17  but that's not the objective of this analysis.  We were
18  looking at the upward motion of the hanger and the
19  displacement and force transfers through the hanger.
20  Q    So does this criticism have any validity in your
21  opinion?
22  A    Not for the purpose of our analysis.
23  Q    Okay.  And, sir, if you can comment, if you're -- when
24  you're doing an analysis, do you typically have a goal or an
25  objective?

I-138

1  A     Yes, you do.

2  Q     Is it important to know what that goal or objective is?

3  A     Yes, it is.

4  Q     And if you're evaluating someone else's analysis, would

5  it be important to know what that person's objective was?

6  A     Yes, it would be.

7  Q     Okay.  Based on your review of Mr. Brugman's report and

8  listening to his deposition testimony, did he seem to have

9  an understanding of what your objective was?

10  A     No.  In fact, he said once or twice that he had no idea

11  what I -- what was in my mind is the way he put it.

12  Q     Okay.  Let's go to the next one, alleged error number

13  eight.  It says "U-cup seal plasticity not considered."

14  A     Again, that was changed in run number six where we made

15  the U-cup seal material elastic plastic, including the

16  ability to deform.  We also changed the -- the hanger, and

17  we changed the BX gasket to elastic plastic steel as well.

18  Q     And are those the results we've talked about here in

19  court today?

20  A     Yes, it was.

21  Q     All right.  How about modeling error number nine,

22  "Invalid radial constraint on tubing spool lower flange?"

23  A     He's talking about a constraint that was added down at

24  the very bottom of the model where I cut the model off and

25  cut the lower flange out of the assembly to save the

*Echo Reporting, Inc.*

I-139

1  solution time so there didn't have to have a bunch of

2  elements down there at the bottom where nothing was going

3  on.  Sort of to counteract that, the fact that I was leaving

4  that radial constraint to the lower flange out, I elected to

5  put in a radial constraint here.

6       The thing to note here is that that radial constraint

7  is so far away from any of the action we're interested in in

8  the model that it's going to have virtually no effect

9  whatsoever in the model.

10 Q    All right.  Let's take a look at the next one.  Alleged

11 error number 10, "Pressure loads on hanger not used

12 properly" he says.

13 A    What was going on here is he was figuring the -- the

14 pressure across the annular space at 15,000 psi times the --

15 the area from the ID of the flange to the -- or from the ID

16 of the spool, rather, to the ID of the tubing hanger over a

17 22 and a half degree arch.  That area is -- is larger than

18 the area that I was actually physically loading in the

19 model.  I was only loading the bottom edge of the hanger and

20 the bottom edge of the hard seat.  Those areas are

21 different.  So to balance the forces, I had to basically

22 adjust the pressure loads to account for the fact that I had

23 a different area involved here.

24 Q    Okay.  So did this alleged error have any effect on

25 your ultimate conclusions or would it?

I-140

1  A    Not really, because we're applying a pressure from

2  below and a force from below, and pretty much what we're

3  trying to prove here is that the hanger is moving under the

4  bottom of pressure -- force from below, and we're trying to

5  prove that the -- any -- any pressure from below is

6  counteracted by the force at the lock screw and the U-seal.

7  And I could have picked any number.  I could have picked

8  100,000 or 200,000 or, you know, pick a number.  I'm trying

9  to put a load of force on the bottom of the hanger to push

10 it up, and I just elected to use the 15,000 psi and then

11 adjust according to the areas that I was applying the load

12 to.

13 Q    All right.  Let's go to alleged error number 11.  It

14 says "Well bore pressure not applied to all wetted

15 surfaces."  What's that about?

16 A    Well, when you look at the assembly there and you put

17 well pressure below -- below the hanger, what you see is

18 that there's -- there's additional wedded surfaces on the

19 side -- excuse me -- on the side of the tubing spool, and

20 there's also a wedded surface on the tubing hanger itself in

21 the radial direction.  And I elected not to do that again

22 because I'm not interested in the radial deflection of the

23 spool and the hanger and any of that.  I'm interested in

24 what's going on when we apply force from below upward in a

25 vertical direction.

I-141

1  Q    All right.  So in your judgment, did this alleged error

2  have any impact on your analysis?

3  A    No, it does not.

4  Q    All right.  Let's go to the last one, modeling error

5  number 12.  "Geometry of lock screw to hanger interface is

6  incorrect."

7  A    What's going on there is the -- the drawings for the

8  hanger do not show an indentation in the hanger, and when

9  you first run in the lock screw, you basically get line

10 contact.  You get the line of the cone on the lock screw

11 interfacing with the shoulder on the hanger.  The thing is

12 that in the real world, both in laboratory testing and in

13 field observations and field work, it's noted that these

14 hangers all have considerable indentation into that softer

15 steel in the hanger caused when the lock screw is run into

16 its full force of 17,000 some odd pounds.

17     So almost immediately as you're making up the lock

18 screw onto the hanger, it's going to indent that surface.

19 So to expedite the FEA analysis, instead of having a line

20 contact, I wanted to have a face-to-face contact between the

21 end of the lock screw and the hanger, and so the -- the CAD

22 folks put a little indentation in there for me that would

23 allow that lock screw nose to seat into the hanger, and

24 that's consistent with what's observed in the field.

25 Q    All right.  In your opinion, is this -- is there any

I-142

1 validity to this criticism?

2 A     Again, you know, if we had line-to-line contact and

3 went through all that -- all that extra work, it may have

4 changed the forces pushing down on the hanger.  It may have

5 changed the numbers.  But, again, it wouldn't change the

6 fact that when you pressure from below, it -- the pressure

7 is trying to lift the hanger off the seat.

8 Q     Having considered all these criticisms set out by Mr.

9 Brugman in his report and his deposition, do any of these in

10 your judgment cause you to question your ultimate conclusion

11 of your analysis that this is a dual load path device?

12 A     No, they do not.

13           MR. REDDEN:  Thank you, your Honor.  Pass the

14 witness.

15           THE COURT:  Cross?

16                   CROSS EXAMINATION

17 BY MR. THOMAS:

18 Q     Good afternoon, Doctor Frishmuth.

19 A     Good afternoon.

20 Q     I'm fighting a little bit of a cold.  So if you don't

21 quite understand my question, let me know.  I'll be happy to

22 repeat it or rephrase it.

23     Now, on direct examination I understood that you had

24 previously worked for Cameron, correct?

25 A     Yes.

I-143

1  Q     And prior to your engagement in this particular matter,

2  you were also consulting with and doing other work for

3  Cameron, were you not?

4  A     No.

5  Q     Had you done any other work for Cameron?

6  A     No.

7  Q     Okay.  Now, you testified on direct examination that

8  when you were first brought in, you were asked to agree to a

9  dual load path.  Do you recall that testimony?

10 A     I was asked to give my opinion, yes.

11 Q     And, in fact, they told you -- the Cameron people told

12 you at your very first meeting that they wanted your opinion

13 to support a dual load path argument.  Isn't that correct?

14 A     That's not true.

15 Q     Well, you understood that was the reason you were

16 hired, isn't that correct?

17 A     I was under -- I understood that my -- my approach --

18 what I was asked to do was to evaluate whether or not there

19 was a dual load path.

20 Q     Right.  And you understood that Cameron was making the

21 argument that there was a dual load path, did you not?

22 A     I heard the issues that were involved in the case, yes.

23 Q     Okay.  And you understood there was Cameron's desire to

24 have your opinion support that position?

25 A     I didn't understand that.  I suppose that that would be

I-144

1  a logical conclusion.

2  Q     Okay.  Now, you mentioned early also on -- in your

3  direct examination that you considered every part as

4  elastic, is that right?

5  A     Yes, sir.

6  Q     Have I got that right?

7  A     Yes, sir.

8  Q     And elasticity, that goes in all directions, doesn't

9  it, upwards, downwards, sideways?

10 A     Yes.

11 Q     Is that right?  And with regard to your work as running

12 these FEA results, you're an experienced operator, if you

13 will, of that program, the ANSYS program?

14 A     Yes, sir.

15 Q     Okay.  And you understand that the output of those

16 programs is only as good -- or it's dependent upon the

17 quality of the input?

18 A     Yes, sir.

19 Q     And you've heard the phrase garbage in/garbage out

20 before?

21 A     Yes.

22 Q     Okay.  And you understand that if the data that goes in

23 is corrupted in some way, that the output would equally be

24 corrupted, correct?

25 A     Yes.

1  Q    Okay.  Now, let me turn back to your engagement again.

2  You were first retained -- and I think you testified --

3  January 5, 2012?

4  A    I believe that's the date on my engagement letter.

5  Q    Okay.  And you began running your FEA analysis on

6  January 6, correct?

7  A    I don't believe that's quite correct.  I don't think we

8  had the --

9  Q    Well, you began working towards doing an FEA analysis

10  on January 6, isn't that right?

11  A    I believe that's correct, yes.

12  Q    Okay.  So you knew either on the 5th or certainly by

13  the 6th that you were going to be doing an FEA analysis,

14  correct?

15  A    I was headed in that direction, yes, sir.

16  Q    So immediately?

17  A    Yes, sir.

18  Q    From your engagement?

19  A    Yes.

20  Q    And then you served your initial report with no FEA

21  analysis or findings, correct?

22  A    Yes.

23  Q    And that's because you hadn't finished your work?

24  A    Absolutely, yes.

25  Q    Okay.  But it was always your intent to offer an FEA

I-146

1  opinion, isn't that correct?

2  A    We were headed in that direction, yes, sir.

3  Q    From day one?

4  A    Yes, sir.

5  Q    Okay.  All right.  Now, you serve your initial report.

6  Then you later serve a rebuttal report in response to Mr.

7  Boyadjieff, correct?

8  A    Yes.

9  Q    And that was done on or about January 18, you recall

10 that?

11 A    Yes.

12 Q    And that's the first time you put forth your FEA

13 analysis and findings, correct?

14 A    Yes.

15 Q    And at that time, you had run four cases, isn't that

16 correct?

17 A    Yes.

18 Q    And you're an experienced user of the ANSYS program as

19 you've testified, correct?

20 A    Yes.

21 Q    Okay.  And by then you had already issued your original

22 -- I'm sorry -- your initial report?

23 A    Yes.

24 Q    Okay.  And you ran this program -- you ran four cases.

25 And before you ran these four cases, in fact, it took you at

I-147

1  least 14 attempts to get the first converged result,

2  correct?

3  A    I don't know the exact number, but it took several

4  attempts.

5  Q    It was about 14, wasn't it?

6  A    I really don't remember.

7  Q    You just don't remember.  Okay.  In fact, you -- you

8  went to some effort to simplify the model in order to get a

9  converged result, isn't that correct?

10 A    Well, my first model had over 2,500,000 equations in

11 it, and it was just simply too large.

12 Q    Okay.  But you had -- so you had to simplify that to

13 get it to work?

14 A    I had to reduce the mesh size -- or increase the mesh

15 size, decrease the density and then try to eliminate some

16 parts that I knew would not be critical.

17 Q    And each time you simplify a model in an FEA analysis,

18 it's less likely that the result you get is going to

19 correspond to the real one, isn't that correct?

20 A    I don't agree with that.

21 Q    Okay.  And you testified on direct examination that at

22 some point you removed the flange bolts from this analysis,

23 correct?

24 A    Yes.

25 Q    And you bonded the U-cup to the flanges, correct?

I-148

1  A     U-cup top and bottom.

2  Q     Yes.  And that's not the way that device as we saw

3  downstairs or as we saw the photographs of it, that's not

4  the way that device is built, correct?

5  A     That's correct.

6  Q     Okay.  All right.  Now, let me -- your initial report

7  of January 18, which I understand you prepared, you have an

8  opinion that you believe there's a test that was run that

9  you believe supports your opinion of a dual load path,

10 correct?

11 A     A test?  I don't understand.

12 Q     Well, let me -- let me see if I can work with the

13 overhead here.  This is Exhibit D to Defendant's Exhibit 17,

14 which is in your supplemental report January 18.  Do you see

15 that?

16 A     Yes, I do.

17 Q     Do you recall that?

18 A     Yes, I do.

19 Q     Okay.  And then behind that Exhibit D is a diagram,

20 correct?

21 A     Yes, that's right.

22 Q     All right.  And you relied on this test which you did

23 not run because you believe this also supported a dual load

24 path, correct?

25 A     I wouldn't say I relied on it, no.

I-149

1  Q    And -- but the fact is you don't know who ran this

2  test, correct?

3  A    It was run by Cameron engineers or Cameron folks.

4  Q    I mean, you don't know who, what individuals who ran

5  this test, do you?

6  A    No.

7  Q    So you never talked to the person, did you?

8  A    No, I didn't.

9  Q    And you don't know how the test was run, do you?

10  A    Well the drawing pretty much shows you how it was run.

11  Q    But you have no personal knowledge as to how that test

12  was run, do you?

13  A    That's correct.

14  Q    Okay.  And you don't know if -- look at this, this

15  drawing here.  The device that was used in this test was not

16  the MTBS tubing hanger, was it?

17  A    I don't believe we knew exactly what that product was.

18  In fact, it's not really a product because it's not a full

19  tubing hanger.

20  Q    Right.  So you agree it's not the MTBS tubing hanger as

21  shown in the 1994 Cameron catalog, correct?

22  A    That would be correct.

23  Q    Okay.  And, in fact, you can't tell if the lock screws

24  were tightened in on this particular test?

25  A    It would be hard to run the test without the lock

I-150

1  screws being run in.

2  Q    But you don't know?

3  A    I don't know.

4  Q    Okay.

5  A    But I don't know how they would run the test without it

6  being locked.

7  Q    And you don't know if there was any preload applied for

8  that particular test, do you?

9  A    Well, again, if the screws were locked in there, they

10 would have had to have been driven in with some sort of a

11 load to make sure it made contact.

12 Q    And, conversely, if they weren't driven in, there would

13 be no preload, correct?

14 A    If they weren't being -- if they weren't being driven

15 in, when they applied the pressure down below, it would have

16 blown the hanger out of the -- out of the device.

17 Q    Okay.  Now, let's turn back to your first four test

18 results, which are the ones that you had done I think before

19 your deposition, right?

20 A    Before my supplemental -- before my deposition.

21 Q    Yeah, before your supplemental and your -- your

22 deposition in this case?

23 A    That's correct.

24 Q    And at that time you had gotten past these attempts to

25 get a converged result and finally got yourself to a

1  converged result, and those are reflected in cases one, two,

2  three, and four, correct?

3  A    Yes.

4  Q    Okay.  And at your deposition, that's what you were

5  prepared to testify to support your dual load path opinion,

6  correct?

7  A    Yes.

8  Q    Based on cases one, two, three and four, correct?

9  A    Yes.

10 Q    Okay.  And in each of those four cases, you failed to

11 consider the weight of the production tubing of about

12 400,000 pounds, isn't that correct?

13 A    That's correct.

14 Q    Okay.  So the results of those four tests really don't

15 have any -- don't support anything, isn't that correct?

16 A    I believe I'm still -- they still support the

17 objectives of load case one and two which were different

18 from the dual load path --

19 Q    Okay.

20 A    -- situation.

21 Q    But you agree that the results of those tests, since

22 they don't include the 400,000 pounds of production tubing,

23 don't -- aren't relevant data for supporting your opinion of

24 a dual load path, isn't that correct?

25 A    I would say that that's -- the question I have in my

I-152

1 mind is 400,000 pounds is the required load in the running

2 procedure to avoid doing extra steps.  The point is that

3 according to the running procedure, you could have zero

4 tubing in the well and still follow the running procedure to

5 make up the well.  So you wouldn't have to have any tubing

6 in the well in order to set this hanger correctly.

7 Q    Well, the purpose of this hanger is to hang production

8 tubing, is it not?

9 A    Yes, I agree with that.

10 Q    And those hangers are -- we just saw one.  It's 5,000

11 pounds or more than that, 10,000 pounds.  It's an

12 enormous --

13 A    Yes.

14 Q    Do you know what the price of that is?

15 A    No, I don't.

16 Q    Could you even estimate what the price of that is?

17 A    I would guess $200,000 perhaps.

18 Q    Nobody's going to spend $200,000 and ship a 10,000

19 pound device with the intent of not paying tubing,

20 production tubing, isn't that correct?

21 A    That's probably true.

22         THE COURT:  Except for the one downstairs.

23         MR. THOMAS:  You got me, your Honor.  Maybe that's

24 why we saw it.  Okay.

25         THE COURT:  Generally out in the field you need

I-153

1  some production tubing.

2          MR. THOMAS:  We'd say in use.

3          THE COURT:  Yes.

4  BY MR. THOMAS:

5  Q    Okay.  And you would agree that the -- that the

6  installation procedures do account for the weight of the

7  production tubing, correct?

8  A    Yes, that's right.

9  Q    But you didn't consider that when you ran these first

10 four cases, correct?

11 A    That's correct.

12 Q    Okay.

13         THE COURT:  Run that by me one more time.  Doesn't

14 include what?

15         MR. THOMAS:  The weight of the production tubing,

16 the 400,000 pounds.

17 BY MR. THOMAS:

18 Q    And, in fact, you didn't consider the weight of the

19 production tubing until you saw Mr. Brugman's report,

20 correct?

21 A    No.  That's wrong.

22 Q    Well, that's the first time you began to consider it,

23 isn't it?

24 A    No, it's not.

25 Q    But at no time prior to your deposition did you run a

I-154

1  report that incorporated the weight of that production

2  tubing, isn't that right?

3  A    The first run with hanging load on the tubing was in

4  process when I had my deposition.

5  Q    The first load of -- was in process.  Explain what you

6  just said to me because I don't understand.

7  A    I believe the day before my deposition I set up a model

8  with the -- the load being -- hanging on that hanger.

9  Q    Okay.  And that was the first time you did that,

10 correct?

11 A    Yeah.  I believe it was the day before my deposition.

12 Q    Okay.  And at the time of your deposition, you didn't

13 know the results of that report, did you?

14 A    That's correct.

15 Q    Okay.  And you would agree with me that in terms of

16 rendering an opinion using FEA analysis that didn't

17 incorporate the 400,000 pound weight of production tubing

18 was an oversight?

19 A    I wouldn't call it an oversight.  Again, we were trying

20 to get solutions, and it's a step -- excuse me -- step by

21 step process.  So the first approach I took was let's try to

22 get a solution without worrying about all the intricacies of

23 adding weight and doing other things.  So let's walk before

24 we stand up and try to run.

25 Q    Okay.  So at the time of your deposition, you weren't

I-155

1 walking or running?

2 A    Well, I was starting to run at that point.

3 Q    Starting to run, but you had no test results that

4 incorporated the weight of the production tubing, correct?

5 A    At the time of my deposition, correct.

6 Q    So case five is the first time you accounted for the

7 weight of the production tubing, isn't that right?

8 A    Yes, that's correct.

9 Q    And when you made this change, you increased the load

10 by 610,000 pounds of force on the U-cup seal as a result,

11 isn't that correct?

12 A    I would have to look at the numbers to see.

13 Q    Well, those numbers -- because I'm sure you'll hear Mr.

14 Brugman testify, and he'll testify -- that doesn't make any

15 sense, does it?

16 A    Why not?

17 Q    Okay.  Well, is a 600,000 pound upward force, that

18 really -- that doesn't reflect the real response to a

19 400,000 pound weight of the production tubing, does it?

20 A    I'm sorry, but you're losing me.  Could you point out

21 what you're talking about?

22 Q    You know, I'm going to come back to that.

23 A    Okay.

24 Q    I understand that you don't recall it, and we have some

25 other slides.  So I will come back to that.  Okay.

1  A     Okay.

2  Q     Okay.  Now, one of the other problems with your -- your

3  case five was you failed to consider the plasticity of the

4  U-cup seal, isn't that right?

5  A     That's correct.

6  Q     So while you thought to add back in the production

7  tubing weight, you didn't -- you failed to account for the

8  plasticity of the U-cup seal, isn't that right, in case

9  five?

10 A     That's correct.  Again, it's a walk before you run.

11 Q     You're still walking.  And you agree that the U-cup

12 seal is a plastic device?

13 A     Yes, it is.

14 Q     And when you model the U-cup seal as an elastic device,

15 that's improper.  Would you agree to that?

16 A     It's appropriate for beginning -- beginning analysis.

17 Q     But not for rendering final opinions on, is it?

18 A     That's correct.

19 Q     And your first four reports also all modeled the U-cup

20 seal as an elastic device, isn't that right?

21 A     Yes.

22 Q     As well as your fifth report?

23 A     Yes.

24 Q     Okay.  In fact, the only model that you've ran that

25 accounted for both the production weight of the tubing, the

I-157

1   400,000 pounds, and the plasticity of the U-cup seal is the

2   sixth report, isn't that right?

3   A    That's correct.

4   Q    Okay.  Let me --

5   A    I wonder if I might amplify some of this discussion,

6   your Honor?

7            MR. THOMAS:  Your counsel will be --

8            THE COURT:  Not at this time.

9   BY MR. THOMAS:

10  Q    -- be able to ask you questions.

11       Let me do this.  I'm going to -- let me ask you why in

12  the sixth case did you finally decide to run the U-cup seal

13  as plastic?

14  A    Because I knew you would object.

15  Q    Well, in fact, the U-cup seal is a 3/16th stainless

16  steel device, isn't that right?

17  A    Yes.

18  Q    Okay.  And I'm going to show you -- I'm going to have

19  you look at Plaintiff's Exhibit 76, which is the printout of

20  your case six report.

21           THE CLERK:  What number was this one, 76?  It's

22  not on the --

23           MR. THOMAS:  If I might approach the witness, your

24  Honor, and hand this one to him.

25           THE COURT:  You may.

I-158

1  BY MR. THOMAS:

2  Q     If you can just confirm this is the printout from your

3  case six report, Plaintiff's Exhibit 76.

4  A     Well, without taking a lot of time to scroll through

5  every page -- there's 54 pages here -- it looks like that is

6  from my sixth report.

7  Q     Okay.  Now, I would -- I want to ask you to open to

8  page 51 of Exhibit 76.

9  A     Fifty-one.  Okay.

10  Q     Okay.  And you have that in front of you?

11  A     Yes.

12  Q     And we also have this now on the overhead.  And before

13  I go there, when you -- you would agree that a -- as a

14  stainless steel device, the U-cup seal --

15  A     Yes.

16  Q     -- we talked about the 3/16 stainless steel device,

17  that would go into plastic deformation at stress levels of

18  approximately 36,500 psi?

19  A     I believe that's correct, yes.

20  Q     Okay.  And if you go to this page number, this -- this

21  is out of your report at the very bottom, and this is hard

22  to read what's on the screen.

23        MR. THOMAS:  Just for the Court's edification, I'm

24  referring down to where it says stress -- table 56, it says

25  stress psi.

*Echo Reporting, Inc.*

I-159

1 BY MR. THOMAS:

2 Q    Do you see that?

3 A    Yes, I see that.

4 Q    And you ran the stress psi for this product at 5.29,

5 isn't that correct?

6 A    This is stress output looks like.

7 Q    Right.  You used the 5.29 in your FEA plastic analysis,

8 isn't that correct, for the U-cup seal?

9 A    Hang on just a minute.  I'm trying to figure out what

10 this is.

11         THE COURT:  Do I have that in your Plaintiff's

12 exhibit book?  It goes up through 75.

13         MR. THOMAS:  Oh, it does?

14         THE COURT:  And I've got --

15         MR. KOLEGRAFF:  Your Honor, there's actually two

16 binders.  There should be a small binder.

17         THE COURT:  A small -- oh.

18         MR. KOLEGRAFF:  It has three --

19         MR. THOMAS:  Because it's -- it's a thick

20 document.  So I think it's in its own --

21         THE COURT:  Got it.  It was buried underneath.

22         MR. KOLEGRAFF:  I'm sorry.  You can't find it?

23         THE COURT:  I just --

24         MR. THOMAS:  And, your Honor, just this page 51

25 out of -- on that exhibit.  They're numbered on there.

I-160

1          THE WITNESS:  Okay.  I see what you're saying.

2   BY MR. THOMAS:

3   Q    And you modeled the plasticity of the stainless steel

4   device at 5.29 psi, isn't that correct?

5   A    Yes.  That's what these numbers are saying.

6   Q    And you should have modeled this at 36,500 psi, isn't

7   that correct?

8   A    Not for that first number.

9   Q    And, in fact -- okay.  This -- this 5.29 number is a

10  number you put into that program, isn't that right?

11  A    I would have to check the codes, but it appears that

12  way.

13  Q    Okay.  And that's --

14  A    Again, I would have to check the ANSYS code.

15  Q    Right.  And that's not consistent with the -- the real

16  stress point for stainless steel, which is at 36,500 psi,

17  correct?

18  A    Yes.

19  Q    Okay.  You haven't run any further cases after your

20  case six, have you?

21  A    No.  I believe I reran case six, but not for the

22  material issue.

23  Q    Okay.  Meaning dual load path?  You said material

24  issue.  I'm trying to understand what you mean.

25  A    No, not for what you're discussing here.

I-161

1   Q    Okay.  Okay.  Okay.  All right.  Now, let me turn to

2   another exhibit which is Exhibit -- this will be new Exhibit

3   80, and I'm going to hand you and opposing counsel a copy of

4   that.

5        Okay.  Do you recognize Exhibit 80?

6   A    Yes, I do.

7   Q    Okay.  And would you describe what Exhibit 80 is?

8   A    That's one of the outputs of the ANSYS code that shows

9   where the force is being applied.  Force number five is

10  being applied to the inner surface of the tubing hanger.

11  Q    Okay.  All right.  Let me put it up so we can do two

12  things at one time here.  Why don't we put up the blowup of

13  the tubing spool hanger.  Can you see that from where you're

14  seated?

15  A    Yes.

16  Q    Okay.  And this model shows that you applied the forces

17  evenly across the tubing hanger, isn't that correct?

18  A    The -- which forces?  Excuse me.

19  Q    Well, the forces -- you see on there there's forces

20  that are shown in red?

21  A    Right.

22  Q    Those forces are shown to be evenly applied up and

23  down --

24  A    Oh, I see.

25  Q    -- the length of that tubing hanger.

I-162

1   A    The length of the tubing hanger, right.

2   Q    That's not correct, is it, in reality?

3   A    No.  In reality, it's the lower part there.

4   Q    Only -- only that those forces would all be collected

5   on the lower portion, isn't that correct?

6   A    That's correct.

7   Q    But yet you modeled it showing it evenly applied across

8   the entire --

9   A    That's correct.

10        MR. THOMAS:  Okay.  Now, let me turn to another

11  exhibit.  This is again up here.  This is the same tubing

12  hanger.

13        And, your Honor, he showed the forces on that diagram

14  were evenly applied up and down, the length of the tubing

15  hanger, and the witness has testified that in reality all

16  these forces are concentrated at the lower end of that.

17  BY MR. THOMAS:

18  Q    I want to hand you what we've marked as Exhibit 81.  I

19  want to hand you what we've marked as Exhibit 81.  It's also

20  on the overhead.

21        You're familiar with a stress plot, are you not, Doctor

22  Frishmuth?

23  A    Yes, I am.

24  Q    And could you explain what a stress plot is?

25  A    Basically the -- the various colors on the stress plot

I-163

1 show you the stress range that's in that color band.

2 Q    Okay.  Now, the color band appears on the left-hand

3 side?

4 A    I can't see that.

5 Q    And shows on this 250,000 pounds plus for yellow,

6 200,000 for light green, 150,000 for darker green, and I

7 think 100,000 for light blue, 50,000.  You've seen those

8 before, have you not?

9 A    Yes, I have.

10 Q    Did you ever run a stress plot on your case six?

11 A    Yes, we looked at some stress plots as part of the

12 exhibits today, in fact.

13 Q    Okay.  Did you look at a stress plot on that U-cup

14 seal?

15 A    No, we didn't zoom in on the U-cup seal.

16 Q    Okay.  Now, I'll represent to you that Mr. Brugman ran

17 a stress plot on the U-cup seal based on your case six,

18 something you could have done, correct?

19 A    Yes.

20 Q    Okay.  And, according to the color coding chart here,

21 here -- just something everybody's familiar with, as you can

22 see inside this area is the U-cup seal, correct?

23 A    Yes, sir.

24 Q    Okay.  And this is showing actually stresses in excess

25 of 250,000 where it's red?

I-164

1  A    Yes.

2  Q    Across that U-cup seal, do you see that?

3  A    Might I ask what stress this is, because I can't see

4  it?

5  Q    I'm going to have to let Mr. Brugman answer that

6  question for you, okay.  But this shows a stress plot from

7  your case six study with pressures greater than at points

8  250,000 pounds.  Do you see that?

9  A    Yes.

10 Q    And in some points greater than 200,000 pounds,

11 correct?

12 A    Yes.

13 Q    And the U-cup seal could not withstand pressures of

14 that magnitude, could it?

15 A    I don't agree with that.

16 Q    You don't agree with it?

17 A    No, I don't.

18 Q    Okay.  And what pressures do you believe the U-cup seal

19 could withstand?

20 A    Nearly infinity because it's constrained -- it's a

21 triaxial stress, and if you have a triaxial stress on any

22 part -- it's triaxial compression actually.  If you have a

23 triaxial compression on any solid part like that, it can go

24 to infinity virtually, because it's the -- it's -- in what

25 -- in the stress analysis, it's the -- it's what's called

I-165

1  the deviatoric stress.  I don't want to get into all that

2  stuff, but you can basically take a piece of steel, drive it

3  down to the bottom of the ocean, and, you know, go to the

4  bottom of the Marianas Trench, and a one-inch cube of steel

5  will collapse uniformly because of the hydrostatic pressure

6  to something smaller than that, and the stress levels in

7  that -- in that are horrendously high compressive, and the

8  reason why it can be done in a piece of steel is because the

9  stresses are triaxial, and in this case we have a triaxial

10  stress condition.  And so what we need to look at in terms

11  of the can you do it or can't you do it, we have to look at

12  the deviatoric part of the stress tensor.  And, again, I

13  don't want to get into all that stuff, but the bottom line

14  is when you have a piece of steel in very high compression

15  in all three directions, the stresses can get very high.

16  Q    Okay.  Well, you agree that stainless steel will

17  plastically deform at about 36,500 pounds psi, correct?

18  A    Only -- only if it's a deviatoric stress.  It's not

19  going to deform that way if it's a triaxial stress.

20  Q    And you agree that this -- this device, the MTBS tubing

21  hanger, is usually operated at atmospheric pressure?

22  A    Yeah.  That's true.

23  Q    And atmospheric pressure is about 15 psi, is it not?

24  A    That's correct.

25  Q    Okay.  And then going back, when we looked at the

I-166

1  parameters that you set for the -- on the stress for the U-
2  cup, you had it at 5.29 psi.  Do you recall that sheet that
3  we looked at previously?
4  A    Yes, sir.
5  Q    And you would not expect the plastic -- or the
6  stainless steel U-cup to plastically deform at five psi,
7  would you?
8  A    No, I would not.
9  Q    Okay.  Okay.  And just so we're clear, this U-cup seal
10  is the one that's called out at the top here on the
11  overhead, correct?
12  A    Yes, that's the U-cup assembly.  There's three parts
13  there.
14  Q    Okay.  Okay.  Now, let me cover a couple of points I
15  think your counsel may have already asked you about, but I'm
16  going to go back in and do it anyway.
17      If I could look at -- have you look at this FEA
18  modeling error number one.
19  A    Yes.
20  Q    Okay.  You agree that the lock screw is important to
21  the load distribution, do you not?
22  A    Yes.
23  Q    And how that lock screw is modeled could dramatically
24  affect the outcome of a finite element analysis, isn't that
25  correct?

I-167

1  A    It would depend on what the objective of the analysis

2  was, whether it's dramatic or not dramatic.

3  Q    Okay.  In the real device, lock screw is threaded into

4  the tubing head, correct?

5  A    Yes.

6  Q    And in the real device, the horizontal loads applied to

7  the end of the lock screw will be transferred to the tubing

8  head, correct?

9  A    Yes.

10  Q    And you modeled the lock screws without any threads,

11  isn't that right?

12  A    That's correct.

13  Q    And you modeled the lock screws that were anchored

14  could move outward, correct?

15  A    It was locked in position at preload.

16  Q    Right.  So we talked earlier in your -- in my cross

17  examination about elasticity.  And you agreed with me that

18  elasticity goes up and down and out?

19  A    Yes.

20  Q    So if there's an outward force, your model wouldn't

21  count for that, correct?

22  A    I don't know what you mean outward force.

23  Q    Well, if there's a force that was forcing -- that was

24  reacting externally, widening the -- the tubing hanger, your

25  model doesn't account for that.

I-168

1  A    What do you mean widening the tubing hanger?  I don't

2  understand that.

3  Q    Well, the -- would you agree that it's possible that

4  the load transfers could force outward on this lock screw,

5  correct?

6  A    I still don't understand the question.

7  Q    Well, you anchored this lock screw so it couldn't move,

8  correct?

9  A    Yes.

10 Q    And that's not the way it operates in the real world,

11 is it?

12 A    That's correct.

13 Q    It does actually have lateral movement potential,

14 correct?

15 A    Not -- not once it's set.

16 Q    Meaning what, you believe if the lock screw is set, it

17 can never move outward in any way?

18 A    When you set the lock screw and then you drive the

19 packing gland in and set the packer around the packing

20 gland, the lock screw's only going to move in an elastic

21 manner when you push -- when you push back on the lock screw

22 at the nodes of the lock screw.  It's going to basically

23 compress the lock screw.  So, because it's an elastic body,

24 as you said, it's basically going to deform axially the lock

25 screw.  It's going to drive it -- drive it back, and the

I-169

1    reaction that stops that being driven back is the fact that

2    it's in the -- it's transferring that transverse force

3    through the threads into the spool.

4         In my case, what I did is I anchored the back of that

5    as shown there so that it couldn't move in a horizontal

6    direction.  So if there's additional load coming in from the

7    tip of the lock screw, it's going to compress that lock

8    screw and increase the compressive stress in the lock screw.

9    Q    Okay.

10   A    Because it's an elastic body.

11   Q    But you modeled the lock screw as not connected to the

12   tubing head in a horizontal direction, correct?

13   A    That's correct.

14   Q    And, therefore, no horizontal loads on the lock screw

15   would ever be transferred to the tubing head?

16   A    That's correct.

17   Q    Okay.  So your model ignores the effects of horizontal

18   forces on the lock screw, correct?

19   A    Not on the lock screw.  There are horizontal forces on

20   a lock screw.

21   Q    So your answer is no?

22   A    My answer is that there will be horizontal forces on

23   the lock screw.

24   Q    And it's true, Doctor Frishmuth, your model does not

25   model the forces as they are in the real device, isn't that

I-170

1  right?

2  A    That's correct.

3  Q    Okay.  Now, let's turn to error number two, the tubing

4  hanger upper flange preload method.  In the real device, the

5  bolts and nuts connect the tubing flange to the adapter cap,

6  isn't that correct?

7  A    That's correct.

8  Q    And you didn't even attempt to model them in your final

9  case six, isn't that right?

10  A    Right.  I took them out of the model.

11  Q    And you simply used fixed forces, correct?

12  A    Fixed force, yes.

13  Q    Okay.  And in your design, you actually had nuts and

14  bolts in because you loaded the CAD files that you obtained

15  from Cameron, correct?

16  A    Yes.

17  Q    So you actually had to manually go in and suppress

18  those in order to run the test the way you did it?

19  A    That's correct.

20  Q    Okay.  Let's turn to --

21       MR. THOMAS:  And, for the record, I was examining

22  the witness there on error number two on Exhibit --

23  Plaintiff's Exhibit 78.2.

24  \\

25  BY MR. THOMAS:

I-171

1  Q     And when we talked about these fixed forces, that red

2  line there -- I know it's just a section, but that red line

3  shows fixed forces on there?

4  A     Yes, that's right.

5  Q     As opposed to the nuts and bolts connecting, correct?

6  A     That's correct, yes, sir.

7  Q     And this shows what you did, this -- where it says

8  suppressed upper range to not contact the surface here, this

9  is Plaintiff's Exhibit 78.3 to show what you've testified to

10  which is you actually banned away and kind of suppressed

11  this so this did not come out as part of your case six

12  results, correct?

13  A     That's correct.

14  Q     All right.  Now let's turn to error number three with

15  the hanger seat.  Let's just maybe make sure we're all

16  talking about the same thing.  The hanger seat is this area

17  right here?

18  A     Yes.

19  Q     Okay.  And up there on that, it's that area, correct?

20  A     That's correct.

21  Q     Where the laser pointer is?

22  A     Yes.

23  Q     And you agree that the hanger seat takes the largest

24  portion of the preload energy?

25  A     Yes.

I-172

1  Q     And the seat carries the entire downward force from the

2  tubing hanger into the tubing spool, correct?

3  A     Yes, that's right.

4  Q     Okay.  And there's at least a million pounds of force

5  acting on the metal to metal surfaces on this?

6  A     Yes, that's right.

7  Q     Okay.  And you agree there would be substantial

8  friction forces at that point as well, correct?

9  A     Yes, sir.

10 Q     And friction would alter the response of the hard seat

11 to that million or so pounds of force, isn't that correct?

12 A     I don't agree with that.

13 Q     Okay.  And ANSYS has actually built in functions to

14 reflect friction force, does it not?

15 A     Yes, it does.

16 Q     And you used friction forces in other parts of your

17 case six test, isn't that right?

18 A     Yes, that's correct.

19 Q     But you chose on this one which has this million pounds

20 of force to suppress it and not use it here, isn't that

21 right?

22 A     That's right.

23 Q     Okay.  Do you have your little wooden dowel model that

24 you talked about this morning with you up there?

25 A     Okay.

I-173

1          MR. THOMAS:  Okay.  May I approach, your Honor?

2          THE COURT:  You may.

3    BY MR. THOMAS:

4    Q    So I think I heard you, you testified the washer is the

5    hard --

6    A    Flip it over.

7    Q    I'm sorry.  I have it upside down.  This washer --

8          THE COURT:  Makes it all clear.

9          MR. THOMAS:  It makes it very clear to me, your

10   Honor.

11   BY MR. THOMAS:

12   Q    This washer is the hard seat, correct?

13   A    Yes.

14   Q    This washer is the lock -- represents the lock screw,

15   right?

16   A    No.

17   Q    I'm sorry.  Which --

18   A    Let's back up.

19   Q    Okay.

20   A    The bottom washer is the hard seat.

21   Q    Okay.

22   A    The top washer is -- no, the middle washer, the next

23   one up, is the hanger.

24   Q    Okay.

25   A    And the other washer that's in the middle there that

I-174

1  you can hardly see on the middle screw, right here, see

2  this --

3  Q    That one.

4  A    -- that's the polyethylene washer.  That's the lock

5  screw.

6  Q    Okay.

7  A    And then the upper metal washer is the hard seat.

8  Q    Okay.  So basically this model is supposed to represent

9  what is occurring from the hard seat down -- I'm sorry --

10 the heard seat up to the U-cup?

11 A    U-cup, yeah.

12 Q    But does this -- this -- that, what does that --

13 A    Nothing.  That's to keep the screws from -- or the

14 springs from deflecting out of line.

15 Q    So this isn't really part of -- the dowel itself is

16 just to be able to hold it together?

17 A    That's right.

18 Q    It's not the tubing hanger, is it?

19 A    That's correct.

20 Q    So this model does not take into account the effects of

21 the adapter and the spool, correct?

22 A    That's correct.

23          MR. THOMAS:  Okay.

24          THE COURT:  And remind me what you -- the adapter

25 ring is for?

I-175

1          THE WITNESS:  That's the spool, and the adapter is

2 the green part.

3          MR. THOMAS:  Green is the adapter.  The blue

4 outside is the spool, tubing head spool.

5          THE COURT:  Which we've referred to as the first

6 flange and the secondary flange?

7          MR. THOMAS:  Yes.  The spool is the entirety of

8 it, and there are elements that are called first and

9 secondary flange when you read the claim.

10 BY MR. THOMAS:

11 Q    But you would agree, would you not, Doctor Frishmuth,

12 that since this device doesn't account for the forces on the

13 flange or the tubing spool, right?  I believe you testified

14 to that.  This -- this --

15 A    Yeah.

16 Q    I don't know what you call it.  Do you have a name?

17 A    A spring model I guess.

18 Q    Spring model, okay.

19 A    The spring model is just trying to demonstrate how the

20 different parts move with respect to each other.  That's all

21 it's for.

22 Q    That's all it's intended to do.  So this device itself

23 would not establish a dual load path or a lack of a dual

24 load path or anything in between, is that right?

25 A    Well, no, that's not quite correct.  It's showing the

I-176

1 dual load path through the two springs.

2 Q    Without consideration to the forces on the adapter or

3 the tubing spool, isn't that right?

4 A    That's right.

5 Q    So it's an incomplete hypothetical, isn't it?

6 A    Yeah, again, the purpose was trying to show that when

7 you unload one spring, you load two others.

8 Q    Okay.

9 A    And that's all.

10 Q    That's it?

11 A    That's all.

12 Q    All right.  So it really --

13           MR. THOMAS:  All right, your Honor.  I have no

14 further questions of the witness at this time.

15           THE COURT:  Thank you.

16           Redirect?

17           MR. REDDEN:  Nothing further, your Honor.

18           THE COURT:  You may step down.

19           THE WITNESS:  Thank you.

20           MR. THOMAS:  Your Honor, before we move on, I want

21 to move into evidence the exhibits I have identified on

22 cross examination of Doctor Frishmuth.

23           THE COURT:  And can you tell us the --

24           MR. THOMAS:  Yeah.  Just give me a second, and I

25 can.  It would be page 16 and 17 of Defendant's Exhibit --

I-177

1  I'm sorry -- Defendant's Exhibit 16 and 17, is that right?

2       THE CLERK:  ED, Defendant's Exhibit ED, pages 16

3  and 17.

4       MR. THOMAS:  Okay.  Defendant's Exhibit ED, page

5  16 and page 17.

6       THE COURT:  ED 16, page 16 and 17 are received.

7       MR. THOMAS:  Exhibit 80, which was the page from

8  the -- yeah, this will be Plaintiff's newly added 80 by

9  Doctor Frishmuth.

10      THE COURT:  Plaintiff's 80 is received.

11      MR. THOMAS:  And Exhibit 33 which was --

12      THE COURT:  And has that been marked, Plaintiff's

13 80?

14      MR. KOLEGRAFF:  Yes, your Honor.

15      THE COURT:  Okay.

16      MR. THOMAS:  Exhibit 33, which is the drawing of

17 the MTBS tubing spool hanger that I had there.

18      THE COURT:  That's received.

19      MR. THOMAS:  And Plaintiff's Exhibit 76 in its

20 entirety, and Exhibit 76 is a -- I showed him page 51 that

21 he testified to.  That would -- that's the case --

22      THE COURT:  You want all of the case study, all of

23 76?

24      MR. THOMAS:  Yes.

25      THE COURT:  76 is received.

I-178

1          MR. THOMAS:  And then Plaintiff's Exhibit 78.1,

2    78.2, 78.4.

3          THE COURT:  Not .3?  That's the suppression?

4          MR. THOMAS:  I'm sorry, point -- did I skip one?

5          THE COURT:  78.3.

6          MR. THOMAS:  I'm sorry, and three.  I'm sorry.  I

7    missed that, 78.1 to .3 and .4.

8          THE COURT:  Those are received.

9          MR. THOMAS:  And .5.

10         THE COURT:  That's received.

11         MR. THOMAS:  Okay.  Thank you.

12         THE COURT:  All right.  We'll take a brief

13   afternoon recess, and then we can reassemble.  We'll

14   reassemble at 3:10.

15        (Proceedings recessed briefly.)

16         THE COURT:  You may call your next witness.

17         MR. ROGERS:  Defense calls Mr. Gary Devlin.

18         GARY DEVLIN - DEFENDANT'S WITNESS - SWORN

19         THE CLERK:  Please state your name and spell your

20   first and last name for the record.

21         THE WITNESS:  My name is Gary Devlin.  It's G-A-R-

22   Y D-E-V-L-I-N.

23         THE CLERK:  Thank you.

24   \\

25

I-179

1                    DIRECT EXAMINATION

2  BY MR. ROGERS:

3  Q    Good afternoon, Mr. Devlin.

4  A    Good afternoon.

5  Q    Do you understand that you're here today to provide

6  opinion testimony regarding the validity of the '925 patent?

7  A    I do.

8  Q    Before we get into your opinion testimony, I'd like to

9  first start a little bit with your background.  Are you a

10 Cameron employee?

11 A    I am.

12 Q    And how long have you been a Cameron employee?

13 A    Thirty-four years now.

14 Q    What is your current title?

15 A    I'm the vice president of quality and customer

16 experience.

17 Q    What does that mean?  What are your job duties?

18 A    Well, obviously direct the quality activities for our

19 manufacturing service organization worldwide.  So that's

20 something I take near and dear to my heart.  I've done that

21 for quite a while.  And also we're engaging employees and

22 clients in -- in a new way in Cameron, and so there's some

23 projects that we're undertaking that deal with the

24 experience that our customers have.

25 Q    And what's your current location where you work?

I-180

1  A     I work in Houston.

2  Q     Did you grow up in Houston?

3  A     As a boy I grew up in San Antonio and then moved to

4  Houston when I was about 12.

5  Q     So you graduated from high school in Houston?

6  A     In Houston, yes, sir.

7  Q     All right.  And then what's your formal education?

8  A     I have a bachelor of science in technology degree from

9  University of Texas in Tyler, various and sundry additional

10 education courses, Bryce University, those kinds of things,

11 but that would be my professional education.

12 Q     All right.  Well, leading up to your bachelors of

13 science degree, did you go straight through high school or

14 were you -- were you working and going to night school?

15 A     I did not work -- well, I did work afternoons and

16 evenings in high school, but during -- after high school, I

17 graduated and began working.  I worked for about a year at a

18 print shop, and then I went to work at a company called

19 McEvoy Oil Field Equipment, which was later acquired by

20 Cameron.

21 Q     Is this before you got your degree?

22 A     Oh, absolutely.  I was -- it took me a long time to get

23 my degree in night school.

24 Q     And how long?  What year did you get your BS?

25 A     1992.

I-181

1  Q     And let's talk about your -- your job experience.

2  McEvoy, that's actually Cameron, isn't it?

3  A     It is.

4  Q     Tell me about that.

5  A     Actually, going to University of Houston at night, I

6  found a job opening at the University of Houston's placement

7  center as -- for an engineering technician in the

8  engineering laboratory at McEvoy, was hired on and continued

9  to go to the University of Houston at night, enjoyed that

10 position for many years, worked as a metallurgical

11 technician, worked as an engineering test technician.  So a

12 lot of the big iron we've been looking at, and especially

13 that monster downstairs that we looked at, I probably put

14 them together a few times.

15 Q     Well, that's what I was going to ask you.  Did looking

16 at the model down on the street, did that bring back some

17 memories of your actual work on this particular device?

18 A     You know, it's funny.  I looked at it.  The bottom

19 seals -- of course, nobody's talking about that, but the

20 bottom seals down there are called con seals, and those were

21 developed in the early '80s, and I actually put together

22 several versions of those and tested them in the lab.

23 Q     All right.  So moving forward from that early

24 experience, lead me up to your work experience up to today.

25 A     Manufacturing for 20 years in two different locations,

I-182

1  Temple, Texas, Tyler, Texas, acquired by Cameron, moved back

2  as a senior quality engineer, later appointed division

3  director of quality, which was for then a much smaller

4  Cameron, but, nonetheless, the entire organization.  Held

5  that position for five, six years, seven years, moved into

6  marketing and business development as an alternate path and

7  did that for about 10 years.  A lot of that was mergers and

8  acquisitions, and then about a year and a half ago, I was

9  asked to come back and lead the quality organization once

10 again.

11 Q    Well, did your education and your work experience

12 relate in general to wellhead assemblies and then go into

13 particulars as far as the MTBS device?

14 A    Certainly in general, when I began with the

15 organization, I was working on surface wellhead equipment,

16 and then both of the manufacturing facilities that I worked

17 in as quality manager, quality supervisor, and metallurgical

18 specialist were building surface wellhead equipment.  So,

19 yeah, I'm very familiar with the manufacturing, the quality

20 plans, the materials, et cetera.

21 Q    Did you have any projects with Cameron that involved

22 sales of the MTBS device?

23 A    Yeah.  Yes.

24 Q    What time period?

25 A    What time period?

I-183

1  Q    Prior to the year 2000?

2  A    Oh, definitely.  1995 to 19 -- well, to 2000 basically.

3  That was the -- the U-cup and the MTBS were premier metal

4  seals that Cameron was offering during that period of time.

5  So a lot of the high-pressure, high-temperature, more

6  critical applications would have been done with this kind of

7  metal seal technology because metal seal technology is the

8  premium offering.  So this would be at the high end of our

9  product range.  A couple of projects in the Gulf of Mexico.

10  We did one in Trinidad.  I think we did several in Katar

11  that I recall during those times.

12  Q    Well, it's funny that you mentioned that.  You bring up

13  the U-cup seal material.  You were in the courtroom just a

14  few minutes ago when you heard the cross examination of

15  Doctor Frishmuth regarding the material with which the U-cup

16  seal was made.  Do you recall that?

17  A    I do.

18  Q    There was some question as to whether it was 3/16 or

19  not?

20  A    Yeah.  It just struck me as a little odd.  Typically

21  these are high-pressure, high-temperature, very sour.  That

22  would be high -- hydrogen sulfide, critical applications.

23  And we wouldn't use 316 material.  Typically it would be an

24  inconel material such as 718 or 625.  I'm familiar with the

25  718 because I know that that hanger, that tubing hanger is

I-184

1  typically 718 material.

2  Q    Is the U-cup seal material 718?

3  A    In most applications, virtually all applications, yes.

4  Q    Not 316?

5  A    I don't think we would have made it out of 316, no.

6  Q    All right.  What is the yield strength difference

7  between the 316 and 718 stainless steel?

8  A    It's huge.  316 on yield stainless steel has the yield

9  strength in the 30,000 psi range, and 718 can be as high as

10  100,000 psi.

11  Q    All right.  I appreciate you clearing that up.

12      As far as your work experience and your projects

13  involving MTBS, have you -- have you seen that model on sale

14  at trade shows in the United States?

15  A    Oh, yes, yes.

16  Q    Prior to the year 2001?

17  A    Early to mid '90s this was our premier offering.

18  That's one of the reasons they went to the expense -- we

19  went to the expense to go ahead and build a full scale cutup

20  model.

21  Q    All right.  Did there come a time when you were asked

22  to analyze the '925 patent in this case?

23  A    Yes, early on.

24  Q    And you testified in the prior trial not only as a

25  validity expert but also as an infringement expert, is that

I-185

1  correct?

2  A    That's correct.

3  Q    All right.  And in your analysis -- we'll get to your

4  specific opinions in a little bit, but right now I'd like to

5  first start out with your foundation and the basis for your

6  opinions.

7       Did you view and analyze validity of the '925 patent

8  from the -- from the viewpoint of one of ordinary skill in

9  the art?

10 A    I did.  I did.

11 Q    And what level of one of ordinary skill in the art did

12 you attach to that hypothetical person when you were doing

13 your invalidity analysis?

14       MR. KOLEGRAFF:  Objection, your Honor.  This gets

15 into an area of one of our motions in limine.

16       THE COURT:  Overru8led.

17 BY MR. ROGERS:

18 Q    You can answer the question.

19 A    Yeah, I guess I would described one who's skilled in

20 the art as having had some technical degree and several

21 years of experience to be able to interpret the claims in

22 the patent and also to understand the -- the function of a

23 tubing spool or a frac mandrel, whatever the case may be.

24 So that -- I would describe that as either a technical

25 school graduate or an engineering school graduate with

I-186

1 several years of experience working with somebody who's

2 mentoring them along.

3 Q    And do you have that experience yourself?

4 A    Certainly, yes.

5 Q    All right.  And in your work experience, did you have

6 occasion other than this case to examine patents?

7 A    Yes, sir.

8 Q    And tell me a little bit about that.

9 A    Predominantly in business development, when we are

10 looking at the assets of a corporation, we're looking at

11 patents, we're also approached in partnerships and joint

12 ventures to share in technology or to build technology

13 perhaps that hasn't been built before, and in many cases

14 evaluating the value of a patent and its relative position

15 in the marketplace.  So, yeah, we've looked at a lot of

16 companies, a lot of startup companies who have technology.

17 And, you know, quite honestly, it's a challenge for us to

18 sit down and review these patents and to understand the

19 value of them in the marketplace.

20 Q    All right.  And I'd like to get back to the foundation

21 and bases for your opinion on validity.  I'd like you to

22 turn in your notebook to the tab that says Markman.

23      MR. ROGERS:  And, your Honor, we have witness

24 notebooks that have the particular exhibits used for this

25 witness in a -- compiled into an individual notebook so you

I-187

1 don't have to be looking through all the different exhibit

2 lists.  I hope that's it right in front of you.

3          THE COURT:  Right here.

4          MR. ROGERS:  If it says Gary Devlin witness

5 notebook on it, you've got the right one.

6          THE COURT:  It does.

7          MR. ROGERS:  All right.  And you folks?

8          MR. THOMAS:  That's what this is?

9          MR. ROGERS:  Okay.  Yes.

10          MR. KOLEGRAFF:  Mr. Rogers, for your information,

11 I don't have tab numbers or how to identify it.

12          MR. ROGERS:  I will.  I will.

13          MR. KOLEGRAFF:  Thank you.

14          MR. ROGERS:  And, Mr. Kolegraff, we're looking at

15 the Markman, the three different claim constructions done

16 here.

17 BY MR. ROGERS:

18 Q    All right.  So are you at the Markman?

19 A    I am.

20 Q    All right.  And you see there the Court's claim

21 construction, Markman ruling docket number 71 is the first

22 document?

23 A    I do.

24 Q    And then the next one you see something that says at

25 the header at the top 491, document number 491?  It's the

I-188

1  next tab that says the supplemental Markman?

2  A    Oh, I'm sorry.  Yes, I do.  Thank you.

3  Q    All right.  And the next tab where it says jury charge

4  Exhibit B?

5  A    I do.

6  Q    All right.  And are those the Court's claim

7  construction that you used in your invalidity analysis?

8  A    Yes.

9  Q    All right.  I want to take you back and go through a

10 little bit the prosecution file history that you examined

11 for your invalidity analysis.  I want you to take a look at

12 the second tab -- third tab, JX 44, and JX 44 is a joint

13 exhibit that is the complete prosecution file history for

14 the '925 patent, and what's in your witness notebook is just

15 a few excerpts.

16         MR. ROGERS:  And, your Honor, at this time we have

17 an agreement for the joint exhibits -- we were going to

18 preadmit them, but at this time I will offer all of the

19 joint exhibits.

20         THE COURT:  And there's no objection?

21         MR. THOMAS:  Yeah, we agree to that, your Honor.

22         THE COURT:  All right.  So what my clerk will need

23 is the numbers.  So maybe somebody can make sure that we

24 have them, but they're all received.  All joint exhibits are

25 received.

I-189

1          MR. ROGERS:  There's just a very few.

2          THE COURT:  We don't have to do it right now, but

3   they can do it afterwards, make sure that we're in sync.

4          MR. ROGERS:  Yes, your Honor.

5          MR. THOMAS:  Your Honor, I don't know that we'll

6   have any dispute.  We have to go through that list.  We'll

7   work it out with counsel.

8          MR. ROGERS:  Well, we're talking about the joint

9   exhibits that you guys prepared.

10          MR. THOMAS:  Okay.  Again, I just want to go

11   through the exhibits.  We don't have to do this right this

12   second.

13          MR. ROGERS:  Okay.  You're going to do it before

14   he gets off the stand, right, so we won't have any problems?

15          MR. THOMAS:  The ones that he's covered, we can

16   definitely work out I'm sure.

17          MR. ROGERS:  Okay.  Well, at this time then I'd

18   like to offer JX 44, the prosecution file history.

19          THE COURT:  It's received.  And earlier I referred

20   to prosecution history estoppel.  I meant prosecution

21   history disclaimer.

22          MR. ROGERS:  Appreciate that.  That clears up some

23   of the questions I was planning on asking.

24   BY MR. ROGERS:

25   Q    All right.  I'd like you to look within your witness

I-190

1  notebook, JX 44 tab, and in particular move to JX 44.144 and

2  145.  And if you look at 144, the title on it says

3  supplemental preliminary amendment and response to

4  restriction requirement, and then if you turn to 145, the

5  next page, and there it is claim one, and can you tell me --

6  do you understand that's claim one before the wherein clause

7  was added?

8  A   I do.  You can see that it's been reworded, that the

9  accepted version is slightly different in the patent today.

10  Q   All right.  And then I'd like you to turn -- now, the

11  prosecution file history is in reverse chronological order.

12  So I believe you're going to have to be turning -- as we go

13  forward in the file history, you're going to have to go

14  backwards in the exhibits.  So I'd ask you to turn to JX

15  44.115.

16  A   Yes, sir.

17  Q   And do you understand that that is the first office

18  action with this application claim and it was rejected by

19  the Patent Office?

20  A   I do.  Number eight it says claims one, four, six,

21  seven, 12, 19, and 63 are rejected as being anticipated by

22  the '386 Cornelssen patent.

23  Q   All right.  And I can see where you're reading from.

24  So let me point that out to the Court.  That is --

25          THE COURT:  I know where it is.

1          MR. ROGERS:  That's 122.  All right.

2  BY MR. ROGERS:

3  Q    So I'd like you to turn to the next page, 123, and

4  there's some -- I guess there's some text at the top, and

5  I'd like to direct your attention to the first full

6  paragraph where it says a generally elongate annular member

7  pin suspended in the first tubular member, and do you

8  understand -- you'd have to go back to the page before it,

9  but do you understand that this is the patent examiner in

10 his rejection of the claims, including claim one, he's

11 referring to the Cornelssen reference?

12 A    Yes.  There's an exhibit in Cornelssen where it shows

13 some of the -- the components he's talking about there.

14 Q    All right.  So I'd like to go ahead and put up and

15 project the Cornelssen reference, which is JX 77.  And then

16 while we're doing that -- well, while it's being projected,

17 I want to have it up there so you can see it, and then we

18 can refer to the patent examiner's rejection comments

19 regarding this patent.  This is JX 77.

20      And while I wait for it to come up there, I'm going to

21 keep going through it with you.  Do you understand when the

22 -- when the patent examiner is rejecting claim one and a lot

23 of other claims too, he -- the then -- he says:

24          "Regarding claim one, Cornelssen et al

25          disclosed wellhead assembly comprising."

I-192

1       And there's a list, and tell me the significance in

2   your analysis of the listing of the generally elongate

3   annular member.

4   A     Well, in this case, the generally elongate annular

5   member would be item 10 as well as the sub that goes above

6   it.  So he's pointing to a tubing hanger, which is not a

7   frac mandrel, but it is a tubing hanger.

8   Q     So you're saying that Cornelssen -- the Cornelssen

9   prior art patent, and in particular this Figure 7, shows a

10  tubing hanger?

11  A     It does.

12  Q     And the Patent Office is referring to the generally

13  elongate annular member in claim one as being a tubing

14  hanger?

15  A     They are.

16  Q     All right.  Then I'd ask you to turn to JX -- still

17  working in the prosecution file history, JX 44.66.

18  A     Yes, sir.

19  Q     And within that, that's the -- Duhn Oil's response to

20  the rejection.  And turn to the next page, 71, and I'm going

21  to direct your attention to the very bottom of the page

22  where at the very last line it has some underlining with the

23  word wherein.  Do you understand that to be the -- Duhn Oil

24  as the patentee adding the wherein clause to claim one in

25  response to the Cornelssen based rejection by the patent

1  examiner?

2  A    Yes.  That's the wherein clause.

3  Q    And I'd like to direct your attention further in this

4  document to JX 44.103, and the last full paragraph.  Do you

5  understand that this is the patentee's arguments in support

6  of their amendments?

7  A    Yes.  This is after adding the -- the wherein clause

8  and describing the claims as being directly and indirectly

9  dependent on claim one, and with the addition of the wherein

10 clause, now claim one has been accepted.

11 Q    Well, we're not to the acceptance yet.  These are just

12 the arguments.  So tell me what -- tell me again the

13 significance of this argument where the patent applicant

14 says at the bottom of JX 44.103 --

15 A    Oh, right.

16 Q    -- that claim one is now believed to be a condition of

17 allowance over Smith and Cornelssen.  Then it says:

18         "As such, applicant submits these claims

19         are also allowable over Smith and

20         Cornelssen, et al, as being dependent

21         from a claim allowable over both Smith

22         and Cornelssen."

23    What does that -- that's a lot of words, but what does

24 that tell you on how you used that in your analysis?

25 A    You're right.  This is -- and this is Duhn's response,

I-194

1   and what they're saying here is that adding in the wherein

2   clause, now claim one is acceptable, and these other claims

3   are dependent on claim one.

4   Q    And what does that tell you as to whether or not the

5   Patent Office, when it allowed claim one -- when it allowed

6   the patent to issue, what does that tell you as to whether

7   the Patent Office examined all the claims, one and the

8   dependent claims or just claim one?

9   A    It's unclear to me what they examined, but it's clear

10  to me that they allowed claim one after adding the wherein

11  clause.  You wouldn't likely assume that that was the

12  trigger for them to -- to accept claim one and then have the

13  other claims be dependent upon them.

14  Q    All right.  I'd like to now move to another topic.

15  Let's move straight into your opinions.  You have a validity

16  opinion, correct, in this case?

17  A    I do.

18  Q    And is it based on anticipation?

19  A    It is.

20  Q    And the prior art references at the '94 catalog, the

21  MTBS device shown in the '94 catalog and the '993 patent, is

22  that correct?

23  A    Yes, sir.

24  Q    And for each of those, I'm going to list the claims,

25  and tell me if I've got this right.  The '94 catalog --

I-195

1  well, let's do the '993 patent.  That's the easy one.  All

2  asserted claims one through five, 19 and 29, do you have an

3  opinion as to the validity of those claims?

4  A    I do.  I believe they're invalid on the basis of

5  anticipation.  I -- I do have an issue with claim 19.  We

6  can talk about that there.  It's very difficult to

7  interpret.  I'm not sure -- I'm not sure I can have an

8  accurate opinion on claim 19.

9  Q    All right.  Well, we'll get to that in more detail.  I

10  appreciate the foreshadowing, but we'll get to that in more

11  detail when we get there.  For the -- and just a summary

12  here, for the '94 catalog and the MTBS device shown in the

13  '94 catalog, is your invalidity based on anticipation

14  opinion regarding claims one, two, four, five, 19 and 29?  I

15  know I skipped three.

16  A    Yes.

17  Q    All right.

18          THE COURT:  So he's doing it both on the '93 and

19  the '94?

20          MR. ROGERS:  The '94 catalog -- '94, '95 catalog

21  as a printed publication and the MTBS device shown in that

22  catalog and then the '993.

23          THE COURT:  And he's going to go through where the

24  -- where there's a bit there?

25          MR. ROGERS:  We're going to go through the claim

I-196

1 charts for the claims on which he has an opinion for each of

2 the two prior art -- well --

3          THE COURT:  Okay.

4          MR. ROGERS:  For each of the prior art references,

5 and we're going to put the '94 catalog and the MTBS device

6 showing the '94 catalog as one single analysis.  So we're

7 going to go through two claim charts.

8 BY MR. ROGERS:

9 Q    And so before we get to the claim charts which are

10 dealing with your opinion on these prior art references, I

11 want to first discuss with you the issue of whether these

12 references are prior art and --

13 A    Okay.

14 Q    The '993 patent is easy because it's conceded that

15 that's published prior to the critical date.  The '94

16 catalog as well in our joint pretrial order is conceded to

17 be published prior to the critical date, but we have a

18 disputed fact issue as to the MTBS device showing the '94

19 catalog as to whether or not that product is prior art by

20 being on sale or in public use over a year before the filing

21 of the patent application, and so we touched on this a

22 little bit before as far as your experience with seeing the

23 MTBS device at trade shows prior to the year 2000.

24      But I want to go through some documents as well.  I'm

25 going to ask you to turn in your witness notebook to DX A.

I-197

1  And we're going to start -- before we get to the sales

2  issue, I want to get some documents into evidence.  So I

3  want to take a look at DX A, which is the '94, '95 catalog,

4  two pages, three pages of it.  Tell me if you recognize that

5  -- that document?

6  A    I do.

7  Q    What is it?

8  A    The -- Cameron had a general catalog at the time and it

9  would publish sections of that catalog as surface or sub C

10 or whatever the case may be.  This would be a couple of

11 pages of the surface section of that catalog.

12 Q    Is the first page the cover page of the catalog?

13 A    It appears to be, yes.  I'd have to believe it is.

14 Q    The second page table of contents?

15 A    It is.

16 Q    And is the third page -- it's actually two pages in the

17 one.  What is that?

18 A    That would be a section of that catalog that deals with

19 surface wellhead equipment, the likes of which we've been

20 talking about here today.

21 Q    All right.  Then let's move to the next exhibit, DX B,

22 and tell me what that is.  We've basically taken the two

23 pages of the catalog and put it on one page.

24 A    It looks like an enlargement of the same thing.

25 Q    All right.  DX D, which is a multi-page exhibit, which

I-198

1  goes from DX D-1 to 8.  So can you tell me what these eight

2  pages are?

3  A    They are photographs of the model, the MTBS with U-cups

4  that we saw downstairs.  The first picture is shown in our

5  showroom.  So that would be an internal product display case

6  that we have in Cameron, but this would be a cutaway model

7  that was produced for trade shows and whatnot.

8          MR. ROGERS:  Your Honor, at this time I'd like to

9  offer DX A, B, and D into evidence.

10          THE COURT:  They're received.

11 BY MR. ROGERS:

12 Q    Now, let's move on to DX E.  I'm going to ask you to

13 skip past DX E.  We're going a little bit out of order.  Go

14 to DX G, and tell me what that document is.  And this is a

15 multi-page document that goes from GS1 to 13 which says on

16 the front of it "Running procedures for MTBS tubing hanger,

17 running procedure with U-cup and SRL seal top."

18 A    Yes, sir.

19 Q    What is that document?

20 A    This would be instructions on how to properly install

21 an MTBS spool and U-cup and seal assembly.

22 Q    Is that a -- go ahead.

23 A    this is intended for -- generally speaking, for the use

24 of our service hands and others who might be inclined to

25 attempt the installation of this in the field.

I-199

1  Q    And you see the date on that document, on the front

2  page?

3  A    I do.  It's February 2000.

4  Q    What does that tell you as to whether the MTBS device

5  shown in the Cameron '94 catalog was on sale and in public

6  use prior to the year 2001?

7  A    Yeah, absolutely.  The MTBS had been on sale and had

8  been sold in the mid to late '90s.  So the running

9  procedures like this were constantly updated.  In this case,

10 I think they were adding an SRL seal to the top of it.  So

11 there would be iterations of this for sizes and pressures

12 and whatnot, but a running procedure is an essential element

13 to go install this equipment in the field.  Basically, a

14 must have for using this product in the field.

15 Q    All right.  Let me now ask you to turn back to Exhibits

16 DX F -- E, I'm sorry, DX E, the bill of materials.  Do you

17 recognize those?

18 A    I do.

19 Q    And then DX F, invoices, do you recognize those?

20 A    Yes.  This would be invoices out of our worldwide MRP

21 system, SAP.

22 Q    All right.  Let's break this down.  First give me a

23 general description of the bill of materials and then the

24 invoices and what they tell to you -- tell you as to whether

25 the MTBS device shown in Cameron's '94 catalog was on sale

I-200

1  or in public use prior to the year 2001.

2  A    Well, the bill of material is a traditional Cameron

3  bill of material.  So this bill of material is going to

4  highlight all the materials, the quality plans, the -- the

5  elements of that particular product.

6       I will take note that the drawing that's behind this

7  bill of material -- I think it's referenced on here, X36125,

8  this would be the dimensional drawing on how you make a U-

9  cup seal.  So we're -- we don't go to the level of making

10 detailed drawings on products that aren't being sold.  I

11 mean, just as a general rule.  It's not an engineering

12 exercise.  Just to point out that this drawing was first

13 made in 1989, which you'll see in the title block down at

14 the bottom by Jean McNally.

15 Q    Okay.  All right.  And then let's move to the invoices,

16 DX F.  What do those invoices tell you as to whether the

17 MTBS device was on sale and in public use prior to the year

18 2001?

19 A    You'll see the first shown is 1996.  That's for Shell.

20 There's another here for BP America.  I think we used this

21 equipment for BP's Pompano platform.  In fact, I'm pretty

22 sure we did, in or about '98.  So it's -- it's a mid '90s to

23 early 2000s product.

24 Q    Are the bill of materials, Exhibit DX E, and the

25 invoices, DX F, business records of Cameron?

I-201

1  A    Oh, yes, of course.

2          MR. ROGERS:  At this time, your Honor, I'd offer

3  into evidence Exhibits DX E and DX F.

4          THE COURT:  E and F are received.

5  BY MR. ROGERS:

6  Q    So at this point I'd like to go ahead and dive right

7  into the claim charts.  We're going to go through one by one

8  your validity opinion for the asserted claims and

9  individually we'll go through first the MTBS device and the

10 '94 catalog all together, and then we're going to go through

11 the Dallas '993 patent.

12         And so we're going to start with claim one and it's --

13 it's projected on the screen, but you also have it at the

14 back of your witness notebook.  So whatever is easiest for

15 you to refer to.  I recall you asking me for a laser pointer

16 before.  Did you get one?

17         MR. ROGERS:  May I approach the witness, your

18 Honor?

19         THE COURT:  You may.

20         THE WITNESS:  Thank you, sir.

21 BY MR. ROGERS:

22 Q    All right.  And before we go to this entire claim one,

23 I'd first like to summarize.  You understand that in this

24 entire claim there are only two disputed claim limitations,

25 that everything else is conceded?

I-202

1  A    With the '994 catalog, I believe that's true.

2  Q    All right.  And what are those two claim limitations?

3  Do you understand them to be the elongate annular member and

4  the wherein clause?

5  A    I do.

6  Q    All right.  So let's quickly go through so you can

7  point out -- we're not going to dwell on them because

8  they're conceded, but can you show me where the casing is --

9         THE COURT:  Do the parties agree on that?

10         MR. KOLEGRAFF:  No, we don't, your Honor.

11     (Pause.)

12  BY MR. ROGERS:

13  Q    All right.  I have in my hand what's referred to as the

14  detailed claim chart comparing claims of Duhn's '925 patent

15  to the Cameron '94 catalog.  It is -- is the Plaintiff's

16  claim chart.  So let me take you through at least the first

17  three elements, the casing, the first tubular member mounted

18  over the casing, and the first tubular member flange

19  extending from the first tubular member.

20     Can you point out where you had an opinion that each of

21  these elements are found in the MTBS device?

22  A    Sure.  Would you like for me to use this one?

23         THE COURT:  Sure.

24  BY MR. ROGERS:

25  Q    And if it's easier for you, you can stand up, walk

I-203

 1  around or use your laser pointer, however you want to do it.

 2          THE COURT:  The laser pointer is helpful.

 3          THE WITNESS:  Very good.  Casing, in this case

 4  there's two pieces of casing here, but this would be the

 5  last piece of casing, and the first tubular member mounted

 6  over the casing is this what we call a spool.  It looks like

 7  a spool.

 8          And then the first tubular member flange, which is

 9  the top flange or what we would normally refer to as the

10  tubing spool.

11          THE COURT:  So show me the top flange.

12          THE WITNESS:  It's this extended tube that comes

13  over here and comes out.  It's the extended -- there it has

14  the bolts that pass through.  So typically this would be

15  called a flange and -- extended flange, and those would be

16  the bolts that connect two flanges together.

17          Likewise, down here this would be a lower flange,

18  and the upper flange with the spool below it.

19          THE COURT:  So what are you saying is the first

20  tubular member flange?

21          THE WITNESS:  Mind if I walk?

22          THE COURT:  Just use the laser pointer.

23          THE WITNESS:  That flange with these lock screws.

24          THE COURT:  And where does it begin?  Where does

25  it end?

I-204

1          THE WITNESS:  The flange would be starting here at

2   this point where it extends outward, and it would end

3   obviously up here at the very top.  The utmost -- the

4   topmost piece would be holding this BX gasket in place right

5   here.

6          THE COURT:  Okay.

7          MR. ROGERS:  May I approach the witness, your

8   Honor?

9          THE COURT:  You may.

10  BY MR. ROGERS:

11  Q    Now, I've handed you what is the Plaintiff's claim

12  chart, which is supposed to have their contentions regarding

13  invalidity for each of the elements of claim one in

14  comparison to the '94 catalog.  And the right-hand column

15  has their arguments.

16       Do you see anything other than blank space in the

17  right-hand column for the casing, the first tubular member

18  mounted over the casing, and the first tubular member flange

19  extended from the first tubular member?

20  A    There are no comments on this sheet.

21  Q    And what does that tell you with the blank space there

22  as to whether or not these are conceded issues in this case?

23  A    It would lead me to believe that they're conceded.

24          MR. ROGERS:  May I approach, your Honor?

25          THE COURT:  You may.

I-205

1  BY MR. ROGERS:

2  Q    All right.  So let's use real words to point out the

3  parts of that.  I know you've pointed to them.  You called

4  the casing in the claim limitation, the corresponding

5  physical part, the MTBS, what do you call it?

6  A    Right here.

7  Q    Do you call it a casing also?

8  A    I would call that production casing, yes.

9  Q    All right.  The next element, the first tubular member

10  mounted over the casing.  What is the real world term in

11  that particular product that corresponds to the claim

12  language first tubular member?

13  A    Tubing spool or tubing head.

14  Q    All right.  And the first tubular member flange

15  extending from the first tubular member, does the -- what do

16  you call the flange on the tubing spool?

17  A    We call that the top flange.

18  Q    Do you call it a tubing spool flange?

19  A    Yes.  They're both tubing spool flanges.  I would call

20  it the top tubing spool flange.

21  Q    So you have the top flange and the bottom flange?

22  A    Yes.

23  Q    And this particular one is the top flange on the tubing

24  spool?

25  A    Right.

I-206

1  Q    Now, the next one -- we're getting into what I

2  understand are disputed issues, and this says a generally

3  elongate annular member suspended in the first tubular

4  member, said annular member having a first end portion

5  extending above the first tubular member and a second end

6  portion, and I have the rest.  It says below the first end

7  portion.

8       Do you understand that of all those words in that

9  claim, that the only thing that's disputed in this case is

10 the generally elongate annular member, not the rest of the

11 words?

12 A    I believe that's so.

13 Q    All right.  What is your understanding of the

14 Plaintiff's argument as to the term "generally elongate

15 annular member" and why they claim that the claim language

16 generally elongate annular member is not found in the MTBS

17 device?

18 A    It's my understanding that the generally elongate

19 tubular member is only a frac mandrel.

20 Q    And what is your opinion?

21 A    My opinion would be that if the patent said frac

22 mandrel, it would be ultimately clear what that meant, but I

23 think that what it means is that it can be other things as

24 well.

25 Q    Is your opinion -- is it your opinion that the claim

I-207

1 language generally elongate annular member not only covers

2 frac mandrels but also covers tubing hangers such as those

3 shown in the MTBS device?

4 A     Oh, yes.  I think the examiner did too.

5 Q     That's what I'm getting at.  And so tell me the basis

6 for that opinion that the generally elongate annular member

7 covers tubing hangers?

8 A     Well, in this case generally elongated, generally

9 meaning more or less and elongated meaning longer than it is

10 wide, and an annular member meaning it has a ring portion

11 that forms a ring is pretty much an open-ended description.

12 Q     Well, what is your understanding of what the Patent

13 Office said on this issue while it was examining this claim

14 and making a decision as to whether to allow it to issue?

15 A     Well, certainly the Patent Office turned back

16 Cornelssen which was a tubing hanger and said this is a

17 generally elongate tubular member.  So it was clear that

18 they weren't giving any limitation to frac mandrels alone.

19 Q     All right.  Do you have another basis?  Are you using

20 the Court's claim construction for your opinion that a

21 generally elongate annular member covers more than just a

22 frac mandrel and covers the tubing hanger such as an MTBS

23 device?

24 A     I do.  I think in the supplemental Markman or maybe it

25 was the original Markman ruling that the -- the judge cited

I-208

1 a generally elongate tubular member (e.g. frac mandrel) as a

2 way of indicating that a frac mandrel can be -- can be a

3 generally elongate tubular member, but other things can

4 also.

5 Q    Well, let's look straight to it so we can have that in

6 context.  If you look in your notebook under the

7 supplemental Markman, it's document number 491 at page two

8 of two, line six.  And once you get there, tell me what the

9 Court's claim construction says on this issue.  And I'm --

10 once again, I'm at document number 491 under the tab that

11 says supplemental Markman.  It's the Court's supplemental

12 Markman ruling from November 10th, 2010 and the fifth and

13 sixth line where it says the claimed elongate annular member

14 and then in parentheses, e.g. a frac mandrel.  What does

15 that mean to you, and how did you use that in your analysis?

16 A    Well, e.g. a frac mandrel means, for instance, a frac

17 mandrel.  That doesn't limit the number of instances.  It

18 doesn't say that only a frac mandrel is a generally elongate

19 tubular member.

20 Q    Does that tell you that the Court has already resolved

21 this dispute?

22 A    I believe yes, at this time, yes.

23 Q    All right.  For the rest of the -- the language in this

24 clause, the clause that has the elongate annular member --

25 go back to the claim language -- although I understood that

I-209

1  all the rest of it was conceded, let's go through there and

2  point out just where -- well, first of all, where's the

3  generally elongated annular member in the MTBS device?

4  A    In this photograph it's the pale yellow tubing hanger.

5  Q    And you answered my next question, what is the real

6  world term for that particular component in that device?

7  A    Well, it's not generally elongate tubular member.  It's

8  a tubing hanger.

9  Q    Tubing hanger, and is -- in the MTBS device, is the

10  tubing hanger suspended in the tubing spool?

11  A    Yes, it is.

12  Q    And does the tubing hanger have a first end portion

13  extending above the tubing spool?  If so, tell me where that

14  is.

15  A    Well, here's the end of the tubing spool.  The end of

16  the top flange, as I mentioned, is probably -- the most

17  extreme point is right about in here, and the first end

18  portion obviously extends up higher into the lower flange at

19  the secondary flange or as we would call it, the seal flange

20  that goes on top.

21  Q    Now, what is the real world --

22          THE COURT:  Can you tell me -- how can you tell me

23  that the tubing spool ends there?

24          THE WITNESS:  These bolts are tying together this

25  flange with this flange, and they're designed to be able to

I-210

1  be removed and separate that top flange.  So that top flange

2  will come lose, and the only thing left here will be this

3  ring gasket sitting in that groove, and these will part --

4  part away.

5  BY MR. ROGERS:

6  Q    And what do you call the flange above the tubing spool

7  that separates?

8  A    We would call this a seal flange.

9  Q    Have you seen it referred to as an adapter flange in

10 the running procedure?

11 A    Same thing.

12 Q    All right.  And this feature, what's the real world

13 term for this feature where the top portion of the tubing

14 hanger extends above the top of the tubing spool?  Is that

15 called an extended neck tubing hanger?

16 A    It is.  It's an extended neck.

17 Q    All right.  So does the MTBS device have an extended

18 neck tubing hanger?

19 A    It does.

20 Q    And does that mean that the tubing hanger's first end

21 portion extends above the tubing spool?

22 A    It does.

23 Q    All right.  Does the tubing hanger and the MTBS -- the

24 MTBS device have a second end portion below the first end

25 portion?

I-211

1  A     Yes, it does.  The second end portion would be anything

2  south of that flange I guess you'd say.  There's no real

3  description and location of second end portion other than

4  it's below, and certainly there is an end to that -- to that

5  hanger, which is at the bottom.  So this -- I guess you

6  would call this a secondary portion.

7  Q     Pretty simple, right?  The top portion is above the

8  bottom portion?

9  A     I think I got that part of it right.

10 Q     The bottom portion is below the top portion?

11 A     That's one of the easier parts.

12 Q     Okay.  Let's keep moving on.  The next element -- the

13 next limitation in claim one says a secondary flange

14 extending from the elongate annular member.  Do you

15 recognize that extending from language is language that has

16 been resolved by the Court through claim construction

17 earlier in the case?

18 A     Absolutely I recall the discussions about what extended

19 from meant, and basically it was resolved by the Court that

20 it's basically surrounding or around or coming from but not

21 necessarily integral or any such thing as that.

22 Q     All right.

23 A     So that secondary flange it talks about in the patent

24 would be this adapter flange as you called it or seal flange

25 as I call it, but it would be this uppermost flange.

I-212

1  Q    All right.  According to within the Court's claim

2  construction, does the adapter flange and the MTBS device

3  extend from the tubing head?

4  A    Yes, it does.

5  Q    Does that tell you that this claim limitation, the

6  secondary flange extending from the elongate annular member

7  is found within the MTBS device?

8  A    Yes, it is.

9  Q    Next limitation, a plurality of fasteners fastening the

10  secondary flange to the first tubular member flange.  Do you

11  have an opinion as to whether that limitation was found in

12  the MTBS device?

13  A    Yes, they are.  These would be the fasteners connecting

14  those two flanges together.  We can see two of them right

15  here.

16  Q    Do you call those flange bolts or through bolts?

17  A    We call them bolts with two nuts, but flange bolts

18  would be adequate.

19  Q    All right.  Are there a plurality of those bolts?

20  A    Yes, there are.  There's a number of them.

21  Q    Are those bolts fasteners?

22  A    That's the job, yes, sir.

23  Q    Are they fastening the two flanges together?

24  A    Yes, sir, they are.

25  Q    All right.  Next limitation says a production tubular

I-213

1  member aligned with the elongate annular member, and it

2  refers to turquoise as the color.  So I want you to tell me

3  whether or not you have an opinion as to whether there is

4  one or more elements in the MTBS device that fall within

5  this language where it says a production tubular member?

6  A    Well, one of the distinctions between a tubing hanger

7  and a -- a casing hanger is that -- there's two

8  terminologies used for casing.  One is just casing, and the

9  other is production casing.  Production casing has special

10  meaning in the oil field, and that is the last string of

11  casing prior to the production tubing.

12       Production tubing is what normally carries the gas or

13  the oil through on into a series of valves and out for

14  production.  The production casing below it is equally

15  important because that is the very prime annulus if you

16  will.  That annulus can receive pressure as well.

17       So in the case of the patent claim, the production

18  tubular is this piece of tubing but could also be construed

19  as being that piece of casing, because both of them carry

20  the word "production," and they didn't distinguish between

21  production tubing or production casing.

22  Q    All right.  The next language -- so there's two

23  different parts that could qualify, is that what you're

24  telling me?

25  A    Yeah.  In their patent, this is the production tubing.

I-214

1  And when this configuration -- this is production tubing by

2  definition.

3  Q    All right.  So we have the production tubing and the

4  production casing that could both be the production tubular

5  member in the claim language?

6  A    Yes, sir.

7  Q    All right.  And so for both of those, are they -- in

8  the MTBS device, are they aligned with the tubing hanger?

9  A    Yes.

10  Q    And by -- what do you mean by aligned?  Are you talking

11  about a common axis?

12  A    I mean, they're on the same -- yeah, same vertical

13  axis.

14  Q    All right.  So what is your opinion as to whether the

15  MTBS device has the production tubular member aligned with

16  the elongate annular member limitation of claim one of the

17  '925 patent?

18  A    It's present in the MTBS device.

19  Q    All right.  Next clause.  It says:

20          "Wherein, an axial force acts on the

21          generally elongate annular member and is

22          reacted in both the first tubular member

23          flange and the secondary flange."

24      What is your opinion as to what happens when the axial

25  force, for example, well pressure coming from below, acts on

I-215

1 -- pushes up on the tubing hanger in the MTBS device?  Do

2 you have an opinion as to whether that axial force is

3 reacted in both the adapter flange and the tubing spool

4 flange?

5 A    I do.  I think it's -- I agree with the conclusions

6 that were reached this morning, that this pushing up on this

7 tubing, force acting actually on this tubing trying to push

8 it up is going to be reacted in these lock screws and hence

9 this flange and then hence into these bolts as well as this

10 U-cup seal assembly and hence into this flange and into

11 those bolts as well.

12 Q    All right.  So what is your opinion as to whether the

13 MTBS device shown on the '94 catalog meets this limitation

14 of claim one of the '925 patent which is when an axial force

15 acts on the generally elongate annular member and is reacted

16 in both the first tubular member flange and the secondary

17 flange?

18 A    I believe it does.

19 Q    What is your opinion as to whether the MTBS device

20 shown in the '94 catalog includes each and every one of the

21 limitations of claim one of the '925 patent?

22 A    The MTBS device currently is -- shows each of the

23 elements of claim one.

24 Q    All right.  Let's go to claim two.  Claim two of the

25 '925 patent, have you heard that referred to as the annular

I-216

1 lip claim?

2 A    Yes, the -- the bit guide.

3 Q    I think you're jumping ahead to the Dallas '993 patent.

4 So let's take a look, just focus on the '94 catalog, the

5 MTBS device, and let's break this down.  Claim two says, "A

6 wellhead assembly as recited in claim one."  We've already

7 gone over that and you have an opinion, correct, as to

8 whether or not the MTBS device has everything in claim one?

9 A    Yes.  It does.

10 Q    All right.  So then it says "wherein the first tubular

11 member comprises an inner surface and an annular lip."  Does

12 the tubing spool on the MTBS device have an inner surface

13 with an annular lip?

14 A    Yes, it does.

15 Q    Where do you see it?

16 A    Well, in that diagram, you'll see it circled with the

17 hash lines, but basically this smaller diameter if I'm

18 looking below the tubing hanger on this photograph is a very

19 long lip, but it serves the same function as lining up with

20 the production casing below it so that you have no damage to

21 that casing, and it provides the same service that that

22 guide has.

23 Q    And I've got to tell you I had trouble understanding

24 annular lip when I first saw this.  I'd like you to describe

25 it in a little more detail.  Would you describe it as a

I-217

1  change in diameter?

2  A    Yes.  It's a smaller diameter that's used to protect

3  the top of that production casing and also to guide any

4  equipment that might be run into that tubing spool before

5  the tubing hanger is put in place.

6  Q    All right.  So in the inner diameter of the tubing

7  spool, the yellow up here that we're projecting right below

8  the brown element in the MTBS that's been referred to as a

9  hard stop, right there, do you see a change in diameter?

10  A    There is.

11  Q    What's the change, bigger, smaller?  What is it?

12  A    From the shoulder of the MTBS hanger, that diameter is

13  decreased below it.

14  Q    All right.  Does that smaller inner diameter feature,

15  does that continue on down all the way down to where it then

16  has another -- where it meets up with the turquoise color?

17  A    Until it meets with that production tubular, yes.

18  Q    All right.  And so what is that turquoise color?  What

19  is it production?

20  A    That's the production casing, but the intent of the lip

21  is to protect the top of that casing.

22  Q    All right.  And so looking further into this claim

23  where it says after you -- after it defines or recites the

24  inner surface having an annular lip, it says "wherein the

25  annular lip extends between the elongate annular member

*Echo Reporting, Inc.*

I-218

1 second end portion and a portion of the production tubular

2 member."

3      So let's break this down.  In the MTBS device, does

4 this annular lip that you've identified and have circled

5 with the dashed marks up there, does that annular lip extend

6 between the second end portion, the lower portion of the

7 tubing hanger in red and a portion of the production casing

8 in turquoise?

9 A    It does.  The -- the words there give you direction as

10 to where you find that lip, and you do find that lip from

11 the bottom of that tubing hanger to the top of the

12 production casing below it.

13 Q    So what is the extending between, is it left and right

14 or up and down?

15 A    It's up and down.

16 Q    All right.  So what is your opinion as to whether the

17 MTBS device shown in the '94 catalog has each and every one

18 of the limitations of claim two of the '925 patent?

19 A    Claim two limitations are present in the '94 -- I'm

20 sorry -- in the '94 catalog MTBS device.

21 Q    All of them?

22 A    All of them.

23 Q    All right.  Let's go to claim three.

24           THE COURT:  Can you go back on claim two.

25           MR. ROGERS:  Yes.

I-219

1          THE COURT:  And show me where the annular lip is.

2          THE WITNESS:  Sure.  I can use it right here.

3 Annular lip, there's a shoulder right here that has a

4 diameter, and you can see it just cut out just a bit right

5 there.  Can you see it?

6          THE COURT:  No.

7          THE WITNESS:  You want something bigger?

8          THE COURT:  You mean right above that red portion?

9          THE WITNESS:  Right below that, we can see the

10 annular right here on the -- right there, it turns inward.

11 Right there.  So you have this shoulder that supports the

12 hanger like this, and it comes down in the annular, and then

13 it has another diameter that goes below it.

14 BY MR. ROGERS:

15 Q    Similar to this?

16 A    Uh-huh.

17 Q    Let me ask you this question.  When this device is in

18 use, when the tubing hanger is inserted into the spool and

19 it comes down here, what this all --

20 A    That's where it stops.

21 Q    What do you call that, the shoulder?

22 A    The shoulder.

23 Q    Or annular lip?

24 A    Well, that's -- that's the landing shoulder.

25          THE COURT:  I thought the annular lip was supposed

I-220

1  to prevent the tools from dropping down.  Am I wrong?

2          THE WITNESS:  It actually guides them.  It's a

3  smaller diameter.  So if you take this out, if that tubing

4  hanger is not in place and you're running equipment down

5  into that, it comes down here, and this is a bigger

6  diameter.  So it stays protected from those things banging

7  into it.  When it reaches here, it guides itself in this lip

8  diameter if you will, and it stays guided so it goes right

9  into the middle of this casing without damaging it.  They

10  call it a bit guide because if the bit is on the bottom of

11  the drill, it really makes a mess when you're running it

12  through.

13          THE COURT:  So bit guide and the shoulder are the

14  same?

15          THE WITNESS:  Well, the -- the annular lip and a

16  -- and a landing shoulder are usually integrated together.

17  So this shoulder is where that hanger is designed to stop.

18  That -- this one.  When this hanger is not in here, it's

19  going to stop right there because it's going to -- it's

20  going to meet angle to angle and stop.

21  BY MR. ROGERS:

22  Q    Is this the turquoise, this part down here, does it

23  match up with the turquoise?

24  A    It does.

25  Q    Now, this annular lip that you've identified, does it

I-221

1  extend between the bottom portion of the tubular hanger and

2  the production casing?

3  A    It does.

4  Q    Are we ready to move on, your Honor?

5        THE COURT:  Yes.

6  BY MR. ROGERS:

7  Q    All right.  So let's move on to claim three.  I

8  understand that you're not preventing an invalidity opinion

9  on claim three, and I also understand that there may have

10 been some confusion in your deposition -- your recent

11 deposition on this topic.

12     Do you understand -- well, let's put it this way.  Is

13 the '94 catalog or MTBS device, is it a full bore device?

14 A    Well, it is.  It's -- this tubing hanger is designed to

15 allow products, you know, coiled tubing and other things to

16 be run completely through that tubing.  So that just -- it

17 provides full access, full bore access, if you will, to the

18 tubing.

19 Q    I'll tell you I had trouble understanding it when I

20 first read that term.  Tell me what it means.  What's the

21 significance of a device being full bore as opposed to not

22 being full bore?

23 A    A restricted bore, if -- if this tubing hanger had a

24 narrower bore here, then anything that was going to be

25 running through the Christmas tree, which would be above

I-222

1  this --

2  Q    Narrower than what?

3  A    Narrower than this diameter right here.

4  Q    What's narrower than what?

5  A    Smaller in diameter.

6  Q    Which two parts?  Which two positions in the bore are

7  you talking about one being narrower than the other?

8  A    If this tubing hanger had a smaller diameter in it,

9  then this diameter here at the top, it would restrict the

10 diameter of anything that you tried to push down through it.

11 So the idea behind full bore is to allow the largest

12 possible device, whatever that is, that would pass through

13 this to reach the tubing and to go on down into the well.

14 Q    All right.  So tell me again why the MTBS device is a

15 full bore device.

16 A    Well, in this case the -- the largest diameter of a

17 product or a tool that could be run into this assembly would

18 be through this diameter right here, and this elongate

19 tubular member provides full access to the tubing of that

20 diameter below.

21 Q    Are you saying that if you take the diameter at the top

22 and --

23 A    And you don't restrict it all the way down --

24 Q    All the way down --

25 A    -- it's full bore.

I-223

1  Q    -- it never sees something with a smaller diameter?

2  A    Right.  Correct.  That would stop something trying to

3  go through.

4  Q    All right.  Now, claim three.  It's up there.  I know

5  it's got a lot of words to it, but have you heard this claim

6  referred to as the full bore claim?

7  A    Yes, absolutely.

8  Q    All right.  But you understand that when you look at

9  the language of it, it recites three particular diameters in

10 three particular places along this claim, correct?

11 A    I do, and that's -- that was my confusion during the

12 deposition when that -- when you -- when you realize that

13 the production tubing or the production casing can be the

14 production tubular of choice, you can easily get confused as

15 to what that means.

16 Q    All right.  So would it be fair to say that you believe

17 that the MTBS device meets the -- what's been referred to as

18 the claim being full bore but not necessarily has all the

19 particular limitations recited?

20 A    That's correct.

21 Q    All right.  So it's not your opinion -- you're not

22 rendering an invalidity opinion on claim three --

23 A    That's correct.

24 Q    -- the '94 catalog, MTBS device, correct?

25 A    Correct.

I-224

1  Q    All right.  Well, let's -- let's go to claim four.

2  Claim four of the '925 patent says "A wellhead assembly as

3  recited in claim one."  We've got that, right?

4  A    We do.

5  Q    All right.  "Further comprising a seal between the

6  elongate annular member second end portion and the first

7  tubular member."

8       So let's put this into plain -- in plain English,

9  specifically referring to the MTBS device.  Is there in the

10 MTBS device a seal between the tubing hanger second end

11 portion -- that's the bottom of the tubing hanger, right?

12 A    It is.

13 Q    The bottom portion?  All right.  Is there a seal

14 between the bottom portion of the tubing hanger and the

15 tubing spool?

16 A    There is.  This is the tubing spool.  Here's the tubing

17 hanger.  And that seal is right in this area right here.  It

18 could be seen pretty well in that enlargement over there,

19 the bubble.

20 Q    What's the name of that seal?

21 A    That's the -- that's the MTBS seal.

22 Q    That's what I'm getting at.  Isn't that where this

23 whole thing gets its name from?

24 A    Yes, it is.

25 Q    All right.  And does that seal --

I-225

            THE COURT:  Is that what the other person was
referring to as the hard seal or not?

            MR. ROGERS:  The hard stop is the -- is the brown
in this particular --

            THE COURT:  So it's different?

            THE WITNESS:  That's just a support ring that
holds that seal in place.

BY MR. ROGERS:

Q    There's the MTBS seal, correct?

A    Uh-huh.

Q    And then as part of the entire seal assembly, below
that is the hard seat, is that correct?

A    Yeah.  I would call that a support ring, but, yeah,
exactly.

Q    All right.  Then what's the next thing down from there,
the blue?

A    That is a -- that's a ring that secures it in place
when you run it.

Q    All right.  There's silver, red, and blue in the
photograph, correct?

A    There is.

Q    All right.  And you've got the MTBS seal.  That's the
silver, correct?

A    Yes.

Q    Piece of metal.  You've got the hard stop, the red,

I-226

1 correct?

2 A     Yes.

3 Q     And then the -- and moving on down beyond the seal

4 assembly, what's the -- what's that -- is it turquoise below

5 there, blue?

6 A     It looks turquoise in that picture.  It's really just a

7 threaded ring.  You have to remember you have to put this

8 thing together in that configuration, and those parts will

9 fall off as you're lowering this through the BOP stack and

10 everything else.  So you have a threaded ring just to hold

11 them in place to get them down there.

12 Q     Okay.  Now, what is your opinion then as to whether the

13 MTBS device shown in the '94 catalog has all of the

14 limitations of claim four of the '925 patent?

15 A     Claim four limitations are present in the MTBS spool

16 assembly.

17 Q     All right.  Let's move on to claim five.  Once again,

18 we got a lot of words here, but let's try to break it down.

19 Claim five "A wellhead assembly as recited in claim four."

20     We've covered that, right?

21 A     We have.

22 Q     All right.  Then it says:

23         "Wherein, the seal is between the

24         elongate annular member second end

25         portion and a first inner surface

I-227

1           section of the first tubular member."

2      And there's a comma.  So let's break it there, and

3  let's break that down.

4      Does the MTBS device have a seal between the bottom

5  portion of the tubing hanger and an inner surface section of

6  the tubing hanger?

7  A    It does.

8  Q    No, I'm sorry.  Tubing spool.  I got it wrong.

9  A    Tubing spool.

10  Q    Let's try again.

11  A    Okay.

12  Q    The seal between -- the seal on the MTBS, is it between

13  the bottom portion of the tubing hanger and an inner surface

14  of the tubing spool?

15  A    Yes, there is.  It's right here.

16  Q    It sounds like we already covered that.  That's pretty

17  similar to what we already talked about.

18  A    Yeah, sure.

19  Q    All right.  So let's see what else it says.  Then it

20  says:

21           "herein, the first tubular member

22           comprises a secondary surface section

23           immediately above and concentric with

24           the first inner surface section, said

25           second inner surface section having a

I-228

1          diameter greater than the first inner

2          surface section."

3      So let's see if we can break this down.  In the MTBS

4  device, is there two different diameters on the inner

5  surface of the tubing spool?

6  A    Yes, that's what we were talking about earlier.  This

7  is an angle right here.  So that is a -- a taper, and this

8  diameter that we call that lip diameter there is smaller

9  than the diameter above it.

10 Q    All right.  So we've got a second inner surface section

11 that's immediately above and concentric with the first inner

12 surface section.  So can you tell us where those two

13 sections are, whether they're concentric and whether one is

14 above the other?

15 A    Yeah, the second inner surface section is the larger

16 diameter which is shown above this, above that angle.  And

17 the first inner surface section is below that angle and it's

18 a smaller diameter.  And the reason I say angle is because

19 this is really just a diameter cut into a -- an ID.  So it

20 appears to be an angle here.  It's actually an angle

21 reflecting the change in diameters.

22 Q    All right.  It's a lot of fancy words, but isn't it

23 just the act of just having an annular lip?  There's two

24 different inner diameters on the tubing spool?

25 A    Yes.

I-229

1  Q    All right.  What is your opinion as to whether the MTBS

2  device has all of the limitations of claim five in the '925

3  patent?

4  A    I believe it does.  This seal assembly sits in that

5  diameter, and the diameter here above this -- this diameter

6  is larger than the one below it.  So I believe it's there.

7  Q    All right.  Let's move on to claim 19.  Now, in our

8  claim chart we have up there we skipped claim 19, and I

9  think I figured out why, because I think it's a conceded

10  issue, but we're having trouble with that.  So let's go

11  ahead and just go through this, and I want you to tell me

12  what your opinion is as to claim 19 as to whether all the

13  limitations in claim 19 are found in the MTBS device, and

14  understand that on the screen up here we've moved forward to

15  the '993 patent.  So just ignore the references to the '993

16  patent up there, and let's just focus on the claim language

17  19 where it says, claim 19:

18            "A wellhead assembly as recited in claim

19            four."

20       We covered that, right?

21  A    We did.

22  Q    And it says:

23            "Further comprising wherein the elongate

24            annular member flange is fastened to the

25            first tubular member flange."

*Echo Reporting, Inc.*

I-230

1       In the MTBS device, is the tubing spool flange fastened

2  -- is the -- start over.  Is the adapter flange in the MTBS

3  device fastened to the tubing spool flange?

4  A    It is.

5  Q    How is it fastened?  Show me?

6  A    It's fastened with -- it is fastened with these bolts

7  here.

8  Q    The through bolts?

9  A    The through bolts.

10 Q    And what else can you call them?

11 A    Flange bolts.

12 Q    Flange bolts.  All right.  So in the MTBS device, the

13 two flanges are fastened together, correct?

14 A    They are.

15 Q    All right.  Next -- let's go to the next slide that's

16 going to show the next part of claim 19.  Was that it?

17          THE COURT:  All right.  We can stop here, and

18 we'll start tomorrow again at 9:00 o'clock.

19      (Proceedings recessed.)

20

21

22

23

24

25

I-231

1           I certify that the foregoing is a correct

2   transcript from the electronic sound recording of the

3   proceedings in the above-entitled matter.

4

5   /s/Jordan Keilty_____      2/17/12_____
    Transcriber                       Date
6
    FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8   /s/L.L. Francisco_____
    L.L. Francisco, President
9   Echo Reporting, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*