1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**
9        **EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**
10

11   DUHN OIL TOOL, INC.,                    CASE NO. 1:05-CV-1411-MLH-GSA
12                            Plaintiff,     **MEMORANDUM DECISION**
           vs.
13   COOPER CAMERON CORPORATION,
14                            Defendant.
15

16        This is a patent lawsuit filed by Plaintiff Duhn Oil Tool, Inc. ("Duhn Oil") against

17   Cameron International Corp. ("Cameron"). The patent-in-suit is United States Patent No.

18   6,920,925 "Wellhead Isolation Tool" ("the '925 patent"). The '925 patent issued on July 26,

19   2005 from an application filed on February 19, 2003.

20        The Court held a bench trial on the issue of invalidity by anticipation beginning on

21   February 15, 2012. Attorneys Joseph Thomas, William Kolegraff, W. Paul Schuck, and Kerri

22   Ann Rich appeared on behalf of Plaintiff Duhn Oil. Attorneys Joe Redden and Charles Rogers

23   appeared on behalf of Defendant Cameron. Cameron seeks a declaration that claims 1-5, 19,

24   and 29 of the '925 are invalid under 35 U.S.C. § 102 as anticipated by the following prior art:

25        1. The 1994 Cooper Cameron Oil Tool Catalog and the MTBS tubing spool and hanger

26           shown in the catalog ("the '94 catalog") (Exs. DX-A, DX-B, P 33.1); and

27        2. United States Patent No. 6,289,993, entitled "Blowout Preventer Protector and

28

1   Setting Tool," issued on September 18, 2001 ("the '993 patent").  (Doc. No. 739, at 4;

2   Ex. JX 76.)

3   **I.    Background**

4       On November 9, 2005, Plaintiff Duhn Oil filed a complaint for patent infringement

5   against Defendant Cameron.  (Doc. No. 1.)  On January 12, 2011, the case proceeded to a jury

6   trial.  At trial, Duhn asserted that Cameron directly and indirectly infringed claims 2, 3, 5, 19,

7   and 29 of Duhn's '925 patent.  Cameron raised affirmative defenses of invalidity, incorrect

8   inventorship, and inequitable conduct of those claims and claim 1 of the '925 patent.

9       On February 2, 2011, the jury returned verdicts finding Defendant liable for infringing

10  dependent claims 2, 3, 5, 19, and 29 of the '925 patent, and for contributory infringement of

11  claims 2, 3, 5, and 29, but not claim 19.  (Doc. No. 668).   The jury awarded Plaintiff

12  $5,909,974 in lost profits and $2,750,000 in royalties.  (Doc. No. 668.)  The jury also found

13  that dependent claims 2, 3, 4, 5, 19, and 29 were invalid for obviousness, and that claims 2, 3,

14  4, 5, and 29 were invalid for anticipation.  (Doc. No. 668.)  The jury found that claim 1, the

15  independent claim from which claims 2, 3, 4, 5, 19, and 29 depend, was not proven to be

16  anticipated or obvious.  (Doc. No. 668.)

17      During trial, both sides made Rule 50 motions for judgment as a matter of law on the

18  issue of obviousness, and Defendant Cameron presented a Rule 50 motion on the issues of

19  anticipation and damages.  After the trial, the trial judge granted in part and denied in part the

20  Rule 50 motions and granted a motion for a new trial on anticipation in his memorandum

21  decision.  (Doc. No. 706.)

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

Specifically, the trial judge ruled as follows:

- Affirmed the jury's verdict that Cameron directly infringed claims 2, 3, 5, 19, and 29 of Duhn's '925 patent. (Doc. No. 706 at 10:20-:22, 66:12-:19);

- Affirmed the jury's verdict that Cameron contributorily infringed claims 2, 3, 5, and 29 of Duhn's '925 patent. (Doc. No. 706 at 10:20-:23, 66:12-:19);

- Affirmed the jury's verdict that Cameron did not induce infringement or willfully infringe Duhn's '925 patent. (Doc. No. 706 at 10:25-:27, 66:12-:19);

- Ordered a new trial on the issue of anticipation, finding that the jury's verdict that claims 1 and 19 are not anticipated was inconsistent with the verdict that dependent claims 2, 3, 4, 5, and 29 are anticipated. (Doc. No. 706 at 45:13-:17, 45:23-:28);

- Granted Duhn's Rule 50 motion for judgment as a matter of law that Duhn's 1, 2, 3, 4, 5, 19, and 29 patent claims are not invalid as obvious based on the '993 patent and the '94 catalog. (Doc. No. 706 at 58:18-:28);

- Affirmed the jury's verdict on inventorship. (Doc. No. 706 at 59:28-60:3);

- Ruled that Duhn did not engage in inequitable conduct in naming the inventors or providing prior art to the patent office. (Doc. No. 706 at 60:5-:8, 63:1-:17, 64:18-65:11); and

- Postponed entry of judgment pending a decision on the issue of anticipation. (Doc. No. 706, at 65:22-:27, 66:12-:17.)

On November 14, 2011, Plaintiff filed a post-trial motion for summary judgment of no invalidity of the '925 patent. (Doc. No. 714.) On November 14, 2011, Defendant filed a motion for reconsideration of the trial court's order entering judgment as a matter of law in favor of Duhn Oil on the issue of obviousness. (Doc. No. 715.) On November 15, 2011, the case was reassigned to this Court pursuant to 28 U.S.C. § 292(b).[1] (Doc. No. 717). On December 22, 2011, the Court denied the parties' motions and set a trial on anticipation for February 15, 2012. The parties consented to a bench trial on anticipation.

///

///

///

---

[1] The case was reassigned after the retirement of Senior U.S. District Judge Oliver W. Wanger.

1:05cv1411

## II.     '925 Patent Claims

The claims of the '925 patent at issue provide as follows:

1. A wellhead assembly comprising:
a casing;
a first tubular member mounted over the casing;
a first tubular member flange extending from the first tubular member;
a generally elongate annular member suspended in the first tubular member, said annular member having a first end portion extending above the first tubular member and a second end portion below the first end portion;
a secondary flange extending from the elongate annular member;
a plurality of fasteners fastening the secondary flange to the first tubular member flange;
and a production tubular member aligned with the elongate annular member, wherein an axial force acts on the generally elongate annular member and is reacted in both the first tubular member flange and the secondary flange.

2. A wellhead assembly as recited in claim 1 wherein the first tubular member comprises an inner surface having an annular lip, wherein said annular lip extends between the elongate annular member second end portion and a portion of the production tubular member.

3. A wellhead assembly as recited in claim 2 wherein said annular lip extends radially inward defining an opening having a first diameter, wherein the elongate annular member first end portion comprises an inner surface having a second diameter and wherein the portion of the production tubular member comprises an inner surface having a third diameter, wherein said first, second and third diameters are equal.

4. A wellhead assembly as recited in claim 1 further comprising a seal between the elongate annular member second end portion and the first tubular member.

5. A wellhead assembly as recited in claim 4 wherein the seal is between the elongate annular member second end portion and a first inner surface section of the first tubular member, wherein the first tubular member comprises a second inner surface section immediately above and concentric with the first inner surface section, said second inner surface section having a diameter greater than the first inner surface section.

19. A wellhead assembly as recited in claim 4 further comprising: a plurality lock screws each radially threaded through the first tubular member flange and engaging at least a depression formed on the elongate annular member outer surface, wherein the elongate annular member flange is fastened to the first tubular member flange.

29. A wellhead assembly as recited in claim 1 wherein an end of the elongate annular member is aligned with and faces an end of the production tubular member, wherein an inner surface diameter of said end of said elongate annular member is about equal to an inner surface diameter of said end of said production tubular member.

(Ex. JX 1.1, .16-.17)

1

Figure 1 of the '925 patent depicts an exemplary embodiment of the claimed invention.



**Figure 1 '925 Patent**

### III.    Anticipation: Legal Standard

A patent is presumed valid.  35 U.S.C. § 282; <u>Microsoft Corp. v. i4i Ltd. P'ship</u>, 131 S.Ct. 2238, 2242 (2011); <u>Laryngeal Mask Co. v. Ambu</u>, 618 F.3d 1367, 1373 (Fed. Cir. 2010). "To show that a patent claim is invalid as anticipated, the accused infringer must show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention."  <u>Silicon Graphics, Inc. v. ATI Techs., Inc.</u>, 607 F.3d 784, 796 (Fed. Cir. 2010); <u>see also</u> <u>Microsoft</u>, 131 S.Ct. at 2242; <u>Uniloc USA, Inc. v. Microsoft Corp.</u>, 632 F.3d 1292, 1321 (Fed. Cir. 2011).

"Determining whether claims are anticipated involves a two-step analysis."  <u>In re Aoyama</u>, 656 F.3d 1293, 1296 (Fed. Cir. 2011).  The first step is construction of the claims of the patent at issue, which is a question of law. <u>Id.</u>  "The second step in the analysis requires a comparison of the properly construed claim to the prior art and is a factual matter reviewed for clear error." <u>Power Mosfet Techs., L.L.C. v. Siemens AG</u>, 378 F.3d 1396, 1406 (Fed. Cir. 2004) (citing <u>Oakley, Inc. v. Sunglass Hut Int'l</u>, 316 F.3d 1331, 1339 (Fed. Cir. 2003)).

If the patentee disclosed the prior art to the patent examiner during prosecution, the examiner is deemed to have considered it. Molins PLC v. Textron, Inc., 48 F.3d 1172 (Fed. Cir. 1995) ("Absent proof to the contrary, we assume that the examiner did consider the references."); see also Semiconductor Energy Lab. Co. v. Samsung Elecs. Co., 204 F.3d 1368, 1378 (Fed. Cir. 2000). The patent examiner's failure to discuss a reference is not proof that it was not considered. See Lear Siegler, Inc. v. Aeroquip Corp., 733 F.2d 881, 885 (Fed. Cir. 1984).

Not only are examiners presumed to have considered a reference, they are presumed to have evaluated it properly. See Norian Corp. v. Stryker Corp., 363 F.3d 1321, 1329 (Fed. Cir. 2004); see also Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1574 (Fed. Cir. 1992) ("[T]his presumption [of validity] is based in part on the expertise of patent examiners presumed to have done their job.").

"[I]nvalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d 1272, 1282 (Fed. Cir. 2000). If a prior art reference does not expressly set forth a particular claim element, the reference may still anticipate if the element is inherent in the prior art. In re Robertson, 169 F.3d 743, 745 (Fed. Cir. 1999). The claim element must necessarily be present in the prior art. Id. "Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." Bettcher Indus., Inc. v. Buznl USA, Inc., 661 F.3d 629, 639 (Fed. Cir. 2011) (quoting In re Oelrich, 666 F.2d 578, 581 (C.C.P.A. 1981)); see also Trintec Indus., Inc. v. Top-U.S.A. Corp., 295 F.3d 1292, 1297 (Fed. Cir. 2002) ("Inherency does not embrace probabilities or possibilities."). Thus, if prior art potentially has all claim elements, but does not necessarily have all claim elements, the prior art does not anticipate the patent claim.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In certain circumstances, a reference may incorporate information outside the four corners of the document. "Material not explicitly contained in the single, prior art document may still be considered for purposes of anticipation if that material is incorporated by reference into the document." Advanced Display Sys., 212 F.3d at 1282. To do so, the "host document must identify with detailed particularity what specific material it incorporates and clearly indicate where the material is found in the various documents." Id.; see also Callaway Golf Co. v. Acushnet Co., 576 F.3d 1331, 1346 (Fed. Cir. 2009); Kyocera Wireless Corp. v. Int'l Trade Comm., 545 F.3d 1340, 1352 (Fed. Cir. 2008) ("[I]n order for one document to incorporate another document by reference, the incorporating document must identify the incorporated document with detailed particularity, clearly indicating the specific material for incorporation.").

If an independent claim is not anticipated, any claims that depend upon that claim cannot be anticipated. See Minn. Mining & Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1299 (Fed. Cir. 2002); Hartness Int'l, Inc. v. Simplimatic Eng'g Co., 819 F.2d 1100, 1108 (Fed. Cir. 1987). Here, claims 2, 3, 4, 5, 19, and 29 all depend on claim 1. Therefore, if claim 1 is not anticipated, then claims 2, 3, 4, 5, 19, and 29 cannot be rendered invalid as anticipated by that prior art.

The inverse is not true. Patent law provides that "dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim." 35 U.S.C. § 282. Thus, even if claim 1 were determined to be anticipated, the Court would still need to determine independently if each of claims 2, 3, 4, 5, 19, and 29 is anticipated. See Apple Computer, Inc. v. Articulate Sys., Inc., 234 F.3d 14, 24 (Fed. Cir. 2000) (finding that district court erred in failing to consider dependent claims individually).

///
///
///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.   Claim Construction

### A.   Legal Standard

The Court turns to the claim construction, the first step of its anticipation analysis. Enzo Biochem, Inc. v. Applera Corp., 559 F.3d 1325, 1332 (Fed. Cir. 2010).   Claim construction is an issue of law for the court to decide.   Markman v. Westview Instruments, Inc., 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).  A "bedrock principle" of patent law is that the "claims of a patent define the invention." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted).  In construing claim terms, a court must determine the meaning of any disputed words from the perspective of one of ordinary skill in the pertinent art at the time of filing.  Id. at 1313.  Claim terms should be read in a consistent and uniform manner throughout the patent.  Nystrom v. TREX Co., Inc., 424 F.3d 1136, 1145 (Fed. Cir. 2005).

The intrinsic evidence consists of the claims, the specification, and the prosecution history.   Phillips, 415 F.3d at 1317.  The baseline for a claim construction analysis is the "ordinary and customary meaning" of the claim term to a person of ordinary skill in the art at the time of the invention.  Id. at 1312-13.

A court must read claims "in view of the specification, of which they are a part." Markman, 52 F.3d at 979.   The specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). The patentee also can define in the specification the terms it uses in the claims.  Schoenhaus v. Genesco, Inc., 440 F.3d 1354, 1358 (Fed. Cir. 2006).

A court may look to the prosecution history during claim construction.  Phillips, 415 F.3d at 1317.  The prosecution history may reveal that the "inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  Id. The patentee's statements during prosecution narrow the claim scope when the statements are

"both so clear as to show reasonable clarity and deliberateness . . . and so unmistakable as to be unambiguous evidence of disclaimer." Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1325 (Fed. Cir. 2003) (citations omitted); see also N. Am. Container, Inc. v. Plastipak Packaging, Inc., 415 F.3d 1335, 1345 (Fed. Cir. 2005) (noting the "high standard required in order to show a prosecution disclaimer").

A court should generally construe the patent claims to encompass the preferred embodiments described in the specification, and it is often error to adopt a construction that does not include them. See On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH, 386 F.3d 1133, 1138 (Fed. Cir. 2004). But a court must not import limitations from the specifications into the claim. Phillips, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); see also Agfa Corp. v. Creo Prods., Inc., 451 F.3d 1366, 1367-77 (Fed. Cir. 2006); Ormco Corp. v. Align Tech., Inc., 463 F.3d 1299, 1306-07 (Fed. Cir. 2006). Conversely, if the specification discloses an embodiment that is not included in the claims, "this action dedicates that unclaimed subject matter to the public." Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co., Inc., 285 F.3d 1046, 1054 (Fed. Cir. 2002).

The patent and its prosecution history usually provide "the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the invention." V-Formation, Inc. v. Benetton Group SpA, 401 F.3d 1307, 1310 (Fed. Cir. 2005). But in addition to intrinsic evidence, a court may also consider pertinent extrinsic evidence. Phillips, 415 F.3d at 1317.

**B.   Analysis**

Cameron requests the Court to change the trial court's prior claim construction. Duhn asserts that this Court is bound by the law of the case to the trial court's previous claim construction. The doctrine of law of the case does not apply to interlocutory orders before

final judgment.   Amarel v. Connell, 102 F.3d 1494, 1515 (9th Cir. 1996) (quoting In re United States, 733 F.2d 10, 13 (2d Cir.1984)) ("'[T]he interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment, and may be modified to the same extent if the case is reassigned to another judge.'").   Moreover, "[t]here is no imperative duty to follow the earlier ruling—only the desirability that suitors shall, so far as possible, have reliable guidance how to conduct their affairs."   Id. (internal quotation marks omitted); see also Regents of Univ. of Cal. v. Dakocytomation Cal., Inc., 517 F.3d 1364, 1371 (Fed. Cir. 2008); Langevine v. District of Columbia, 106 F.3d 1018, 1023 (D.C. Cir. 1997) (quoting Schoen v. Wash. Post, 246 F.2d 670, 673 (D.C. Cir. 1957)) ("'[S]o long as the court has jurisdiction over an action, it should have complete power over interlocutory orders made therein and should be able to revise them when it is consonant with equity to do so.'").

        Even though the Court has the authority to vary from the trial court's claim construction, it declines to do so.  The trial court construed the disputed claims in a detailed memorandum decision filed on February 1, 2007.  (Doc. No. 71.)  The parties continued to dispute the "wherein clause": "wherein an axial force acts on the generally elongate annular member and is reacted in both the first tubular member flange and the secondary flange." (Ex. JX 1.)  In a supplemental construction, the court construed the "wherein" clause as follows:

> [T]he disputed "wherein" clause requires . . . a "dual load path" - which means that there must be an independent force path (engagement) between the claimed "elongate annular member" (e.g., a "frac mandrel") and each of the two claimed flanges, which are the "first tubular member flange" (e.g., the upper flange of a "tubing head") and the "secondary flange." These two separate independent force paths (engagements) each have contact with the frac mandrel, which provides for a transmission of the axial force from the elongate annular member to the first tubular member flange, and a separate transmission of the axial force from the elongate annular member to the secondary flange.

(Doc. No. 491.)  The trial court carefully explained the claim construction in its memorandum decision and supplemental construction.  (Doc. Nos. 71, 491.)  The supplemental construction

1:05cv1411

explained the disputed "wherein" clause in light of the prosecution history (Ex. JX 44) and further court hearings on December 8, 2008 and January 6, 2009. (Doc. Nos. 261, 287.)

During these hearings, the parties extensively discussed the invention, the prior art, the accused devices, and the court's claim construction. (Doc. Nos. 267, 287.) Duhn Oil argued that the prosecution disclaimer doctrine required the court to interpret the "wherein" clause with a dual load path because Duhn disavowed a single load path in overcoming a rejection. (Doc. No. 287.)

The patent examiner initially rejected the '925 patent claims as unpatentable over the Cornelssen U.S. Patent No. 6,688,386, a Tubing Hanger and Adapter Assembly ("Cornelssen '386 patent"). (Ex. JX 44.125.) In response to the rejection, Duhn added the "wherein" clause. (Ex. JX 44.71-.72.) The wherein clause requires a dual load path, such as a reaction in both the first tubular member flange and the secondary flange, as illustrated by Figure 1. (Ex. JX 44.71-.72.) Duhn amended the claims to include the "wherein" clause to overcome the Cornelssen '386 reference. (Ex. JX 44.71-.72., .102 ("[I]t does not appear that an axial load acting on the alleged generally elongate member 10 of Cornelssen, et al. will be reacted in both of the alleged first tubular member and secondary flanges disclosed therein.")). The Cornelssen patent, published on July 24, 2003, more than five months after Duhn filed the '925 patent, discloses a tubing hanger including one set of lock screws, similar to Figure 2 of the '925 patent. (See Ex. JX 77 at Fig. 7.)

Duhn's reply to the office action argued that the Cornelssen device is a single load path design. (Doc. No. 287.) Duhn's addition of the "wherein" clause to overcome the rejection made the '925 patent a dual load path design. (Doc. No. 287.) In doing so, the patent issued. (Ex. JX 44.102-.03.) In amending the claims to overcome the Cornelssen '386 prior art, Duhn disavowed the single load path design depicted in Figure 2 of the '925 patent. (See Doc. No. 287.) As a result, the trial court properly construed the claims to require a dual load path. (Doc. No. 491.)

## V.     Trial Evidence

The next step of an anticipation analysis is a comparison of the claim to the prior art. Power Mosfet Techs, 378 F.3d 1936.  The Court reviews the trial evidence for its analysis of the two prior art references, the '94 catalog (Ex. DX-A.) and the '993 patent (Ex. JX 6.).  At trial, Defendant called witnesses Ronald Frishmuth, Gary Devlin, and Robert Meek (via deposition), and introduced exhibits.  (Doc. Nos. 757, 758, 759.)  Plaintiff called witnesses George Boyadjieff, Phillip Terry (via deposition), and James Brugman, and introduced additional exhibits.  (Doc. Nos. 756, 758, 759.)  Further, the parties agreed the Court could consider the prior trial testimony.  Having evaluated the witnesses' testimony and the relevant exhibits, the Court now turns to evaluate whether the two prior art references anticipate the '925 claims.

## VI.    Analysis of '925 Claims in Light of the '94 Catalog

Cameron contends that the '94 catalog anticipates claims 1-5, 19, and 29 of the '925 patent.  The '94 catalog discloses a metal-to-body-seal ("MTBS") tubing spool hanger. (Ex. P 33.)  The '94 catalog was not disclosed to the patent office.  Duhn indicates that a 2002-2003 Cameron catalog was disclosed and specifically considered by the patent examiner, as shown by the asterisk next to the 2002 reference in the '925 patent.  (Ex. JX 1.)  The 2002-2003 catalog includes a brief reference to a MBS Multi-Bowl Wellhead and a short reference to a metal seal capability, stating "available seals include metal-to-metal seals primary sealing applications."  (Ex. P 28.33)  Given the presumption of validity and clear and convincing evidence standards, Duhn urges the Court to uphold the validity of the '925 patent, and Cameron seeks to invalidate the patent.  With these standards in mind, the Court reviews the anticipation evidence.

### A.     Anticipation of Claim 1 by the '94 Catalog

At trial, Gary Devlin testified for Cameron that the MTBS tubing spool hanger meets each of the elements of claim 1.  (Doc. No. 754.)  The MTBS tubing spool and hanger is a

wellhead assembly.  The MTBS device has a casing and a tubing spool mounted over the casing, satisfying the recited "first tubular member mounted over the casing."  A top flange extends from the tubing spool, meeting the "first tubular member flange extending from the first tubular member" limitation.  The elongated tubing hanger satisfies the required "generally elongate annular member," as illustrated:



**1994 Catalog**

Duhn's expert witness, George Boyadjieff, testified that the claimed generally elongated annular member must be a frac mandrel and not a tubing hanger.  (Doc. No. 760.) Consequently, Duhn maintains that the MTBS tubing hanger cannot satisfy this claim limitation.  (Ex. DX-EC, Boyadjieff expert report.)  The Court disagrees.  The trial court's claim construction specifically referenced a frac mandrel as an example (e.g.) of an elongate annular member.  (Doc. No. 491.)  The prosecution history of the '925 patent cited a tubing hanger in the Cornelssen '386 patent as prior art and termed the tubing hanger "an elongate

annular member." (Ex. JX 44.125.) As a result, an elongate annular member is broader than a frac mandrel, and the '94 catalog MTBS tubing hanger satisfies the claimed elongate annular member.

The tubing hanger also meets the claimed "generally elongate annular member suspended in the first tubular member, said annular member having a first end portion extending above the first tubular member and a second end portion below the first end portion." (JX 1.) The tubing hanger is suspended in the tubing spool by the adapter flange. The top portion of the tubing hanger extends above the tubing spool, and the tubing hanger has a bottom portion below its top portion. The production tubing is in vertical alignment with the tubing hanger, satisfying the "production tubular member aligned with the elongate annular member" limitation.

The MTBS device has an adapter flange suspended from the tubing hanger, satisfying the recited "secondary flange extending from the elongate annular member." The MTBS device shows a number of bolts fastening the adapter flange and the top flange of the tubing spool. The Court rejects Duhn's argument that the bolts connecting the adapter flange to the tubing head are not a "plurality of fasteners" because they are not connected to a secondary flange without a frac mandrel. (Doc. No. 747.) For this argument, Duhn continues to incorrectly assert that an elongate annular member must be a frac mandrel. The Court concludes that the adapter flange is a secondary flange having a plurality of fasteners with the necessary claim elements. Therefore, the MTBS device also meets the "plurality of fasteners fastening the secondary flange to the first tubular member flange."

Finally, the parties dispute whether the '94 catalog discloses a dual load path. To resolve this dispute, the Court reviews the parties' evidence of whether the device shown in the '94 catalog has a dual load path. Devlin testified that it meets the claim limitation. (Doc. No. 754 at 219.) Boyadjieff testified that it does not. (Doc. No. 760.) Cameron also introduced testimony of Robert Meek, an inventor of the '925 patent, stating that there is a

preload reaction in the adapter flange from the metal seal.  Cameron also relied on the testimony of Frishmuth on action/reaction mechanical engineering principles and his finite element analysis  to support its position that the '94 catalog shows a dual load path in the first and secondary flanges.  In response, Duhn's expert James Brugman disputed the finite element analysis.  The parties agree that the lock screws constitute a first load path but disagree on whether there is a second load path reaction in the adapter flange.

Cameron's expert witness Gary Devlin, supported by witness Frishmuth's mechanical force opinion and finite element analysis, concluded that the metal U-cup seal assembly in the adapter flange of the '94 catalog figure supplies the structure for a second load path reaction in the secondary flange.  (Exs. DX-A, DX-B, DX-D, Diagrams of the MTBS Tubing Spool and Hanger; Ex. P 35, Diagram of the MTBS Tubing Spool and Hanger with Devlin's notes.) Duhn's expert, Boyadjieff, disagreed.  Boyadjieff testified that the adapter flange in the '94 catalog figure, as the secondary flange, has no structure for reacting an axial force.  (Doc. No. 760.)  To further support Duhn's position, Boyadjieff points to the API standards requiring the lock screws to sufficiently absorb an axial force in a tubing hanger device.  (Doc. No. 760; Ex. P 31.)  He testified that because the lock screws have been designed to absorb any axial load, the lock screws provide the only load path in the MTBS device.  (Doc. No. 760.) Boyadjieff did not explain why the second set of lock screws near the adapter flange in Figure 1 of the '925 patent was beneficial over the '386 Cornelssen single set of lock screws if the first set of lock screws in the '925 patent absorb the entire axial force.  (Doc. No. 760.)  He also did not explain why the reaction in the second set of lock screws of the '925 patent would not occur through the metal U-cup assembly and bolts in the '94 catalog.  (Doc. No. 760.)

The Court disagrees with Boyadjieff's opinion that there would be no reaction at the U-cup metal assembly seal and the adapter flange.  The "wherein clause" requires a functional limitation that an axial force be reached in both the first tubular member flange and the secondary flange as specified in the court's claim construction.  (Doc. 491.)  Even if the

reaction at the metal U-cup assembly were less than the reaction at the lock screws, the '94 catalog meets the claim element of a reaction in the secondary flange.

Cameron's expert witness Devlin testified that the "wherein clause" is satisfied by the dual load path shown in the '94 catalog. In the '94 catalog device, any upward force on the tubing hanger (the elongate annular member) is transferred to the surrounding components, including the secondary adapter flange. The tubing hanger is in contact with the lock screws causing a reaction in the first tubular member. This is the first load path. The second load path is the reaction by the contact between the tubing hanger, the metal U-cup seal assembly, and the adapter. (Doc. No. 754 at 219.) The transfer of force is less than the reaction at the lock screws. But the claims and the court's claim construction do not specify a particular level of force reaction. (Doc. No. 491.) In the Markman ruling, the court noted that "[o]ne can infringe claim 1 by assembling a device that when under an axial force reacts (transmits) the axial force onto the first tubular member flange and the secondary flange." (Doc. No. 71 at 30.) Devlin credibly testified that the '94 catalog and device had a dual load path when an axial force acts on the generally elongate annular member and is reacted in both the first tubular member flange and the secondary flange:

> Q:   Do you have an opinion as to whether that axial force is reacted in both the adapter flange and the tubing spool flange?
> A:   I agree with the conclusions . . . that this pushing up on this tubing force acting actually on this tubing trying to push it up is going to be reacted in these lock screws and hence this flange and then hence into these bolts as well as this U-cup seal assembly and hence into this flange and into those bolts as well.

(Doc. No. 754 at 219.)

Further evidence of force in the adapter flange came from deposition testimony of Robert Meeks, an inventor of the '925 patent, read at trial:

> Q:   And can that metal seal transmit an axial force into the adapter flange?
> A:   If a load were imposed upon it from below, I would assume it could, yes.
> Q:   So would it be fair to say that the metal seal is transmitting a force into the tubing hanger?
> A:   Yes.
> Q:   And that tubing hanger is then reacting to that force, correct?
> A:   Yes.

1:05cv1411

> Q:    So there is—it is fair to say that there is an action/reaction pair for a
>       force that is being transmitted?
> A:    Yes.

(Dep. of Meeks, Feb. 8, 2012, at 44-45.)  When asked whether an upward axial force would

be transmitted through the tubing hanger, through the metal seal, and into the adapter flange,

Meeks acknowledged that a force could be transmitted if it exceeded the preload condition.

(Dep. of Meeks, Feb. 8, 2012, at 46.)

Similarly, Cameron's expert witness Frishmuth also testified that under Newton's laws

of physics, any axial force applied to the tubing hanger results in a reaction counter force in

the components of the adapter flange through the metal U-cup seal assembly.   More

specifically, during his testimony, Frishmuth confirmed the conclusion in his expert report:

> "For the reasons discussed above, it is my opinion that the MTBS is a dual load
> path device because it has two mechanisms that push down on the annual[ar]
> member, and that in turn retain the annular member when an upward load is
> applied to it, number one, the lock screws, number two, and the adapter flange
> U-cup seal."

(Doc. No. 754.)

Frishmuth also supported his opinion that the '94 catalog discloses a dual load path

with a finite element analysis.  His finite element analysis using a computer modeling system

known as ANSYS showed a reaction at the U-cup seal assembly and bolts in the secondary

flange.  He ran several finite element analysis reports to confirm his opinion of a dual load

path in the MTBS device.

In opposition, Duhn's expert witness Brugman challenged the assumptions and

accuracy of Frishmuth's finite element analysis.  These challenges, based on the trial record

as a whole, rendered the finite element analysis inconclusive on the issue of whether there is

an axial force reacted in the metal seal assembly of the secondary adapter flange in the '94

catalog device.   For example, Frishmuth's ANSYS project reports #1-4 did not include the

significant reaction of 400,000 pounds of downward pressure from the tubing weight.  The

parties' experts also disagreed on other assumptions such as plasticity considerations.

Cameron's expert Frishmuth ran additional reports to respond to criticisms of his assumptions. ANSYS project report finite element analysis case #6 (Ex. P 76.) is Cameron's best attempt in evidence to show a reaction force in the metal seal of the adapter flange. While persuasive, the evidence is not clear and convincing under the anticipation standard, rendering the finite element analysis inconclusive on the issue of an axial force reacting in the metal seal of the secondary flange.

In addition to challenging the finite element analysis, Duhn's expert Boyadjieff testified that the adapter flange has no structure for reacting to a force, interpreting the force reaction from the wherein clause narrowly. (Doc. No. 760.) But as Duhn's infringement expert, he interpreted the "dual load path" of the wherein clause broadly to cover the Cameron device. For Duhn's infringement support for a dual load path, Duhn cited to the patent language for Figure 1, referring to absorption and redistribution of loads: "[E]xcess loads on the wellhead isolation tool not absorbed by lock screws installed in upper flange are absorbed by lock screws installed in secondary flange and redistributed through studs and nuts to the upper flange." (Ex. JX 1, col. 6, lls. 29-35.) Because the dual load path required by the wherein clause was added to overcome a single load path design disclosed in prior art, Duhn's attempt to ignore the absorption and redistribution of force in the adapter flange of the MTBS device is inconsistent with its broad infringement position at trial.

After weighing the conflicting evidence, the Court concludes that the axial force created by the upward pressure meets the claimed axial force that "acts on the generally elongate annular member and is reacted in both the first tubular member flange and the secondary flange." (Ex. JX 1.) Cameron has convincingly shown that an axial force is reacted from the tubing hanger in the metal seal assembly and transferred from the metal seal assembly into the adapter flange. After evaluating the credibility of the witnesses, the reasons given for the expert testimony, and the record as a whole, the Court concludes that the '94

catalog meets all claim 1 elements of the '925 patent.  Accordingly, the '94 catalog anticipates claim 1 of the '925 patent.

### B.   Anticipation of Claim 2 by the '94 Catalog

Claim 2 depends from claim 1 and further requires that "the first tubular member comprises an inner surface having an annular lip, wherein said annular lip extends between the elongate annular member second end portion and a portion of the production tubular member."  (Ex. JX 1.)  Devlin testified that the '94 catalog anticipates claim 2.  The tubing spool, the first tubular member, has an inner surface.  The tubing spool also has an annular lip that slants diagonally inward from a point immediately below the seal assembly.  In addition, the annular lip extends from the bottom portion of the tubing hanger (elongate annular member) between a portion of the production tubing.  In response, Duhn incorporated its unsuccessful challenges to claim 1.  As a result, the '94 catalog satisfies each element of claim 2 and anticipates claim 2.



**From '94 Catalog**

C.    **Claim 3**

Claim 3 depends from claim 2 and also states:

wherein said annular lip extends radially inward defining an opening having a first diameter, wherein the elongate annular member first end portion comprises an inner surface having a second diameter and wherein the portion of the production tubular member comprises an inner surface having a third diameter, wherein said first, second and third diameters are equal.

(Ex. JX 1.)   Cameron offered no evidence that the '94 catalog anticipates claim 3.[2] Therefore, the Court concludes that Cameron has failed its burden to show claim 3 anticipates the '94 catalog.

D.    **Anticipation of Claim 4 by the '94 Catalog**

Claim 4 depends from claim 1 and further requires "a seal between the elongate annular member second end portion and the first tubular member."  (Ex. JX 1.)  Devlin testified that the MTBS depicted in the '94 catalog shows a seal.  (Doc. No. 754.)  The seal is between the hanger (elongate annular member) and the tubing spool (first tubular member). Therefore, the MTBS well assembly meets the claim limitations of claim 4.  Accordingly, the MTBS device from the '94 catalog anticipates claim 4.

E.    **Anticipation of Claim 5 by the '94 Catalog**

Claim 5 depends from claim 4 and recites "wherein the seal is between the elongate annular member second end portion and a first inner surface section of the first tubular member, wherein the first tubular member comprises a second inner surface section immediately above and concentric with the first inner surface section, said second inner surface section having a diameter greater than the first inner surface."  (Ex. JX 1.)  The '94 catalog discloses a seal assembly located between the bottom portion of the tubing hanger and the bottom inner surface of the tubing spool.  The top inner surface "above and concentric with" the seal assembly is a larger diameter than the bottom inner surface.  As explained by

---

[2] The jury previously concluded that claim 3 was invalid by anticipation and obviousness, but the Court set the special verdict aside in granting a JMOL of nonobviousness and ordering a new trial on anticipation. (Doc. No. 707.)

witness Devlin and the record, the MTBS device from the '94 catalog discloses all elements of claim 5 and anticipates claim 5.



**From '94 Catalog**

## F.    Anticipation of Claim 19 by the '94 Catalog

Claim 19 depends from claim 4 and further requires "a plurality [of] lock screws each radially threaded through the first tubular member flange and engaging at least a depression formed on the elongate annular member outer surface, wherein the elongate annular member flange is fastened to the first tubular member flange." (Ex. JX 1.)  Cameron's witness Devlin testified that the '94 catalog meets all claim 19 elements.  The MTBS wellhead assembly contains a plurality of lock screws.  The lock screws are threaded through the top flange of the tubing spool.  The tubing hanger contains depressions that allow the lock screws to engage the outer surface of the tubing hanger.  The adapter flange connects to the tubing hanger, satisfying the "elongate annular member flange."  The MTBS has bolts that fasten the adapter

flange to the top flange of the tubing spool.  Therefore, the MTBS wellhead assembly meets all limitations of claim 19 and anticipates claim 19.



**From '94 Catalog**

### G.    Anticipation of Claim 29 by the '94 Catalog

Claim 29 depends from claim 1 and additionally recites "an end of the elongate annular member is aligned with and faces an end of the production tubular member, wherein an inner surface diameter of said end of said elongate annular member is about equal to an inner surface diameter of said end of said production tubular member." (Ex. JX 1.) The '94 catalog shows the end of the tubing hanger in vertical alignment with and facing an end of the production tubing.  The inner surface diameter of the tubing hanger is about equal to the inner surface of the production tubing.  Therefore, the MTBS device meets each limitation of claim 29.  Accordingly, the '94 catalog anticipates claim 29.

1:05cv1411



1
2
3
4
5
6
7
8
9
10
11
12

**From '94 Catalog**

13  Based on clear and convincing evidence at trial, the Court concludes that the '94 catalog

14  anticipates claims 1, 2, 4, 5, 19, and 29 of the '925 patent.

15  **VII.    Analysis of '925 Claims in light of the '933 Patent**

16          The Court next evaluates the '993 patent for anticipation of Duhn's '925 patent.

17  Cameron asserts that the '993 patent inherently—not expressly—anticipates the '925 patent.

18  Schering Corp. v. Geneva Pharm., 339 F.3d 1373 (Fed. Cir. 2003).  After conducting an

19  analysis of the '993 patent, the Court concludes that the '993 patent does not anticipate claim

20  1 of the '925 patent.

21
22
23
24
25
26
27
28

1:05cv1411

FIG. 3

'993 Patent

Figure 3 of the '993 patent discloses a wellhead assembly with frac mandrel and blowout preventer.  The parties agree that the '993 patent discloses many of the claim elements of the '925 patent.  Unlike the '94 catalog reference, the '993 patent includes a frac mandrel, so there is no dispute over whether the '993 patent has a generally elongate annular member.  (Ex. JX 76.)  As depicted in Figure 3, the mandrel extension is suspended in the tubing head spool.  The top portion of the mandrel extends above the tubing head spool, with a second end portion below.  Therefore, the mandrel meets the claimed "generally elongate annular member suspended in the first tubular member, said annular member having a first end portion extending above the first tubular member and a second end portion below the first end portion."  (Ex. JX 1.)  Figure 3 also has a casing and a tubing head spool that is mounted over the casing, satisfying the "first tubular member mounted over the casing."  A top flange

- 24 -

extends from the tubing head spool and meets the "first tubular member flange extending from the first tubular member" limitation.



**From '993 Patent**

The production tubing casing is in vertical alignment with the mandrel extension, satisfying the "production tubular member aligned with the elongate annular member" limitation. The first load path is expressly disclosed in the '993 patent. Pressure comes up through the production tubing casing creating an axial force. The axial force is transferred from the mandrel through the lockdown nut and into the base plate or lockdown flange. As a result, the axial force meets the first load limitation.

The parties dispute whether the '993 patent discloses a second load path. Cameron concedes that a second load path is not expressly disclosed because the lock screws are not engaged in Figure 3 of the '993 patent. But the axial force can act on the tubing head spool through the lock screws only if the lock screws are tightened, or "run-in," to engage the mandrel extension. The lock screws in Figure 3 are shown in an open position. Therefore,

the open lock screws do not expressly provide for a reaction of the axial force in the tubing head spool.

Instead, Cameron asserts that the '993 patent inherently discloses a second load path. Cameron contends through the testimony of Devlin that one of ordinary skill in the art would inherently know that the lock screws would be "run-in" to contact the frac mandrel.

Duhn correctly points out several problems with Cameron's inherency argument. The court's supplemental claim construction and infringement order specified that infringement requires the lock screws to be engaged. (Doc. No. 491.) Additionally, Duhn's independent witness Phillip Terry testified that one skilled in the art would not engage the lock screws in the commercial embodiment of the '993 invention, the Stinger device. (See Ex. JX 57.) The Court concludes that the clear and convincing weight of the evidence supports Duhn's position that the '993 patent does not inherently disclose a dual load path.

As a result, there is no axial force on the first tubular member flange in the '993 patent, and one skilled in the art would not inherently conclude that the lock screws would be run in to create an axial force on the tubing head spool. Accordingly, the '993 patent does not disclose all elements of claim 1 and does not anticipate claim 1.[3]  Because claim 1 is not anticipated by the '993 patent, neither are dependent claims 2-5, 19, or 29.  See 3M, 303 F.3d at 1299 (discussing that if an independent claim is not anticipated, then claims depending from that claim are also not anticipated).

///

///

///

---

[3] The parties further dispute whether the '993 patent meets the limitation of a "plurality of fasteners fastening the secondary flange to the first tubular member flange." Duhn contends that the large blow out preventer prevents the fasteners from fastening the secondary flange to the first tubular member flange. Cameron responds that dependent claim 30 provides for a direct connection, leading to the conclusion that claim 1 does not require a direct connection. As the '993 patent does not disclose all claim elements of claim 1, the Court need not resolve the dispute.

## VIII.  Conclusion Regarding Anticipation

The Court concludes that the '94 catalog anticipates claims 1, 2, 4, 5, 19, and 29 of the '925 patent.  The Court determines that the '993 patent does not anticipate claims 1-5, 19, and 29 of the '925 patent.  As a result of the '94 catalog, claims 1, 2, 4, 5, 19, and 29 of the '925 patent are invalid for lacking novelty.

## IX.  Conclusion

Based on the Court's conclusion that claims 1, 2, 4, 5, 19, and 29 of the '925 patent are invalid by anticipation, only claim 3 of the '925 patent remains valid and infringed.  In light of the Court's conclusion on anticipation, the Court requests further briefing on the following:

**A.    Damages**

(1)    Duhn may file a brief and submit a proposed judgment by March 9, 2012 justifying the lost profit and reasonable royalty damages for infringement of claim 3, including any appropriate allocation of damages from the trial record. Duhn may alternatively address whether a new trial on damages is warranted.

(2)    Cameron may file an opposition brief and submit a proposed judgment by March 23, 2012 in response to Duhn's request for a judgment including lost profit and reasonable royalty damages.  Cameron may also address any allocation to claim 3 of the '925 patent.

**B.    Obviousness**

(1)    Cameron may file a brief by March 9, 2012 on whether the trial record supports another motion for reconsideration of the Court's order concluding that claim 3 is not obvious and, if so, on what grounds.

(2)    Duhn may file an opposition brief by March 23, 2012 to Cameron's motion for reconsideration of the Court's conclusion setting aside the jury's determination that claim 3 is obvious.

///

1:05cv1411

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.     Other Matters**

If a party seeks to file an additional post-trial motion in light of the Court's ruling on anticipation, it may do so by March 9, 2012, with an opposition brief by March 23, 2012.

**IT IS SO ORDERED**.

Dated: February 23, 2012

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

- 28 -

1:05cv1411